# POLICE DEPARTMENT COUNTY OF SUFFOLK, NEW YORK

### INTERNAL CORRESPONDENCE

TO: Deputy Chief John Hough
     C.O., Internal Affairs Bureau
FROM: Captain Patrick K. Cuff
     Internal Affairs Bureau
SUBJECT: IAB CASE #99-41

DATE: 05/21/02

COPY:

I have reviewed the attached investigative report of **Lieutenant James Feil** that addresses allegations of conduct unbecoming involving prostitution and supplying drugs against **Detective Lieutenant James Burke**. The complainant, **Guy Malone**, alleged that **Burke** was running a prostitution enterprise involving the complainant's estranged wife, **Heather Malone**.

**Detective Lieutenant Peter Desposito**, formerly of this command, initiated this investigation. **Lieutenant Feil** has completed it. In 1999 this matter was referred to the District Attorney's Office for possible criminal investigation. **ADA Jeremy Scileppi** was appraised of relevant details. He has advised **Lieutenant Feil** that no information was discovered to support the allegations. There has not been one individual who could provide first hand information to corroborate any of these allegations. **Lieutenant Feil** has therefore recommended that the conduct unbecoming allegation regarding the prostitution activity be classified as **Unsubstantiated.** Similarly the complainant could not provide information concerning the conduct unbecoming involving drugs. This also has been classified as **Unsubstantiated.**

I concur with his conclusions.

7/1/02 - Concur - Paul J. Ryan D/I/1500

Respectfully submitted,

Patrick K. Cuff CAPT 1500 IT-2
Patrick K. Cuff
Captain
Internal Affairs Bureau

7-8-02 Concur - J.J. Hough D/Chief CO IA/ISB

7/10/02 Concur James Abbot D/I/C

7/11/02 McMann, Insp./1000

7.11.02 - Concur, Phil Robilotto, C.D./2000
( See Attachment 8/2)

7/17/02 Edward Vitt DChy

8/1/02 Thom Spma C.O.'s

PDCS2042

## POLICE DEPARTMENT COUNTY OF SUFFOLK, NEW YORK

### INTERNAL CORRESPONDENCE

TO:  Deputy Chief John J. Hough, Commanding Officer     DATE:  05/21/02
       Internal Affairs/Inspectional Services Bureau
FROM:  Lieutenant James Feil                         COPY TO:
       Internal Affairs/Inspectional Services Bureau
SUBJECT:  **Internal Affairs Bureau Case #99-41**

### SOURCE:

The source of this complaint is a Civilian Complaint Report, Alert #A99-143, filed by the complainant on March 31, 1999 (Attachment #1).

### COMPLAINANT:

Mr. Guy J. **MALONE**, Jr.
d.o.b. 01/16/51
20 Pine Acre Drive
Smithtown, N.Y. 11787

### NATURE:

This complaint alleges Detective Sergeant James C. **BURKE** of the Fourth Precinct, now Detective Lieutenant James C. **BURKE**, had been involved in a prostitution ring involving the complainant's estranged wife, Heather **MALONE**.

The complainant alleges a pager net device was supplied to Heather **MALONE** by Det. Sgt. **BURKE** to facilitate contacts between Ms. **MALONE** and those patronizing her. He also alleges pay-off protection money being paid to Suffolk County Police.

### INVOLVED OFFICER:

**Detective Lieutenant James C. BURKE**
District Attorney's Section, Command 3430

### BACKGROUND:

The complainant is in the process of obtaining a divorce from his wife, Heather **MALONE**. He has used the services of Ms. Phyllis **GAGLIARDI**, of Lexas Investigations, Inc., for investigative purposes, to assist him in his divorce.

PDCS 2042

BURKE-001676

## INVESTIGATION:

### The Complainant:

The complainant has no prior arrest record in Suffolk County. He possesses a valid New York State Driver License (Attachment #2). He has one other complaint against D/Lt. James **BURKE**, wherein he alleged unprofessional conduct. The investigation was classified as unfounded (Attachment #3). Lieutenant **BURKE** was at his residence and off-duty at the time of that allegation.

The complainant provided a written statement, which was taken by Lt. Michael **CALDARELLI**, formerly of the Internal Affairs Bureau (Attachment #4). In sum and substance he related the following:

- In mid-May, 1998, Mrs. **MALONE** told her husband she no longer wanted to have sex with him, and their relationship subsequently deteriorated.

- On January 3, 1999, the complainant went into Mrs. **MALONE'S** pocketbook and discovered a Patrolman's Benevolent Association card with the signature of a "Sgt. Jim **BURKE**." Also, therein were a miniature badge and a business card with Sgt. **BURKE'S** name on it.

- On January 21, 1999, the complainant had an argument with Mrs. **MALONE**. He indicated she punched him in the face, and he accidentally stepped on her foot. He was subsequently arrested for Assault in the Third Degree.

- After his arrest, many people came forward and told him of numerous affairs his wife was involved in. He hired a private investigator, who took written statements from them, and he requisitioned his telephone records for the previous year and one-half.

- The complainant heard rumors of Mrs. **MALONE** and Bonnie **CICCONE** being involved in prostitution in the area of the Smithtown Railroad Station. He received this information from Ms. Jackie **VELLA**, a hairdresser who worked at the Spiral Salon with Mrs. **MALONE**.

- After he acquired his home telephone records, he realized telephone number 332-5076 was called numerous times by Mrs. **MALONE**. After May 1998, it was called up to twenty (20) times a day. He discovered the unlisted number was a pager net, with a message left by Bonnie **CICCONE**. He believes the billing address was 2 Sammis Dr., Smithtown and the person named on the billing is Jane **BURKE**.

    (**Note:** The Department Alpha List indicates **BURKE'S** home address as 2 Sammis Dr., Smithtown.)

BURKE-001677

- The complainant believes there is a prostitution ring, which has been going on involving Mrs. **MALONE**, Bonnie **CICCONE**, and Sgt. James **BURKE**.

Lieutenant Peter **DESPOSITO**, formerly of the Internal Affairs Bureau, interviewed the complainant on the telephone on eleven (11) different occasions. The complainant related the following (Audio Tapes 1-11):

(**NOTE:** Information is condensed due to redundancy in allegations made by the complainant.)

- There is a prostitution ring in Smithtown with approximately seven girls. The police were being paid approximately $2,000.00 per week in protection money. This was going on for at least a couple of years. His source, Les **FISHER**, told him the officer was Lieutenant **MURPHY**. The complainant told his source the lieutenant's father was Chief **MURPHY**. Mr. **FISHER** would not divulge where he heard this information. Mr. **FISHER** felt organized crime was involved, the officers were definitely paid off, and **BURKE** was involved. He alleges **BURKE** gave Mrs. **MALONE** a badge and card, which was a form of protection given.

- The complainant explains that Mrs. **MALONE** is a hooker, gives men a card with the pager net number. Lt. **MURPHY**, Sgt. **BURKE**, or whoever sets up the telephone number, the police look the other way and they pay the police $2,000 per week.

- The complainant stated William **SAVERESE**, a bakery owner, told him about **BURKE** and Lieutenant **MURPHY**. Allegedly, officers from the Fourth Precinct told **SAVERESE** about **MURPHY** getting a girl pregnant and **BURKE** bringing a large sum of money to pay the girl off to protect **MURPHY** from having the story get out. **SAVERESE** told the complainant **BURKE** was disciplined on two occasions for something to do with prostitution.

- The complainant stated his wife was required to have a hair follicle test performed to ascertain if she was using drugs. He alleges **BURKE** had something to do with Mrs. **MALONE'S** hair follicle test being lost for a two-week period and then being found, with "negative" results (Attachment #5). He alleges **BURKE** is supplying drugs to Mrs. **MALONE**.

### The following witnesses were interviewed during the course of this investigation:

- Ms. Phyllis **GAGLIARDI**, Private Investigator
- Ms. Dina **SERAPIGLIA**
- Ms. Stacey **SOBELMAN**
- Mr. Patrick **PRISCO**, haircutter- Richard Jean Salon
- Mr. William **HELLINGER**

- Ms. Jackie **VELLA**
- Ms. Linda **O'DWYER**
- Mr. William **SAVERESE**
- Mr. Richard **MENASIAN**, ex-brother-in-law of complainant
- Mr. Gary **KETAY**
- Mr. Les **FISHER**
- Mr. Roger **HAWKINS**- retired SCPD Officer

### Ms. Phyllis GAGLIARDI:

Ms. **GAGLIARDI** is a Private Investigator hired by the complainant. Lt. **DESPOSITO** and Sergeant Kenneth **RAGGOZINE** of the Internal Affairs Bureau interviewed her. She described the case as matrimonial in nature. The complainant alleged his wife was involved in a prostitution ring, but Ms. **GAGLIARDI'S** investigation has revealed no evidence to support his allegation. She described **BURKE'S** relationship as that of a paramour, not a "John." Ms. **GAGLIARDI** had conducted surveillance, interviewed a number of people, and obtained written statements from several individuals attesting to the lifestyle of Mrs. **MALONE** (Attachments #6 & #7). Mrs. **MALONE** was described as being sexually active with various partners other than her husband, and had used marihuana.

Although the complainant stated Ms. **GAGLIARDI** determined the pager net number was listed to a Jane **BURKE** with a billing address of 2 Sammis Dr., Smithtown, Ms. **GAGLIARDI** claimed she did no investigation into the phone services issue and has no knowledge about it.

### Dina SERAPIGLIA:

Ms. **SERAPIGLIA** works at the insurance company where the complainant is employed and also works at the Next Generation Salon on Rt. 25, Smithtown. Her father owns the salon. Mrs. **MALONE** worked there when it was named Spirals Salon. She was interviewed by Lt. **DESPOSITO** and told him another employee, Stacey **SOBELMAN,** once said that another male hairdresser, Patrick **PRISCO,** once told her that a customer told him prostitution was being conducted out of the salon.

### Stacey SOBELMAN:

Lt. **DESPOSITO** interviewed Ms. **SOBELMAN** on November 24, 1999. She was extremely nervous and was reluctant to talk. She did verify that Mr. **PRISCO** told her of the prostitution rumor approximately four years earlier. Lt. **DESPOSITO** felt Ms. **SOBELMAN** was withholding information. She would neither provide her address nor telephone number.

BURKE-001679

## Patrick PRISCO:

Mr. **PRISCO** formerly worked at Spiral's Salon. He was interviewed and stated he did hear rumors about prostitution six (6) or seven (7) years ago, but could not recall names or persons associated with those rumors. Mr. **PRISCO** did not hear any rumors regarding any police officer involved in prostitution. He did not hear of any police officers spending any time at any hairdresser or salon.

## William HELLINGER:

Mr. **HELLINGER** was interviewed on the telephone and he recalled Mrs. **MALONE** did cut his hair at Spiral's Salon (Audio Tape #12). One-day back in the 1980's, Heather **MALONE** called him at home. He was single at the time, and shied away from seeing her. He knew Mr. **MALONE**, and thought he was a nice guy. He stated Mrs. **MALONE** never propositioned him for sex, and he has no proof of prostitution. Mr. **MALONE** approached him and told him about an individual in a body shop who had sex with Mrs. **MALONE**.

## Jackie VELLA:

Ms. **VELLA**, a haircutter at Spiral's Salon for ten years who lives in an apartment above the salon, was interviewed on the telephone (Audio Tape #13). She recalled that four to five years ago there was a "rumor" of prostitution going on at the Salon. Ms. **VELLA** knows of a girl who was "loose." One night she saw one girl walking in the alley with a man. On another occasion, she saw her across the street in the parking lot with another man. She stated one girl's name was Heather. She described her as a "little loose" and flirtatious. She had an idea something might be "going on," but had no direct knowledge of prostitution activity. She did hear of one police officer who was involved with a hair dresser. His name is Roger.

