UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| - against - | No. 2:17-cr-0587 (JMA) |
| CHRISTOPHER MCPARTLAND and THOMAS J. SPOTA, | |
| Defendants. | |

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANT CHRISTOPHER MCPARTLAND'S MOTION FOR A NEW TRIAL PURSUANT TO FEDERAL RULE OF CRIMINAL PROCEDURE 33 AND FOR AN EVIDENTIARY HEARING**

KRANTZ & BERMAN LLP
747 Third Avenue, 32nd Floor
New York, NY 10017
(212) 661-0009

BALLARD SPAHR LLP
1675 Broadway, 19th Floor
New York, NY 10019
(212) 223-0200

*Counsel for Mr. McPartland*

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................... 1

ARGUMENT ............................................................................................................................. 2

I.     THE GOVERNMENT FAILS TO RESPOND TO THE CRITICAL FACTUAL
QUESTIONS PRESENTED BY THIS MOTION ............................................................ 2

II.    THE GOVERNMENT FAILS TO RESPOND TO THE DEFENSE'S REQUEST FOR
AN EVIDENTIARY HEARING ........................................................................................... 6

III.   THE BURDEN WAS NOT ON THE DEFENSE TO "CORRECT" HICKEY'S
TESTIMONY BY CALLING GOVERNMENT WITNESSES ...................................... 8

IV.   THE GOVERNMENT'S STATEMENT OF THE APPLICABLE LEGAL
STANDARDS IS INAPPOSITE AND WRONG ........................................................... 11

CONCLUSION ....................................................................................................................... 16

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Alvarez v. United States*,
   808 F. Supp. 1066 (S.D.N.Y. 1992) ......................................................................13

*Fernandez v. Capra*,
   916 F.3d 215 (2d Cir. 2019) ............................................................................13

*Mooney v. Holohan*,
   294 U.S. 103 (1935) ........................................................................................12

*N. Mariana Islands v. Bowie*,
   243 F.3d 1109 (9th Cir. 2001) ........................................................................16

*Napue v. Illinois*,
   360 U.S. 264 (1959) ..........................................................................................9

*Perkins v. LeFevre*,
   642 F.2d 37 (2d Cir. 1981) ...............................................................................9

*Podlog v. United States*,
   Nos. 97-Civ-3292 (JFK), S2-92-CR-374 (JFK), 2003 U.S. Dist. LEXIS 8904
   (S.D.N.Y. Apr. 22, 2003), *aff'd*, 2005 U.S. App. LEXIS 738 (2d Cir. 2005) ..........................7

*Reyes v. Ercole*,
   No. 06-Cv-5525 (SHS), 2018 U.S. Dist. LEXIS 51595 (S.D.N.Y. Mar. 26,
   2018), *aff'd*, 785 F. App'x 26 (2d Cir. 2019) ........................................................13

*Sanders v. Sullivan*,
   900 F.2d 601 (2d Cir. 1990) ....................................................................12, 15

*Shih Wei Su v. Filion*,
   335 F.3d 119 (2d Cir. 2003) ...........................................................................12

*United States v. Austin*,
   No. 94-CR-737 (JBW), 1997 WL 43523 (E.D.N.Y. Jan. 27, 1997) ........................7

*United States v. Avellino*,
   136 F.3d 249 (2d Cir.1998) ...............................................................................7

*United States v. Bernal-Obeso*,
   989 F.2d 331 (9th Cir. 1993) .............................................................................7

*United States v. Biaggi*,
   823 F. Supp. 1151 (S.D.N.Y. 1993) .................................................................15

*United States v. Block*,
    No. 16-CR-595, Dkt. No. 194 (S.D.N.Y. Oct. 12, 2018) .........................................................7

*United States v. Brown*,
    No. 86-CR-738 (CSH), 1987 U.S. Dist. LEXIS 6751 (S.D.N.Y. July 29, 1987) .....................7

*United States v. Cromitie*,
    727 F.3d 194 (2d Cir. 2013) ...............................................................................................12

*United States v. D'Angelo*,
    No. 02-CR-399 (JG), 2004 U.S. Dist. LEXIS 2239 (E.D.N.Y. Feb. 18, 2004) ......................15

*United States v. Damblu*,
    945 F. Supp. 672 (S.D.N.Y. 1996) ........................................................................................3

*United States v. Feng Ling Liu*,
    No. 12-CR-934-01 (RA), 2015 U.S. Dist. LEXIS 94899 (S.D.N.Y. July 20,
    2015), *aff'd on other grounds sub nom. United States v. Bandrich*, 636 F.
    App'x 65 (2d Cir. 2016) ......................................................................................................12

*United States v. Gallego*,
    191 F.3d 156 (2d Cir. 1999) ...............................................................................................15

*United States v. Gambino*,
    59 F.3d 353 (2d Cir. 1995) .................................................................................................15

*United States v. Gibson*,
    No. 91-CR-669 (PNL), 1993 U.S. Dist. LEXIS 2684 (S.D.N.Y. Mar. 9, 1993) ......................3