## Ms. Linda O'DWYER:

Ms. **O'DWYER** was interviewed on the telephone by Lt. **DESPOSITO** (Audio Tape #14). She indicated she used to work with Heather **MALONE**. She admitted that Guy **MALONE** told her he felt Heather **MALONE** was a tramp and prostitute, but described her as a floozy and a flirt. She stated the male customers loved Heather **MALONE**. She did not hear any rumors about prostitution being conducted out of the hairdressing shop. An acquaintance, Tom **KEENAN**, told her he had his hair cut at his house by a woman who worked in the same shop who would "get naked" and cut his hair, but she was not sure if he was "making it up." Guy **MALONE** told her Heather was prostituting herself out of his home, but Ms. **O'DWYER** did not believe it.

## Mr. William SAVERESE:

Mr. SAVERESE was interviewed by Lt. DESPOSITO (Audio Tape). He heard BURKE paid "hush money" to someone in Florida after Lt. MURPHY got a girl pregnant. He also heard that BURKE spent the night at a hotel with Mrs. MALONE after she left her husband. Mr. SAVERESE did not divulge who told him this, and had no current information concerning BURKE.

## Mr. Richard MENASIAN:

Mr. MENASIAN was interviewed by Lt. DESPOSITO (Audio Tape 16). He stated he met BURKE at Mrs. MALONE'S haircutting salon at her house in the early 1990's. BURKE was there while Mr. MENASIAN was getting his hair cut. He did not know what, if any relationship, BURKE may have had with Mrs. MALONE. He only saw him there once, but his children saw BURKE quite often. Mrs. MALONE told him she had been seeing someone "on the side" for a long time, and he assumed it was James BURKE. He was not familiar with any unlawful activities of Mrs. MALONE. Mrs. MALONE showed him a badge given to her by BURKE, but he could not describe it.

## Mr. Gary KETAY:

Mr. KETAY, a friend of the complainant, was interviewed by Lt. DESPOSITO (Audio Tape #17). He would not mention names, but he heard about a certain sergeant who there was a lot of talk about. He knows police officers and heard rumors from those officers about prostitution years ago. Mr. KETAY had no current information on any recent activity. He was told there always seems to be somebody to get the sergeant out of trouble.

## Les FISHER:

Mr. FISHER was interviewed on the telephone (Audio Tape #18). He stated he heard years ago there may be some haircutters involved in prostitution a long time ago, but it was all hearsay. He also stated he never told anyone that police officers may have been paid money for providing protection to a prostitution ring, or that organized crime was involved. Mr. FISHER related that the complainant told him Mrs. MALONE was seeing a police officer and was involved in prostitution. He did not hear that Mrs. MALONE was involved in prostitution from anyone other than the complainant.

## Roger HAWKINS:

Mr. HAWKINS is a retired police officer of the Suffolk County Police Department. He was interviewed and stated Mrs. MALONE used to cut his hair at her residence several years ago and he dated her once. Mr. HAWKINS stated he was unaware of any prostitution activities.

## Detective Lieutenant James BURKE:

As per his testimony in an Examination Before Trial in the **MALONE** divorce proceeding held on June 13, 2000, he testified to the following (Attachment #8; Video Tape #1):

- He met Mrs. **MALONE** in late 1997.

- He has given her between $5,000 and $10,000. They have a verbal agreement that she will pay him back.

- A voice mail number, 516 332-5076 through Page Net, Garden City, was obtained in either 1993 or 1994. The purpose of giving it to Mrs. **MALONE** was to protect her from physical abuse from the complainant.

- The application for the number was under the name "James **BURKE**, not "Jane **BURKE**."

- He gave Mrs. **MALONE** a miniature badge and a P.B.A. card.

- Mrs. **MALONE** denied to **BURKE** that she sold sexual services for a fee.

- He neither knows anyone, nor has ever contacted anyone at the Brunswick Toxicology Lab in Amityville.

## Mrs. MALONE:

In a deposition filed with the Supreme Court, County of Suffolk, N.Y., dated August 28, 1999, Mrs. **MALONE** denies that she and Ms. **CICCONE** are involved in prostitution (Attachment #9). She relates she is a friend of both **BURKE** and **CICCONE**, and the beeper number with **CICCONE'S** business name on it was not used in the course of a prostitution ring. It was used as a means of getting in touch with each other, since the complainant would not allow her to have any male friends.

In an Examination Before Trial on June 7, 2000, Mrs. **MALONE** testified she may have dialed the voice mail up to ten or fifteen times in one day (Attachment #10). She further testified the pager number was not used to transact any type of activity for which she received compensation.

A statement given by Andrea **MALONE-POLYDOR** indicates she purchased cocaine from Heather **MALONE** two or three times in 1986 and 1987 (Attachment #11).

BURKE-001682

## Bonnie CICCONE:

In a deposition filed with the Supreme Court, County of Suffolk, N.Y., dated August 28, 1999, Ms. **CICCONE** denied being involved in prostitution or a prostitution ring (Attachment #12). She knows **BURKE**, and described the voice mail as a means of protecting Mrs. **MALONE** from the complainant.

## District Attorney's Office:

On June 21, 1999, a memorandum from Inspector Philip **ROBILOTTO**, at the time Commanding Officer of the Internal Affairs Bureau, was sent to T. Michael **CONLON**, then Chief of the Public Integrity Bureau. (Attachment #13). It indicates the Internal Affairs Bureau could not substantiate administrative charges in this investigation. It requested the District Attorney's Office examine the case for possible criminal charges and assigned Lt. **DESPOSITO** to assist as a liaison.

Assistant District Attorney Jeremy **SCILEPPI** advised that his office received no clear evidence of criminal activity by either Mrs. **MALONE** or Det./Lt. **BURKE** (Attachment #14). He further advised that investigators conducted surveillance and **BURKE** was not seen with Mrs. **MALONE**.

## INVESTIGATIVE SUMMARY:

The complainant is going through a divorce with his wife and hired a private investigator to assist him. He has made one other civilian complaint against D/Lt. **BURKE**, which was investigated and determined to be unfounded.

The complainant alleges his wife was involved in a prostitution ring in the Smithtown area, and **BURKE** was involved. **BURKE'S** alleged involvement was described as providing the complainant's wife with the pager net device, a police shield and courtesy card. D/Lt. **BURKE** would then "look the other way," and receive cash payments. He also alleges organized crime was involved in the prostitution ring.

Of those interviewed, none could produce evidence linking either Mrs. **MALONE** or D/Lt. **BURKE** to a prostitution ring in the Smithtown-St. James area. A computer check revealed no arrest record in Suffolk County for either Mrs. **MALONE** or Bonnie **CICCONE**. Many of those whom the complainant claimed had knowledge of his wife's extramarital activities were based upon hearsay, and no direct link to prostitution could be confirmed. Additionally, Mr. **SAVERESE**, Mr. **FISHER**, or other individuals either spoke with or overheard police officers relating stories about prior Internal Affairs Bureau investigations of D/Lt. **BURKE** and Lt. Michael **MURPHY** that involved prostitutes. Some of these stories were told to the complainant. Mr. **FISHER**, the complainant's "source" of information, denied telling those allegations to the complainant.

D/Lt. **BURKE** admitted to providing Mrs. **MALONE** with a mini shield and a P.B.A. card. **BURKE**, Mrs. **MALONE** and Ms. **CICCONE** described the use of the voice mail device as a means for them to contact each other due to the circumstances surrounding the personal lives of the complainant and Mrs. **MALONE**.

The Internal Affairs case was referred to the District Attorney's office in June, 1999, to examine the case for possible criminal charges. Investigation by the District Attorney's office revealed no evidence of criminal activity on the part of Mrs. **MALONE** or D/Lt. **BURKE**.

## CONCLUSION:

The allegation that D/Lt. **BURKE** was involved in a prostitution ring, providing protection for the complainant's wife and possibly others should be classified as **UNSUBSTANTIATED**.

The allegation that D/Lt. **BURKE** supplied drugs to Mrs. **MALONE** should be classified as **UNSUBSTANTIATED**.

Respectfully submitted,

James Feil
Lieutenant
Internal Affairs/
Inspectional Services Bureau

JF:dd

## ATTACHMENTS

1. Alert Report A99-143
2. N.Y.S. Driver License – Complainant
3. Internal Correspondence – Alert #01-191
4. Statement – Complainant (3 pages)
5. Drug Testing Order and Complainant's allegation (2 pages)
6. Gagliardi's Report (8 pages)
7. Statements from acquaintances of Ms. Malone (16 pages)
8. Excerpts of Examination Before Trial – Burke (9 pages)
9. Excerpts – Deposition of Heather Malone (4 pages)
10. Excerpts of Examination Before Trial – Heather Malone (2 pages)
11. Statement of Andrea Malone-Polydor
12. Deposition of Bonnie Ciccone (4 pages)
13. Photocopy of Memorandum from Inspector Robilotto to D. A. Office
14. Correspondence from A.D.A. Scilleppi

## AUDIO TAPES

1. Complainant - 8/24/99
2. Complainant - 8/31/99
3. Complainant - 9/7/99
4. Complainant - 11/3/99
5. Complainant - 11/25/99
6. Complainant - 11/30/99
7. Complainant - 12/3/99
8. Complainant - 12/7/99
9. Complainant - 12/10/99
10. Complainant - 12/15/99
11. Complainant - 6/21/00
12. Hellinger - 3/4/02
13. Vella - 3/11/02
14. Complainant/O'Dwyer - 12/23/99
15. Saverese - 11/19/99
16. Menasian - 11/29/99
17. Ketay - 12/14/99
18. Fisher - 5/10/02
19. Marrone - 8/24/99

## VIDEO TAPE

1. Examination Before Trial - Burke  6/13/00



POLICE DEPARTMENT, COUNTY OF SUFFOLK, N.Y.
# CIVILIAN COMPLAINT REPORT
PDCS-1300f    53-0205..8/94Mcs

ALERT # 99-143
☐ THIRD PARTY COMPLAINT ALERT # REQUIRED
☐ THIRD PARTY COMPLAINT ALERT # NOT REQUIRED

**INSTRUCTIONS:** The officer in charge (O.I.C.) will complete the appropriate portions of this form when reporting a civilian complaint (written, verbal or otherwise) alleging misconduct by a member of the Department or an improper or inadequate Department policy or procedure. The completed form along with any relative documents (photos, statement, medical records, etc.) will be forwarded to the commanding officer of the officer in charge. The complainant will be advised that the commanding officer or his representative will contact them regarding the complaint. The commanding officer will ensure that the appropriate distribution of this form and related paperwork is made.
**DISTRIBUTION:** PERSONNEL: Original-Internal Affairs Bureau; 1st copy-subject officer's C.O.; 2nd copy-Division Chief; 3rd copy-Complainant.
PROCEDURAL: Original-Internal Affairs Bureau; 1st copy-Chief of Dept.; 2nd copy-Division Chief; 3rd copy-Complainant.