*United States v. LaGrua*,
    Nos. 98-1323 (L), 98-1568, 1999 U.S. App. LEXIS 12091 (2d Cir. June 11,
    1999) .....................................................................................................................................8

*United States v. McCourty*,
    562 F.3d 458 (2d Cir. 2009) ...............................................................................................14

*United States v. Moore*,
    54 F.3d 92 (2d Cir. 1995) .....................................................................................................3

*United States v. Ng Lap Seng*,
    No. 15-CR-706 (VSB), 2018 U.S. Dist. LEXIS 83441 (S.D.N.Y. May 9,
    2018) .....................................................................................................................................3

*United States v. Pavloyianis*,
    996 F.2d 1467 (2d Cir. 1993) ...............................................................................................3

*United States v. Sanchez*,
    969 F.2d 1409 (2d Cir. 1992) ...............................................................................11, 12, 14

*United States v. Schlesinger*,
    438 F. Supp. 2d 76 (E.D.N.Y. 2006) ..................................................................3, 7

*United States v. Stofsky*,
    527 F.2d 237 (2d Cir. 1975)..............................................................................13

*United States v. Surgent*,
    No. 04-CR-0364 (JG), 2006 U.S. Dist. LEXIS 62698 (E.D.N.Y. Sept. 1, 2006)....................13

*United States v. Truman*,
    688 F.3d 129 (2d Cir. 2012)..............................................................................12

*United States v. Wallach*,
    935 F.2d 445 (2d Cir. 1991)........................................................................ *passim*

*United States v. Wallach*,
    979 F.2d 912 (2d Cir. 1992)..............................................................................3, 15

## Other Authorities

Federal Rule of Criminal Procedure 33 .............................................................. *passim*

## PRELIMINARY STATEMENT

In our moving papers, we argued that Mr. McPartland (joined in by Mr. Spota) was entitled to an evidentiary hearing because a preponderance of the evidence supports the conclusion that: (1) James Hickey testified falsely at trial in several critical and highly material respects; (2) the government was aware, or should have been aware, of that falsity; and (3) the government failed to correct that testimony or to disclose its falsity to the defense. We relied on five critical aspects of Hickey's testimony, all of which appear to have been patently false, and all of which the government knew, or should have known, were false. Specifically, Hickey testified that he:

1. Witnessed a meeting in February 2013, during which Mr. McPartland "coached" James Burke and became the "architect" of the lies Burke should tell about the Loeb assault.

2. Disclosed the "coaching" incident to the government at "the very beginning of his cooperation."

3. Disclosed his hallucinations to the government at his very first meeting with them – indeed, "before they even sat down."

4. Disclosed his hospitalization for alcoholism to the government "in the early beginnings of his meetings with them."

5. Never falsely told the government, prior to the commencement of trial, that he had no follow-up medical care of any kind from his October 2015 hospitalization.

In its opposition papers, the government largely ignores these serious allegations of falsity and misconduct. It submits no affidavits or other evidence to suggest that Hickey's statements – as to what he told the government, and when – were actually true. It provides no explanation for how Hickey seems to have remembered – apparently 4 years into his cooperation – that the February 2013 "coaching" incident had purportedly taken place. It does not even address the merits of defendants' request for an evidentiary hearing, which is the centerpiece of the defense's motion.

Rather, the government appears to respond to a motion other than the one Mr. McPartland actually filed. It relies on legal standards not applicable to Mr. McPartland's Rule 33 motion, such as its erroneous suggestion that the defense must show that Hickey's testimony was "patently incredible." It both ignores and misstates the legal standards governing the actual claim made – namely, that Hickey testified falsely and that the government knew or should have known of that falsity. It attempts to turn the issue on its head by arguing, in essence (with no legal support), that even if Hickey's testimony was false, and even if the government knew or should have known of that falsity, the burden was on the *defense* to prove that at trial by calling government agents as witnesses.

All of these arguments are unavailing, and only serve to underscore the palpable need for an evidentiary hearing in this case to shine the light of day on what actually transpired here. Only then can the Court properly assess whether Hickey testified falsely, whether the government was aware or should have been aware of that falsity, and whether a new trial is therefore warranted. Accordingly, the government's arguments should be rejected and an evidentiary hearing ordered.

## ARGUMENT

### I.

### THE GOVERNMENT FAILS TO RESPOND TO THE CRITICAL FACTUAL QUESTIONS PRESENTED BY THIS MOTION

In the face of the defense's detailed factual recitation, the government stands largely mute. It does not submit any affidavits, exhibits or even arguments suggesting that this testimony from Hickey was true. It does not dispute any of the facts set forth in the Krantz Affidavit ("Krantz Aff."), particularly as to defense counsel's prior conversations with the government. Moreover, it inexplicably refers to the omission of any of these statements from Hickey's 3500 material (including interview reports from 17 sessions over 4 years) and two detailed search warrant

applications as "of no moment factually or legally." Opp. Br. at 2. The government chooses to sweep that evidence aside because it apparently has no answer to the question of how Hickey's testimony could possibly have been true, when considered in light of that 3500 material, the government's prior conversations with defense counsel, the prior notes of Hickey himself (including in his calendars), the prior notes of Hickey's counsel, the government's prior submissions to the Court, and the testimony of two other cooperators who describe an entirely different genesis of the Burke cover story (one that *excludes* Mr. McPartland's participation). Simply put, the government resorts to burying its head in the sand and asks the Court to do the same.