| DATE/TIME RECEIVED 3-31-99 0930 | HOW COMPLAINT RECEIVED ☒ PERSON ☐ MAIL ☐ TELEPHONE ☐ OTHER | | | |
|---|---|---|---|---|
| RECEIVING OFFICER CALDARELLI | RANK MICHAEL J | SHIELD LT | COMMAND /500 | SQUAD T-1 |

| COMPLAINANT'S LAST NAME, FIRST, M.I. MALONE, GUY J. JR | | DATE OF BIRTH 1-16-51 | ☒ MALE ☐ FEMALE |
|---|---|---|---|
| ADDRESS 20 PINE ACRE DR, SMITHTOWN | | | HOME PHONE 544-9082 |
| OCCUPATION INSURANCE SALES | ADDRESS New York Life Insurance, 576 Broad Hollow Rd, Melville | | BUSINESS PHONE 391-2998 |

| PRIMARY LANGUAGE OF COMPLAINANT ☒ ENGLISH ☐ SPANISH ☐ OTHER | REPRESENTATIVE/INTERPRETER |
|---|---|
| ADDRESS — | PHONE — |

| NAME OF POLICE OFFICER(S) IF UNKNOWN PROVIDE DESCRIPTION(S) JAMES BURKE D/SGT | SHIELD(S) 535 | TYPE OF DUTY ☐ AUTO ☐ FOOT PATROL ☒ CIVILIAN CLOTHES ☐ OTHER (EXPLAIN) | CAR OR POST NO. — | COMM. OR PCT. 3140 4140 |
|---|---|---|---|---|

| LOCATION OF INCIDENT(S) (INCLUDE VILLAGE, TOWN, OR HAMLET) SMITHTOWN AREA | DATE & TIME OF OCCURRENCE ☒ VARIOUS |
|---|---|

| WITNESSES - NAME/ADDRESS/PHONE NUMBER — | NAME OF ATTORNEY/ADDRESS/OR PHONE NUMBER ARNOLD FIRESTONE 612 Vet's Hwy, Hauppauge 543-3700 CRIMINAL |
|---|---|
| | KROWL, Robert 1808 W. Merrick Rd, Merrick 378-3051 - Criminal MR FIRESTONE IS HANDLING THE DIVORCE PROCEEDINGS. |

| DOES COMPLAINANT GIVE PERMISSION TO BE CONTACTED AT PLACE OF EMPLOYMENT? ☒ YES ☐ NO | DEPOSITION TAKEN ☒ YES ☐ NO | OTHER DOCUMENTATION ☐ PHOTOGRAPHS ☐ OTHER ☐ PHYSICAL EVIDENCE |
|---|---|---|

INDICATE NATURE OF COMPLAINT: ☒ PERSONNEL ☐ PROCEDURAL
BRIEF DETAILS OF COMPLAINT (INCLUDE CC#, A#, IF APPLICABLE)    THE COMPLAINANT REPORTS THAT HE BELIEVES HIS WIFE, HEATHER MALONE, IS INVOLVED IN A PROSTITUTION RING OPERATING IN THE SMITHTOWN AREA. HE FURTHER STATES THAT HE BELIEVES THE ABOVE NAMED DEPT. MEMBER IS ALSO INVOLVED. HE IS BASING THIS BELIEF UPON INFORMATION HE HAS DEVELOPED WHICH INDICATES THAT A PAGER NET DEVICE WAS IN USE FACILITATING CONTACTS BETWEEN HIS WIFE AND THOSE PATRONIZING HER. HE REPORTS THAT THE BILLING ADDRESS FROM THE PHONE COMPANY FOR THIS SERVICE IS 2 SAMMIS DR, SMITHTOWN, WHICH IS SGT BURKE'S PLACE OF RESIDENCE.    4/1/99

| OFFICER IN CHARGE - ACTION TAKEN Assigned IAB Case #99-41 to Lt. M. Caldarelli ? ☐ RESOLVED - NO FURTHER ACTION REQUIRED ☐ FORWARD TO C.O. | COMMANDING OFFICER - ACTION TAKEN ☐ TO BE INVESTIGATED WITHIN COMMAND ☒ Assign IAB Chief to ... ☐ FORWARD TO ☐ RECEIVED WITHIN COMMAND ... ☐ FOR INVESTIGATION | AUTH |
|---|---|---|

| SIGNATURE Michael J. Caldarelli | COMMAND/SQUAD LT /500 T-1 | DATE/TIME 3-31-99 1300 | SIGNATURE | COMMAND/SQUAD Cpt 1500 | DATE/TIME 3/31/99 1630 hrs. |
|---|---|---|---|---|---|

BURKE-001006

```
35
NYMV DALL NSUF 1450
EAL1
  TODAY'S DATE: 03/05/2002 TIME: 14:51:21
                 RECORD EXPANSION FOR: MALONE,GUY 01/16/51M
                                            CLIENT ID#: 520996475
  MALONE,GUY,J                         DOB: 01/16/1951    SEX: M
  20 PINEACRE DRIVE                    HEIGHT: 5-8    EYE COLOR: BROWN
  SMITHTOWN      NY 11787              COUNTY: SUFF
                                       MI #: M01430 43828 210953-51
  RESTRICTIONS: CORRECTIVE LENSES
  LICENSE CLASS  CDL *A*               STATUS: VALID      EXPIRATION: 01/16/2005
  CDL ENDORSEMENTS: NONE
  RESTRICTIONS: CDL INTRASTATE ONLY
  ********************            ACTIVITY            ********************
  CDL-A     12/07/1999 ENDORSEMENTS: NONE
  RESTRICTIONS: CDL INTRASTATE ONLY
  > MOR




35
NYMV DMOR NSUF 1451
EAL1
  CDL-A     11/10/1997 ENDORSEMENTS: NONE
  RESTRICTIONS: CDL INTRASTATE ONLY
  CDL-A     12/11/1995 ENDORSEMENTS: NONE
  RESTRICTIONS: NONE
  ********************    CONVICTIONS/BAIL FORFEITURES    ********************
  CONVICTION: SPEED IN ZONE         050/045
    VIOLATION: 02/23/2000    CONVICTED ON: 05/12/2000
  LOCATION: SUFFOLK COUNTY, TOWN OF SOUTHOLD
  PENALTY: FINE- $50                POINTS: 3
  COMM VEH: UNKNOWN   HAZMAT: UNKNOWN
  ********************           ACCIDENTS            ********************
  ACCIDENT DATE: 09/19/2000 INJURY & PROP DAM COUNTY: SUFF   CASE #: 00-387492
  POLICE & MOTORIST REPORT
  > MOR




35
NYMV DMOR NSUF 1451
EAL1
  ********************         END OF RECORD          ********************
  >
```



BURKE-001687

# POLICE DEPARTMENT COUNTY OF SUFFOLK, NEW YORK

## Internal Correspondence

TO:  John McElhone, A/Chief of Patrol      DATE: 7/27/01

FROM:  Dennis J. Meehan, D/Inspector      COPY TO:
Executive Officer - 3rd Precinct

SUBJECT:  __Civilian Complaint A# 01-191__

  Attached is the completed investigative report of Captain George Fasanelli regarding the civilian complaint made by Mr. Guy Malone involving Lieutenant James Burke of the Third Precinct. Based on a careful review of this report, the undersigned concurs with the findings and respectfully recommends the final disposition of Mr. Malone's allegation be reported as follows:

  __Unprofessional Conduct -__  That Lieutenant Burke while off duty and at his residence, acted unprofessionally towards the complainant. **Unfounded.**

  It appears that Mr. Malone is seeking this complaint as a form of retaliation toward Lieutenant Burke for being involved in a relationship with his estranged wife. The complainant's credibility is questionable at best when he states that he was not following his wife to the Burke residence and only came across his wife accidentally while he was taking this indirect route to a friend's home. Given his stated intent to request sole custody of his daughter, it would seem that this complaint is an attempt to bolster his case in any future hearing addressing custody.

      Respectfully submitted,

      Dennis J. Meehan, D/Inspector
      Executive Officer - 3rd Precinct

DJM/nl

8/7/01  Concur
John McElhone A Chief /oo



Att# ③

BURKE-001688



POLICE DEPARTMENT COUNTY OF SUFFOLK, N.Y.
STATEMENT FORM
PDCS-1165b

C.# IAB **ALERT** 99-143
Date 3-31-99  Time 10:42 AM
Page 1 of 3

I, **Guy MALONE JR.**
_____ name _____ (being duly sworn) deposes and says:

(words "being duly sworn" are to be crossed out if a sworn statement is not being prepared) that I am **48** years old.
(age)

I was born on **1-16-51**. I am giving this statement to **LT. MICHAEL J. CALDARELLI**
_____ d.o.b. _____ (name of officer)

I am giving this statement freely, having received no threats or promises to do so.

IN MID-MAY 1998, MY WIFE HEATHER INFORMED ME SHE WAS NEVER GOING TO HAVE SEXUAL RELATIONS WITH ME AGAIN. SHE SAID "It's NOT YOU, It's ME, I DON'T WANT TO HAVE SEX WITH ANYONE." AT THAT TIME WE HAD BEEN MARRIED FOR 13 YEARS, AND WE HAD SOME PROBLEMS, BUT I DIDN'T THINK THEY WERE AS SERIOUS AS THEY TURNED OUT TO BE. OVER THE NEXT 8 MONTHS, OUR RELATIONSHIP DETERIORATED.

AT 9:30 PM ON 1-3-99, HEATHER WAS IN BED. SHE ASKED ME TO GET SOMETHING FROM HER PURSE (WHICH WAS IN HER POCKETBOOK). I WENT TO THE POCKETBOOK AND DISCOVERED A PBA CARD SIGNED BY SGT JIM BURKE. IT SAID "TO HEATHER MALONE" ALSO. THERE WAS A MINATURE BADGE AND A SUFFOLK BUSINESS CARD WITH SGT BURKE'S NAME ON IT. THE CARD ALSO SAID "SUFFOLK COUNTY POLICE" ON IT. WHEN I ASKED HER WHO JIM BURKE WAS, SHE GOT NERVOUS AND SAID HE WAS A CLIENT OF HERS (SHE IS A HAIRDRESSER). I DIDN'T PURSUE IT FURTHER AT THAT TIME.

ON 1-21-99, HEATHER AND I HAD AN ARGUMENT AT ABOUT 9:45 PM. IT INVOLVED SUSPICIONS ABOUT HER ACTIVITIES AND MY BELIEF THAT SHE WAS BEING UNFAITHFUL. DURING the ARGUMENT SHE PUNCHED ME IN THE LEFT SIDE OF MY FACE NEAR THE TMJ JOINT. I APPROACHED HER AND ACCIDENTALLY STEPPED ON HER FOOT. I HAD A BRUISE FROM WHERE SHE HIT ME, AND SHE HAD A BRUISE ON HER LEFT FOOT. SHE CALLED 911 AND I WAS ARRESTED FOR ASSAULT 3. By OFFICER McGEE OF THE FOURTH PRECINCT. HE LATER INDICATED THAT HE'S NEVER SEEN A WOMAN PUSH ALL the RIGHT BUTTONS AT THE RIGHT TIME AS HEATHER DID, AND IT APPEARED SHE HAD BEEN COACHED. CONTINUED ON PAGE 2

False statements made herein are punishable as a class "A" misdemeanor pursuant to Section 210.45 of the Penal Law

Signature of person giving statement

Signature of person giving statement _____ 3/31/99
_____ Date

Witnessing officer _____ Kenneth Regazzire, Sgt 804/1500/T-1

Sworn to before me _____ **Att# 41**
_____ , 19
Notary Public

53-138...2/91

BURKE-001689

AFTER MY ARREST, MANY PEOPLE CAME FORWARD WITH STORIES OF
NUMEROUS AFFAIRS MY WIFE WAS INVOLVED IN OVER THE 10 YEARS PRIOR.
THIS RAISED MY SUSPICIONS, SO I HIRED AN INVESTIGATOR, REQUISITIONED MY
PHONE RECORDS FOR THE PREVIOUS YEAR AND A HALF AND DID SOME INVESTIGATING
OF MY OWN.

THE INVESTIGATOR CONTACTED SEVERAL PEOPLE WITH INFORMATION REGARDING
MY WIFE'S AFFAIRS AND TOOK WRITTEN STATEMENTS FROM THEM. IT TOOK 5 WEEKS
FOR ME TO RECEIVE THE PHONE RECORDS AND DURING THAT TIME I SPOKE
TO SEVERAL PEOPLE ABOUT MY WIFE AND RUMORS OF HER BEING INVOLVED IN
PROSTITUTION IN THE AREA OF THE SMITHTOWN RAILROAD STATION. I HEARD THAT MEN
WERE CALLING THE SALON WHERE HEATHER WORKED AT THAT TIME, THE
SPIRA SALON ON MAIN ST, SMITHTOWN phone#. I GOT THIS INFORMATION
FROM A WOMAN WHO WORKED AT THE SALON AT THE SAME TIME AS MY WIFE,
JACKIE VELLA, SHE LIVES IN AN APARTMENT ABOVE THE SALON AND HER HOME
PHONE # IS 724-3767.