One would have hoped that, as in many similar cases, the government would have taken these allegations seriously, including through responsive affidavits and further investigation of the facts.[1] Instead, the government's silence is deafening, just as its silence in response to the three

---

[1]    *See*, *e.g.*, *United States v. Moore*, 54 F.3d 92, 100 (2d Cir. 1995) (the government's response to defendant's motion for a new trial included an affidavit from a DEA Special Agent); *United States v. Pavloyianis*, 996 F.2d 1467, 1471 (2d Cir. 1993) (the government disclosed to the defense and the court, post-trial, that the witness had perjured herself and, on eve of a hearing as to what the government knew or should have known, and following the personal intercession of the then-U.S. Attorney, consented to the defendant's Rule 33 motion); *United States v. Schlesinger*, 438 F. Supp. 2d 76, 94 (E.D.N.Y. 2006) (in opposing the defendant's Rule 33 motion after conducting an investigation into the allegations, the government attached affirmations by the agents involved in the investigation and the attorneys involved in the prosecution); *United States v. Damblu*, 945 F. Supp. 672, 674 (S.D.N.Y. 1996) (the government acknowledged having investigated the defendant's allegations of perjury); *United States v. Gibson*, No. 91-CR-669 (PNL), 1993 U.S. Dist. LEXIS 2684, *6-7 (S.D.N.Y. Mar. 9, 1993) (the government, post-trial, continued investigating the possibility its witness had perjured himself with regard to his background, including through questioning of the witness, and ultimately conceded the perjury). In the lead *United States v. Wallach* case, reported at 935 F.2d 445, 457 (2d Cir. 1991), and 979 F.2d 912, 914 (2d Cir. 1992), the government investigated *mid-testimony* the possibility that its lead witness had perjured himself, questioning him "extensively" and conducting other interviews. *See also United States v. Ng Lap Seng*, No. 15-CR-706 (VSB), 2018 U.S. Dist. LEXIS 83441, *20-21 (S.D.N.Y. May 9, 2018) (where similarly, mid-testimony, the government took steps to investigate alleged perjury).

separate *Brady/Giglio* requests from the defense on these exact subjects, including during Hickey's testimony, immediately after that testimony, and the night before the defense rested. *See* Krantz Aff. ¶¶ 14-15. But its silence is not an adequate response – particularly when someone's liberty is at stake – and only punctuates the need for an evidentiary hearing to address the following critical questions, at a minimum:

1. How is it that the government elicited testimony from Hickey as to a key alleged meeting with Mr. McPartland in February 2013, during which he supposedly "coached" Burke and became the "architect" of Burke's lies, when that allegation: (a) does not appear in the interview notes of *any* of Hickey's 17 meetings with the government (meetings that took place for almost 4 years prior to trial); (b) does not appear in Hickey's calendars (which Hickey himself claimed was an authoritative source for meetings and other important dates), or in his own notes (provided to his counsel at the commencement of his cooperation); (c) does not appear in his attorney's detailed notes of his (and his colleagues') meetings with Hickey (notes used by his counsel as the basis for an attorney's proffer to the government at the commencement of Hickey's cooperation in late 2015); (d) does not appear in either of the government's two search warrant applications, dated September 15, 2016 and April 21, 2017 (applications that purport to summarize the evidence against Mr. McPartland and refer specifically to information provided by Hickey); (e) was not included in any of the government's pre-trial submissions or discovery disclosures; and (f) was inconsistent with the testimony of two other cooperating witnesses – each of whom testified to a genesis of the Burke cover story that did *not* include Mr. McPartland?

2. When did Hickey first make the allegation of a February 2013 "coaching" meeting, and what steps, if any, did the government take to understand why Hickey had not made this pivotal allegation for what appears to have been several years?

3. How is it that Hickey claimed, on cross-examination, to have informed the government of this critical allegation "at the very beginning" of his cooperation, when: (a) it is absent from *any* of the government's interview notes (which surely would have recorded and recited such an important accusation); and (b) it is absent from his own attorney's notes, which, according to Hickey's lawyer, were read to the government as part of his "lawyer's proffer" at the commencement of Hickey's cooperation in late 2015?

4. How is it that Hickey claimed, on cross-examination, to have disclosed his hallucinations to the government at their first meeting, "before they even sat down," when: (a) that allegation is not reflected in any of the government's interview notes; (b) the government informed (falsely, as it turns out) defense counsel for years that this allegation (*i.e.*, that Hickey had hallucinations) was not true, and was merely a "rumor" manufactured by Burke, *see* Krantz Aff. ¶ 19; and (c) the government did not even ask Hickey to obtain his hospital records until 2018, *after* the defense had independently learned of his hospitalization and demanded that the government produce them?[2]

5. How is it that the government elicited testimony from Hickey that he had never been asked, prior to trial, if he had visited any medical doctors following his October 2015 hospitalization, when: (a) an AUSA specifically told defense counsel, in August 2019, that she had asked Hickey this precise question, and that he had answered that he "was prepared to testify under oath" that he had not seen any doctors at all, for any reason, after his October 2015 hospitalization (with the possible exception of a visit to an eye doctor); (b) this conversation between the AUSA and defense counsel was memorialized in an e-mail from defense counsel, the substance of which was "confirmed" by the AUSA in a responsive e-mail; and (c) this conversation was memorialized in a pre-trial brief submitted by the defense, with no refutation by the government?