WHEN I RECEIVED THE PHONE RECORDS BETWEEN MARCH 8th AND MARCH
13th, I REALIZED THERE WAS ONE # 332-5076, WHICH APPEARED 2 OR 3
TIMES A WEEK FROM OCTOBER 1997 AND MID-APRIL 1998. STARTING WITH
MAY 1998 AND THEREAFTER, HEATHER STARTED CALLING THIS NUMBER MORE
FREQUENTLY, SOMETIMES 20 TIMES A DAY.

WHEN I FIRST SAW THE NUMBER I CALLED IT. I GOT A RECORDING
SAYING "YOU HAVE REACHED Bonnie's NAILS AND FACIALS BY BONNIE.
PLEASE LEAVE A MESSAGE" THE VOICE WAS THAT OF BONNIE CICCONE,
MY WIFE'S BEST FRIENDS. I KNEW BONNIE WORKED FOR A SALON IN
SMITHTOWN, BUT I ALSO KNEW SHE DIDN'T HAVE A BUSINESS IN    Continued

FALSE STATEMENTS MADE HEREIN ARE PUNISHABLE AS A CLASS A
MISDEMEANOR, PURSUANT TO SECTION 210.45 OF THE NEW YORK
STATE PENAL LAW.

SIGNATURE _____     DATE _____

Att# 42

PDCS-7129        Kenneth Ferguson Sgt 804/1500 (1-)     BURKE-001690   33-113...1/91

NASSAU COUNTY, WHICH IS COVERED BY THE 332 EXCHANGe, SO I WAS SUSPICIOUS. MY OWN INVESTIGATING INDICATED THAT Bonnie WAS INVOLVED IN PROSTITUTION WITH MY WIFE. JACKIE Vella HAD TOLD ME about this. I LATER LEARNED, THROUGH MY OWN INVESTIGATING THAT I WENT BACK TO my PRIVATE INVESTIGATOR, 332-5076 WAS AN UNLISTED NUMBER, WHICH STRUCK ME AS VERY UNUSUAL FOR A BUSINESS. I ALSO FOUND OUT THAT THIS NUMBER WAS A PAGER NET, (WHICH MOST LIKELY MEANS VARIOUS People CAN LEAVE AND RETRIEVE MESSAGES FROM IT) THE BILLING ADDRESS FOR THIS NUMBER IS 2 SAMMIS DR, SMITHTOWN AND THE PERSON NAMED ON THE BILLING IS JANE BURKE, 467-9182 is THE PHONE NUMBER LISTED ON THE BILLING. THE ACTIVITY IN WHICH MY WIFE WAS CALLING 332-5076 STOPPED SUDDENLY ON 1-22-99, WHICH WAS THE DAY AFTER MY ARREST. I THINK SHE CALLED IT TWICE MORE VIN JANUARY 1999, BUT I Don't think SHE CALLED IT SINCE then. HEATHER MOVED OUT OF MY HOUSE ON 3-5-99. HER NEW ADDRESS IS 491 GIBBS POND Rd, NESCONSET (IN A BASEMENT APT), HER PHONE # IS 774-1169.

I BELIEVE THERE IS A PROSTITUTION RING WHICH HAS BEEN GOING ON INVOLVING HEATHER MALONE, BONNIE CICCONE AND SGT JANE BURKE. MY OLD RESIDENCE, WHICH WAS AT 6 browning St, ST JAMES, which IS ABOUT 2 BLOCKS FROM SAMMIS DR. I WAS TOLD THAT SGT BURKE LIVES AT 2 SAMMIS DR BY A FRIEND WHO I KNOW FROM THAT NEIGHBORHOOD, WILLIAM SAVERSE.

FALSE STATEMENTS MADE HEREIN ARE PUNISHABLE AS A CLASS A MISDEMEANOR, PURSUANT TO SECTION 210.45 OF THE NEW YORK STATE PENAL LAW.

SIGNATURE _____          DATE: 3/31/99

PDCS-7129            Kenneth _____ St 804/1500/T-1            Att#

INDEX
1999-03267

SUPREME COURT · STATE OF NEW YORK
TRIAL TERM, PART 11 SUFFOLK COUNTY

PRESENT:
   Honorable Donald R. Blydenburgh

DRUG TESTING ORDER

----------------------------------------x
HEATHER MALONE

                              Plaintiff,

      - against -

GUY MALONE

                              Defendant.
----------------------------------------x

PLAINTIFF'S ATTORNEY
FIRESTONE & FIRESTONE
612 VETERANS MEMORIAL HWAY
HAUPPAUGE, NY 11788
543-3700

DEFENDANT'S ATTORNEY
COFFMAN & MCNICHOL ESQS.
4 TIFFANY LANE
SMITHTOWN, NY 11787
265-1355

Heather Malone, the Plaintiff wife herein, is ordered to report to Brunswick Toxicology, 317 Broadway, Amityville, NY (516)789-1800, for the purpose of Body Hair follicle testing for drugs, specifically narcotics, controlled substances and marijuana. The Cost of Tests are $275.00 and must be paid at time of appointment by a certified bank check or money order. No personal checks will be accepted. Appointments can be made for Monday through Friday between 10:00 AM to 3:00 PM. You must call for an appointment first. Fee will be paid by the Defendant husband with right to request reapportionment at the conclusion of this matter.

   Please Forward a copy of the drug tests results to;

The Honorable Donald R. Blydenburgh, Supreme Court, Suffolk County, 400 Carleton Ave. C.I. N.Y. 11722 or faxed to (516) 853-7542.

   Please forward all results as they are available.

      ENTER

Dated: 6/30/99
Central Islip, N.Y.

**DONALD R. BLYDENBURGH**
J.S.C.



# HEATHER MALONE'S DRUG TEST

On June 30th 1999 Judge Blydenburgh ordered a drug test for both Heather and myself. Shortly after receiving the order I made an appointment to have the test done. I had my teest done on Friday July 16th 1999, at which time Dr. Closson took my hair sample.

When I had my test done I paid Dr. Closson in person the sum of $550, to cover the cost of the drug test for both Heather and myself [copy of check enclosed], as this was court ordered. At the time of my test I asked Dr. Closson if Heather had made an appointment yet, and he said NO.

On July 28th 1999 Heather's attorney sent a letter to Arnold Firestone saying they could not confirm that I paid the drug test fee. I found out about this on Monday August 2, 1999, and immeadiately called Dr. Closson to ask him if he told Heather's attorney that I did not pay for the test. He said no, and remembered me paying for the test, and remembered depositing the check. I asked him if he would send a letter confirming that the test was paid for on July 16, 1999. On August 3, 1999 Dr. Clossen sent a letter confirming I paid for the test. This put an end to the nonsense that Heather was trying to pull, or so I thought.

Heather finally went for her test on Monday August 16, 1999, a FULL 48 days after the test was ordered. She used the excuse that I did not pay for the test. I would like to point out that the court ordered a forensic evaluation on July 21, 1999, that I was ordered to pay $5000 for. Heather had NO PROBLEM going to see Dr Klein for a three hour session on or about August 3, 1999. Heather's visit to Dr. Klein was the day BEFORE I went to see him. Heather had no problem seeing Dr. Klein before I paid him, and she was able to find THREE HOURS time available, but she couldn't find 10 minutes available for 48 days for her drug test.

Heather's excuse about the difficulty in scheduling the drug test is nothing but a pack of lies, [ Heather's sworn statement dated 08/28/99 statement #10 page #4]. According to Heather's statement she says Dr. Closson still could not verify if the test was paid for. I would like to look at Exibit G [ page #4 statement #10]. It is my contention that someone OTHER THAN DR. CLOSSON wrote the statement on the test sheet " Guy Malone will pay for the test ". If you look closely at the handwriting you will notice that the word test is written completely different than it is where there is an "X"next to hair test. Also everywhere Dr. Closson writes the letter "A" , he uses a capital "A". Who ever wrote the statement at the bottom used a small "a"

At the time of the test Heather had NOT admitted to even the existence of Sgt. James Burke, so she was not aware of what I knew about him. I think it is important to note that Sgt. Burke was a narcotics detective in the 1st Precient in Amityville for some time. The drug test lab was the Brunswick Toxicology Lab located in Amityville. I am positive that the 48 day delay with Heather getting her drug test done was for Sgt. Burke to make the necessary arrangements with the lab to alter her test results. Remember Heather's test results were lost for about 2 weeks, and when they were miracuously found they were negative. What a surprise!

At the time when the results were lost no one in the court could ever remember that happening before. This entire episode stinks, and I think the key is who wrote that statement at the bottom of the test sheet. Remember Dr. Closson wrote a letter dated 08/03/99 saying the test was paid for in full on 07/16/99. It took Heather exactly 1 MONTH after I went for her to get her drug test done. Obviously she was not so anxious to have it done.

Guy Malone


Att# 5/2

BURKE-001693

# Lexas Investigations, Inc.

## Licensed & Bonded

Post Office Box 345
Farmingville, New York 11738

March 1, 1999

Tel (516) 585 - 7700
Fax (516) 585 - 7794

Mr. Guy Malone
2o Bonark Lane
Nesconset, NY 11767

Re: Heather Malone

Dear Mr. Malone;

Pursuant to request, I have commenced my investigation concerning the background and activities of subject, Heather Malone. To date, the following services have been conducted, and the results of same are reported as follows.

Surveillance of subject was conducted on three separate occasions. The activity observed is as follows.

## ACTIVITY LOG

**FEBRUARY 10, 1999**
**11:10 a.m.** In position a subject residence, 20 Pineacre Drive, Smithtown. No vehicles observed at residence.

**11:32 a.m.** Observation of young child, believed to be Jillian, being brought from the driveway and put onto school bus by white male, approximately 55 years of age, white hair, beard, black jacket, blue jeans, green cap. This individual is believed to be subject's father. This white male was observed driving away from above residence in a blue Suzuki utility type vehicle.

**11:46 a.m.** Pretext call to house (544-9082) Answering machine response. It appeared as if there was no one home at the subject residence so



BURKE-001694

a canvass of the area was conducted to search for subject vehicle at various local parking lots.

**12:35 p.m.** Surveillance terminated as subject vehicle was not located.

## FEBRUARY 13, 1999

**9:45 a.m.** In position at subject residence. No vehicles observed.

**10:45 a.m.** Pretext call to residence. Female answers telephone and it is believed to be subject.

**11:20 a.m.** Due to lack of activity, surveillance is terminated.

## FEBRUARY 13, 1999

**5:00 p.m.** Surveillance commences at T. Carlton (subject place of employment) Subject vehicle not observed.

**5:15 p.m.** Subject vehicle identified (1998 Ford Contour SVT, silver, bearing NY U45-6zf). This vehicle is parked in the driveway of residence. Front lights of residence of home are on.

**5:20 p.m.** Individual observed walking down the driveway of subject residence. It is believed to be subject, Heather Malone, wearing a long black wool coat (closed), black hat and a scarf wrapped around her face, covering her identity. This individual walked toward subject vehicle. Observation is made of this individual driving subject vehicle on Pineacre Road, after immediately departing residence. Individual is observed on cell phone in the car as she passes my field of view. This vehicle is followed, at a high rate of speed, to 22 Antrin Court, Commack, NY.

**5:29 p.m.** Subject vehicle parks in driveway of one family residence located on the corner of Antrin Court and Ashlon Lane. There is a small, two



door gray Toyota parked in the side driveway. It was not possible to obtain the plate number of this vehicle as the subject had parked immediately behind it. Subject not observed.

**6:45 p.m.** Residence is kept under surveillance for activity. White male, approximately 35 years of age, dark colored hair, is observed cooking on outside bar-b-cue.