6. How is it that Hickey testified, on cross-examination, that he informed the government about his hospitalization for alcoholism "in the early beginnings of meeting with them," (which meetings began in December 2015) when: (a) that subject is not reflected in any of the government's interview notes until April 11, 2018 (3500-JH-34), more than two years into his cooperation, and after specific request from the defense; (b) the government did not acknowledge this hospitalization to the defense – despite repeated requests – until June 10, 2019, several years into the case, and even then only after the defense had independently learned of the hospitalization and confronted the government with that information, *see* Krantz Aff. ¶ 18; and (c) the government did not ask Hickey to obtain his hospital records on this subject until 2018, nearly three years into

---

[2]     The history of the government's disclosures as to Hickey's medical conditions and records is set forth in the defense's sealed letter to the Court dated August 8, 2019. ECF Dkt. No. 91. A review of that history shows that it is entirely inconsistent with Hickey's claim at trial that he told the government about his hospitalizations for hallucinations or alcoholism at the very beginning of his cooperation.

his cooperation, and only then upon the specific demand of the defense?

7. How is it that the government advised defense counsel the night before the defense rested, in response to a direct inquiry as to what appeared to be glaring inconsistencies between Hickey's trial testimony and his 3500 material, that "there was no *Giglio* disclosure to make," Krantz Aff. ¶ 15, if it was aware of any falsity in Hickey's testimony?

Instead of answering any of these critical questions, the government resorts to one boilerplate denial: "Hickey did not offer false testimony on any topic whatsoever." Opp. Br. at 2. But in the face of the defense's specific allegations of falsity, coupled with ample evidence to suggest that falsity, the government must do more than offer one unsworn, wholly conclusory sentence as its response. In short, the government's factual response is woefully inadequate to resolve the questions raised by this motion and is reason alone to grant the defense's request for a hearing.

## II.

## THE GOVERNMENT FAILS TO RESPOND TO THE DEFENSE'S REQUEST FOR AN EVIDENTIARY HEARING

Not only is the government's response silent on the key factual questions raised by this motion, it also stands mute on the defense request for an evidentiary hearing. In fact, this request – which was the centerpiece of the defense motion – is outright ignored by the government in its response, other than to baldly assert, without any support whatsoever, that it should be denied. The government proceeds as if the defense asks the Court to grant a new trial on the current record alone, and then proceeds to attack that imagined argument. But that is not the defense's request. To the contrary, we submit that when our *actual* motion is considered, it will be clear that under the facts presented in this case, and in the absence of any factual response at all, the law clearly supports our request for a hearing.

Respectfully, the law entitling the defense to this hearing is well settled. It is a basic principle that where, as here, a motion is brought pursuant to Rule 33 on claims of prosecutorial misconduct, the Court may hold an evidentiary hearing "to resolve the disputed facts and to develop the record on the materiality of the alleged *Giglio* material, as well as the government's actual or constructive knowledge of such information." *Schlesinger*, 438 F. Supp. 2d at 95. Such hearings are not unusual. Indeed, courts in this and other circuits have held that an evidentiary hearing on a Rule 33 motion may not only be warranted, but also necessary to "flush out the truth from behind the government's veil and then determine what to do with it in the light of its implications." *United States v. Bernal-Obeso*, 989 F.2d 331, 333 (9th Cir. 1993); *accord United States v. Avellino*, 136 F.3d 249, 261 (2d Cir. 1998) (district court has discretion to order an evidentiary hearing where there is "any nonspeculative basis for inferring that … the government had not made available to [the defendant] all pertinent material in its possession"); *United States v. Austin*, No. 94-CR-737 (JBW), 1997 WL 43523, at *1 (E.D.N.Y. Jan. 27, 1997) (referencing "full post-trial evidentiary hearing" on, among other things, the "failure of the government to supply [defendant] with exculpatory evidence known to the government at trial"); *United States v. Block*, No. 16-CR-595, Dkt. No. 208 (S.D.N.Y. Oct. 12, 2018) (granting an evidentiary hearing to explore the factual disputes surrounding the defendant's Rule 33 motion alleging the withholding of *Brady/Giglio* information); *Podlog v. United States*, Nos. 97-CV-3292 (JFK), S2-92-CR-374 (JFK), 2003 U.S. Dist. LEXIS 8904, at *2 (S.D.N.Y. Apr. 22, 2003) (reflecting evidentiary hearing on Rule 33 motion for new trial "to determine the issue of [the cooperating witness'] alleged perjury"), *aff'd*, 2005 U.S. App. LEXIS 738 (2d Cir. 2005); *United States v. Brown*, No. 86-CR-738 (CSH), 1987 U.S. Dist. LEXIS 6751, at *1 (S.D.N.Y. July 29, 1987) (ordering an evidentiary hearing in connection with the defendant's Rule 33 motion where the record "suggest[ed] at least

the possibility of" perjured testimony by the government's "principal witness"); *cf. United States v. LaGrua*, Nos. 98-1323 (L), 98-1568, 1999 U.S. App. LEXIS 12091, at *13-14 (2d Cir. June 11, 1999) (no error in district court's denial of evidentiary hearing where, *inter alia*, alleged perjured testimony came from a "minor witness" whose "testimony was introduced only to provide partial corroboration for that of other, more important, witnesses").