**7:05 p.m.** Dark colored, new model Voyager, NY 9824574, parked in driveway. This van bears dealer plates.

**8:15 p.m.** Pretext call is made to subject residence by mother of Guy Malone. She identifies woman answering the telephone as Heather Malone. At this time, subject vehicle is still at Commack residence.

**8:17 p.m.** Subject vehicle observed departing 22 Antrin Court, Commack. It appeared as if the driver of this vehicle was deliberately waiting to be followed. Surveillance is terminated due to unusual activity.

It may be concluded that subject, Heather Malone, was not the driver of the her vehicle that was followed from her residence to Commack, but rather an unknown individual that made a diligent attempt to impersonate the subject and manipulate field surveillance.

A New York State Department of Motor Vehicle plate search was conducted to attempt to identify individual who arrived at 22 Antrin Court, Commack. This van is registered to Tom Rice Buick; Pontiac, GMC, Truck Inc., 305 W. Jericho Turnpike, Huntington, NY 11743. This is a dealer registered plate.

Database search was conducted for residence identified as 22 Antin Court, Commack, NY. Sources indicate that this James Lynch is the current resident. Telephone number 516-864-3307. This telephone number is listed to Nora T. Lynch, SSN 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, Date of birth 03/32. Nora and Joseph



Lynch are the listed homeowners of 22 Antin Court. James C. Lynch, SSN: 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, Date of birth 03/32.

**************************

In addition to the above stated field surveillances, numerous database searches have been conducted to attempt to identify any possible paramours of subject. These results have been continuously reported to client. These searches include identification of telephone numbers, NYS license plate searches, and database profiling to locate witnesses and to identify unknown individuals.

## INTERVIEWS

As further requested, numerous telephone interviews have been conducted for possible sworn witness statements that would reflect the questionable and inappropriate lifestyle of subject.

## PAUL ARIOLA

According to information provided, Paul Ariola, was to be located and contacted to obtain his statement of a sexual affair that he had with Heather Malone. His last known residence was 479 Goodrich Avenue, North Babylon, NY 11703. Due to the fact that the listed telephone number of 516-254-2445 does not receive any incoming calls, a visit to this residence was made. At the time I was present, none of the residents of this two family dwelling were home. I had left my business card and a note stating the urgency of contacting Paul Ariola.

On Februray 19, 1999 I received a telephone call from a female who identified herself as Paul's sister. She confirmed that Paul was in the Navy and was overseas. Although she was hostile during our conversation and did not want anyone to attempt to contact her brother, she stated that even if <u>she</u> wanted to reach him she could not. She explained that she is the only family



BURKE-001697

member who would or could reach Paul, if it were possible. She reiterates that is not possible to contact Paul at this time. She does not want Paul involved with any type of litigation or other people's personal situations. She advised that 479 Goodrich is not his home residence at this point in time, but houses other tenants. A search for Paul has been temporarily discontinued.

## GEM HATTAT

On February 19,1999 a telephone interview was conducted with Cem Hattat. His current residence is 99 South Grove, Apt. 1C, Valley Stream,NY. He has recently moved to Valley Stream and advised me that his wife was in the hospital with post-partim depression and does not want to be involved in any matters concerning the Malones. Cem firmly states that he never had any relationship with Heather Malone. He continues to state that when confronted by accusations made Larry Lederer about him and Heather he merely played along. Cem denies all accusations made about him and Heather having a sexual relationship and denies the incident in the car where Heather allegedly exposed herself to him. He said that I could confirm the fact that nothing ever happened between him and Heather with his co-worker, Mike Varrone. Cem would not provide a statement and wishes not to be involved.

## LINDA O'DWYER

Telephone interview conducted 2/23/99. Linda will not talk about anything regarding Heather and will not provide an interview or statement. She said that everything she knew about Heather's activities were hearsay and knew nothing about her first hand, or knew about any inappropriate behavior.

## BARBARA SACHS

Telephone interview conducted 2/23/99. Barbara states she does not know anything about Heather and will not provide an interview or statement. She said she would discuss my request to obtain a statement from her with
Page 6



BURKE-001698

her husband and call me back. Upon her return call, she decided not to be involved.

**DINA** (Spiral Salon)

Telephone interview conducted. No statement provided. Dina states she worked alongside Heather but could not confirm any allegations about her behavior with any of the male clients at the salon. She states she knew she was a married woman and she did not look to hang out with her. She did not go to any bars, etc., with Heather because she was so much younger. She never observed any inappropriate activity.

**TONY** (Spiral Salon)

Telephone interview conducted 2/28/99. Tony could not state any first-hand knowledge of any inappropriate activities of Heather Malone. He advised that on a few occasions Heather would go to the bar next to the shop (Peppermills) and have a beer or two or a Tom Collins in the summer. She would go on her break and was gone usually about fifteen minutes to a half hour. She never came back drunk or out of control. She came back to the salon once with a drink in hand. Tony told her never to do this again because it was not acceptable. Tony continued to state that many of the personnel from the salon would stop in Peppermills on occasion and it was not usual or inappropriate. He will provide a statement to this effect if requested.

**MICHAEL COOK**

Telephone interview conducted 2/25/99. He firmly states that he never had an affair or relationship with Heather. He states that Heather never called him and never came to his home. He is extremely hostile. He believes that the statements made by Larry Lederer are an attempt to personally attack him. No statement will be provided. Michael Cook advised that he has litigation pending against Larry Lederer.

**JACKIE VELLA**

Telephone interview conducted 2/26/99. Jackie advised me that she saw Heather with a drummer on one occasion in the parking lot behind the salon when she thought that Heather had gone home for the day. She did not see Heather and this individual, touching or doing anything else inappropriate.



She did not see them together for any substantial length of time. Jackie also saw Heather on another occasion with Joe Stein driving in his Jeep. Heather called Jackie over to the car where she was the front seat passenger with Joe. Jackie did not see any inappropriate behavior at this time.

Jackie continued to advise that she heard a story about Heather, Bonnie and a guy named Chris. She said they were all in a limo together going to a concert when Heather was involved in sexual activities in the back of the limo. She is attempting to locate Chris so perhaps I can obtain a statement from him. She is further trying to locate Joe Stein so that I can interview him about his relationship with Heather.

### VASIL IVANOV

Telephone interview conducted 3/1/99. Statement will be obtained indicating that he had gone to Heather's salon, in her home. She made him very uncomfortable by her suggestive demeanor and conversation. He went twice and never returned again. He found her to be extremely inappropriate and provocative. He further relayed an incident when he saw her in a casino in Puerto Rico. He went up to her when she was with one of the pit bosses. She was alarmed when Val went up to her because, as she stated, she was trying to "put the move on" the pit boss.

### MICHAEL VARRONE

Sworn statement obtained February 16, 1999.

### LAWRENCE LEDERER

Sworn statement obtained February 15, 1999.

### JUDITH PELLEGRINO

Sworn statement obtained February 24, 1999.

Attempts will be continued to interview Mary Wagner, Jillian's school teacher.



I will continue to keep you advised as to the status of my investigation.

Very truly yours,

PHYLLIS GAGLIARDI
President

Att# 6/8

BURKE-001701

# SWORN STATEMENT OF LAWRENCE LEDERER

## February 15, 1999

I, Lawrence Lederer, being duly sworn, deposes and says:

I reside at 15 Sea Cliff Lane, Miller Place, New York 11764. My home telephone number is 928-9314. My date of birth is July 3, 1959. Social Security Number is 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. I am the sole proprietor of Lederer Associates. The business I conduct is that of landscaping and general contracting - residential and commercial. My work telephone number is 474-2024. My work place is located in my home.

I have known Guy Malone since approximately May 1988. I first met him as my insurance broker and eventually began to do work at his home. I had met Heather Malone in approximately 1992 or 1993 when she would come to my home to cut my wife's hair.

During the spring of 1995 I was with Paul Ariola and two other employees. We were in my truck going to dinner in Babylon. It was about 7:00 p.m. and Paul was in the front passenger seat and he began talking about a married woman that he knew, that he had a sexual relationship with. He began telling me that he had been with this woman for about six months to a year, and would see her about once a week. He began telling me of the sexual encounters he had with this woman. He told me that on one occasion he had let this woman ( I had later learned was Heather Malone) drive his truck. He had a Chevy Blazer. They were out one evening and Heather was driving. He told me that while she was driving, he was giving her oral sex and she began driving very fast and was screaming. She was driving without headlights on. He said that she was a nymphomaniac and this is the kind of things she would do. He told me that occasionally they would smoke pot together.

He also told me that Heather would cut his hair. He said they would go to a motel in western Suffolk and she would cut his hair in the nude. He said he had the best sex of his life with her.

I asked him how he met Heather and he told me he was a waiter at a restaurant where she came one evening with her husband and two other couples. Heather had given him her telephone or pager number when she passed him by the ladies room. They had been making eye contact during the evening. He called her shortly thereafter and that is when their relationship began. He told me her name was Heather Malone and her husband was involved in insurance. He told me she lived in the Saint James, Smithtown area and I knew it was the same Heather and Guy Malone that live at 20 Pineaire Drive, Smithtown. Paul had a great time

BURKE-001702

during this relationship which consisted of many, many sexual encounters. He told me that Heather always provided him with condoms so she wouldn't get pregnant.

In December 1997 my wife, Cindy, and I went to dinner at Michael and Manette Cook's house for dinner in Port Jefferson Station. Previously Heather Malone's name had come up when I was talking with Michael and he told me he knew Heather, and she had cut his hair. During the dinner at the Cook's house, Guy and Heather's name came up again. Manette said that when her and Michael first got married Heather would not leave her husband alone. Heather would call the house looking for Michael and once had pulled up the driveway and asked if Michael could come out to play.

During the spring of 1998, one of my employees, Cem Hattat, was working on the backyard deck at the Malone residence. Cem worked alone for three days at the house. I found this to be very unusual because there was only work that would have taken one day. I had questioned Cem about what took so long and during one of our conversation he told me that he had sex with Heather in either the kitchen or the salon. He also told me that one afternoon when she was leaving the house she was seated in her car, she had the car door open and pulled up her dress to reveal herself and asked Cem if she looked like a movie star.

On January 12, 1999 I was with John Rider between 1 and 2 p.m. We had gone to a shopping center located on the northeast corner of Route 111 and Route 347 in Smithtown. I saw a black Thunderbird with the plate GUY10. I knew the car belonged to Guy Malone so I looked for him in all the shops at this shopping center. I could not find him. We waited around for awhile to see if Guy or Heather showed up. A few minutes later I saw a Champagne colored car that may have been an Altima, pull up next to Guy's car. I saw Heather in the passenger seat. She was with a white male, approximately 35 - 40 years old and with dark colored, conservatively cut hair. He has sunglasses on. I watched as they talked in the car for a few minutes and then Heather got into the Thunderbird. They spoke again through the windows, car to car, for a few more minutes. I then left the area. As I was pulling out of the lot I noticed the Thunderbird backing out. I saw Heather with this man for about five minutes.

I have read these five pages and they are true to the best of my knowledge.

LAWRENCE LEDERER

Att# 7/2

Sworn to before me this
6th day of February 1999.

## SWORN STATEMENT OF JUDITH ROGERS PELLEGRINO

February 24, 1999

I, Judith Rogers Pellegrino, being duly sworn, deposes and says:

I reside at 15 Manchester Boulevard, Wheatley Heights, New York 11798. My home telephone number is (516) 491-4092. My date of birth is November 23, 1945. I have been a babysitter for Guy and Heather Malone for approximately five years. I take care of their daughter, Jillian, a few days a week, a few hours a day.

In September 1998, Jillian started kindergarten and my schedule was to go to the Malone residence, located at 20 Pineacre Drive in Smithtown, on Wednesdays and Thursdays from approximately 2:30 p.m. to approximately 5:00 p.m. Tuesdays would vary and I would come in only if requested to do so.