Here, for the reasons set forth in our moving papers and in this submission, the record compels the conclusion that a hearing is needed to allow the defense to establish that Hickey testified falsely, and that the government was aware or should have been aware of that falsity. Moreover, given the undisputed centrality of Hickey's testimony to the government's case, the materiality standard – should such falsity be established – would be easily satisfied as well. Indeed, the government makes no effort to even suggest otherwise.

Accordingly, the Court should grant the defense's request for an evidentiary hearing, so that the Court can rule on the motion for a new trial on a full and complete record, and thereby ensure that justice is done in this case, in accordance with controlling law.

## III.

### THE BURDEN WAS NOT ON THE DEFENSE TO "CORRECT" HICKEY'S TESTIMONY BY CALLING GOVERNMENT WITNESSES

Not only is the government's response to the defense's request for a hearing inadequate, but in a classic example of deflection, it attempts to turn the issue on its head by placing the burden of having "corrected" Hickey's trial testimony on the defense. Indeed, the government argues that the defense had a full opportunity to cross-examine Hickey at trial, and that if it believed Hickey had testified falsely about what he had previously told the government, it should have called government agents as witnesses at trial. The government goes so far as to argue that if the defense is correct that Hickey's testimony was false, then calling these government witnesses would have

been "powerful evidence that Hickey was lying." Opp. Br. at 21. This argument misses the point entirely, for four principal reasons.

**First,** to the extent that the government was aware that Hickey testified falsely about *anything*, it had the affirmative obligation to disclose that fact to the defense, and could not sit on its hands and effectively "dare" the defense to call witnesses blind, in order to prove the falsity. The law makes that obligation clear. *Napue v. Illinois*, 360 U.S. 264, 269 (1959) (holding that due process prohibits the government from obtaining a conviction by intentionally allowing false testimony to go uncorrected); *Perkins v. LeFevre*, 642 F.2d 37, 40 (2d Cir. 1981) ("Due process requires not only that the prosecutor avoid soliciting false testimony, but that he not conceal it, and that he not allow it to go uncorrected when it has occurred.").

**Second**, to the extent that the government was aware of any falsity (as appears to have been the case), it affirmatively misled the defense by stating, in response to the defense's specific requests on this subject (by e-mail during Hickey's testimony, by e-mail after Hickey's testimony, and by a telephone call on the night before the defense rested), that there was no *Brady/Giglio* material to disclose. *See* Krantz Aff. ¶ 15. If that response was false (as appears to have been the case), then the government can hardly foist the burden of calling witnesses onto the defense, since it misled the defense for the purpose of avoiding that very scenario. Surely, the government cannot mislead the defense counsel by failing to disclose *Brady/Giglio* material, thereby improperly tainting the defense's decision-making process in deciding whether to call defense witnesses, and then profit from its own wrongdoing.

**Third,** for the defense to have effectively explored the truthfulness of Hickey's testimony on each of these contested points, one of the most significant witnesses to call would have been the AUSA who: (1) was present for every in-person interview with Hickey; (2) prepared him for

his testimony at trial; (3) presented his testimony at trial; (4) advised the defense for years that Hickey had not had hallucinations (and that this was a false allegation made up by Burke); (5) advised defense counsel by phone and by confirming e-mail that she had addressed the subject of any post-hospitalization treatment directly with Hickey, and that he was "prepared to testify under oath" that he had seen no medical professionals (except perhaps an eye doctor) subsequent to his hospitalization in October 2015[3]; and (6) advised the defense, in resisting disclosure, that Hickey's 2015 hospitalization "was not related to a mental health issue." *See* Krantz Aff. ¶¶ 16-36. Obviously, the defense was not in a position to call the AUSA as a witness at trial, given her role as one of the trial prosecutors. Of course, this problem does not apply to a post-trial evidentiary hearing.

**Fourth**, the suggestion that the defendants are not entitled to post-trial relief because they had a full opportunity to cross-examine Hickey at trial is illogical. If effective cross-examination was thwarted by the government's failure to disclose that Hickey had testified falsely, then the defendants' confrontation and due process rights were plainly violated. The government may not come back now and say "you had your opportunity," if it was an opportunity that was tainted due to the government's failure to disclose the falsity of Hickey's testimony.