To the best of my recollection I received a telephone call from Heather Malone on Monday evening, January 11, 1999. She requested that I come over to her home a little earlier than usual. I was to be at her house on Tuesday, January 12, 1999 at about noon. She told me Jillian was sick and was running a high fever.

When I arrived Jillian was in her pajamas and lying on the couch. I could tell she was sick. She was on over-the-counter medication as well as an antibiotic that was prescribed by the doctor previously. On this date (Tuesday) after I arrived, Heather went out and returned a couple of hours later. When she returned she went to the salon (in the house) and was giving haircuts to clients. I stayed at the Malone residence until Guy came home from work.

To the best of my recollection, Heather had taken Jillian's temperature before I got there and told me it was 103. I took her temperature later in the day and it had gone down slightly. She was glassy eyed and lethargic.

To the best of my recollection I brought Jillian to the doctor on Wednesday for a re-check because she was not improving. The doctor was still concerned with her breathing. She had been coughing. We discussed the fact that Heather had originally suggested a chest x-ray because she was concerned about her breathing. This request for the chest x-ray was before I took Jillian to the doctor on Wednesday. I recall Guy took Jillian for a chest x-ray shortly thereafter.

I have read these three pages and they are true to the best of my knowledge.

JUDITH ROGERS PELLEGRINO

Att# 73

Sworn to before me this
24th day of February 1999.

# SWORN STATEMENT OF MICHAEL LOUIS VARRONE

## February 26, 1999

I, Michael Louis Varrone, being duly sworn deposes and says:

I reside at 368 Commack Road, Commack, New York 11725. My home telephone number is 516-462-0346. My date of birth is 4/28/57. I am employed, full time, with Lederer Associates which performs construction and lawn care.

During the late spring/early summer, I was directed to work on a home construction job located at 20 Pineacre Drive in Smithtown. This is the residence of Guy and Heather Malone. I worked at this home for approximately seven days. I worked at this job with Cem Hattat, Brandon and Paul Porchia.

When I arrived at the house in the morning, Heather always answered the door. On five of the seven days I went to the front door in the morning, Heather opened the door to greet me in a sexy, provocative, short, slinky, silky nightshirt. She stood, in full view, and talked about the work to be done that day. He attire was totally inappropriate an she made no attempts to cover herself.

During the same job, Cem told me of things that went on between him and Heather when he was alone working at the house. We had this conversation in Lederer Associates office. Larry Lederer was present at this time. This was still the spring/summer of 1998.

Cem told me that one day Heather was in her car in the driveway. Cem was outside with her. Heather had on a short dress. She had her driver's door open and was talking with Cem. She said to him. "Do I look like a movie star?" She then pulled up her dress and exposed herself. She was not wearing any underwear. They both went into the house and had sex in the kitchen, on or near the kitchen counter. He commented that her thighs were a little heavy, but the sex was good.

During the time I worked at the house with Cem, he would always comment on her appearance. Paul and Brandon would also comment on her



Att# 74

BURKE-001705

appearance, how good she looked and they would be with her, given the opportunity.

On one occasion I called the Malone residence looking for Cem. Heather answered the phone and it sounded like she as in the house. I asked for Cem and she said he as right here. She handed him the phone, which he answered immediately, within seconds, as it seemed he must have been standing right next to her in the house. I found that to be very unusual There was no work being done in the house that he should have been inside for. At this time I was with Larry Lederer on the car phone. I turned to Larry and said "Cem is doing Heather". This telephone call was the day before Cem told us about him and Heather in the kitchen.

I have read these three pages and they are true to the best of my knowledge.

MICHAEL LOUIS VARRONE

Sworn to before me this
26th day of February, 1999.

Att# 

BURKE-001706

1  I, Vasil T. Ivanov, Sr. being duly sworn
2  deposes and says.
3      I reside at 9 Deep Woods Court,
4  Glen Cove, NY 11542. My home telephone number
5  is 516-676-6347 My date of birth is 3-5-35.
6  I am currently managing partner at New
7  York Life Insurance Company located at 576
8  Broadhollow Rd, Melville NY 11747.
9      During the years 1991 or 1992, I had
10 the opportunity to meet with Heather Malone
11 at her home salon located on PineAcre Rd
12 in Smithtown. I had known Heather for a
13 while, as her husband, Guy, works for my company.
14 During the two occasions that I went
15 to the Malone residence to have my hair
16 cut, Heather made me very uncomfortable
17 with her inappropriate behavior and
18 appearance. She wore a very short dress
19 and conducted herself in a sexually
20 suggestive manner. She would tell
21 me stories about parties and bars that
22 she would go to with her friend Marie
23 It was very apparent that she was
24 loose and liked to live life on the wild
25 side. I did not return to get my hair

Att# 2/6

BURKE-001707

out by Heather again because I did not like
the way she conducted herself. I was married
at the time and Heather knew this.

In approximately 1989/1990 I was in Puerto
Rico in the casino located in Palmas Del Mar.
During the evening hours I was at the
baccarat table gambling. As I was sitting
at the table, I heard a voice that sounded
familiar. I turned and saw Heather Malone
leaning over the ropes that separate the
public from the dealers and pit bosses. She
was dressed in an exceptionally sexy,
provocative dress. I saw her whispering into
the ear of one of the pit bosses. When she
saw me and we acknowledged each other's
presence, she was very surprised. She
said, "I'm trying to make out with the
pit boss". She was very close to this casino
employee and she acted very friendly towards him.
She then backed away for a short period of time,
but then I saw her with the same man again
later in the evening for a brief time. I had
asked her where Guy was and she justed waved
it off as he was somewhere else. When

1  I went to get my haircut by Heather in 1991 or
2  '92 we briefly talked about this incident.
3  I talked about how you never know who is
4  around and who can see you. The matter was
5  then dropped & not discussed again.
6         I have read these 3 pages & they are
7  true to the best of my knowledge
8
9
10
11                                Vasil T. Ivanov, Sr
12  Sworn to before
13  me this 1 day of
14  March, 1999
15  PHYLLIS GAGLIARDI
      NOTARY PUBLIC, State of New York
16        No. 48654862
      Qualified in Suffolk County
17  Commission Expires Jan. 31, 2000
18  Phyllis Gagliardi
19
20
21
22
23
24
25

Att# 78



BURKE-001709

1. I, Mary Elizabeth Wagner, being duly
2. Sworn deposes and says.
3.    I reside at 3 Leaf Court, Kings Park
4. NY 11754. My home telephone number is
5. 516-544-4753. My date of birth is
6. 4-18-51. I am currently employed full
7. time at St Patrick's School in Smithtown.
8. NY. I am Jillian Malone's kindergarten
9. teacher.
10.    Jillian Malone has been a student of
11. mine since September 1998. The first
12. scheduled parent-teacher conference was scheduled
13. for February 2, 1999. At this meeting student
14. report cards are distributed. A notice
15. was sent home in mid January
16. which advised of the date + time of the
17. meeting, with a request to respond. The
18. bottom of the notice, had a tear off
19. for response. To the best of my
20. recollection I believe the return slip
21. indicated that the meeting could not
22. be attended. Due to the lack of
23. further communication with the Malone
24. family, I called their home on Feb 1, 1999
25. to reschedule the conference. At this

Mary Elizabeth Wagner

Att# 76
BURKE-001710

time, I spoke with Heather Malone and
briefly discussed some of the difficulties
Jillian was having in school. Mrs Malone
told me she would get back to me to
re-schedule. the next time, I spoke to her,
on the phone, was approximately February 11, 1999
I told her that her husband had already
picked up the report card on February 3rd or 4th.
We discussed testing Jillian and scheduled
an appointment for her to come in on
February 23 to meet with me and the
Principal. Mrs Malone attended this meeting
with her mother. My last contact with
Mrs Malone, as of this date was on March 1st,
but we did not discuss Jillian's school M.W.
progress. M.W.

     On February 2nd I met Guy Malone,
for the first time (to the best of my recollection)
He had come to the Rectory of St. Patricks,
to see a Priest. It was not until he
told me who he was that I connected him
as Jillian's father and we began discussing
her. I informed him of some of Jillians.
academic difficulties and that the parent
conference was not attended. He stated

Mary Elizabeth Wagner Att# 70 2 of 2

BURKE-001711

He did not know about the meeting &
requested Jillian's report card. He
came to school on either the 3rd or 4th
to pick up the report card. At that time
I advised Mr Malone whom to
contact to have Jillian tested. Since
the time of our first meeting, Mr
Malone has called me to discuss Jillian
at least three times a week. This
includes occasional visits to the rectory mill
The last time I spoke with Mr Malone
about Jillian was February 27th.
        I have read these three pages & they
are true to the best of my knowledge.

*Mary Elizabeth Wagner*
Mary Elizabeth Wagner

Sworn before
me this 2nd day
of March 1999.

PHYLLIS GAGLIARDI
NOTARY PUBLIC, State of New York
No. 4S454862
Qualified in Suffolk County
Commission Expires Jan. 31, 19 2000

*Phyllis Gagliardi*

Att# 7/11 page 3 38

1. I Salvatore Mark Amato, being duly sworn
2. deposes and says
3.     I reside at 8 Browning Street, St James
4. NY 11780. My home telephone number is 516-366-3163.
5. My date of birth is 2-14-68.
6.     In September of 1995 I moved into
7. my new home on 8 Browning St. St James.
8. One late morning, a new neighbor of mine,
9. Heather McLone, came to my house to
10. welcome me & my family to the neighborhood.
11. Heather was wearing a very revealing low cut
12. "club dress" which I felt was very inappropriate
13. & odd for the time of day & that she would
14. come to my house so exposed. I was very
15. uncomfortable. We talked very briefly in the driveway
16. when she gave me some pasta & a jar of sauce.
17. My father, who was with me at this time, was
18. also shocked by her attire.
19.     Some time later, I had learned that
20. Heather cut hair in her home. As a neighbor
21. I made an appointment to get my haircut.
22. When I went there Heather always carried
23. the conversation. If she wasn't talking to
24. me, she was on the phone, as it would
25. constantly ring. As she cut my hair she

Att# (7/2)

BURKE-001713

1 would tell me how guys hit on her all the time.
2 She always asked if I noticed if she lost weight,
3 if I liked what she was wearing and if she looked
4 like a movie star. She would tell me that
5 when she cut the hair of her male clientele, many
6 they would grab her butt and they would put
7 their hands in her. She told me a story
8 that on one occasion she had just finished
9 cutting a guy's hair. When she took off the
10 cape, she saw he was sitting in the
11 chair with his genitals exposed. She found
12 this amusing but I found it made me very
13 uncomfortable. After being exposed to her
14 continuous ~~sexual conv~~ Suggestive conversation,
15 I stopped getting my hair cut by Heather.
16 In Approximately Nov. of 1996. and old
17 school friend come to visit me. When he
18 found out I lived next to Heather. he found it
19 very amusing. He told me that in approximately
20 1984, 1985 or 1986 he had Heather come to his
21 house to cut his hair. On that occasion
22 no one was home. She cut his hair and
23 performed oral sex on him. He told
24 me she was a "party girl."
25        During the time period of about 1995 to

1  1997, Heather was often the topic of conversation
2  among the male neighbors in my area. They
3  all knew she cheated on her husband, Guy
4  and that it had been going on for a long
5  time. I have read these three pages and they
6
7  are true to the best of my knowledge.

Salvatore M. Amato
Salvatore M. Amato

Sworn to before
me this 23rd day
of April, 1999.

PHYLLIS GAGLIARDI
NOTARY PUBLIC, State of New York
No. 4845,862
Qualified in Suffolk County
Commission Expires Jan. 31, 2000

Phyllis Gagliardi

Att# 5/14

page 3



BURKE_001715

# SWORN STATEMENT OF BARBARA A. SACHS

## May 20, 1999

I, Barbara A. Sachs, being duly sworn deposes and says:

I reside at 246 Asharoken Avenue, Northport, New York 11768. My home telephone number is 516-754-6146. My date of birth is 10/28/42.