In other words, the government may not sit idly by while it watches its star witness perjure himself on the stand. Nor can it shift the burden onto the defense to uncover that fact, especially

---

[3] While the government now claims that this was in fact "their error," and that Hickey should not be held accountable for "the government's erroneous representations," Opp. Br. at 8, this position seems irreconcilable with the specificity of defense counsel's conversation with the government, the specificity of the e-mail confirmation, and the fact that the AUSA expressly referred to the possible exception of a visit to an "eye doctor." If, as the government now claims, the question it had posed to Hickey was whether he had seen a "psychiatrist," *id.*, this carve-out would be nonsensical. And while we are loath to challenge the veracity of an AUSA, the facts compel the conclusion that the defense is at least entitled to a hearing, so that the full circumstances of this alleged "error" can be fully explored.

when it misleads the defense into thinking that the witness's testimony was entirely true. Simply put, if Hickey lied, and the government knew or should have known it, then the defendants are entitled to a new trial, regardless of who they could have called to testify. Accordingly, a hearing is plainly required in order to shine the light of day on the facts, and to allow the defense a full and fair opportunity to establish its claims.

## IV.

## THE GOVERNMENT'S STATEMENT OF THE APPLICABLE LEGAL STANDARDS IS INAPPOSITE AND WRONG

The government's final attempt to stave off a hearing and a new trial is based on a recitation of law that ignores and misstates the applicable legal standards.

**First**, the government essentially treats the motion as one for a new trial based on the argument – never raised by the defense – that the Court should engage in a wholesale revisiting of the credibility of Hickey's testimony, and reject it. The government then rebuts that argument by citing case law as to the high standard that the defense must meet for a new trial on witness credibility grounds. It relies on the deference that must ordinarily be given to the jury's credibility determinations, and argues that the defense has failed to prove that Hickey's testimony was "patently incredible or [defied] physical realities." Opp Br. at 15.

Of course, the defense has not moved on these grounds. It has not asked the Court to engage in a wholesale revisiting of Hickey's credibility and has not argued that Hickey's testimony was "patently incredible" or "defying of physical realities." Thus, this argument is simply a red herring.[4]

_____

[4] In support of its argument that the Court owes deference to the jury's evident finding that Hickey was credible, the government relies primarily on the Second Circuit's decision in *United States v. Sanchez*, 969 F.2d 1409 (2d Cir. 1992). *E.g.*, Opp. Br. at 2, 15, 16, 19-20. The decision

**Second,** while relying on inapposite legal standards, the government ignores the applicable law that *does* govern the defense's claims here. Specifically, while the government erroneously suggests that the defense must establish that Hickey's testimony was "patently incredible" or otherwise worthy of the Court's wholesale rejection, it is well settled that Rule 33 relief "is not tethered to any particular deficiency." *Feng Ling Liu*, 2015 U.S. Dist. LEXIS 94899, at *20. The government's knowing use of, or failure to correct perjured testimony is plainly another exceptional circumstance justifying Rule 33 relief. *See Shih Wei Su v. Filion*, 335 F.3d 119, 126 (2d Cir. 2003) ("Since at least 1935, it has been the established law of the United States that a conviction obtained through testimony the prosecutor knows to be false is repugnant to the Constitution") (citing *Mooney v. Holohan*, 294 U.S. 103, 112 (1935)); *United States v. Cromitie*, 727 F.3d 194, 221 (2d Cir. 2013) ("A conviction obtained by the knowing use of perjured testimony is fundamentally unfair"); *Sanders v. Sullivan*, 900 F.2d 601, 607 (2d Cir. 1990) ("Few rules are more central to an accurate determination of innocence or guilt than the requirement . . . that one should not be convicted on false testimony") (internal quotations and citations omitted). Indeed, a multitude of cases establish that this is, in fact, not only a basis for Rule 33 relief, but a "virtually automatic" one, as the Second Circuit stated in the leading decision in this area, *United*

---

in *Sanchez*, however, did not involve any allegation of government misconduct, and so is wholly inapposite to the instant motion. *Id.* at 1411, 1414 (where the "district court specifically declined to reach the issue" of the government's alleged knowing use of perjured testimony and the Second Circuit noted that "[t]here is nothing in the record before us in this case to indicate that the prosecutor knowingly used false testimony to convict [the defendant]"); *see United States v. Feng Ling Liu*, No. 12-CR-934-01 (RA), 2015 U.S. Dist. LEXIS 94899, at *20 (S.D.N.Y. July 20, 2015), *aff'd on other grounds sub nom. United States v. Bandrich*, 636 F. App'x 65 (2d Cir. 2016) (noting that Rule 33 "claims of specific deficiencies have specific tests"). The government's reliance on *United States v. Truman*, 688 F.3d 129 (2d Cir. 2012), is similarly misplaced. Opp. Br. at 20. *Truman* did not involve any perjury allegation, let alone any claim that the government knew or should have known of the perjury. Thus, the Rule 33 motion there was governed by an entirely different legal standard. *See Feng Ling Liu*, *supra*.

*States v. Wallach*, 935 F.2d 445, 456 (2d Cir. 1991).[5] *See also Alvarez*, 808 F. Supp. at 1083 (the

*Wallach*-dictated result in the event of knowing use of perjury "follows from the well-established

principle that knowing use of perjured testimony violates the due process clause of the Fourteenth

Amendment") (citations omitted).