I have known Heather Malone since she was about 16 years old and Guy Malone for about 20 years.

I recall a telephone call I received from Heather Malone approximately February, 1997. When she called me at work she was crying and very upset. She told me that Guy found rolling papers in the car and was very angry with her. He threatened to divorce her if she did not reveal to him who was providing her with marijuana. she asked me to talk to Guy to try to calm him down. She told me she knew she needed help to "clean up her act." To the best of my recollection she told me she wanted to stop smoking marijuana but felt she needed outside help. As a result of this conversation I told Guy to give her some space to work this out.

A few days later Heather called me again. She told me she spoke with a counselor at Apple. She made this call anonymously. She told me that as a result of this conversation with the counselor, he felt she could get off the marijuana on her own. This made her feel somewhat more at ease.

Approximately 12 months later, during another conversation with Heather, she told me that she had been clean for about a year.

I have read these two pages and they are true to the best of my knowledge.

BARBARA A. SACHS

Sworn to before me this
20th day of May, 1999.

Att# 

BURKE-001716

# SWORN STATEMENT OF DEBORAH ESPERTO

## May 11, 1999

I, Deborah Esperto, being duly sworn deposes and says:

I reside at 102 Avalon Lake Road, Danbury, Connecticut 06810. My home telephone number is 203-730-0543. My date of birth is October 31, 1964.

*730 0543 o/c*

Approximately five years ago, my husband and I would meet with Heather and Guy Malone, on a regular basis to socialize. My husband and I would go to Guy and Heather's home about once a month.

When we were at the Malone residence, Heather would always look for an excuse to go for a ride in her car. I would go with her when she would make excuses to leave the house and go in the car. During these short excursions from home, Heather would smoke marijuana. I didn't smoke, but I personally witnessed Heather smoking marijuana. Heather did not smoke every time we went for a ride in her car, but if we went out in the car together 12 times, she smoked at least 10 of the 12 times. During these short excursions, Heather told me that she would get stoned with the baby in the car. She said she did this when Jillian was less than six months old. I further recall that Heather told me she used birth control pills while Guy was trying to have another child. She planned trips without Guy's knowledge. Heather purchased a purse for $800 and said it cost $35 at a Flea Market. Heather hired cleaning ladies without Guy's knowledge.

I have read the preceding one page and it is true to the best of my knowledge.


_____
DEBORAH ESPERTO

Sworn to before me this
7th day of June, 1999.

*State of Connecticut*
*County of New Haven*

*Christie Gorlick*

My Commission Exp. Nov. 30, 1999

Att# (7/16)

BURKE-001717

2   plaintiff, Heather Malone?

3          A        Yes, I do.

4          Q        Where did you meet the plaintiff,
5   Heather Malone, sir?

6          A        I met her in the neighborhood in
7   which I reside which is in the Smithtown/St.
8   James area.

9          Q        And did Mrs. Malone ever cut your
10  hair, sir?

11         A        Yes, she has.

12         Q        And do you recall when that first
13  commenced, sir?

14         A        Late 1997, perhaps 1998.

15         Q        May I ask you, sir, where that
16  occurred?

17         A        I'm not sure where the first
18  haircut occurred.

19         Q        Okay.  How about any subsequent
20  haircuts after the first, sir?

21         A        She primarily cuts hair at my house
22  -- my hair at my house.

23         Q        And what is that address, sir?

24         A        It's #2 Sammis Street in Smithtown,
25  New York.

SUPREME COURT REPORTERS, INC.  *  516-541-8023



BURKE-001718

2          Q      Did you keep a record of it, sir?

3          A      No.

4          Q      Did Mrs. Malone ever sign any

5     document that she was going to repay you these

6     moneys, sir?

7          A      No, we have a verbal agreement.

8          Q      What is the nature of the verbal

9     agreement, sir?

10         A      That at some point down the road

11    she'll pay me back.

12         Q      With or without interest, Mr.

13    Burke?

14         A      I don't plan on charging her

15    interest.

16         Q      So, Mr. Burke, you say that five to

17    $10,000 is how much you have given to Mrs.

18    Malone; is that right?

19         A      Yes.

20         Q      The single largest sum that you

21    gave her, sir, would be what?

22         A      I don't have a specific

23    recollection.  Perhaps -- I wouldn't even

24    venture a guess, maybe a thousand dollars on

25    one shot.



2          Q       Okay.  Since 1997, sir, when you

3     met Mrs. Malone, have you involved yourself in

4     any business with her, sir?

5          A       None whatsoever.

6          Q       Are you aware of any business that

7     she's been in, sir?

8          A       Not that I'm aware of other than

9     her profession of cutting hair.

10          Q       Okay.  Did there come a time, sir,

11     that you had a beeper?

12          A       Yes, there did.

13          Q       And what was the beeper number,

14     sir?

15          A       332 -- 516 332 5076.   It was a

16     voice mail number that I maintained.

17          Q       And do you recall when you first

18     got that voice mail number, sir?

19          A       '93, '94, I'm not exactly certain.

20          Q       Do you recall the name of the

21     company that you got that voice mail number

22     through?

23          A       Sure, PageNet.

24                    MS. MC NICHOL:  I didn't hear

25                    that.  What was that?

SUPREME COURT REPORTERS, INC. *  516-541-8023



BURKE-001720

1

2              THE WITNESS:    PageNet in

3         Garden City, Long Island.

4         Q       What was the purpose of you having

5    a beeper number, sir, at that time?

6         A       The purpose that everybody else has

7    beeper numbers for, to be contacted by

8    individuals or people regarding personal and

9    business matters.

10        Q       Did you have any business matters,

11   sir, at that time other than as a police

12   officer?

13        A       That required use of a beeper, no,

14   sir.

15        Q       Did you have any business from 1993

16   up until the present time, sir, other than as

17   a police officer, regardless of what, where

18   you required a beeper?

19        A       No.

20        Q       Did you have a voice on that

21   beeper, sir, answering or giving a message?

22        A       At some point, some time, I did.

23        Q       Was Mrs. Malone's voice ever on

24   that beeper, sir?

25        A       Never.

Att# (8/4)

BURKE-001721

2          Q       Whose voice was, sir?

3          A       Different people's voices were on

4    it but I would imagine that you're interested

5    in Miss Bonnie Ciccone's voice being on the

6    beeper; is that correct?

7          Q       Yes.  Was her voice on the beeper?

8          A       Yes, it was.

9          Q       And did you have a business

10   relationship with Bonnie Ciccone, sir?

11         A       Not at all.

12         Q       What was the purpose of having her

13   voice on the beeper, sir?

14         A       Miss Malone was involved in a

15   domestic relationship which was to be

16   described, I guess, at least, as abusive

17   physically, emotionally and economically.

18              My friendship developed with Miss

19   Malone and what happened was -- was there was

20   no way for Miss Malone to get in contact with

21   me because the defendant monitored the

22   outgoing phone calls in the house, and I and

23   Miss Malone were fearful that she would become

24   the subject of physical abuse if the defendant

25   was to find out she was having phone



BURKE-001722

conversations with me, so in an effort to
stave off Miss Malone being the subject of
such abuse, we put Miss Ciccone's voice on the
beeper number in the event that he would find
out through the phone records or whatever the
case might be -- so that Miss Malone might not
again be the subject of physical abuse.

Q    When did this first occur, sir,
that Miss Ciccone's voice was on the voice
machine?

A    1997, perhaps.  I can't be exactly
certain but my best estimate would be 1997.

Q    So as I understand your testimony,
the purpose was to protect Mrs. Malone from
your belief of physical abuse from her
husband, my client; is that right, sir?

A    That is exactly correct, sir.

Q    And could you explain to me, sir,
then, why there were occasions where Mrs.
Malone would call that phone beeper up to 10
or 15 times a day?

A    That was pretty much the sole means
that she had to get in contact with me.

Q    So --



BURKE-001723

Q    Is there a miniature that you have?

A    There are -- they make miniatures.

Q    Did you ever give one to Mrs. Malone, sir?

A    Yes, I have.

Q    When?

A    Miss Malone, I think the first time that she got a miniature shield from me was maybe this year or last year, shortly after I got promoted to lieutenant, to the best of my recollection.

Q    Did you write anything in that case that the shield was contained in, sir?

A    No, I believe it's contained in a wallet.

Q    Did you write anything on any part of the wallet pertaining to that?

A    I never wrote on the wallet, no.

Q    Did you give Mrs. Malone a PBA card, sir?

A    Yes, I have.

Q    Did you write anything on the PBA card, sir?

A    I don't recall what I wrote on it.

SUPREME COURT REPORTERS, INC. *  516-541-8023



BURKE-001724

2       I probably wrote my name and her name on it --

3       as is standard with the PBA cards.

4            Q      Mr. Burke, at the time that you

5       were seeing Mrs. Malone as a friend since

6       1997, when she confided in you and all of

7       these other things that you've indicated to

8       us, sir, did Mrs. Malone ever confide in you

9       that she had engaged in sexual relations with

10      persons other than her husband?

11           A      No.

12           Q      Did Mrs. Malone ever indicate to

13      you, sir, that she had sold sexual services

14      for a fee, sir?

15           A      We discussed that and she

16      absolutely denied it and actually is

17      devastated about the fact of what the

18      defendant has done with respect to that

19      allegation.

20           Q      I missed what you said.  You're

21      devastated or she is devastated?

22           A      Actually, both of us are devastated

23      about that terribly false, absolutely false

24      allegation.

25           Q      I take it, sir, that you, then,

Att# 8/8

BURKE-001725

2        have never involved yourself personally, other

3        than on official police business, perhaps,

4        with a prostitute?

5            A        That's correct.

6            Q        Did you ever live with a

7        prostitute, sir?

8            A        No, sir.

9            Q        To your knowledge, at least?

10           A        To my knowledge, no.

11           Q        Sir, did there ever come a time

12       that you disguised yourself as a female in

13       connection with trying to impersonate Mrs.

14       Malone?

15           A        No.

16                    I think the moustache would give it

17       away.

18           Q        You could have worn a veil.

19                    Do you know anybody at the

20       Brunswick Toxicology Lab located in

21       Amityville?

22           A        No.

23           Q        Did you ever contact anybody there,

24       sir?

25           A        Never once.



BURKE-001726

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF SUFFOLK

-------------------------------------------------------------x

HEATHER MALONE,

               Plaintiff,

      -against-

GUY MALONE,

             Defendant.

-------------------------------------------------------------x

Index No. 99-03267
IAS:Hon. Donald Blydenburgh

**PLAINTIFF'S REPLY AND
AFFIDAVIT IN OPPOSITION**

STATE OF NEW YORK)
COUNTY OF SUFFOLK) SS.:

HEATHER MALONE, being duly sworn, deposes and says:

1. I am the plaintiff in the above captioned action for divorce and submit this affidavit in reply to defendant's affidavit in opposition to my motion and in opposition to defendant's cross-motion for shared custody.

2. It is apparent from defendant's affidavit in opposition to my pendent lite application that despite his allegations, he is requesting that custody be shared. In February of this year, I had hoped that defendant would put aside his abusive and obsessive behavior toward me so that we could work together and communicate in rational, calm manners for the sake of decision making for our daughter. It is clear to me by defendant's continued verbal abuse over the phone, his calculated actions to exclude me from matters involving Jillian, his threatening notes that have been sent to me (Exhibit "F" herein) and to my parents, and his continued derogatory

1



BURKE-001727

name as beneficiary of our various life insurance investments. Since there is significant value to these accounts (with significant cash surrender value as well), defendant should be directed to reinstate me on the policies.

19. Although defendant asserts that my health insurance has remained in tact, I recently discovered from our dentist that I am no longer covered while my daughter is. Prior to this action, and throughout the marriage, defendant provided dental insurance coverage for me. Defendant should be directed to reinstate all health coverage for me, including dental.