Moreover, the government's discussion of *Wallach* skates around the government

misconduct issue. In fact, it ignores altogether the decision's controlling legal holding, namely

that:

> Where the prosecution knew or should have known of the perjury,
> the conviction must be set aside if there is any reasonable likelihood
> that the false testimony could have affected the judgment of the jury.
> Indeed, if it is established that the government knowingly permitted
> the introduction of false testimony reversal is virtually automatic.
> Where the government was unaware of a witness' perjury, however,
> a new trial is warranted only if the testimony was material and the

---

[5]     *See also Fernandez v. Capra*, 916 F.3d 215, 230 (2d Cir. 2019) ("As to materiality, [the defendant] is entitled to a new trial if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury. Indeed, if it is established that the government knowingly permitted the introduction of false testimony reversal is virtually automatic.") (internal quotation marks omitted) (citing, in part, *Wallach*, 935 F.2d at 456); *United States v. Surgent*, No. 04-CR-0364 (JG), 2006 U.S. Dist. LEXIS 62698, at *9 (E.D.N.Y. Sept. 1, 2006) ("a less demanding standard has been held to apply in two types of cases: where the prosecution has suppressed or failed to disclose the evidence in question; and when a government witness has committed perjury and the government knew or should have known of it. In such cases, motions for a new trial are analyzed pursuant to a more lenient 'possibility' test, under which reversal is virtually automatic") (internal citations omitted); *Reyes v. Ercole*, No. 06-cv-5525 (SHS), 2018 U.S. Dist. LEXIS 51595, at *11, *37 (S.D.N.Y. Mar. 26, 2018), *aff'd*, 785 F. App'x 26 (2d Cir. 2019) (in reference to the standard that a conviction must be set aside if there was a "reasonable likelihood" that the false testimony could have affected the judgment of the jury, stating that "the 'could have' materiality bar is so low that it has been said to make relief 'virtually automatic' upon a showing that the prosecution knowingly used perjury at trial. This is because 'once it is shown that a material witness has intentionally lied with respect to any matter, it is difficult to deny that the jury, had it known of the lie, 'might have acquitted'"") (citing *Wallach* and quoting *United States v. Stofsky*, 527 F.2d 237, 246 (2d Cir. 1975))); *Alvarez v. United States*, 808 F. Supp. 1066, 1083 (S.D.N.Y. 1992) ("[defendant] claims that [the witness] lied about several other subjects at trial, that the government knew it at the time, and that the government remained silent. If these claims are correct, then the conviction is on precarious ground. As the Second Circuit has held, 'if it is established that the government knowingly permitted the introduction of false testimony reversal is virtually automatic") (quoting *Wallach*, 935 F.2d at 456).

> court [is left] with a firm belief that but for the perjured testimony,
> the defendant would most likely not have been convicted.

935 F.2d at 456 (internal quotations and citations omitted).

This above-quoted language from *Wallach* – while ignored by the government – is plainly the applicable legal standard for adjudicating the defense's Rule 33 motion.  Under *this* standard, if the defense can establish that the government elicited (or allowed to stand uncorrected) testimony from Hickey that it knew or should have known was false, a new trial is required "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Id.*  Surely, given the allegations of falsity here – relating to critical accusations from the government's star witness – that standard can easily be met.

**Third,** to the extent that the government refers at all to the standard governing claims of perjury, it misstates the burden on the defense.  Specifically, the government claims that "even where courts in this Circuit have clearly identified perjured testimony, they have refused to grant a new trial unless the court could find that the jury '*probably* would have acquitted in the absence of the false testimony.' *United States v. McCourty*, 562 F.3d 458, 476 (2d Cir. 2009) (quoting *Sanchez*, 969 F.2d at 1413-15 (refusing to grant a new trial under Rule 33 on the basis of perjured testimony because 'it could not be said that the jury *probably* would have acquitted in the absence of the false testimony")) (emphasis added).  Opp. Br. at 15.[6]  As is made clear from the language of *Wallach* quoted above, however, this higher standard – requiring a showing that the jury would "probably" have acquitted in the absence of the false testimony – applies only in the event that the

---

[6]    While relying on the above sentence from *Sanchez* to its advantage, the government ignores the immediately subsequent sentence in *Sanchez* wherein the Second Circuit, consistent with *Wallach*, confirmed the lesser burden in cases where the government knew or should have known of the alleged perjury – language that is squarely applicable to Mr. McPartland's claim.  *Sanchez*, 969 F.2d at 1413-14 (citations omitted).

government was "unaware of a witness's perjury," which is not the allegation here. The cases confirming this distinction are legion.[7] Thus the government's argument that the defense must show that the result would "probably" have been different is flatly wrong.