20. Defendant's obsessive assertion that I am a prostitute with a friend, Bonnie, is simply false and absurd. As defendant's exhibits show, throughout the marriage, defendant ordered a monthly print out of our telephone calls to check up on me to see who I called. James Burke is and has been a friend of mine for quite some time. I regularly call him and Bonnie as well, especially when I have suffered the threatening behavior and verbal abuse from my husband. The beeper number with Bonnie's business name on it was not a prostitution ring, but a number we used to get in touch with each other, and specifically, a number that I would call to reach Jim, as defendant would not allow me to have any male friends. I readily admit that my relationship with Jim has grown closer since the abuse by my husband has increased. I believe that this relationship in and of itself has enraged defendant and

7



Att# 9/2

BURKE-001728

caused him to repeatedly tell me "I will see to it that you get nothing."

21.  Neither Bonnie nor I are or were prostitutes. I have not met with clients in parking lots and gone to motels with them. Bonnie has been a friend for many years. She has witnessed defendant's abuse of me in front of our daughter and can attest to defendant's explosive conduct. Attached hereto as Exhibit "H" is her affidavit.

22.  The evidence clearly shows that defendant was the financial support of this family. The evidence also shows that this matter has escalated and caused considerable expense to be incurred solely due to defendant's decision to contest everything and not to properly provide for your affirmant and Jill. Defendant seeks shared custody, but his actions speak otherwise.

23.  Defendant claims that he had to borrow $9,000.00 from his mother, yet there is no indication on his net worth statement of this debt. The court should be made aware that defendant receives a $10,000.00 gift from his mother on an annual basis, as do her other children. Perhaps this is the money to which defendant refers.

24.  Defendant claims he had over $7,000.00 in expenses for Jill. A review of his exhibit B indicates his inclusion of $1,700.00 for his trip to Disneyworld, concerts, investment accounts, bunk beds (a double bed was in the home for Jill), another television (there were 7 TVS in the house - I took 2 when I left) and medical

8.



BURKE-001729

insurance. No expenses are listed beyond June, 1999.

25. There is no evidence of defendant's earnings in 1999 to date. Defendant's physical abuse of me, his verbal abuse and derogatory statements of me and to my family certainly would cause my sister to rightfully refuse to continue a business relationship with him. N.Y. Life requires a reason when a client requests a change in accounts. My sister simply told the truth.

26. Defendant's cross-motion is without merit and will only cause additional problems to arise.


**WHEREFORE**, your deponent respectfully requests that the court grant the relief requested in my **pendente lite** motion, deny defendant's cross-motion in its entirety, together with such other, further and different relief as to the Court may seem just and proper under the circumstances presented.

_Heather Malone_
HEATHER MALONE

Sworn to before me this
28th day of August, 1999.

_[signature]_
Notary Public

JOAN E. McNICHOL
NOTARY PUBLIC, State of New York
No. 4713449
Qualified in Suffolk County
Commission Expires June 30, _____

9

A        I would have to say probably.

Q        Probably more than once or twice in a given day?

A        Sometimes I probably did.

Q        Can you tell me, to the best of your recollection, the maximum number of times in any particular day you called that pager?

A        No.

Q        Could it have been as much as ten or fifteen times?

A        If it was, I don't know.

Q        Does that correspond with your recollection of the number of times you called it?

A        Ten or fifteen times?

Q        In one day.

A        In one day?

Q        In one day.

A        I very well may have. I may have not. I don't recall exactly how many times.

Q        Was any aspect of you using that pager number to transact any type of activity for which you anticipated compensation?

A        No.

Att# (10/1)

Q      That was purely non involving

business; is that right?

A      Yes.

Q      Did that pager have what's referred to

as a pin number or some other number in order to

determine the messages?

A      In order to?

Q      Determine the messages or find out

anything about the service from the provider of

the pager service?

A      The company?

Q      Like a password.

A      The company?

Q      Yes.

Do you know what company issued that

pager?

A      No.  I have no idea.

Q      Are you still renting your apartment,

Mrs. Malone?

A      Yes, I am.

Q      Is the rent still the same?

A      Yes.

Q      I think you said it was like $900 a

month?

Att# (10/2)

May 7, 1999

To whom it may concern;

     I, Andrea Malone-Polydor, unbeknownst to Guy Malone, did purchase the narcotic, cocaine, from Heather Chiafalo Malone. This occurred on two to three occasions in 1986-1987. This was an unfortunate period in my life. I entered a rehabilitation program and have been drug free for twelve years.

     I would also like to submit photographs of my God daughter , Jillian Malone, taken from January 1996 to March 1996. These photographs show conclusively the chemically coloured streaks in her hair. Jillian was just two years and three months of age at the time.

AND I MAKE this solemn declaration by virtue of the Statutory Declarations Act 1959 and subject to the penalties provided by that Act for the making of false statements in statutory declarations conscientiously believing the statements contained in this declaratin to be true in every particular.

Andrea Malone-Polydor

DECLARED at SYDNEY in the State of New South Wales, Australia this 7ᵘ day of May 1999 before me:



PETER R MURPHY
SYDNEY, N.S.W.
AUSTRALIA
PUBLIC NOTARY





BURKE-001733

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF SUFFOLK
----------------------------------------------------------------x
HEATHER MALONE,

                  Plaintiff,

        -against-

GUY MALONE,

               Defendant.
----------------------------------------------------------------x

Index No. 99-03267
IAS:Hon. Donald Blydenburgh


AFFIDAVIT

STATE OF NEW YORK)
COUNTY OF SUFFOLK) SS.:
    BONNIE CICCONE, being duly sworn, deposes and says:

    1. I am not a party to this action, I over the age of eighteen (18), I reside in St. James, New York, and submit this affidavit on behalf of Heather Malone.

    2. I am a long time friend of the plaintiff, Heather Malone. I know both the plaintiff and defendant, Guy Malone, and have socialized with them on occasion and witnessed interactions between them.

    3. The defendant, Guy Malone, has always demonstrated himself to me as an obsessive, self-centered, abusive husband and father. On numerous occasions when I would visit with plaintiff and Jill at their residence, defendant would come in and begin yelling, screaming and cursing at plaintiff, in front of me, my daughter, his daughter, and anyone else who happened to be present. On more than one occasion in the last two years, defendant would enter the home and start yelling at plaintiff

1



BURKE-001734

"What the fuck did you do today.... you worthless piece of shit." Defendant would then storm around the house slamming doors and cursing.

4. Plaintiff would regularly, sometimes a number of times in one day, call me on the phone crying. I would hear defendant in the background yelling and screaming at her that she was a "fat pig", "a worthless slob". On other occasions Heather would call me crying because Guy would not let her leave the house and refused to let her visit her sister.

5. More recently, while I was with plaintiff and her daughter Jill, defendant began saying derogatory remarks about plaintiff directly to the child. Defendant said your mother is no good, she's fat, stupid, she's not a good mother". Jill became visibly upset and yelled back at her father, "No, don't say that... I love mommy, she's a good mommy, .... stop saying that".

6. On numerous occasions I would attempt to comfort plaintiff and expressed my concern that her relationship with defendant was not healthy and in fact, was harming plaintiff emotionally and psychologically.

7. I know James Burke, as my sister went to school with him. Jim, Heather and I became friends over the last year or so. I am not a prostitute, I have never been a prostitute, nor have I been involved with anyone with a prostitution ring as defendant has suggested of me.

2

Att# 

BURKE-001735

8. I did put my voice mail on a mutual beeper that plaintiff, Jim and I relied on to contact one another. It really was designed for Heather's protection from her husband, as she was aware that he checked all of her phone calls and was always jealous and suspicious of her friendships.

9. In late 1998, plaintiff confided in me on a number of occasions that she could not stand the abuse from her husband and that she feared him. His verbal threats were now escalating to kicks, pushes and grabs. I told plaintiff that she must leave before she was hurt or before Jill was harmed.

10. Defendant's assertions that I am involved in prostitution along with the plaintiff is simply untrue and absurd. I have a daughter, Alyssa who is          Years of age. Alyssa and Jill are friends and play with each other often. I have had numerous opportunities to observe plaintiff with her daughter and find her to be an excellent, giving and loving parent. Until this year, I rarely saw defendant interact with his daughter or participate in any events with her.

11. I submit this affidavit to refute the unfounded allegations of the defendant against me as well as against the plaintiff. Defendant can be and is mean spirited and will stop at nothing to gain a perceived "win".

3



BURKE-001736

_(signature)_

**BONNIE CICCONE**

Sworn to before me this
28th day of August, 1999.

_(signature)_

Notary Public

JOAN E. McNICHOL
NOTARY PUBLIC, State of New York
No. 4713239
Qualified in Suffolk County
Commission Expires June 30, 2000

- 4

Att# 12/4

BURKE-001737

# COUNTY OF SUFFOLK



## POLICE DEPARTMENT

**ROBERT J. GAFFNEY**
COUNTY EXECUTIVE

JOHN C. GALLAGHER
POLICE COMMISSIONER

## MEMORANDUM

Date: June 21, 1999

To: T. Michael Conlon, Bureau Chief
Public Integrity Bureau
Office of the District Attorney

From: Inspector Philip Robilotto
Internal Affairs Bureau

RE: **Internal Affairs Bureau Case #99-41**

---

The Internal Affairs Bureau of the Suffolk County Police Department has been conducting an investigation of the allegations made by Guy Malone, DOB 1/16/51, of Pineacre Drive, Smithtown. Mr. Malone has reported that his wife, Heather Malone (nee: Chiafalo), DOB 5/10/63, has been engaging in prostitution in the Smithtown area. Mr. Malone also contends that a member of the Police Department, James Burke, D/Sgt. #535/3140, has been involved in promoting this illegal activity.

The Internal Affairs Bureau has been investigating this allegation and has exhausted all available lines of inquiry. At this time we cannot substantiate administrative charges. For this reason, I am requesting that your office examine this case for possible criminal charges. I understand that an investigator from this office will be assigned to the criminal investigation, and that this investigator will be prohibited from disclosing any information gained via that investigation.

Lieutenant Peter Desposito of the Internal Affairs Bureau will be assigned as a liaison to assist your office in the criminal investigation. He can be reached at 852-6378. Your assistance in this matter is greatly appreciated.

Yours truly,

*Phil Robilotto, Insp.*

Philip Robilotto
Inspector
Commanding Officer
Internal Affairs Bureau

PR/le

30 YAPHANK AVENUE, YAPHANK, NEW YORK 11980 - (516) 852-6000

BURKE-001738

# COUNTY OF SUFFOLK
# DISTRICT ATTORNEY'S OFFICE



THOMAS SPOTA
DISTRICT ATTORNEY

Address Reply To:
Public Integrity Bureau

May 21, 2002

Lt. James Feil
Suffolk County Police Department
Internal Affairs Bureau
Yaphank, NY 11980

<u>Re: Central Complaint #99-991044</u>

Dear Lt. Feil:

Upon final review of Central Complaint #99-991044, this matter has been closed in the Public Integrity Unit. I have carefully evaluated all of the allegations and the investigative leads which were pursued at the time these allegation were first made against the sworn member of the Suffolk County Police Department.

The allegations of prostitution activities by the civilians are not verified through any source including the complainant's own private investigator. I also find the nature of this complaint somewhat suspect since it comes to this bureau from an attorney who represents the complainant/husband who is seeking a divorce and the dissolution of marital assets. While reviewing the contents of this file it became clear that there is no definitive link between the subject and the activities alleged to be occurring, and no clear evidence of criminal activities by the civilian let alone the sworn Suffolk County Police Officer.

I hope this information is helpful, if you have any other questions please feel free to contact me at 853-4626 during normal business hours.

Very truly yours,

Jeremy J. Scileppi
Assistant District Attorney
Public Integrity Unit

Att# (14)

BURKE-001739