**Fourth,** while the government tries to distinguish *Wallach* factually, the reality is that, in numerous respects, the factual record giving rise to a new trial in *Wallach* was actually *weaker* than the record here. Specifically, (1) Hickey's alleged perjury as to the February 2013 "coaching" meeting goes to the very heart of the indictment's allegations, whereas the perjury in *Wallach* concerned a collateral issue; (2) the government here was an eyewitness to certain of the facts as to which Hickey allegedly testified falsely (*e.g.*, what he told the government and when), whereas in *Wallach* that was not the case; and (3) unlike the witness in *Wallach*, Hickey had previously perjured himself under oath (in addition to having told demonstrable lies as to other matters), and

---

[7]    Courts in the Second Circuit have cited time and time again this less stringent standard for relief (alternatively cast as "might have," "could have," "possibly" or "any reasonable likelihood") where government misconduct is involved. *See supra* note 3 *and also United States v. Gambino*, 59 F.3d 353, 365 (2d Cir. 1995) ("When the prosecution knowingly makes use of perjured testimony, the standard for materiality is *reduced* to a showing of 'any reasonable likelihood that the false testimony could have affected the judgment of the jury'") (emphasis added) (citations omitted); *United States v. Wallach* ("*Wallach II*"), 979 F.2d 912, 914 (2d Cir. 1992) ("We reversed [in *Wallach I*], applying the standard that where the prosecution knew or should have known of the perjury, the conviction must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury . . . From the opinion in *Wallach I*, it is evident that the prior panel was not applying the *Sanders* 'but for' test in its traditional sense of meaning that, without the false testimony, a conviction would most likely not have resulted") (internal quotations and citations omitted); *United States v. D'Angelo*, No. 02-CR-399 (JG), 2004 U.S. Dist. LEXIS 2239, at *95 (E.D.N.Y. Feb. 18, 2004) ("where new evidence comes to light that establishes perjury by government witnesses, a more favorable standard might apply depending on the materiality of the perjury to the jury's verdict and the extent to which the prosecution was aware of the perjury") (internal quotation marks omitted) (citing *United States v. Gallego*, 191 F.3d 156, 161-62 (2d Cir. 1999) (quoting *Wallach*); *United States v. Biaggi*, 823 F. Supp. 1151, 1156 (S.D.N.Y. 1993) ("If the Government either knew or should have known that the witness was perjuring himself, a new trial must be granted if the new evidence *might* have altered the jury's verdict. The test is whether there is any reasonable likelihood that the false testimony would have affected the judgment of the jury.") (citing *Sanders*, 863 F.2d at 225, *Wallach*, 935 F.2d at 456, and *Wallach II* at 914).

so the government was surely on notice that additional perjury was within the realm of possibility. Accordingly, the government's attempt to distinguish *Wallach* is unavailing.

**Fifth and finally**, the government is wrong in suggesting that the lack of newly discovered evidence is grounds for denial of this motion. Opp. Br. at 17. Indeed, that suggestion flies directly in the face of the plain language of Rule 33, which explicitly provides an avenue for relief wholly separate and distinct from the discovery of new evidence. *See* Fed. R. Crim. P. 33(b) ("Any motion for a new trial grounded on newly discovered evidence must be filed within 3 years after the verdict or finding of guilty … Any motion for a new trial *grounded on any reason other than newly discovered evidence* must be filed within 14 days after the verdict or finding of guilty.") (emphasis added). Moreover, the principle that a criminal conviction cannot stand if the defense can show, post-trial, that the government sat idly by and watched its witness testify to facts it knew or should have known to be false is well-established, and requires no demonstration of "newly discovered" evidence. *See*, *e.g.*, *N. Mariana Islands v. Bowie*, 243 F.3d 1109, 1117-18 (9th Cir. 2001) (collecting Supreme Court authority on the obligation of the prosecutor to correct any testimony it knows to be false, and reversing and remanding for a new trial where information that was known to the government, prior to trial, should have alerted it to the possible falsity of its witness's testimony; the court concluded that the "record emits clear overtones of the Machiavellian maxim: 'the end justifies the means,' an idea that is plainly incompatible with our constitutional concept of ordered liberty").

## CONCLUSION

The defense has plainly established its entitlement to an evidentiary hearing on its Rule 33 motion for purposes of developing the factual record on the critical questions raised by the application. Only at such a hearing can the proper light be shed on what transpired here, and can

the defendants be given a full and fair opportunity to establish that Hickey testified falsely in certain critical respects, that the government knew or should have known of that falsity, and that the government failed to correct or disclose that falsity. If those facts are established, we respectfully submit that Mr. McPartland will be entitled to a new trial, both under the case law set forth above, and because the verdict in the case would plainly represent a "manifest injustice."[8]

Respectfully submitted,

_/s/ LHK_____
Larry H. Krantz
Lisa Cahill
KRANTZ & BERMAN LLP
747 Third Avenue, 32nd Floor
New York, NY 10017
(212) 661-0009

Bradley R. Gershel
BALLARD SPAHR LLP
1675 Broadway, 19th Floor
New York, NY 10019
(212) 223-0200

*Counsel for Mr. McPartland*

---

[8] To the extent that government claims – in one conclusory sentence – that "there is overwhelming evidence in the record that corroborates significant parts of Hickey's testimony," Opp. Br. at 20, that is no answer to this motion. Whatever can be said about the supposed "corroboration" relied on by the government at trial, it is beyond dispute that this purported "corroboration" in no way supports Hickey's testimony as to any of the issues set forth *in this motion*. As to those issues, corroboration is sorely lacking.