UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

    - against -

CHRISTOPHER MCPARTLAND and
THOMAS J. SPOTA,

                    Defendants.

No. 2:17-cr-0587 (JMA)

**SENTENCING MEMORANDUM ON BEHALF OF THOMAS SPOTA**

COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
(212) 841-1022

*Counsel for Thomas J. Spota*

**Table of Contents**

Introduction ........................................................................................................... 1

Background ........................................................................................................... 2

I.      Tom's Personal History ............................................................................... 2

        A.      Tom's Childhood, Education, and Military Service ......................... 2

        B.      Tom's Marriage to Mary Ellen ........................................................ 4

        C.      Tom's Work Prior to His Tenure as Suffolk County District Attorney ................ 5

        D.      Tom's Tenure as Suffolk County District Attorney ......................... 9

                1.      Strengthening Suffolk County Law Enforcement ................... 10

                2.      Supporting the SCDA Staff .................................................... 12

                3.      Prosecuting Without Fear or Favor ........................................ 14

                4.      Advocating for Victims and the Voiceless ............................. 15

                5.      Caring for the Downtrodden .................................................. 18

                6.      Supported by the Community ................................................ 24

        E.      Tom's Compassion for Those in Need .......................................... 26

                1.      Family, Friends, and Neighbors ............................................ 27

                2.      Staff ..................................................................................... 29

                3.      Others .................................................................................. 31

        F.      Tom's Devotion to His Family ....................................................... 31

II.     The Offense Conduct ................................................................................ 37

Argument ............................................................................................................. 42

I.      The PSR Guideline Range Is Incorrect ...................................................... 43

        A.      The "Substantial Interference" Enhancement Is Inapplicable ............. 44

        B.      The "Extensive in Scope" Enhancement Is Inapplicable ..................... 46

        C.      The "Organizer or Leader" Enhancement Is Inapplicable .................. 47

II.     The § 3553(a) Factors Warrant a Non-Incarceratory Sentence ......................................... 50

        A.      Tom's History and Characteristics Merit a Non-Incarceratory Sentence ............. 50

                1.      Tom's Advanced Age and Declining Health ............................................. 51

                2.      Tom's Extraordinary Record of Civic, Charitable, and Public
                        Service ..................................................................................................... 59

                3.      The Collateral Consequences of Tom's Conviction ................................ 62

        B.      Incarceration Is Not Required to Satisfy the Remaining Goals of
                Sentencing ........................................................................................................... 64

        C.      A Non-Incarceratory Sentence Would Be Sufficient, But Not Greater than
                Necessary, To Comply with the Purposes of Sentencing ..................................... 66

Conclusion .......................................................................................................................... 69

## <u>Letters and Exhibits Submitted to the Court</u>

**Names**      <u>Exhibit No.</u>

Michael H. Ahearn ....................................................................................................1

Dr. John Amato, Jr. ..................................................................................................2

John Ammerman .......................................................................................................3

Anonymous #1 ..........................................................................................................4

Anonymous #2 ..........................................................................................................5

Anonymous #3 ..........................................................................................................6

Diana Arens ..............................................................................................................7

Gilda Avram ..............................................................................................................8

Peter Barnett .............................................................................................................9

Charles Bartels ........................................................................................................10

Robert Bennett ........................................................................................................11

Rev. William F. Brisotti .........................................................................................12

Terrence P. Buckley ...............................................................................................13

Damiano and Helen Buffa ......................................................................................14

John L. Buonora ......................................................................................................15

Susan Cahill ............................................................................................................16

Leonard Calone .......................................................................................................17

Patricia Calone ........................................................................................................18

Gregory T. Carey ....................................................................................................19

Joanne S. Carr .........................................................................................................20

Matthew J. Carr .......................................................................................................21

Msgr. John I. Cervini ..............................................................................................22

John J. Charters III ..................................................................................................23

Matthew Chartrand ...........................................................................................24

Thom Christensen ............................................................................................25

Nancy B. Clifford.............................................................................................26

Mary Lou Cohalan ...........................................................................................27

██████████ ...................................................................................................28

Emily Constant.................................................................................................29

Robert B. Coughlan ..........................................................................................30

Anthony V. Curto.............................................................................................31

J. Michael Daly ................................................................................................32

William DeVore ...............................................................................................33

Gerald J. Di Chiara ..........................................................................................34

David Dolan .....................................................................................................35

Dennis F. Donovan ..........................................................................................36

Daniel T. Driscoll ............................................................................................37

Joseph P. Dwyer Jr...........................................................................................38

Patricia A. Dwyer.............................................................................................39

Spencer Edelbaum ...........................................................................................40

Robert F. Ewald ...............................................................................................41

James J. Feehan ...............................................................................................42

Lauran Fontana ................................................................................................43

Patricia Fox .....................................................................................................44

Adriana Frattura ...............................................................................................45

Robert Gaffney.................................................................................................46

Ralph Gazzillo .................................................................................................46a

Rev. Peter Garry...............................................................................................47

Marty Glennon ...................................................................................................48

████████████ ...................................................................................................49

James Gowan ...................................................................................................49a

Frank B. Guidice ...................................................................................................50

John Halverson ...................................................................................................51

Walter Heesch ...................................................................................................52

Edward G. Heilig ...................................................................................................53

Keri M. Herzog ...................................................................................................54

Terry W. Hill ...................................................................................................55

██████████ ...................................................................................................56

James H. Johnsen ...................................................................................................57

Judith A. Johnsen ...................................................................................................58

Jim Kane ...................................................................................................59

Mary K. Kane ...................................................................................................60

Sister Eileen Kelly ...................................................................................................61

Richard Koubek ...................................................................................................62

Anthony LaPinta ...................................................................................................63

Dick Lee ...................................................................................................64

Joseph Lemrow ...................................................................................................65

Francis J. Leonard ...................................................................................................66

Jean and John Lownds ...................................................................................................67

Robert Mangiamele ...................................................................................................68

████████ ...................................................................................................69

Janet Mareno ...................................................................................................70

Peter Mayer III ...................................................................................................71

Jack McCarthy ...........................................................................................................72

Michael M. McClellan ...............................................................................................73

Mary Spota McCormick .............................................................................................74

Denise Merrifield ........................................................................................................75

████████████ ...................................................................................................76

Frank Mirra ................................................................................................................77

John Mongeluzzi .........................................................................................................78

Kathleen Moran ..........................................................................................................79

Jim Morgo ...................................................................................................................80

Doug Morrell ..............................................................................................................81

Rabbi Dr. Steven Moss ..............................................................................................82

Elizabeth Lynne Naiburg ...........................................................................................83

Eric W. Naiburg .........................................................................................................84

Thomas O'Connell ......................................................................................................85

Peter O. O'Leary ........................................................................................................86

Kathleen O'Rourke .....................................................................................................87

Roy Pannenbacker ......................................................................................................88

Barbara Parr ...............................................................................................................89

Ronald Parr .................................................................................................................90

Dianne Pedelaborde ....................................................................................................91

Michelle A. Pitman .....................................................................................................92

Arthur Pitts .................................................................................................................93

Father Francis Pizzarelli .............................................................................................94

Paul Pontieri ...............................................................................................................95

Gail Prentiss ...............................................................................................................96

James Reynolds.................................................................................................97

Patrick Riegger................................................................................................98

Charles C. Russo.............................................................................................99

Stephen P. Scaring ........................................................................................100

Cindy Scesny.................................................................................................101

Ashley and Marie Shemain...........................................................................102

███████████ .........................................................................................103

Stephen A. Smith ..........................................................................................104

███████████ .........................................................................................105

Anthony Spota...............................................................................................106

Deanna Spota.................................................................................................107

Kate Spota......................................................................................................108

Lawrence R. Spota.........................................................................................109

Mary Ellen Spota...........................................................................................110

Phoebe S. Spota.............................................................................................111

Thomas J. Spota IV........................................................................................112

Catherine Steinberg........................................................................................113

Donald Sullivan..............................................................................................114

John J. Toomey...............................................................................................115

Rafael M. Vasquez.........................................................................................116

███████████ .........................................................................................117

Preston Vineyard............................................................................................118

George Waldbauer..........................................................................................119

James B. Wallace............................................................................................120

Steven Wilutis................................................................................................121

Ralph Zanchelli ........................................................................................................122

Benjamin Zwirn ........................................................................................................123

Pre-Sentence Report Objections ..............................................................................124

Pre-Sentence Report Reply ......................................................................................125

Declaration of Joel A. Sickler ..................................................................................126

## Table of Authorities

**Cases**                                                                    Page(s)

*Gall v. United States,*
    552 U.S. 38 (2007)..........................................................................................................50, 66

*Gane v. United States,*
    592 F. App'x. 4 (2d Cir. 2014) ...............................................................................46

*Koon v. United States,*
    518 U.S. 81 (1996)..................................................................................................54

*Pepper v. United States,*
    562 U.S. 476 (2011)..........................................................................................50, 65

*United States v. Adelson,*
    441 F. Supp. 2d 506 (S.D.N.Y. 2006).......................................................................2

*United States v. Amer,*
    110 F.3d 873 (2d Cir. 1997)....................................................................................44

*United States v. Anderson,*
    533 F.3d 623 (8th Cir. 2008) ..................................................................................63

*United States v. Autery,*
    555 F.3d 864 (9th Cir. 2009) ..................................................................................65

████████████████
████████████████████████ ...................................................................52

*United States v. Booker,*
    543 U.S. 220 (2005)..........................................................................................50, 51

*United States v. Bryan Cohen,*
    No. 19 Cr. 741 (WHP), Doc. No. 48 (S.D.N.Y. Jun. 9, 2020) .................................59

*United States v. Burgos,*
    324 F.3d 88 (2d Cir. 2003)................................................................................47, 48

*United States v. Canova,*
    412 F.3d 331 (2d Cir. 2005)..............................................................................51, 61

*United States v. Capri,*
    111 F. App'x 32 (2d Cir. 2004) ...............................................................................46

*United States v. Chatwal,* No. 14 Cr. 143 (ILG), Doc. No. 40 (E.D.N.Y. Dec. 10,
    2014) ......................................................................................................................68

*United States v. Cohen*,
   No. 19 Cr. 741 (WHP), Doc. No. 48 at pp. 42–44 (S.D.N.Y. Jun. 9, 2020)..........................59

*United States v. Cooper*,
   394 F.3d 172 (3d Cir. 2005)..........................................................................................61

*United States v. Diambrosio*,
   No. 04-CR-66, 2008 WL 732031 (E.D. Pa. Mar. 13, 2008)..........................................63

*United States v. E.L.*,
   188 F. Supp. 3d 152 (E.D.N.Y. 2016) ...........................................................................65

*United States v. Ebbers*,
   458 F.3d 110 (2d Cir. 2006)...........................................................................................66

*United States v. Edwards*,
   595 F.3d 1004 (9th Cir. 2010) ...............................................................................53, 64

*United States v. Escalera*,
   957 F.3d 122 (2d Cir. 2020)....................................................................................44, 45

*United States v. Gaind*,
   829 F. Supp. 669 (S.D.N.Y. 1993) ................................................................................64

*United States v. Germosen*,
   473 F. Supp. 2d 221 (D. Mass. 2007) ...........................................................................65

*United States v. Graham*,
   162 F.3d 1180 (D.C. Cir. 1998).....................................................................................48

*United States v. Greene*,
   249 F. Supp. 2d 262 (S.D.N.Y. 2003)......................................................................51, 61

*United States v. Greenfield*,
   44 F.3d 1141 (2d Cir. 1995)............................................................................................9

*United States v. Hernandez*,
   604 F.3d 48 (2d Cir. 2010).............................................................................................51

*United States v. Hodges*,
   No. 07-CR-706 (CPS), 2009 WL 366231 (E.D.N.Y. Feb. 12, 2009).............................51

*United States v. Hopson*,
   134 F. App'x 781 (6th Cir. 2004) ..................................................................................48

*United States v. Hutcherson*,
   6:05-cr-00039, Doc. No. 211-1 (W.D. Va. Dec. Aug. 30, 2006) ...................................66

*United States v. Jensen,*
   248 F. App'x 849 (10th Cir. 2007) ..........................................................46

*United States v. Jones,*
   900 F.2d 512 (2d Cir. 1990)...................................................................44

*United States v. Lanting,*
   10-CR-998 (RRM), Doc. Nos. 43, 49 (E.D.N.Y. Jan. 11, 2013)............................55

*United States v. Leitch,*
   No. 11-CR-00039 (JG), 2013 WL 753445 (E.D.N.Y. Feb. 28, 2013)....................67

*United States v. McFarlin,*
   535 F.3d 808 (8th Cir. 2008) ...............................................................53

*United States v. McGregor,*
   11 F.3d 1133 (2d Cir. 1993)..................................................................49

*United States v. Nellum,*
   No. 2:04-CR-30-PS, 2005 WL 300073 (N.D. Ind. Feb. 3, 2005)............................51

*United States v. Panayiotis Kyriacou,*
   No. 18 Cr. 102 (KAM) (E.D.N.Y.)........................................................59

*United States v. Petruk,*
   836 F.3d 974 (8th Cir. 2016) ...............................................................46

*United States v. Pugliese,*
   805 F.2d 1117 (2d Cir. 1986)...............................................................44

*United States v. Rioux,*
   97 F.3d 648 (2d Cir. 1996).............................................................53, 61

*United States v. Roth,*
   No. 05-CR-792-5, 2008 WL 686783 (N.D. Ill. Mar. 11, 2008) ............................63

*United States v. Samson,* No. 16 Cr. 334 (JLL), Doc. Nos. 24, 25 (D.N.J. Mar. 7,
   2017) ..........................................................................54, 63, 68

*United States v. Schulman,*
   No. 16 Cr. 442 (JMA), Doc. No. 155 (E.D.N.Y. Sept. 26, 2017)....................62, 65

*United States v. Sloane,*
   308 F.R.D. 85 (E.D.N.Y. 2015) .............................................................54

████████████████████████████████████████████████ .................................52

*United States v. Sostre,* 967 F.2d 728 (1st Cir. 1992)...................................49

*United States v. Speed Joyeros, S.A.,*
   204 F. Supp. 2d 412 (E.D.N.Y. 2002) ...................................................................64

*United States v. Stewart,*
   590 F.3d 93 (2d Cir. 2009)...........................................................................62, 64

*United States v. Tomko,*
   562 F.3d 558 (3d Cir. 2009)...................................................................................61

*United States v. Vandeberg*, 201 F.3d 805 (6th Cir. 2000).........................................48

*United States v. Warner*, No. 13 Cr. 731 (CPK), Doc. No. 33 (N.D.Ill. Jan. 14,
   2014) .................................................................................................................63, 68

**Statutes**

18 U.S.C. § 3553(a) ...................................................................................... *passim*

**Other Authorities**

Bureau of Prisons, *COVID-19 Cases*...........................................................................56

Bureau of Prisons, *FCI Butner Low*............................................................................58

Bureau of Prisons, *FMC Butner*..................................................................................58

Centers for Disease Control and Prevention, *COVID-19 Hospitalization and
   Death by Age* (Aug. 18, 2020) ........................................................................57, 58

███████████████████████████████
██████████████████████████ ...................................................................................58

Centers for Disease Control and Prevention, *Public health recommendations for
   vaccinated persons*................................................................................................57

Filter, *Brooklyn Federal Prison Denying Communication Rights in Pandemic*
   (Jan. 25, 2021)........................................................................................................58

Herb Hoelter, *Symposium on Alternatives to Incarceration* (Jul. 14, 2008).................68

Johns Hopkins Univ., *COVID-19 Dashboard* .................................................................55

L.A. Times, *California's coronavirus strain looks increasingly dangerous: 'The
   devil is already here'* (Feb. 23, 2021)...................................................................57

Law360, *Ex-Investment Manager Dodges Prison For Stock, Tax Crimes* (May 4,
   2020) .......................................................................................................................59

Live 5 News, *35 staff COVID-19 cases, 2 inmate deaths reported at FCI Williamsburg* (Jan. 21, 2021)............................................................................57

Nat'l Institute of Corrections, U.S. Dep't of Justice, *Addressing the Needs of Elderly, Chronically Ill, and Terminally Ill Inmates* (2004).....................................53

Newsday, S*uffolk Sues Spota, McPartland and Burke for Back Pay and Benefits* (May 8, 2020)...............................................................................................62

NJ.com, *Warden at N.J. federal prison reassigned amid massive COVID outbreak* (Feb. 1, 2021)..................................................................................................56

N.Y. Times, *Coronavirus in the U.S.: Latest Map and Case Count, Hot Spots*...........................55

N.Y. Times*, A Bag of Sex Toys, an Alleged Cover-Up and an Ex-D.A. on Trial* (Nov. 14, 2019)...................................................................................................62

N.Y. Times, *A New Coronavirus Variant Is Spreading in New York, Researchers Report* (Feb. 24, 2021)......................................................................................57

Office of the Attorney General, U.S. Dep't of Justice, *Memo. For Dir. of Bureau of Prisons re Increasing Use of Home Confinement at Instits. Most Affected by COVID-19* (Apr. 3, 2020)....................................................................................56

Office of the Attorney General, U.S. Dep't of Justice, *Memo. For Dir. of Bureau of Prisons re Prioritization of Home Confinement As Appropriate in Response to COVID-19 Pandemic* (Mar. 26, 2020)...........................................................56

Office of the Inspector General, U.S. Dep't of Justice, *The Impact of an Aging Inmate Population on the Federal Bureau of Prisons* (Rev. Feb. 2016)...............................52

Office of the Inspector General, U.S. Dep't of Justice, *Pandemic Response Report* (July 2020)............................................................................................................56

The Marshall Project, *1 in 5 Prisoners in the U.S. Has Had COVID-19* (Dec. 18, 2020)...................................................................................................................55

Tribune-Star, *6th inmate at Terre Haute federal prison complex dies of COVID-19* (Feb. 10, 2021)........................................................................................56

U.S. Probation & Pretrial Services, *Court & Community: An Information Series About U.S. Probation & Pretrial Services: Community Service* (2001).................................67

U.S. Sentencing Comm'n, *The Effects of Aging on Recidivism Among Federal Offenders* (Dec. 2017)....................................................................................51

U.S.S.G. § 1B1.3..................................................................................................46

U.S.S.G. § 2J1.2..............................................................................................44, 46

U.S.S.G. § 3B1.1 ................................................................................................47, 48, 49

U.S.S.G. § 3B1.3 ................................................................................................49

U.S.S.G. § 5H1.1 ...............................................................................................51, 55

U.S.S.G. § 6A1.3 ...............................................................................................44

Washington Post, *Prisoners and Guards Agree about Federal Coronavirus
    Response: 'We Do Not Feel Safe'* (Aug. 24, 2020) ............................................56

Washington Post, *Pfizer and Moderna vaccines have reduced effectiveness
    against South African variant, newly published studies show* (Feb. 18, 2021) ......................57

**Introduction**

For the past several years, one aspect of Tom Spota's life—his relationship with James Burke—has been the subject of persistent media coverage and proceedings before this Court. But now, as the Court considers how Tom may spend his final years, the rest of Tom's life—a most impressive and highly commendable life—merits attention as well. As the dozens of letters submitted to the Court by Tom's family, friends, colleagues, community leaders, and complete strangers demonstrate, Tom Spota is a fundamentally good and decent man, a beloved man, a man who has devoted his life to helping others. From volunteering to serve in the United States Marine Corps and community fire departments as a young man; doting on his family members in times of health but also, too often, in times of ███████ routinely seeking out ways to assist others in their times of emotional, legal, and financial need; and working for decades as a public servant to ensure the safety, security, and well-being of Suffolk County residents, Tom has consistently put the needs of others above his own. More often than not, Tom performed these good works quietly, and not for public recognition or accolade, but because they were the right thing to do. Yet Tom was recognized and, over the course of a lifetime of community-minded work, Tom built a legacy—from humble beginnings, he rose to become a long-time, respected community leader.

Now, at 79-1/2 years old and drawing closer to the end of his life, Tom has seen that legacy shattered. What might once have been a time for peaceful reflection is now anything but, with Tom's truly admirable life irretrievably marred by his indictment, trial, and conviction. This memorandum accepts, as it must, the fact that Tom was convicted and that this Court must determine an appropriate sentence. In doing so, we respectfully ask the Court to take into account the enormous good Tom has done throughout his life and the tremendous toll these proceedings have already exacted on him and his family in this final chapter of his life.

For all the reasons below—Tom's exceptional record of civic, charitable, and public service; the devastating consequences Tom has already faced as a result of these proceedings; the absence of any risk of recidivism; and Tom's advanced age and declining health, ███████ ████████████████ and the unusually punitive conditions of confinement that he would suffer—we respectfully submit that a non-incarceratory sentence with special conditions of release, including home confinement and community service, would be sufficient, but not greater than necessary, to accomplish the goals of sentencing here.

### Background

"[I]f ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be in the moment of his sentencing, when his very future hangs in the balance." *See United States v. Adelson*, 441 F. Supp. 2d 506, 513–14 (S.D.N.Y. 2006). As even a summary of Tom's life will make clear, there is an enormous amount to credit in Tom's history—and much that is deserving of the Court's consideration.

**I.      Tom's Personal History**

*A.      Tom's Childhood, Education, and Military Service*

Tom was born on September 6, 1941 in New Hyde Park to Thomas, a first-generation American and MetLife claims supervisor, and Mary, a Department of Motor Vehicles employee and typist. Thomas and Mary instilled in Tom and his two sisters, Mary and Joanne, the values of hard work and education from a young age. As a teenager, Tom worked part-time jobs as a paper boy, potato picker, and grocery store clerk, all while pursuing admission to and then studying at the rigorous Chaminade High School in Mineola, with the goal of achieving his parents' dream— sending their children to college. (J. Carr Letter, Ex. 20; L. Spota Letter Ex. 109.) Tom realized that dream when he enrolled at Fairfield University in Connecticut, graduating in 1963, after which

he attended St. John's Law School in Queens, obtaining his J.D. in 1966.  (A. Spota Letter, Ex. 106.)  Tom was admitted to the New York State Bar the following year.

Tom's family prized volunteerism and public service, and Tom was no exception.  (L. Spota Letter Ex. 109.)  Despite the demands of college, law school, and working as a young attorney at a private law firm, Tom prioritized giving back to his community.  From 1963 to 1971, Tom served as a volunteer firefighter with the Garden City Park Fire Department, where he consistently attended meetings, training drills, and fire calls.  (J. Kane Letter, Ex. 59.; G. Prentiss Letter, Ex. 96.)  As the Vietnam War intensified, in 1966 Tom voluntarily enlisted with the United States Marine Corps, undergoing months of training at Parris Island in South Carolina, Camp LeJeune in North Carolina, and Camp Pendleton in California, before serving four years on active duty and in the Standby Reserves, 1st Division.  Tom was honorably discharged in 1972.  Eager to continue serving his community, Tom then re-enrolled as a volunteer firefighter, this time with Mount Sinai, Engine Company 1, from 1973 to 1974.

Sadly, tragedy struck Tom's family during this period, and not for the last time.  In 1957, Tom's mother, Mary, ████████████████████ when Tom was only 16 years old.  Mary survived, but shortly after Tom returned from active duty with the Marines in 1968, ████████ ████.  She died shortly thereafter, not long before her 58th birthday, when Tom was 26 years old.  (P. Spota Letter Ex. 111; T. Spota Letter Ex. 112.)  Following his mother's death, Tom devoted himself to helping his family, attending to his father whenever he was needed, despite Tom's increasingly demanding work schedule and his own young family.  (J. Carr Letter, Ex. 20; D. Dolan Letter, Ex. 35.)

3

### B.      Tom's Marriage to Mary Ellen

One year after his mother's death, in March 1969, Tom met Mary Ellen Delehanty.  (M. E. Spota Letter Ex. 110.)  Tom and Mary Ellen "knew from the beginning that we were meant for each other"—they were engaged just three months later, in June 1969, and married in January 1970.  (*Id.*)  But it was not an easy beginning.  Shortly before their marriage, Mary Ellen ████ ████████   Then, just before their wedding, Mary Ellen ██████████████████████ ██████████████████  (T. Spota Letter Ex. 112.)  Mary Ellen suggested postponing the wedding, but Tom refused.  (M. E. Spota Letter Ex. 110.)  As Monsignor John Cervini, a friend of Tom's for over 60 years, recalls, "I will never forget him informing me when he just found out that the girl of his dreams, Mary Ellen, ████████████████████████ ██████.  I remember Tom saying, 'I love this lady and ████████ will not stop us from marrying.'"  (J. Cervini Letter Ex. 22.)  Devastated by ████████ but undeterred in their love for each other, Tom and Mary Ellen wed and left for their honeymoon, trying to make the best of ████████████  (A. Frattura Letter, Ex. 45; T. Spota Letter Ex. 112.)  Unfortunately, even their honeymoon was cut short, when Mary Ellen ████████████████████████████.  (*Id.*)

Mary Ellen ████████████████████████████████████  (M. E. Spota Letter Ex. 110.)  To make matters worse, Tom's ████████████████████ Mary Ellen's ████████████████████████████  (T. Spota Letter Ex. 112; M. E. Spota Letter Ex. 110.)  ████████████████████████  Tom and Mary Ellen sold the small home Tom had bought with the money he had saved from work and moved in with Mary Ellen's parents.  (*Id.*)  Tom also took on three jobs to pay the bills.  (*Id.*)  For the next two years, Tom spent his days as a town attorney in North Hempstead, his evenings as a liquor store clerk, and his nights as a janitor at an asphalt plant, cleaning bathrooms until 2:00 a.m., to

4

make ends meet.  (T. Spota Letter Ex. 112.)  In what little free time he had, Tom was by Mary

Ellen's side, ██████████████████  (*Id.*)  As Mary Ellen's life-long friend, Adriana Frattura,

recalls of this challenging time, Tom "was always there for her," "always putting Mary Ellen first."

(A. Frattura Letter, Ex. 45.)

      But Mary Ellen ████████████████████████████████████████

████.  (M. E. Spota Letter Ex. 110.)  Eventually, ████████████████████████████

█████████████████████████████████████████████████████████████.

(*See id.*) ████████████████████████████████████████████

███████████.  (*Id.*)  If there was any silver lining to these trying times, it was the clarity of

Tom's utter devotion to Mary Ellen.  As Mary Ellen recalls, it was "[h]ardly the auspicious start

to a marriage!  It proved to me, however, in no uncertain terms, the kind of man I married.  His

strength of character was shown to me then and has remained intact until this day."  (*Id.*)

      Tom's devotion to Mary Ellen has not wavered since.  As Mary Ellen ██████, she and

Tom moved to their new (and current) home in Mount Sinai.  In 1974, they welcomed their oldest

child, Tom, followed by Kate in 1976 and Patty in 1981.  And, ████████████████████

█████████████████ has become a model of longevity: Tom and Mary Ellen

celebrated their 50th anniversary—their Golden Anniversary, in what they believed would be their

golden years—in January 2020.

### C.    *Tom's Work Prior to His Tenure as Suffolk County District Attorney*

      After Mary Ellen's ██████████████ Tom looked for another opportunity to serve.

In 1972, he joined the Suffolk County District Attorney's Office (the "SCDA") as an assistant

district attorney.  He thrived there.  Tom's hard work, skill, and love of the courtroom helped him

to climb the ranks of the office—rising to Chief of the Complaint Bureau and Chief of the Major

Offense Bureau in 1978, and Chief of the Homicide Bureau and Chief Trial Prosecutor in 1980, roles that allowed him to take on many of Suffolk County's major criminal trials.  (F. Leonard Letter, Ex. 66 S. Scaring Letter, Ex. 100; S. Wilutis Letter, Ex. 121.)

Tom's work at the SCDA was widely admired—inside and outside of the office.  (F. Leonard Letter, Ex. 66; P. Mayer Letter, Ex. 71; S. Scaring Letter, Ex. 100; S. Wilutis Letter, Ex. 121.)  As Steven Wilutis, Tom's former colleague at the SCDA, recalls, Tom was not only a "consummate prosecutor, and extraordinary in his preparation for trial, strategic planning, and trial skills," whose leadership in the office was "lauded by all," he also took the time to "provide[] insight for us less experienced attorneys to deal with difficult witnesses, belligerent defense attorneys, and occasionally an upset judge."  (S. Wilutis Letter, Ex. 121.)  Similarly, attorney and former prosecutor Stephen Scaring recalls Tom's "excellent reputation" during this period, writing that "Tom was a leader, as well as a teacher, and was admired not only by his superiors and co-workers, but also his adversaries on the defense side."  (S. Scaring Letter, Ex. 100.)  And it was not just Tom's legal skill that was admired: despite the adversarial nature of his job, Mr. Wilutis recalls that Tom "always had a smile on his face and a kind remark" for others.  (S. Wilutis Letter, Ex. 121.)

While Tom loved his work at the SCDA, he left the office in 1982 to open his own firm. Through 2001, Tom's practice—focused on personal injury and criminal defense—flourished.  But success in the private sector never shook Tom's commitment to the principles that had propelled his career at the SCDA.  As former judge and SCDA prosecutor Peter Mayer recalls, Tom displayed the "same personal traits"—"[h]ard work, tenacity, commitment and moral integrity"—that had led him to be "one of the great Assistant D.A.'s."  (P. Mayer Letter, Ex. 71.)  Similarly, John Ammerman, who joined Tom's firm as a young associate and rose to become a name partner,

recalls that "Tom taught me by example to vigorously advocate for a client but to never cross the line ethically." (J. Ammerman Letter, Ex. 3.)  As just one example, when Mr. Ammerman had the opportunity to bring in a criminal case that promised a substantial fee but also involved defense witnesses who were evidently lying, he "went to Tom for advice."  (*Id.*)  As Mr. Ammerman recounts:

> He told me two things should guide my decision.  First, no case is worth jeopardizing my license to practice law.  Period.  Second, I must be comfortable from both an ethical and moral standpoint.  Tom explained there is a line in the practice of law that must not be crossed.  The ethos of our profession is clear— zealous representation of a client is expected, but do not compromise your integrity nor jeopardize your reputation.  Ultimately, I did not take the case.  Tom totally supported my decision and by so doing taught a young lawyer a valuable lesson.

(*Id.*)

Friends, colleagues, and even opposing counsel have similarly positive recollections of Tom's mentorship during this time.  Edward Heilig, who first met Tom as a young assistant district attorney and later worked as Division Chief during Tom's tenure as District Attorney, recalls that he "developed a deep respect" for Tom when he was in private practice, "as he always presented himself as a straight shooter, never seeking to take advantage of a newly appointed ADA, always being forthright with me in his arguments for his client, and always giving advice in a helpful manner." (E. Heilig Letter, Ex. 53.)  Mary Kane, who met Tom when she was an assistant district attorney before sharing office space with him for a decade as a solo practitioner, recalls that Tom was always "available for me, and numerous other young attorneys, to answer questions about our upcoming trials," ever "generous with his time and with his knowledge."  (M. Kane Letter, Ex. 60.)  And Tom's care and concern was not limited to other attorneys.  As Ms. Kane recalls, when she worked on a case with Tom concerning a priest's sexual abuse of young boys, Ms. Kane

became "keenly aware of Tom's sensitivity, compassion, and his concern for the well being of these young boys and their families." (*Id.*)

Tom's concern for others also extended beyond the office.  From the mid-1980s and well into his term as District Attorney, Tom served as a volunteer on the Board of Trustees of the Wyandanch Homes and Property Development Corporation ("WHPDC"), a nonprofit organization that provides housing to impoverished women with children.  Tom first learned of the organization when he spoke with his friend, Monsignor Cervini—then the pastor at Our Lady of the Miraculous Medal Church in Wyandanch—about opportunities to provide *pro bono* legal services to the community's poor.  (J. Cervini Letter, Ex. 22; *see also* W. Brisotti Letter, Ex. 12.)  Monsignor Cervini invited Tom to assist the WHPDC, and Tom "immediately joined our board and attended most meetings, contributing his time and expertise" as a "committed" and "compassionate" volunteer.  (J. Cervini Letter, Ex. 22.)  As Peter Barnett, WHPDC's executive director since 1985, recalls, "Tom did not hesitate to join us and his service was critical."  (P. Barnett Letter, Ex. 9.)

In addition to attending numerous WHPDC Board meetings, Tom assisted in establishing the organization's tax exempt status; prepared and reviewed contracts; oversaw property transfers, closings, and funding; interviewed families who sought housing; and assisted families who were involved in court proceedings.  (*Id.*)  Even after Tom was elected District Attorney, his commitment to the organization "never seemed to falter."  (R. Koubek Letter, Ex. 62.)  Instead, as fellow Board member Richard Koubek recalls, "[m]any times, I wondered where Tom got his strength, only to conclude that he must have been energized by his commitment to our mission and to the fragile families we served."  (*Id.*)  As Mr. Koubek writes, "[f]or all the years I have known him, Tom Spota has been a faithful servant of the least, the last, the lonely and the lost.  This is the Tom Spota I know, admire and respect."  (*Id.*)  Ultimately, during Tom's tenure on WHPDC's

Board, the organization provided homes to nearly 100 families in need.  (P. Barnett Letter, Ex. 9.)
As Mr. Barnett attests, the organization—and the invaluable public service it has provided to so
many—"would not have made it without Tom's help."  (*Id.*)

Tom also served for over a decade as a board member at the Cleary School for the Deaf,
which assists hearing-impaired students in developing communication, academic, and social skills,
and as a director of the Suffolk County Community College's Center on the Holocaust, Diversity,
and Human Understanding, which seeks to promote respect and tolerance among Suffolk County's
residents.  (E. Kelly Letter, Ex. 61; J. Morgo Letter, Ex. 80.)  As with so much of his service, Tom
never sought recognition for what he had done.  To the contrary, Judge Arthur Pitts's recollection
of a chance meeting with Tom and Monsignor Cervini illustrates the quiet nature of Tom's giving:

> I came into the Rectory one day, and Tom was there.  When he left, John [Cervini],
> in his quiet, pastoral way, waxed poetically about all the good things about Tom
> and the work he did pro bono for one of the poorest parishes on Long Island.  I
> never forgot it, as it was a side of Tom of which I was not aware.

(A. Pitts Letter, Ex. 93; *see also* J. Carr Letter, Ex. 20.)

Despite his many contributions to the public good, Tom still "missed public service"—and
longed to serve his community again in the office he loved, the SCDA.  (J. Johnsen Letter, Ex.
57.)  As Tom's son recalls, "I asked him 'Dad, do you have any regrets in life?'  Without skipping
a beat, he replied, 'Leaving the DA's office.  I knew in my gut it wasn't the right thing to do but I
didn't listen to my gut." (T. Spota Letter, Ex. 112.)  In 2001, Tom followed his gut, left a successful
law practice, and ran for the office of Suffolk County District Attorney, winning by a substantial
margin.

### D.      Tom's Tenure as Suffolk County District Attorney

Tom was sworn in as District Attorney on January 1, 2002, and immediately set about
revitalizing the SCDA to better serve the residents of Suffolk County.  Over the course of his 16

years as District Attorney, Tom overhauled the structure and operations of the SCDA to improve the functioning of the office; oversaw complex and high-profile investigations and prosecutions that secured justice for numerous victims; and implemented innovative alternatives-to-incarceration programs for worthy defendants, among many other path-breaking achievements— all with the goal of making Suffolk County safer and improving the lives of its residents. Throughout that time, Tom cherished the office and the opportunity the residents of Suffolk County gave to him to serve.  In return, Tom worked day in and day out as "a dedicated, ethical, hardworking prosecutor," who "possessed a strong moral compass" (F. Guidice Letter, Ex. 50) and "took great pride in helping the people of Suffolk County" (E. Heilig Letter, Ex. 53).

### 1.    Strengthening Suffolk County Law Enforcement

As Emily Constant, Tom's long-time Chief Assistant District Attorney, recalls, "Tom's tenure was defined by numerous 'firsts'."  (E. Constant Letter, Ex. 29.)  Those "firsts" included changes Tom made to the structure and operations of the SCDA and its programs, to strengthen the office's ability to meet Suffolk County residents' needs.

For example, Tom established several new bureaus, including "a Vehicular Crime Bureau, a Government Corruption Bureau, an Insurance Crimes Bureau, an Asset Forfeiture Bureau and a Training Bureau," as well as a Labor Law Unit.  (*Id.*)  The Vehicular Crime Bureau targeted the surge in fatal accidents on Long Island caused by drivers impaired by prescription drugs, and promoted prevention by sending prosecutors to visit "dozens of high schools during every prom season to speak to thousands of students about the perils of impaired, intoxicated and distracted driving."  (*Id.*)  The Government Corruption Bureau, created in response to an increase in official misconduct, enabled the office to intensify its scrutiny of malfeasant public officials.  The Insurance Crimes Bureau was formed to target the incidence of insurance frauds in the county.

10

The Asset Forfeiture Bureau focused on depriving wrongdoers of their ill-gotten gains.  And the Labor Law Unit prosecuted contractors who failed to pay their workers the prevailing wage.  In addition, Tom enhanced the Environmental Crime Unit by assigning additional investigators who quickly identified illegal dumping of toxic waste at a park and housing development for veterans that, if left unabated, would have posed "serious health risks to these communities."  (F. Guidice Letter, Ex. 50.)  And Tom created task forces to address the growing scourge of heroin in the county, while also promoting information-sharing among the county's numerous law enforcement agencies, to stem the tide of drugs, human trafficking, guns, and gangs.  (*Id.*)

Tom also "recognized that he represented all jurisdictions within Suffolk County and not just the larger population residing within the western townships."  (R. Coughlan Letter, Ex. 30.)  As a result, Tom worked to ensure that each of the SCDA's offices were meeting Suffolk County's needs.  According to long-time assistant district attorney Robert Ewald, Tom was the first District Attorney in decades who "made frequent and often unannounced visits to all of the Office locations: Hauppauge, Riverhead, the local East End Office and Central Islip."  (R. Ewald Letter, Ex. 41.)  At the offices, Tom "would walk the halls and chat with Assistants, secretaries and police/investigators.  He inquired about their cases and offered assistance . . . [a]nd he did this until the day he left office."  (*Id.*)  Tom also ensured the SCDA's responsiveness by opening his door "to his staff, defense counsel, law enforcement officials, government officials and ordinary citizens.  He carefully listened as they advocated for clients, constituencies and individual causes, offering sage advice when solicited."  (E. Constant Letter, Ex. 29.)  And, as in his younger days at the SCDA, "Tom always had a smile and a kind word for everyone."  (S. Wilutis Letter, Ex. 121.)

Tom's efforts to strengthen Suffolk County law enforcement also extended beyond the SCDA.  As Robert Coughlan, the Police Chief of the Village of Quogue, recalls, "[f]rom the very

beginning" Tom "made it a point to meet with all department heads from the various jurisdictions so he could establish a personal relationship with each police official as he believed this would help promote open communication and enhance professional services wherever you worked or resided within the County of Suffolk." (R. Coughlan Letter, Ex. 30.) Robert Mangiamele, former Agent in Charge of the Long Island District Office for the Drug Enforcement Administration ("DEA"), similarly shares that Tom was "a true partner" to the DEA, "always willing to assign additional assets when necessary," resulting in "one of the most successful and productive taskforces in the United States." (R. Mangiamele Letter, Ex. 68.) And Tom's efforts did not stop there. Tom also routinely distributed funding to other law enforcement agencies—such as the Suffolk County Police Department ("SCPD"), the New York State Police, town and village police departments, and the Suffolk County crime lab—to ensure they had access to "the latest technology . . . [that] they could not provide for in their own limited budgets," including "complex and sophisticated scientific and forensic equipment, bullet proof vests, vehicles, boats, electronic equipment and more." (E. Constant Letter, Ex. 29.)

Tom also directed funds to non-profit organizations crucial to protecting Suffolk County's residents. This included "agencies providing Sexual Assault Nurse Examiner services to sexual assault survivors, the Suffolk County Child Advocacy Center, United Way, Parents for Megan's Law and the Crime Victims Center, MADD [Mothers Against Drunk Driving], various domestic violence agencies and countless others." (*Id.*)

### 2. Supporting the SCDA Staff

Just as Tom worked hard to ensure that the SCDA's staff served the needs of Suffolk County, Tom also worked to ensure that the SCDA served the needs of its staff by overhauling the SCDA's hiring, promotion, and compensation practices. First, Tom endeavored to make the

SCDA's staff more reflective of the population it served, by appointing the first female Chief Assistant in SCDA history (*id.*), as well as "doubl[ing] the number of female Bureau Chiefs and tripl[ing] the number of female Deputy Bureau Chiefs" (M. E. Spota Letter, Ex. 110).  Tom also implemented "the first job sharing arrangement in office history" to aid parents struggling to meet the demands of home and office, and "increased the number of female prosecutors in the office to over 50% and significantly increased minority representation in the professional staff."  (E. Constant Letter, Ex. 29; *see also* M. E. Spota Letter, Ex. 110.)  And, in light of the comparatively modest pay of assistant district attorneys as compared to other law enforcement officers, Tom "fought for appropriate compensation for prosecutors" and "was successful in revamping a decades-old salary plan to ensure continued salary increases." (E. Constant Letter, Ex. 29.)

Tom also took care to mentor junior prosecutors in the office, knowing that such supervision could be foundational to a young attorney's career.  As John Mongeluzzi, who served in the office for over 30 years, writes, "Tom was a unique District Attorney in that, in addition to having an interest in the prosecutors in the felony bureaus, he also was very interested in getting to know the young prosecutors in the office." (J. Mongeluzzi Letter, Ex. 78.)  He recalls that:

> [Tom] would get to know who they were as well as how they were doing with their cases and in court.  He often came to the court in Central Islip and would watch the young ADAs do a hearing or part of a trial.  I had been in Central Islip since 1994 and had never seen or heard of his predecessor observing any young ADA.  It is important for the newer ADAs to know that bosses care about what and how they are doing at work and I know personally from many of them that it meant a lot to them as they were developing as prosecutors.

(*Id.*)  Tom also did his utmost to create a supportive environment for *all* of his prosecutors.  As Mr. Heilig, Tom's long-time Division Chief, recalls, Tom "sought daily to improve the working conditions of underpaid and overworked ADAs and support staff in the District Attorney's office." (E. Heilig Letter, Ex. 53.)  To that end, Tom also worked to ensure that the prosecutors in his office

13

were properly credited for their work—a modest but meaningful recognition of their hard work. As long-time assistant district attorney Nancy Clifford recalls, "[w]hen the cases were covered by media, Mr. Spota allowed me to step into the limelight and gave me the credit when he could have clearly been front and center taking the credit for himself." (N. Clifford Letter, Ex. 26.)

Consistent with these reforms, veterans of the office recall their time working for Tom warmly. For example, long-time prosecutor Michelle Pitman writes that "I have nothing but the utmost respect for Thomas Spota because he made me feel validated, worthy, and proud to serve Suffolk County." (M. Pitman Letter, Ex. 92.) Former prosecutor and criminal defense attorney William DeVore writes, "I worked for three different District Attorneys and in my opinion the professionalism and morale in the office was never higher than under the Spota administration. He was demanding but fair and always demonstrated understanding and compassion" for others. (W. DeVore Letter, Ex. 33.) And Mr. Mongeluzzi similarly writes, "I served under three different District Attorneys, the best being Tom Spota. . . .  I have the utmost respect for him as a person and as the District Attorney." (J. Mongeluzzi Letter, Ex. 78.)

### 3.  <u>Prosecuting Without Fear or Favor</u>

With his partners in law enforcement, Tom took on "numerous high-profile cases" to ensure the safety and security of Suffolk County residents—occasionally, in the face of death threats (P. Dwyer Letter, Ex. 39)—including homicide cases and those involving "environmental catastrophes [and] organized criminal rings involved in the trafficking of humans, narcotics, guns, stolen property and counterfeit luxury goods" (E. Constant Letter, Ex. 29). As a result of these prosecutions, Tom "dismantled groups of insurance fraudsters who engaged in dangerous staged accidents and prosecuted the first drunk driver in the county for Murder in the Second Degree." (*Id.*) And Tom took public corruption head-on. "In his first term alone," Tom "obtained the

14

convictions of at least thirteen public officials without regard to position or party." (*Id.*)  As to one such case, Thomas O'Connell, a former Suffolk County assistant district attorney and Assistant United States Attorney in Nevada, recalls "being struck by [Tom's] integrity, telling me, 'Tommy I don't care where this leads, what political party might end up with an interest, just take it where it goes.'" (T. O'Connell Letter, Ex. 85.)  Indeed, as Ms. Clifford, a former prosecutor, recalls, the "outcome wasn't as important [to Tom] as doing the right thing in a full and fair way" (N. Clifford Letter, Ex. 26), a sentiment echoed by former prosecutor Michelle Pittman, who writes that, under Tom, "[j]ustice was the guiding principle on all my prosecutions" (M. Pittman Letter, Ex. 90).

Ms. Constant, who served in various supervisory and executive capacities throughout Tom's tenure as District Attorney—and knew him better than anyone there—sums up Tom's approach to prosecutorial work well:  "Tom Spota was an enthusiastic, hardworking, smart, demanding and challenging boss.  He loved being the District Attorney.  He embraced the complexities of the position, understood the limitations of his authority, and exercised it humbly and thoughtfully." (E. Constant Letter, Ex. 29.)

### 4.   Advocating for Victims and the Voiceless

Tom also relentlessly "pursued justice for victims, some of whom had no voice at the time they were victimized." (F. Guidice Letter, Ex. 50.)  Of many remarkable examples, Tom, just months after being sworn in as District Attorney, empaneled a grand jury to investigate sexual abuse allegations against priests in the Catholic Church—one of first prosecutors in the nation to examine these issues. (J. Buonora Letter, Ex. 15.)  That grand jury investigation resulted in "a comprehensive, ground-breaking review of the abuse of children by priests working in the Diocese of Rockville Center . . . and the exposure of a decades-long cover up at the highest levels of the

15

Diocese." (E. Constant Letter, Ex. 29.) While then-existing statutes of limitation prevented criminal charges, the grand jury "issued a report of almost 200 pages that exposed the predator priests and their supervisors and provided a blueprint for change" (E. Constant Letter, Ex. 29), resulting in "a significant beneficial effect on so many of the people whose lives had been affected by that scandal" (J. Buonora Letter, Ex. 15). Despite his Catholic faith, Tom persevered in the investigation because "[h]is understanding of love required him to confront the very church he was a member of, for the common good of society. He understood what an oath before God meant, even if it conflicted with the very institution that taught him God's commandments." (J. Cervini Letter, Ex. 22.)

As District Attorney, Tom used this tool many times to seek justice for victims and the voiceless. In the course of his tenure, Tom empaneled grand juries to investigate "Long Island School District Finances (2006), NYS Medicaid (2006), Suffolk County Ethics Commission (2012), the Opioid Crisis and its Origins (2012), the tragic limousine crash that resulted in the deaths of four promising young women (2016), and an expose of the New York State Foster Care system (2017)." (E. Constant Letter, Ex. 29.) Each of the resulting grand jury reports "exposed critical failures in government and elsewhere at the federal, state and local level, along with regulatory systems and decisions by public officials that cost taxpayers millions of dollars and put the lives of citizens, including many of the most vulnerable, at risk." (*Id.*) The reports also "took on powerful institutions and special interest groups, including . . . public school administrators and teachers, pharmaceutical companies, medical professionals, politicians, the automobile industry and entrenched government bureaucracies." (*Id.*) Nevertheless, "and despite the political risk associated with challenging the status quo embraced by these constituencies, Tom persevered for one reason: because it was the right thing to do." (*Id.*)

16

Tom also reached beyond grand jury investigations and prosecutions to achieve justice for Suffolk County residents.  For example, to help stanch the silent biases that can tarnish the criminal justice system, Tom "partnered with the Amistad Black Bar Association to offer the first Diversity and Implicit Bias training in the County to Assistant District Attorneys." (E. Constant Letter, Ex. 29.)  To protect against miscarriages of justice, and "[o]ver the objection of many prosecutors statewide," Tom also "mandated open file discovery in all cases." (*Id.*)  And to protect long-struggling workers, Tom helped overhaul the state's outdated labor laws, which frequently left workers—including Long Island's substantial immigrant population—without recourse for wage violations.  (C. Bartels Letter, Ex. 10.)

As long-time SCDA detective Charles Bartels recounts, when Tom learned that working men and women on Long Island were being abused by "dishonest contractors, vendors and public officials," Tom not only created a Labor Law Unit at the SCDA to "level the playing field in the labor force," but also pushed for the passage of an amendment to the New York State Labor Law that would create criminal penalties for employers who failed to pay workers and provide benefits. (*Id.*)  The result, according to Long Island labor attorney Marty Glennon, was "the most significant change to the NYS Prevailing Wage law in more than half a century." (M. Glennon Letter, Ex. 48.)  Mr. Glennon writes:

> As a result of this amendment, famously known as the 'Spota Bill' to working men and women, these typically vulnerable and underserved workers now had a 'voice' in the labor market with the assistance of the [SCDA]. . . .  Because of Tom, the contracting landscape in Suffolk County changed and there were fewer cheating contractors because they now knew there were real consequences for failing to comply with their legal obligations.

(*Id.*)  Tom's efforts bore fruit: during his tenure as District Attorney, the Labor Law Unit recovered "over a million dollars a year from contractors and returned between 15 and 20 million dollars in lost wages to hundreds of workers, regardless of their social status." (C. Bartels Letter, Ex. 10.)

17

In addition, Tom did not limit his efforts to enforcement of this new law in Suffolk County alone.  Instead, "[h]e made sure that he communicated with every District Attorney in New York State about the importance of the bill and his staff was dispatched to numerous DA's offices around New York State and the country to train ADAs on the enforcement of prevailing wage laws."  (M. Glennon Letter, Ex. 48.)  All told, "through Tom's support of this legislation and its enforcement, hundreds if not thousands of employees received millions of dollars in back pay that they would have otherwise not have recovered."  (*Id.*; *see also* C. Bartels Letter, Ex. 10.)  That Tom would focus on such injustices—inflicted on workers without a voice, that would otherwise pass with little notice—is unsurprising.  As labor leader Matthew Chartrand writes, "Tom didn't just care about the big cases with publicity; he cared about the ordinary worker that just wanted to put a roof over his or her family's head and provide healthcare benefits."  (M. Chartrand Letter, Ex. 24.)

That desire to make things right is evident throughout Tom's work as District Attorney.  As Tom's friend of over five decades, Ms. Frattura, writes of Tom's tenure, Tom brought a "true moral compass" to his work as District Attorney, and "[w]hen he spoke of his work he always spoke with great conviction for what is right and what is wrong."  (A. Frattura Letter, Ex. 45.)

### 5.  <u>Caring for the Downtrodden</u>

Tom also instituted groundbreaking reforms at the SCDA that offered many defendants, who were themselves suffering, a second chance.  One such effort involved Tom's agreement to defer prison sentences for hundreds of defendants convicted of drug crimes, if they agreed to participate in a residential treatment program at Hope House in Port Jefferson.  Father Francis Pizzarelli, the longtime Executive Director of Hope House, recalls that Tom was the "first" District Attorney "to openly support residential treatment as an alternative to incarceration for non-violent criminals" and that "[h]is willingness to listen with an open heart to our advocacy for some of the

most wounded and broken among us has directly contributed to the transformation of literally hundreds of lives that otherwise would have been lost in our broken criminal justice system." (F. Pizzarelli Letter, Ex. 94.)  Hope House's long-time Chairman of the Board and counsel, Charles Russo, similarly recalls that:

> Before there were diversionary measures such as Drug Court, there were District Attorneys such as Thomas Spota, ready to listen and eager to help create pleas and sentences that would help forge a new life for any young man willing to live up to the constraints and conditions imposed. . . .  For many years I have watched in total amazement as these young men, when given the opportunity afforded by Mr. Spota, gradually change, emerging as men in control of their lives eager to grow into meaningful careers and create families. . . .  Thomas Spota opened the door to that better life.

(C. Russo Letter, Ex. 99.)

A glimpse of even a few of the lives touched by Tom's embrace of the Hope House program demonstrates the astounding transformations he helped bring about.  For example, Father Pizzarelli recalls a 19-year-old who, faced with a "laundry list" of drug charges and an eight-year sentence stemming from his addiction, was instead permitted "an opportunity to redeem his life" at Hope House—after which "[h]e left treatment with renewed hope that he could become whatever he dreamed of," eventually marrying, raising a family, and practicing law. (F. Pizzarelli Letter, Ex. 94.)  Another Hope House alum, who once faced multiple felony charges and significant jail time, writes that Tom "is the person that gave me a shot. . . .  He pushed boundaries against a society that condemned young people hurting from drug addiction and advocated for alternative treatments to incarceration.  He did not quit on me . . . ." (Anonymous #1 Letter, Ex. 4.)  That alum is now a "[p]artner at a national CPA firm.  I am blessed with a wife and a child.  I have founded a public foundation that has provided hundreds of thousands of dollars to people in need.  Without the opportunity Mr. Spota provided me, I would probably still be in jail, or worse." (*Id.*)  Yet another alum credits Tom's "progressive and compassionate-minded philosophy" with

19

his current career as an attorney and his young family, writing that, when he has seen Tom and told him of his progress, "I can recall seeing the happiness in his eyes when he heard how well I was doing." (Anonymous #2 Letter, Ex. 5.) He continues that "[i]t was clear he took a genuine interest in my well-being. Put simply, if it were not for the risk-taking compassion that Mr. Spota showed me years ago, I may not be the person I am today." (*Id.*)

There are countless other such stories. As Hope House alum ███████ writes:

> [I]f it weren't the compassion and forgiveness [Tom] has exhibited consistently for people like myself who have made mistakes in the past, I and many of my close friends would not be here today. To put it frankly, we would be dead or in prison. Instead, we are productive members of society. We are lawyers, social workers, teachers and so much more, thanks to people like Tom Spota.

███████ Letter, Ex. 28.) Hope House alum ███████ another practicing attorney, concurs, writing that Tom "did not judge us based on our worst acts, but rather on our potential" and that "[b]ecause of Mr. Spota's efforts, Hope House has successfully rehabilitated hundreds of young men . . . [m]any of [whom] have gone on to become lawyers, accountants, healthcare professionals, and more. . . . This would not have been possible without Mr. Spota's assistance." ███████ Letter, Ex. 49.) Another Hope House alum, ███████ similarly recounts that he and so many other Hope House alumni "have families, homes and careers because a District Attorney granted us the opportunity to change our lives. Without [Tom], we would not be where we are today. Hope House exists and continues to thrive because of people like Mr. Spota." (*Id.*) He continues that "I truly can't count how many of us were graciously mandated to Hope House because of his direct intervention." (*Id.*) And ███████ another Hope House graduate— who is now a licensed social worker, helping numerous individuals with their own substance abuse disorders—writes that, as a result of Tom's intervention, "I was able to benefit from completing a

residential treatment program at Hope House Ministries.  Tom took the time to listen with empathy and compassion, and I owe a lot of who I am today to Tom."  ████ Letter, Ex. 117.)

Even recent Hope House residents, years after Tom's tenure, credit him with their new path in life.  One such resident writes that "some of the strongest, kindest, and most influential people in my life were sent to Hope House by Mr. Spota.  He has positively impacted so many lives by offering individuals in the system the option of recovery in lieu of jail.  Mr. Spota has been instrumental in changing people's lives on Long Island for the better over the years."  (Anonymous #3 Letter, Ex. 6.)  And ████ father of a Hope House resident who has struggled with addiction since the 1990s, writes that Tom "took a strong interest in helping my son" and "I truly believe my son ████ would not be alive today if it were not for the caring, kindness and professional guidance that Mr. Spota gave to my son."  ████ Letter, Ex. 69.)

Of course, Tom's early decision to support Hope House came with substantial political and professional risk—had residents reoffended, the responsibility and public rebuke would have fallen on Tom.  But, as ████ the third person Tom directed to the program, writes:

> Mr. Spota believed in the program, believed in the people he served, and believed in his community.  His decision took courage and an outside the box approach.  He took chance on me and I will forever be in his debt. . . .  Due to the opportunity I was offered by Mr. Spota, I am happily married with two beautiful children.  I own a home.  I am a practicing attorney and a productive member of the community.  None of this would have been possible if it was not for Mr. Spota.  I owe my life to him and his courage to think outside the box.  There have been countless others who have come after me that share a similar story. . . .  The world is a better place due to the journey and actions of Mr. Spota.

████ Letter, Ex. 103; *see also* ████ Letter, Ex. 105.)

While Tom's involvement with the Hope House program was not well known publicly at the time, the extraordinary impact of Tom's support was well-recognized by those the program touched.  For example, Mary Ellen, Tom's wife, recalls that "[w]hen we attend Mass at St. Francis'

21

Chapel at Hope House's Friary, many parents of children who went from hopelessness to hope thank Tom for saving their child's life." (M. E. Spota Letter, Ex. 110.)  Mr. Russo, Hope House's Chair and counsel, writes, "I don't think that Tom recognizes just how many young men he has affected," yet "we could fill [the] Courtroom with hundreds of the young men who now lead productive and meaningful lives, enjoy family life, and the freedom from their addiction.  Tom created hope for all of them by helping to pave a path to a future filled with possibility." (C. Russo Letter, Ex. 99.)  Father Pizzarelli agrees: "I will be forever grateful for his power of example and his leadership to serve and make our community a safer and better place." (F. Pizzarelli Letter, Ex. 94.)

Tom's commitment to innovative and productive prosecution strategies was also evident in his treatment of United States military veterans.  Tom was "instrumental in setting up a Veterans Court for those veterans who found themselves in trouble with the law and deserved a second chance." (F. Leonard Letter, Ex. 66.)  As retired Suffolk County Judge John Toomey, who assisted in starting and presided over the Veterans Court, recalls:

> When the court was formed it was only the second such court in all of New York State and one of the very few in the country.  The court was a huge success.  A large part of that success was due to the empathy Tom had for returning veterans who had put their lives at risk for their country, and now were coming home, and because of Post Traumatic Stress Disorder and other traumas, were finding themselves in the criminal justice system.  In any veteran's treatment court the District Attorney is the gatekeeper and controls who will be allowed to enter the program and who will not get admitted.  The veterans of Suffolk County were extremely fortunate to have a man like Tom Spota making those serious decisions.

(J. Toomey Letter, Ex. 115.)

Under Tom's supervision, defendants accused of committing both minor and more serious crimes were considered for diversion to the court, a result of Tom's "insight and compassion to see that, with professional counseling and judicial supervision, these veterans could be

22

rehabilitated and live productive, law-abiding lives." (*Id.*)  Much like Hope House, "it was a leap of faith for Tom" to support the Veterans Court "and a position that took a lot of courage, for if one of these veterans re-offended, it would have been Tom, and no one else, that would have shouldered the blame." (*Id.*)  But ultimately, "[t]he court had a success rate of over ninety-five percent, so Tom's faith was not misplaced." (*Id.*; *see also* R. Zanchelli Letter, Ex. 122.)  As a result, as Judge Toomey writes, "the positive effect Tom has had on numerous veterans and their families has been immense and long-lasting." (J. Toomey Letter, Ex. 115.)

Tom's compassion did not end with Hope House and the Veterans Court.  Terry Hill, a four-decade veteran of the SCPD and Tom's frequent police escort, recalls how Tom worked with arresting officers to reduce charges in cases involving first-time, non-violent offenders "in order to give the offender a second chance." (T. Hill Letter, Ex. 55.)  Tom's daughter, Patty, writes of the time that Tom, at a victim's behest, approved a plea deal resulting in a significantly reduced sentence for a teenager whose prank had caused the victim terrible injuries. (P. Dwyer Letter, Ex. 39.)  Tom predicted that the plea deal would mark "a real turnaround" for the teen, and it did—he became an inspirational speaker for other inmates and troubled youth, work he continued to perform years after his term of community service had ended. (*Id.*)

Anthony LaPinta, who worked with Tom after Tom retired as District Attorney, writes of a time before he knew Tom, when Mr. LaPinta sought relief from the SCDA on behalf of his mother. (A. LaPinta Letter, Ex. 63.)  As Mr. LaPinta movingly recalls, his mother was incarcerated for killing his father after she endured years of physical abuse that Mr. LaPinta had witnessed first-hand as a child. (*Id.*)  After his mother's appeals were exhausted, Mr. LaPinta took up the fight to overturn her conviction, on the ground that her attorney should have presented evidence of that abuse as a defense. (*Id.*)  Mr. LaPinta wrote to Tom—whom he'd never met—to seek his support,

and, after hearing Mr. LaPinta's story, Tom agreed.  (*Id.*)  Mrs. LaPinta was released to her children

and grandchildren not long after, allowed to spend her later years with those she loved.  (*See id.*)

Similar stories echo throughout the letters submitted to the Court.  As they reflect, Tom

took his duty to protect the residents of Suffolk County as seriously as he took his duty to ensure

that justice—the right amount of justice—was meted out to its defendants as well.  (*See, e.g.*, J.

Buonora Letter, Ex. 15; E. Constant Letter, Ex. 29; D. Driscoll Letter, Ex. 37; R. Gazzillo Letter,

Ex. 46a; E. Naiburg Letter, Ex. 84; P. Pontieri Letter, Ex. 95.)

## 6.    **Supported by the Community**

While Tom's reputation has, in recent years, been irreparably damaged, during his 16 years

as District Attorney, he strove to make the lives of Suffolk County residents better.  As a result,

Tom earned the respect and admiration of law enforcement, his staff, and the broader Suffolk

County community.

As Peter O'Leary, a long-time Suffolk County detective and labor leader writes, Tom's

"reputation and stellar performance garnered the full support and endorsement for the elected

office of District Attorney from not only all law enforcement organizations in Suffolk County, but

those, as well, from the Metropolitan NY/Long Island area, including Nassau County and New

York City." (P. O'Leary Letter, Ex. 86.)  The support was not just political, but also personal.  As

Mr. Coughlan, the Chief of Police in the Village of Quogue, writes, "Tom Spota is truly one of the

kindest individuals I have ever had the pleasure to know." (R. Coughlan Letter, Ex. 30.)

Tom's SCDA colleagues concur.  As Mr. Bartels, a long-time SCDA detective, writes,

"after working for four different administrations in the District Attorney's Office, I can attest to

the fact that Thomas Spota is one of the most honorable, loyal and caring men I have met or worked

for." (C. Bartels Letter, Ex. 10.)  Kathleen Moran, SCDA's grants administrator for over a decade,

24

recalls that Tom was "one of the most respectful and professional, yet also friendly and approachable, administrators I have been fortunate to work for in my forty plus years of active employment.  I have always held him in high regard, and still do."  (K. Moran Letter, Ex. 79.) And Keri Herzog, a former assistant district attorney who served for 31 years in the office, under Tom and three other Suffolk County District Attorneys, similarly writes that:

> I have been in the workforce for more than 50 years.  And I can say, without hesitation, that Tom was the boss that other bosses should aspire to be.  He led by example.  He did not expect more of the lawyers than he would expect of himself. But make no mistake, he expected a lot from himself.  Tom never lost sight of the fact that we were there to seek justice for crime victims as well as defendants.

(K. Herzog Letter, Ex. 54.)

In addition, the legal community supported Tom.  As Suffolk County criminal defense attorney and Suffolk County Criminal Bar Association board member Daniel Driscoll, writes, "I always have considered, and continue to consider, Mr. Spota to be a role model for myself and other lawyers who care deeply about the law and about justice."  (D. Driscoll Letter, Ex. 37.) Michael Ahearn, a member of the SCDA for nearly 30 years prior to Tom's tenure as District Attorney, writes that Tom was a "credit to the legal profession" and "it was "reassuring" to know that, when Mr. Ahearn retired, the office was left in Tom's "able hands."  (M. Ahearn Letter, Ex. 1.)  Michael McClellan, a criminal defense attorney in Suffolk County for over 30 years, writes that Tom was a "dedicated public servant" who "served with honor," "tutored many . . . young lawyers," and "was truly a person to emulate."  (M. McClellan Letter, Ex. 73; *see also, e.g.*, T. Buckley Letter, Ex. 13; A. Curto Letter, Ex. 31; G. DiChiara Letter, Ex. 34; J. Reynolds Letter, Ex. 97.)  And Eric Naiburg, a Long Island criminal defense attorney and former prosecutor who has known Tom for nearly 50 years, poignantly captures the breadth of the legal community's support for Tom—whom Mr. Naiburg considers to be a "genuinely exceptional human being":

> Personally and professionally, Tom has the respect of judges, prosecutors and defense attorneys alike. He was a skilled and professional advocate, both as a prosecutor and defense attorney. To this day I have a clear recollection of the skill exhibited by Tom in the cases we tried against each other. I learned from him, and to this day continue to use the things I learned from Tom. As the District Attorney of Suffolk County Tom ran an office with the highest morale. I never heard a young assistant, or a veteran prosecutor, speak negatively about the office in which they worked. . . . I, and my wife, visited the courtroom for a week during Tom's trial. Although it was extremely painful to watch this exceptional man sitting at a defendant's table, it was heartwarming to see the continuing stream of defense attorneys, and former prosecutors, who came to both watch and lend their support to a man that was, and is, so widely respected.

(E. Naiburg Letter, Ex. 84.) And the outcome of the trial has not changed Mr. Naiburg's view. As Mr. Naiburg concludes: "I am a better person for having known Tom Spota. I know I am a better lawyer for having known Tom Spota. Despite everything that has transpired of late, I think Suffolk County is a much better place for having Tom Spota as its chief law enforcement official." (*Id.*)

The broader community, too, supported Tom for the work he did on their behalf. Tom won election to the office of District Attorney four times, and earned the recognition of dozens of community organizations during his tenure, including being honored with Lifetime Achievement Awards, heralded as the Person of the Year, or otherwise commended by such leading community organizations as the Boys and Girls Club of Suffolk County; COPS Foundation; Hope House; Long Island Federation of Labor, AFL-CIO; Lighthouse Mission; Long Island Labor Advisory Council; MADD Long Island; Parents For Megan's Law; Suffolk County Coalition Against Domestic Violence; Temple Beth El; and the Vietnam Veterans of America.

### E. Tom's Compassion for Those in Need

Even during his busy years of service as a public official, Tom continued to give back in other ways. In addition to his work on the boards of the WHPDC and the Cleary School for the Deaf, as well as for other community organizations, Tom frequently offered a helping hand to individuals in need. Whether the support Tom offered was emotional, legal, or even financial, a

26

common refrain of the letters submitted to the Court is clear—when help was needed, Tom was there to provide it.

### 1. Family, Friends, and Neighbors

John Amato, Tom's friend of nearly four decades, writes that he "would frequently hear stories about how Tom was always available to help his friends whenever he could." (J. Amato Letter, Ex. 2.) The letters to the Court bear that recollection out—dozens of Tom's family members, friends, and neighbors have written, recounting example after example of Tom supporting them in their times of need.

For example, Joseph Lemrow, a friend of Tom's since grade school, writes that "[o]f all the friends one accumulates over a lifetime, none has had a greater [e]ffect on my own growth as an adult than Tommy Spota." (J. Lemrow Letter, Ex. 65.) Mr. Lemrow recalls that:

> He interceded in settling my █████████████████████████████████████ and he provided me with the necessary advice to █████████████████████ Tommy remains, in spite of everything that has happened recently, a cynosure of stability, trust, and fidelity in my mind. . . . I would trust Tommy with my life.

(*Id.*) Dianne Pedelaborde, a friend of Tom's since his marriage to Mary Ellen, similarly recalls that, "[d]uring a very difficult time in my life Tom was there for me and my children." (D. Pedelaborde Letter, Ex. 91.) When Ms. Pedelaborde's "████████████████████████ Tom guided us through many hurdles as well as helping us acquire the additional legal support needed to resolve the many issues one is faced with when ███████████████ (*Id.*) Patricia Calone, Tom's friend and neighbor of nearly 50 years, recalls that "as my dad was advancing in age, Tom was very kind to him and helped him navigate the myriad of choices and decisions he needed to make regarding his care. My dad sensed Tom's genuine caring for him and that meant so much to a worried and elderly man." (P. Calone Letter, Ex. 18.) Ms. Calone writes that such instances of

care and support were far from a rarity for Tom—to the contrary, "[h]elping those in need is second nature to Tom Spota. It is who he is, always has been, and will always be. I believe he is a good man who represents the best in humankind." (*Id.*)

      Additional examples abound. Mr. Amato recalls the terrible evening that ███████████ ████████████████████, when Tom visited their home and they cried together. (J. Amato Letter, Ex. 2.) Susan Cahill and her husband, friends of the Spotas for decades, recall the compassion Tom has exhibited for Susan during her ██████████████████████. (S. Cahill Letter, Ex. 16; J. Feehan Letter, Ex. 42.) Ms. Cahill writes of the Spotas' frequent visits: "even though they are going through a trying time, they recently visited and Tom didn't talk about himself, but rather, he concentrated on how I was feeling." (S. Cahill Letter, Ex. 16.) Similarly, Dick Lee, a friend of Tom's since childhood, writes that Tom has "shown me true friendship and sensitive caring. When I was ████████████████████ Tom consistently and faithfully has been in touch with visits and phone calls, easing my ██████████████ With all that is happening in his life, Tom's loyalty has been one of my greatest blessings." (D. Lee Letter, Ex. 64.) Gail Prentiss, a friend of nearly 60 years, recalls that even on the eve of his trial, Tom remained "loyally preoccupied with concern" for her ailing husband, "who, in the fullness of time, passed away November 5, 2019, from ████████████ (G. Prentiss Letter, Ex. 96.) While Ms. Prentiss would frequently "ask Tom how he was holding up[,] his response minimized his problems compared to his friend's. He was seriously shaken, empathetic, and supportive." (*Id.*) Diana Arens, a friend for over 20 years, recalls that, after ██████████████████████ █████████████████████████, "Tom reached out with tremendous kindness and arranged to spend time with him in friendship." (D. Arens Letter, Ex. 7.) She writes that "[w]hile many avoid those with disabling conditions, I know Tom to be compassionate and able to readily

treat people with kindness and respect." (*Id.*)  Similarly, Jean and John Lownds, friends and neighbors for over 25 years, recall the special concern Tom showed for ███████████████ ██████████████████████████████, as well as the assistance Tom offered when Ms. Lownds was ██████████████████████████████, while Mr. Lownds was ███████████. (J. & J. Lownds Letter, Ex. 67.)  And Mary Ellen recalls the time Tom literally saved someone's life—giving his oxygen tank to a friend who was drowning while on a scuba diving trip. (M. E. Spota Letter, Ex. 110.)  The list goes on. (*See, e.g.*, D. Arens Letter, Ex. 7; H. & D. Buffa Letter, Ex. 14; J. Buonora Letter, Ex. 15;  P. Calone Letter, Ex. 18; J. Carr Letter, Ex. 20; S. Edelbaum Letter, Ex. 40; L. Fontana Letter, Ex. 43; J. Kane Letter, Ex. 59; J. Mareno Letter, Ex. 70; J. Morgo Letter, Ex. 80; K. O'Rourke Letter, Ex. 87; D. Spota Letter, Ex. 107; L. Spota Letter, Ex. 109.)

### 2.    Staff

As Tom's former staff members recall, Tom routinely extended such kindnesses at the office as well, going above and beyond merely improving working conditions as an employer. According to Michael Daly, a former investigator for the SCDA and United States Attorney's Office who worked for Tom for over a decade, Tom "treated all of us [at the SCDA] as though we were family." (M. Daly Letter, Ex. 32.)  Both Ms. Constant, Tom's long-time Chief Assistant, and Mr. Heilig, Tom's long-time Division Chief, recall the lengths Tom would go to assist staff members who were in need, with Mr. Heilig writing that Tom "would meet with Assistant District Attorneys that were struggling with personal health or family issues wherein he would help them through their tough times in any way he could." (E. Heilig Letter, Ex. 53; *see also* E. Constant Letter, Ex. 29.)  John Buonora, Tom's first Chief Assistant, recounts a number of examples of Tom's concern and compassion for his staff:

29



> As District Attorney [Tom showed] a special compassion and accommodation to
> staff members battling cancer or other family crises. One example is that of an
> assistant district attorney who was ▮▮▮▮▮▮▮▮▮▮▮▮▮ . . . . Among other
> things, Tom would arrange for files to be shuttled between the office and her home
> so she could continue working (which she wanted to do) while recuperating from
> her surgery. Another example of Tom's compassion is that of a young junior
> assistant district attorney, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ who suddenly
> and unexpectedly died. ▮▮▮▮ had only been in the office for a few months at the
> time of his death. His dream had always been to become a lawyer and an assistant
> district attorney. Tom arranged, with the help of then-Presiding Justice of the
> Appellate Division . . . , to have ▮▮▮▮ admitted to practice posthumously.

(J. Buonora Letter, Ex. 15.)

Tom's compassion also extended well beyond staff members' illnesses. Mr. DeVore, a

former SCDA prosecutor, recalls a situation in which a young assistant district attorney, fresh from

law school, "was beset by stress-related problems that unfortunately rendered her incapable of

coming to work and performing her duties as an ADA." (W. DeVore Letter, Ex. 33.) While

supervisory staff debated whether to terminate her, Tom became involved—working with the

prosecutor and her family and monitoring her progress—and ultimately allowed the prosecutor to

continue her work. (*Id.*) "Due to his understanding and compassion this ADA returned to work

and developed into a fine young attorney who has flourished as a prosecutor. It is not overly

dramatic to state that the fate and future of the young ADA's career was in Tom Spota's hands."

(*Id.*) Ms. Herzog, a 31-year veteran of the SCDA, writes of receiving such care from Tom as well,

while she "coped with a parent who ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (K. Herzog Letter, Ex.

54.) Cynthia Scesny, Tom's assistant for three decades, also recalls the numerous times Tom

"extended a helping hand" to her:

> ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Tom
> not only guided me through the legal aspects of the situation, he also reached out
> to my father and personally attended a meeting with him ▮▮▮▮▮ What
> employer takes that extra step with such concern and compassion? When my dad
> was near the end of his life, after ▮▮▮▮▮▮▮ there were only three people,
> other than family members, my dad allowed to visit him and Tom was one of them.

My father had much respect for the man Tom Spota was and currently is. . . .  The loss of a parent makes you reflect on every aspect of the painful journey.  Tom helped with my dealing with ███████████████████████ ███████████  The lessons he taught me over the years prepared me to get my dad and my family through such a tough time of loss.

(C. Scesny Letter, Ex. 101.)  And Mr. Hill, Tom's former police escort, also recalls steps Tom took to ease his burdens:



(T. Hill Letter, Ex. 55.)

### 3.   Others

Even the many letters submitted to the Court do not reveal the full extent of the good works Tom has done.  As Ms. Moran, the SCDA grants administrator, reports, she has, spurred on by recent events, "heard from many people whose lives [Tom] touched"—including former clients, childhood friends, and a friend of Tom's son—who have "expressed their concern and caring for him and offered their support in any way possible."  (K. Moran Letter, Ex. 79.)  Similarly, Reverend Patrick Riegger, Tom's parish priest, reports that "[e]ven in light of this most unfortunate situation, it is always encouraging to hear so many people tell me what a nice person Tom is. . . .  He has always been such an upright and respectful citizen and friend to so many."  (P. Riegger Letter, Ex. 98.)

### F.   *Tom's Devotion to His Family*

Despite Tom's rewarding professional life and passion for serving Suffolk County, the undeniable light of Tom's life has been his wife, Mary Ellen; their three children, Tom, Kate, and

31

Patty; and their five young grandchildren, ███ (7), ███ (5), ███ (5), ███ (3), and

███ (3). As former judge and SCDA prosecutor Mr. Mayer recalls, Tom's "love for his wife

Mary Ellen and his children has been boundless for the 45 years I have known him." (P. Mayer

Letter, Ex. 71.) Even with the demands placed on him by his career, Tom's sister, Joanne Carr,

writes, "Tom's first priority was always his family" (J. Carr Letter, Ex. 20), with his first cousin,

Deanna Spota, writing that Tom "values his family life above all else" (D. Spota Letter, Ex. 107).

Tom's friends saw that devotion as well. Tom's long-time friend, Ms. Frattura, writes, Tom "loved

his wife and children and would do and did everything for them" (A. Frattura Letter, Ex. 45), and

Tom's friend of 40 years, David Dolan, similarly writes that Tom was "uncompromisingly

dedicated" to Mary Ellen and a "wonderful father" to his three children (D. Dolan Letter, Ex. 35).

The letters submitted to the Court reflect a vibrant young family—replete with trips to

national parks, turtle hunts, and splashing in the swimming pool—that matured into a tight-knit,

supportive, loving unit. (M. E. Spota Letter, Ex. 110; T. Spota Letter Ex. 112.) Mary Ellen writes

that "Tom is a wonderful husband and father. He's been faithful to me and present for his children

in all the important ways. His . . . commitment to our family is absolute." (M. E. Spota Letter,

Ex. 110.) That love and dedication is reflected in Tom's children's letters to the Court. Tom's

eldest daughter, Kate, writes that "[m]y father has had a profound influence on my life. He taught

me invaluable lessons about hard work and loyalty to family and friends . . . . While my mom is

the heart of the family, my dad is its source of exuberance." (K. Spota Letter, Ex. 108.) Patty,

Tom's youngest child, writes that "I rely on my father's strength and dependability to get me

through the good and bad times." (P. Dwyer Letter, Ex. 39.) "My father is the one who builds the

fire we sit around at every family gathering. He is my bridge partner when we play cards. It is

difficult to put into words the joy and life he brings to every occasion." (*Id.*)  And Tom, Tom's son, writes:

> The memories I treasure most are the simple, sweet and often quiet times I've shared with the people I love.  I've had many of these times with my father . . . .  One of my fondest memories was driving cross-country with my father when I was out of college.  We had a great time exploring the countryside, the Badlands in South Dakota, little towns in Wyoming and Montana, and the stunning coastline off the Pacific Coast Highway.  We did the trip in about six days, but we could have easily spent six months together on that trip.  These are the special memories that I hold onto as I look back on life.

(T. Spota Letter, Ex. 112.)

Yet, while there were idyllic times, Tom and his family have faced daunting challenges as well.  As Tom's son writes, "[m]y father is a sweet and loving man," but "has not had an easy path." (*Id.*)  In addition to Mary Ellen's ▆▆▆▆▆▆▆▆ and Tom's mother's death when he was just a young man, Tom—at the same time he was running his law firm—also acted as a caregiver for his father, who was diagnosed with ▆▆▆▆▆▆ and his stepmother, who suffered from ▆▆▆▆▆  As Mr. Dolan, Tom's friend of 40 years, recalls:

> I . . . was very admirably observant of Tom Spota's compassionate dedication to his Dad after the sad passing of his Mom at a relatively young age.  Tom also was wonderfully supportive, kind and helpful in very pragmatic ways to his dear stepmother Kim who developed and ultimately passed from ▆▆▆▆▆.  Once again, notwithstanding his busy career and dedicated attention to his own family, Tom seemed to be ever-present to his twice widowed Dad and helped him in innumerable, loving ways as his father's ▆▆▆▆▆▆▆▆▆▆.

(D. Dolan Letter, Ex. 35.)  Tom's brother-in-law, Matthew Carr, also recalls that Tom was "a kind and attentive son to his father." (M. Carr Letter, Ex. 21.)  He writes that, "[o]n numerous occasions," Tom "was called to his dad's residence to assist ▆▆▆▆▆▆ ▆▆▆▆▆▆ . . . .  He never complained about the situation or burdened his sisters with these occurrences until much later." (*Id.*)  Tom's stepmother died in

1997, and his father died in March 2002, just two months after Tom was sworn in as District

Attorney.

The challenges did not end there. In addition to caring for his father and stepmother, Tom

also assisted in caring for his mother-in-law— ████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████ (C. Scesny Letter, Ex. 101.) And in a frightening replay of Tom's early

years with Mary Ellen, ██████████████████████████████████████

███████████████████████████████ (J. Dwyer Letter, Ex. 38.) ████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████ (*Id.*) ██████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████ (P. Dwyer Letter, Ex. 39.)

There was more. In the wake of his indictment, Tom confronted yet another, horribly

familiar calamity— ████████████████████████████████████████████

As Phoebe recalls of her history with Tom:

> Being the daughter of Egyptian immigrants, I was accustomed to having to explain
> my background, culture and traditions to others. I knew, of course, that Tom and
> Mary Ellen would be open to, and respectful of, my world. But I never anticipated
> how warmly, lovingly and unconditionally they'd embrace me into their family. . . .
> I've grown to love Tom like my own dad. I've discovered that many of the
> attributes that I admire about my husband were instilled in him, through example,
> by Tom. His love of God and devotion to family. His strong work ethic and
> integrity. His humility and down-to-earth, easygoing nature, regardless of status or
> personal accomplishment. His overwhelming kindness and generosity. His tireless
> dedication, at the end of the day, to leaving the world a bit better.



(P. Spota Letter, Ex. 111.) ████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

(T. Spota Letter, Ex. 112.)  As Phoebe writes, ████████████████████

████████████████████████████████████████

████████████  (P. Spota Letter, Ex. 111.) ████████████████████

████████████████████████████████████████

(*Id.*)  As Phoebe recalls, ████████████████████████

████████████  I remember thinking that they were the luckiest kids in the world to have such a

wonderful grandpa who loved them so much."  (*Id.*)  As ever, Tom strove to make life better for

those around him.

       With these personal tragedies behind them, Tom and Mary Ellen had hoped for a quiet

retirement together, surrounded by the joy and mayhem of their five beloved grandchildren.  (M.

E. Spota Letter, Ex. 110.)  As long-time friend Ms. Calone describes it, "[n]ow that [Tom] is finally

a grandpa, he beams with pride at mention of the 5 little ones, . . . and they adore him."  (P. Calone

Letter, Ex. 18.)  But at "a time in life when a couple should be enjoying their later years together,

their life and their future has been turned upside down."  (J. Johnsen Letter, Ex. 58.)  As Tom's

son writes, "[i]t is times like these that can either bring a family closer together or tear it apart."

(T. Spota Letter, Ex. 112.)  Yet, "[a]s a result of the unbreakable bond instilled in us by our parents,

we are closer now more than ever."  (*Id.*)  Indeed, despite Tom's children's own demanding

professional lives—as a video producer, lawyer, and educator—Mary Ellen and at least one or all

of the children attended every day of Tom's trial, in addition to numerous other colleagues and

friends. (J. Johnsen Letter, Ex. 58; A. Spota Letter, Ex. 106; K. Spota Letter, Ex. 108.) As Judith

Johnsen, a friend of Tom's for 30 years, recalls from her attendance at Tom's trial:

> His adult children made hard choices to be at his side. They all have their own careers and families and chose to be there consistently even though it must have been very difficult managing the time away. In addition there were extended family, friends and colleagues at the trial, some who traveled long distances to be there. These people took time out of their busy lives and the holiday season preparations to be at the trial. This says something about Tom as a person. These people loved him and wanted to be with him and his family during this very difficult time.

(J Johnsen Letter, Ex. 58.)

Despite their unity, the trial was particularly challenging for Tom's family. As Tom's son,

Tom, recalls:

> Sitting through the trial was one of the hardest things I've ever had to endure. Throughout those difficult weeks I often found myself wishing I could tell the jury about the real Tom Spota that I know, first-hand. A good, kind-hearted man who lives a simple lifestyle, lives in an understated house, drives a modest car and who still, to this day, rakes leaves and mows his own lawn.

(T. Spota Letter, Ex. 112.)

The verdict came as a shock. Now, in Tom's son's words, "[t]he unfortunate reality is that

because of my father's uncertain future, we have to cherish every single day that we now have

together." (*Id.*) In Mary Ellen's words:

> Time is not on our side. I just had my 75th birthday and Tom will be 79 in September. My mother and grandfather both were ███████████. I have ████████████████████ Knowing the existential realities, we had planned to move South to a new home, travel while we're still able, and enjoy the grandchildren and retirement. Obviously, none of this is happening while our lives are in turmoil. We would treasure the time left to us, but our time is running out.

(M. E. Spota Letter, Ex. 110.)

II.     **The Offense Conduct**

In this life well-lived, there was a blind spot. Tom first met James Burke when Mr. Burke was a teenager and witness to the murder of 13-year-old John Pius. Tom was the prosecutor on the case. As Tom's colleague at the time, Mr. Wilutis, recalls of that challenging prosecution:

> [Tom's] heart went out to homicide victims' relatives. I specifically recall the Pius case, where four young men were charged with brutally killing a 13 year old boy by shoving rocks down his throat. I vividly can still picture Tom speaking to that young boy's parents for hours. I will never forget the compassion and empathy Tom had for those grieving parents.

(S. Wilutis Letter, Ex. 121.) The Court has heard much evidence of Tom's relationship with Mr. Burke in the succeeding years, during which Tom became a professional father figure of sorts to him. We agree with that characterization. And while we adamantly maintain that the testimony the Court heard concerning the allegedly criminal aspect of that relationship, from a single witness (James Hickey), was false, the jury nonetheless found ground to convict Tom for it. This memorandum does not seek to challenge that verdict. Instead, we seek only to highlight the enormous gulf between that alleged conduct and the Tom Spota that his friends, family, colleagues, staff, and constituents have known for decades, and to document the devastating toll the proceedings in this case have taken on both Tom and his family.

The sense of incomprehension over Tom's involvement in this case is palpable. Mr. Ammerman, Tom's former law partner, summarizes the general sentiment: "I can only say the allegations are totally inconsistent from anything I have ever observed from Tom Spota. They are a complete aberration from anything I have seen during the past 30 years I have known Tom. I cannot stress this point more emphatically." (J. Ammerman Letter, Ex. 3.) He is not alone. The following attorneys and law enforcement officials did not recognize the man portrayed at trial as the Tom Spota they know:

- Mr. Buonora, Tom's former Chief Assistant, writes that, based on his review of newspaper accounts, "what I read or heard is not the Tom Spota that I have known for over 45 years." (J. Buonora Letter, Ex. 15.)

- Tom's former Division Chief, Mr. Heilig, writes that, "[d]uring my 16 years in the SCDA working closely with Tom I never witnessed or heard a complaint that in any way reflects the person who was portrayed at trial.  Simply stated, that is not the Tom Spota I know and respect." (E. Heilig Letter, Ex. 53.)

- Retired detective and Tom's friend, Francis Leonard, writes "[i]t's hard for me to comprehend the crime Tom has been convicted of.  This is not the person I know and nor does it fit the person he is." (F. Leonard Letter, Ex. 66.)

- Attorney and former prosecutor, Mr. Scaring, writes "I will not comment on the verdict, but I will say that I never saw or was aware of a situation where Tom acted inappropriately or in a way that was inconsistent with his responsibility as an attorney and a prosecutor." (S. Scaring Letter, Ex. 100.)

- Benjamin Zwirn, a former assistant district attorney, assistant New York State attorney general, and elected official, writes that "Tom Spota has always enjoyed a stellar reputation among those individuals I worked with in Law Enforcement over the years" and that the "way this matter ultimately turned out is completely inconsistent with the Tom Spota that I know." (B. Zwirn Letter, Ex. 123.)

- Former DEA Agent in Charge, Mr. Mangiamele, writes that "I am aware of the gravity of the crime for which he was convicted.  It is impossible for me to comprehend, since this is not the man I know." (R. Mangiamele Letter, Ex. 68.)

Tom's family and friends, too, were dumbfounded.  As Mary Ellen writes, "[i]t feels like the world has gone topsy-turvy—an Alice in Wonderland existence where nothing makes sense anymore." (M. E. Spota Letter, Ex. 110.)  Tom's brother-in-law, James McCormick, writes that "[t]he person portrayed at the trial is not the brother [Tom's] sister knows." (J. & M. McCormick Letter, Ex. 74.)  And Tom's daughter-in-law, Phoebe, describes being "stunned" at the verdict. (P. Spota Letter, Ex. 111.)

38

Beyond the shock of the outcome, the stress and uncertainty of the past several years—the investigation, indictment, trial, and now sentencing—have taken a "tremendous toll" on Tom and his family.  (*Id.*)  Mr. Hill, Tom's former police escort, writes of a recent call with Tom:

> I was very distressed to hear the stress in his voice, his confession of not being able to sleep, and how he has lost everything.  Most importantly, I was concerned about the negative impact this has had on his wife and . . . children.  He grieves for the loss of people who he once thought were his friends.  He is 78 years old, and devastated.

(T. Hill Letter, Ex. 55.)  Many of Tom's friends and colleagues share similar concerns.  As Mr. O'Leary, Tom's friend of 40 years, writes of his recent conversations with Tom, "I can tell you that Tom is absolutely devastated by the turn of events." (P. O'Leary Letter, Ex. 86.)  Mr. Scaring describes visiting Tom at trial, where "I was taken aback by how he has aged" (S. Scaring Letter, Ex. 100), with Ms. Scesny, Tom's long-time assistant, similarly writing that "[h]is vim and vigor has diminished. . . .  [A]t 78 years old and under this tremendous strain, he is simply not the same, physically or emotionally." (C. Scesny Letter, Ex. 101).  And both Barbara Parr, a family friend, and Tom's son, Tom, write about how Tom's spirit has been "broken," with Ms. Parr adding that:

> Although Tom has always been an upbeat, optimistic person, over the past few years while the accusations and trial were hanging over his head, I have seen the change in him. . . .  I cannot imagine what would happen if he were to be taken away from Mary Ellen and his family for any length of time.

(B. Parr Letter, Ex. 89; *see also* P. Vineyard Letter, Ex. 118; T. Spota Letter, Ex. 112).

As many of Tom's loved ones have observed, the strain of these proceedings have accompanied a notable decline in Tom's physical condition.  While Tom was blessed for much of his life with good health, ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████



In addition to the threat of prison at almost 80 years of age and in ███████, Tom has also suffered numerous other personal and professional punishments as a result of these proceedings.  Because of his conviction, Tom has been automatically disbarred—a devastating end to a legal career that he "loved . . . almost as much as he loves his family."  (P. Spota Letter, Ex. 111.)  As Mr. LaPinta, who worked with Tom over the last several years, recounts, "I recently helped Mr. Spota draft a letter to the Attorney Grievance Committee notifying them of his conviction.  Knowing that letter would start the process toward his eventual disbarment, I witnessed his pain as he struggled to sign the letter."  (A. LaPinta Letter, Ex. 63.)  As Mary Ellen writes, "[t]he overwhelming sadness I feel for Tom, the children and me is sometimes beyond description.  Tom facing disbarment after 52 years of practicing law is catastrophic for him.  From honored to dishonored, respected to disrespected, humiliated and disgraced, the fall is more painful for such a man as this."  (M. E. Spota Letter, Ex. 110.)

Tom has also seen the reputation he worked so hard to build obliterated.  As long-time friend Ms. Frattura writes, "the humiliation of the past years, and the weeks of trial, during which he has suffered all the slings and arrows and pain of watching a whole life's work disintegrate before him" have been "a devastating punishment in itself."  (A. Frattura Letter, Ex. 45.)  Indeed, after an otherwise unblemished, decades-long career, devoted to the betterment of his community,

it is no exaggeration to say that this case, above all else, is what Tom will be remembered for.  As Jim Morgo, Tom's friend of 40 years, writes, "[r]ecently Tom said to me, 'No matter everything else I've done in my life, this (his conviction) is how I'll be remembered.'"  (J. Morgo Letter, Ex. 80.)  While Mr. Morgo despairs of that conclusion—writing that "I know deep in my bones that that would be a horrible injustice because Tom Spota is a good, kind, decent and charitable man who is surely deserving of understanding and leniency"—these kind words cannot alter Tom's new reality.  (*Id.*)  As Mr. Wilutis recounts, after seeing Tom recently at church—where Tom once would have lingered, greeting friends and constituents—"[o]n this occasion Tom was clearly stressed and worried.  The brief words we exchanged showed the emotional toll this has taken on him.  After mass he quickly left the church, seemingly embarrassed to speak to other parishioners."  (S. Wilutis Letter, 121.)  It is clear, as Mr. Scaring writes, that this case "will be on [Tom's] mind during every waking moment, for the rest of his life."  (S. Scaring Letter, 100.)  In sum, as Tom's daughter, Kate, writes:

> [M]y father has suffered mightily during this ordeal, as our whole family has.  His professional life and reputation was destroyed, his ability to practice law was stripped from him, he was humiliated relentlessly in the press, and he had to watch as his family and his colleagues suffered as a result.  He has tried to remain stoic, especially in front of his kids, but he cannot hide the fact that this experience has devastated him, and I don't think he will ever recover from it.

(K. Spota Letter, 108.)

But, for Tom, there is a cost that outweighs all of this.  As Lawrence Spota, Tom's cousin, writes, "I know for a fact [Tom's] biggest concern is not for himself . . . .  [W]ithout doubt Tom's biggest concern is what lies ahead for Mary Ellen, on top of the enormous toll this situation already has taken on her."  (L. Spota Letter, Ex. 109.)  And that toll has been immeasurable.  As Elizabeth Naiburg, Tom and Mary Ellen's long-time friend, writes:

My friend Mary Ellen Spota stood by her husband's side, as he did for her years earlier, with her shoulders squared, her unending encouragement, her unwavering love, giving her support, until it brought her to her knees. She watched as her husband lost weight, paced when most of the world slept, and yet she never complained. While insisting on planning Thanksgiving dinner this year, she shared with me that she was doing so with a smile on her face for Tom, their kids, and their grandkids just in case it would be their last. I knew what she meant, as all women our age do. You are coming into the last stretch of your lives together, and each moment spent together is a gift, with no guarantees of how long you may have left. I asked my husband just last week if we were to be able to write our own ending, would the last couple of years end with us not being able to feel each other's touch, see each other's smiles, share each remaining milestone achieved by our children and grandchildren, or just take a walk in town? What if I was to die, and he wasn't there to hold me? He answered me without words, only tears in his eyes. . . .

I chose to write on behalf of my friend, Mary Ellen, a woman I admire and respect. A woman I can relate to. A woman I know is so afraid of the future, uncertain of what life holds for them. This honorable Court holds the power to spare Tom and Mary Ellen Spota from spending this last turn in the road alone, and I can only hope that Your Honor will exercise that power by giving them the gift of leniency, allowing them to spend whatever time they have left together.

(E. Naiburg Letter, Ex. 83.)

For whatever mistakes Tom made in his relationship with James Burke, Tom has suffered and will continue to suffer for the rest of his life. But, as retired detective and Tom's long-time investigator at the SCDA, Frank Guidice, writes after following Tom's trial, "[i]t is my hope that this issue does not negate the record of accomplishment which has been written over a lifetime— a record that reflects the career of a dedicated, honest, ethical career prosecutor." (F. Guidice Letter, Ex. 50.) Instead, as Tom's childhood friend Mr. Lemrow writes, it is his fervent hope— and, as is clear from the dozens of letters submitted to the Court, the fervent hope of so many others—that "[a] lifetime of worthy public service, generosity, and kindness should not be obliterated for having given support to one undeserving of it." (J. Lemrow Letter, Ex. 65.)

## Argument

Tom Spota is a shattered man. Instead of spending his remaining time in peace with family, friends, and the community he served for decades, he occupies a much bleaker world, withered by

the constant public humiliation that has defined his existence for the last several years.  Regardless of the Court's sentence, Tom's long and commendable life will almost certainly end under a cloud of ignominy.  He has been punished tremendously.  In light of that fact, and the existential danger imprisonment would pose due to Tom's advanced age and declining health—particularly in light of ██████████████████ and the COVID-19 pandemic—we respectfully submit that a term of incarceration is not necessary here.  Instead, many factors—such as Tom's age, health, and exceptional history of good works; the significant punishment Tom has already endured and will continue to endure; the fact that Tom does not present any risk to the community; and the availability of a reasonable alternative sentence—all support the imposition of a non-incarceratory sentence with special conditions of home confinement and community service.

## I.     The PSR Guideline Range Is Incorrect

The government's case against Tom turned on the testimony of a single witness—an adjudged perjurer and admitted liar, whose account of Tom's alleged involvement markedly expanded across the four years he cooperated with the government.  (*See* PSR Objections and Reply, Exs. 124, 125.)  In the course of his unsubstantiated and oftentimes facially implausible testimony, that witness, James Hickey, recounted only one meeting involving Tom, on June 4, 2015, for which there is any corroborating evidence that it even took place—a meeting at which, if Mr. Hickey's evolving and provably false account is to be believed, Tom made a number of inappropriate remarks.  (*Id.*)  On that record, the Pre-Sentence Report ("PSR") recommends a total offense level of 25, resulting in an advisory Guideline range of 57 to 71 months, based on the inclusion of several inapplicable and improperly redundant enhancements.  (*See* PSR at ¶¶ 66, 111.)  For the reasons below, the correct total offense level in this case, calculated without the improper enhancements, is 16, resulting in an advisory Guideline range of 21 to 27 months—a

range that provides a far more appropriate starting point for the Court's determination of a sentence in this case.

### A.    The "Substantial Interference" Enhancement Is Inapplicable

A three-point enhancement for "substantial interference with the administration of justice" under U.S.S.G. § 2J1.2(b) is inapplicable to Tom.  The commentary to this Guideline states that this enhancement applies where an offense resulted in "a premature or improper termination of a felony investigation; an indictment, verdict, or any judicial determination based upon perjury, false testimony, or other false evidence; or the unnecessary expenditure of substantial governmental or court resources."  *See* U.S.S.G. § 2J1.2(b), comment (n.1).  In addition, the Second Circuit has held "that other acts—if similarly or even more disruptive of the administration of justice"—may support the enhancement.  *See United States v. Amer*, 110 F.3d 873, 885 (2d Cir. 1997).  Accordingly, the enhancement may also apply where an offense "prevent[ed] or substantially interfere[d] with proper legal proceedings," *see United States v. Escalera*, 957 F.3d 122, 139 (2d Cir. 2020), though the relevant conduct must have been "egregious," *see United States v. Jones*, 900 F.2d 512, 522 (2d Cir. 1990) (rejecting argument that four separate instances of perjury by the defendant supported application of this enhancement and vacating sentence).  There is simply no credible evidence that Tom engaged in any conduct that satisfies these precepts—much less the sort of "reliable" and "accurate" evidence that is required to impose this and other enhancements.  *See, e.g.*, *United States v. Pugliese*, 805 F.2d 1117, 1124 (2d Cir. 1986) (stating that a sentencing court "has an obligation to assure itself that the information upon which it relies in sentencing defendants is both reliable and accurate"); *see also* U.S.S.G. § 6A1.3 (comment).

Under the commentary to this Guideline, conduct that led to the closure of the initial federal investigation in December 2013 could support application of this enhancement on the basis that it

resulted in "a premature or improper termination of a felony investigation." But the only evidence that implicates Tom in the conspiracy at that time is Mr. Hickey's uncorroborated, implausible, and evolving testimony concerning alleged calls and meetings he had with Tom prior to December 2013. (*See, e.g.*, 11.26.19 Tr. 1593:5−16 (Mr. Hickey's claim he spoke to Tom "all the time" on the phone concerning the conspiracy); 12.03.19 Tr. 2034:8−18 (Mr. Hickey's claim he spoke to Tom a "few dozen" times at the SCDA, in the hallway or in or near the bathroom, concerning the conspiracy).) Indeed, *no* officer—other than Mr. Hickey—claimed to have interacted with Tom, or even heard Tom's name mentioned, in the context of the federal investigation. (*See* PSR Objections and Reply, Exs. 124, 125.) And for the reasons stated in objections to the PSR— including the lack of corroborating phone records, calendar entries, swipe card access records, or witness accounts; the sheer implausibility or impossibility of significant portions of Mr. Hickey's testimony; and Mr. Hickey's utter lack of credibility as a witness in light of his conceded history of perjury and deceit—Mr. Hickey's testimony on this issue is nowhere near the "reliable" and "accurate" evidence required to impose this enhancement. (*See id.*)

Nor is there credible and reliable evidence that Tom engaged in any other conduct that "prevent[ed] or substantially interfere[d] with proper legal proceedings." *See Escalera*, 957 F.3d at 139. For the reasons stated in our PSR objections, the only meeting or discussion for which there is any documented corroboration that Tom actually participated is the June 4, 2015 meeting. (*See* PSR Objections and Reply, Exs. 124, 125.) But there is no evidence that any threats or statements allegedly made at that meeting prevented cooperation with the government. To the contrary—not long after that meeting, the officers involved in the assault of Christopher Loeb began cooperating with the government, leading directly to Mr. Burke's arrest. And Tom cannot be punished for any misconduct by others that occurred prior to June 4, 2015, given the palpable

45

lack of credible and reliable evidence that Tom joined the conspiracy prior to that date.  *See, e.g.*, U.S.S.G. § 1B1.3 comment (n.3(B)) ("A defendant's relevant conduct does not include the conduct of members of a conspiracy prior to the defendant joining the conspiracy, even if the defendant knows of that conduct[.]"); *Gane v. United States*, 592 F. App'x. 4, 7 (2d Cir. 2014) (summary order) ("The district court erred because, for purposes of sentencing, a defendant's relevant conduct does not, in the ordinary case, include conduct committed before the defendant joined the conspiracy."); *United States v. Capri*, 111 F. App'x 32, 36 (2d Cir. 2004) (summary order) (vacating sentence where, *inter alia*, the district court failed to take this rule into account).

### B.     The "Extensive in Scope" Enhancement Is Inapplicable

A two-point enhancement for the conspiracy being "extensive in scope" under U.S.S.G. § 2J1.2(b)(3)(C) cannot be applied to Tom, for reasons similar to those above.  Even assuming that Tom attended the June 4, 2015 meeting and discussed the federal investigation, that isolated conduct cannot be considered "extensive" under any reasonable understanding of the term.  *See, e.g.*, *United States v. Jensen*, 248 F. App'x 849, 851 (10th Cir. 2007) (holding this enhancement applied where the defendant engaged in "extreme and repetitive misconduct" that "was far from an isolated occurrence"); *United States v. Petruk*, 836 F.3d 974, 976 (8th Cir. 2016) (holding this enhancement applied where the defendant "concocted a rather elaborate" and "complicated scheme" to conceal an assault, including fabricating an assailant, enlisting a co-conspirator, and drafting a false confession, and collecting cases where the enhancement was applied to similarly broad and/or recurring conduct).  Further, as explained above, Tom cannot be held responsible for others' misconduct that occurred prior to that date (because there is no credible and reliable evidence he joined the conspiracy prior to that date) and the conspiracy unraveled soon after (when the officers cooperated and Mr. Burke was arrested).

### C.    The "Organizer or Leader" Enhancement Is Inapplicable

A four-point enhancement for being an "organizer or leader" under U.S.S.G. § 3B1.1(a) cannot be applied to Tom, for several reasons.  There is simply no credible (much less "reliable" and "accurate") evidence that Tom planned, coordinated, or implemented any element of the conspiracy—or engaged in any other conduct that could be characterized as organizing or leading the conspiracy or its participants.  Even as to the June 4, 2015 meeting—the only one for which there is any corroboration that Tom and Mr. Hickey actually met—that meeting (even according to Mr. Hickey) was initiated and organized by Mr. Burke, not Tom.  (*See* 11.26.19 Tr. 1688:14−1689:23; 12.02.19 Tr. 1838:2−5.)  Moreover, to the extent Tom issued any directive at that meeting, there is no evidence that it was ever enforced or acted upon; to the contrary, Tom's alleged directive was never conveyed to the officers involved in the Loeb assault; the officers cooperated with the investigation into the assault; and Mr. Burke was arrested.  *See United States v. Burgos*, 324 F.3d 88, 92 (2d Cir. 2003) (finding application of this enhancement was in error, and vacating sentence, where the enhancement was based on, *inter alia*, "pressuring" a participant, particularly given that the participant's failure to comply "suggest[ed] independence").

That the evidence cannot support application of this enhancement to Tom is bolstered by reference to the seven factors that inform application of this enhancement.  *See* U.S.S.G. § 3B1.1 comment (n.4) (listing the seven factors).  First, the "nature" of Tom's participation (to the extent there was any corroboration of it) was his attendance at one meeting that resulted in no additional obstructive conduct.  *Id.*  Second, there is no evidence that Tom "recruit[ed]" any "accomplices." *Id.*  Third, to the extent there were any "fruits of the crime," a "larger share" of those fruits did not inure to Tom; the conspiracy instead benefitted those who (for a time) avoided prosecution for their crimes—specifically, Mr. Burke and the other officers who assaulted Mr. Loeb.  *Id.*  Fourth,

47

there is no evidence that Tom "plann[ed] or organiz[ed] the offense"—quite the opposite; even under Mr. Hickey's unreliable version of events, Tom allegedly engaged almost exclusively in brief, unplanned, and episodic meetings and conversations, during which he asked about the status of other participants, and a single meeting not planned or organized by Tom. *Id.* Fifth, whatever "decision making authority" Tom possessed, it was not exercised here—as noted above, there is no evidence that Tom planned or organized any specific course of conduct. *Id.* Sixth, whatever "the nature and scope" of the conspiracy, Tom's alleged involvement was minimal. *Id.* And seventh, as head of the SCDA—an entity distinct from the SCPD—Tom did not have "control or authority" over any of the officers involved in the conspiracy. *Id.* (*See also* PSR Objections and Reply, Exs. 124, 125.)

In the absence of credible evidence that Tom organized or led the conspiracy, the sole basis for applying this enhancement appears to be Tom's position as District Attorney. But Tom's position alone is not a proper basis for imposing the enhancement. *See* U.S.S.G. § 3B1.1 comment n.4) ("[T]itles such as . . . 'boss' are not controlling"). Indeed, courts have held that, even where (unlike here) an individual plays an important role in a scheme, this enhancement does not apply if the defendant was not *also* a leader. *See, e.g.*, *Burgos*, 324 F.3d at 92 (rejecting that defendant's "instrumental" role in scheme supported this enhancement); *United States v. Hopson*, 134 F. App'x 781, 796 (6th Cir. 2004) ("[T]he mere showing that the defendant played an 'essential role' in the offense . . . does not satisfy the Government's burden of showing that the defendant exercised 'managerial control' over other participants." (citing *United States v. Vandeberg*, 201 F.3d 805, 811 (6th Cir. 2000)); *United States v. Graham*, 162 F.3d 1180, 1185 (D.C. Cir. 1998) ("[B]eing an 'essential' participant in a conspiracy is not alone sufficient to trigger § 3B1.1(b)." (quoting *United*

*States v. Sostre*, 967 F.2d 728, 733 (1st Cir. 1992)).  Thus, Tom's role as District Attorney cannot serve as a proxy for his alleged leadership of the conspiracy.

In addition, Tom's position as District Attorney is already captured by the abuse of a position of trust enhancement under U.S.S.G. § 3B1.3.  As a result, Tom's position should not be relied upon to apply the "organizer or leader" enhancement as well.  *See United States v. Greenfield*, 44 F.3d 1141, 1146 & n.3 (2d Cir. 1995) (rejecting imposition of enhancements for both leadership role and more than minimal planning, where the role enhancement was based "solely" on the extent of the defendant's planning, because the enhancements "impermissibly rel[ied] upon the same facet of the defendant's conduct").

Finally, the fact that the PSR applies this enhancement to three different people (Mr. Burke, Chris McPartland, and Tom) further undermines application of this enhancement to Tom.  To the extent these offenses had an "organizer or leader," it was clearly Mr. Burke—not Tom.  It was Mr. Burke who (i) participated in the assault, (ii) initiated the cover-up of that assault, (iii) created the false cover story, (iv) told the officers involved to use that cover story if questioned, (v) created a written timeline that falsely denied his involvement in the assault and distributed the timeline to others, and (vi) repeatedly had direct contact with the officers who lied on his behalf.  Tom did none of those things.  Thus, given that this enhancement is intended to capture participants' "relative responsibility," *see* U.S.S.G. § 3B1.1 (background); *United States v. McGregor*, 11 F.3d 1133, 1139 (2d Cir. 1993) (stating that this goal is the "animating purpose" of the enhancement), applying this enhancement to both Mr. Burke and Tom—in light of Tom's far more limited alleged involvement—would be contrary to the very purpose of the enhancement.

## II.      The § 3553(a) Factors Warrant a Non-Incarceratory Sentence[1]

For the foregoing reasons, the appropriate Guideline range in this case is 21 to 27 months. But *any* Guideline range provides only an "initial benchmark and starting point" for a sentencing decision, and that starting point is, for all the reasons set forth below, too harsh to serve as the basis for a sentence here.  *See, e.g.*, *Gall v. United States*, 552 U.S. 38, 50 (2007) (holding that a court may not "presume that the Guidelines range is reasonable" and instead "must make an individualized assessment based on the facts presented"); *United States v. Booker*, 543 U.S. 220, 245 (2005) (holding that the Guidelines are merely advisory and "serve as one factor among several courts must consider in determining an appropriate sentence").  Instead, the non-Guideline factors the Court must consider under 18 U.S.C. § 3553(a) strongly support that a non-incarceratory sentence, with special conditions of home confinement and community service, would be "sufficient, but not greater than necessary" to achieve the goals of sentencing.

### A.      *Tom's History and Characteristics Merit a Non-Incarceratory Sentence*

Most notably, pursuant to § 3553(a)(1), courts are required to consider the "the history and characteristics of the defendant" to ensure that the sentence imposed "fit[s] the offender and not merely the crime."  *Pepper v. United States*, 562 U.S. 476, 487–88 (2011) (internal quotation marks omitted).  Here, Tom's history and personal characteristics—including his advanced age and declining health; his exceptional record of civic, charitable, and public service; and the significant punishment he has already endured and will continue to endure for the remaining years of his life—all support a non-incarceratory sentence.

---

[1] While this memorandum addresses the propriety of a downward variance under § 3553(a), downward departures from the advisory Guideline range would be appropriate as well, for many of the reasons stated herein.  But the Court need not reach that issue, given its variance authority under § 3553(a).

### 1.   Tom's Advanced Age and Declining Health

Tom's advanced age and worsening physical condition strongly counsel in favor of a non-incarceratory sentence.  *See* U.S.S.G. § 5H1.1 (policy statement on age); *United States v. Canova*, 412 F.3d 331, 358 n.28 (2d Cir. 2005) (permitting "consider[ation of] policy statements concerning departures" in granting a downward variance (internal quotation marks omitted)).

First, Tom's advanced age is one of the many reasons (addressed in greater detail below, *see infra* pp. 64–65) that there is no risk of recidivism here.  At nearly 80 years of age, Tom presents no risk of recidivism.  *See, e.g.*, *United States v. Hernandez*, 604 F.3d 48, 54 (2d Cir. 2010) (recognizing that a defendant's advanced age may indicate a decreased likelihood of recidivism); *United States v. Hodges*, No. 07-CR-706 (CPS), 2009 WL 366231, at *7–8 (E.D.N.Y. Feb. 12, 2009) (noting that, "post-*Booker,* courts have observed that recidivism is markedly lower for older defendants" and that the Guidelines "do not take into account the inverse relationship between age and recidivism"); *United States v. Greene*, 249 F. Supp. 2d 262, 267 (S.D.N.Y. 2003) (imposing a below-Guideline sentence of probation where the court found it was "highly unlikely" the defendant would recidivate due, in part, to the fact that he was 65 years old); *United States v. Nellum*, No. 2:04-CR-30-PS, 2005 WL 300073, at *3 (N.D. Ind. Feb. 3, 2005) (imposing a below-Guideline sentence and noting that "[t]he likelihood of recidivism by a 65 year old is very low").[2]

Further, given Tom's current medical needs— ███████████████████

████████████████████████████████████████████████

---

[2] *See also* U.S. Sentencing Comm'n, *The Effects of Aging on Recidivism Among Federal Offenders*, at 3, 22–25 (Dec. 2017), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20171207_Recidivism-Age.pdf (observing that "[o]lder offenders were substantially less likely than younger offenders to recidivate following release" and "[a]ge and criminal history exerted a strong influence on recidivism," including that the re-arrest rate was lowest for individuals 60 years or older in Criminal History Category I).

██████████████████████—sentencing Tom to a term of incarceration would shift

substantial burdens and costs onto the Bureau of Prisons ("BOP") and taxpayers.[3]  There is also

reason to believe that the BOP may fail to adequately care for Tom, placing him at a significant

risk of ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████

Perversely, if incarcerated, Tom's current medical status could subject him to far more

severe punishment than if he did *not* ████████████  (J. Sickler Decl., Ex. 126, at ¶¶ 14–26.)  While

Tom would otherwise qualify for detention at a minimum-security facility, because he will need

████████████████████████████████████████████████, there is a significant risk

that the BOP would assign Tom to the low-security or administrative-security medical facility at

the Federal Correctional Center ("FCC") Butner, near Raleigh, North Carolina.  (*Id.* at ¶ 17.)

Plainly, that designation would leave Tom hundreds of miles away from his family, a particularly

devastating outcome for Mary Ellen.  (*Id.* at ¶ 18.)  But it would also subject Tom to a far more

restrictive and violent facility than the minimum-security facility he would be eligible for if he

---

[3] *See* Office of the Inspector General, U.S. Dep't of Justice, *The Impact of an Aging Inmate Population on the Federal Bureau of Prisons*, at 11 Fig. 3 (Rev. Feb. 2016), https://www.oversight.gov/sites/default/files/oig-reports/e1505.pdf (reflecting that prisoners 80 years or older are nearly twice as expensive to incarcerate as the youngest prisoners, largely due to medical costs).

█████   (*Id.* at ¶¶ 19–22.)  And it would confine Tom to a facility that, ironically, has proven incapable of providing adequate medical care to its elderly and infirm prisoners.  (*Id.* at ¶¶ 25–26.)

A sentence carrying these risks is simply not necessary here, given that a non-incarceratory sentence with a period of home confinement would punish Tom while permitting continued care by his physicians, who are best positioned to meet his █████ medical needs.  *See, e.g.*, 18 U.S.C. § 3553(a)(2)(d) (requiring consideration of "the need for the sentence imposed . . . to provide the defendant with needed . . . medical care . . . in the most effective manner"); *United States v. Edwards*, 595 F.3d 1004, 1011, 1016–17 (9th Cir. 2010) (upholding a below-Guideline sentence of probation where the district court found that imprisoning a 63-year-old defendant with diabetes and related conditions "would simply pass the cost of medical care on to taxpayers," whereas probation "would satisfy the requirement of providing needed care in the most effective manner"); *United States v. Rioux*, 97 F.3d 648, 663 (2d Cir. 1996) (affirming 10-level downward departure and sentence of probation, with a special condition of home confinement, in part due to the defendant's medical conditions that required "regular blood tests and prescription medicines" and "monitoring"); *United States v. McFarlin*, 535 F.3d 808, 810–11 (8th Cir. 2008) (upholding a below-Guideline sentence of probation based, in part, on the defendant's need for medical care).

In addition, incarcerating Tom—at almost 80 years old—would almost certainly result in an accelerated physical decline.  Based on Department of Justice findings, individuals imprisoned at Tom's age suffer more rapid deterioration in their health and face the omnipresent risk of abuse by other, younger prisoners.[4]  In the Department's own words, elderly prisoners experience

---

[4] *See* Nat'l Institute of Corrections, U.S. Dep't of Justice, *Addressing the Needs of Elderly, Chronically Ill, and Terminally Ill Inmates*, at 9-10 (2004), https://s3.amazonaws.com/static.nicic. gov/Library/018735.pdf.

"accelerated . . . aging and deterioration of health"; are "frightened, anxious, and dependent, particularly on prison staff"; and are "[v]ulnerab[le] to abuse and predation" and "frequently feel unsafe and vulnerable around younger people."[5]  These risks would only be amplified here, given that Tom would be incarcerated for the first time as a senior citizen.  As the Department found, elderly defendants "are likely to have problems adjusting to prison since they are new to the environment, which will cause underlying stress and probable stress-related health problems" and, for the same reason, are "'easy prey' for more experienced predatory inmates."[6]  These risks, too, are simply unnecessary here, given the existence of other, more humane sentencing options.

Taken together, it is not hyperbolic to say that any term of imprisonment could be a death sentence for Tom.  Such a harsh penalty is simply not warranted, either for Tom—who has already paid dearly for his offense and poses no risk to the community—or for his wife, Mary Ellen—who would face the prospect of spending her final years without her husband of five decades, ▮▮▮

▮▮▮▮▮▮▮▮▮▮▮  *See, e.g.*, *United States v. Samson*, No. 16 Cr. 334 (JLL), Doc. Nos. 24, 25 (D.N.J. Mar. 7, 2017) (imposing below-Guideline sentence of home confinement and community service on 77-year-old defendant based, in part, on the court's finding that "[t]he impact of whatever punishment this Court ultimately issues on a person who is in the twilight of his years, that impact is different than it would be on a younger person"); *United States v. Sloane*, 308 F.R.D. 85, 88 (E.D.N.Y. 2015) (imposing below-Guideline sentence of one month of time served, where the defendant's age made it unlikely that he would recidivate and incarceration would negatively impact his sister, who relied on him for stability and housing).

---

[5] *Id.*

[6] *Id.*  Notably, Tom would also be at risk of such abuse due to his career in law enforcement.  *See, e.g.*, *Koon v. United States*, 518 U.S. 81, 111 (1996) (noting, in case concerning officer convicted of using excessive force against an arrestee, that "susceptibility to abuse in prison" is a proper basis for downward departure).

Even under the Guidelines, with a standard stricter than that required for a variance, "[a]ge may be a reason to depart downward in a case in which the defendant is elderly and infirm and where a form of punishment such as home confinement might be equally efficient as and less costly than incarceration."  U.S.S.G. § 5H1.1.  This is precisely the situation here.  *See United States v. Lanting*, 10-CR-998 (RRM), Doc. Nos. 43, 49 (E.D.N.Y.  Jan. 11, 2013) (imposing a sentence of probation with a term of home confinement, below the Guideline range of 37 to 46 months, where the defendant was 85 years old and the sole caretaker for his ailing 76-year-old wife).

*     *     *

All of this was true at the time of Tom's conviction.  But, as the Court is well aware, circumstances relevant to Tom's sentencing have shifted dramatically since that time.  In the past year, at least 114 million people have fallen ill and at least 2.5 million people have died from COVID-19—with more than one fifth of those cases and fatalities occurring in the United States.[7] Given these statistics, the United States is the arguable epicenter of the pandemic globally—and prisons are a hotbed of infection in the United States.  COVID-19 has spread like wildfire through crowded American prisons, reaching at least 1,377 correctional facilities and resulting in at least 626,000 infections and 2,790 deaths—numbers that likely capture only a small fraction of the true toll of the virus.[8]

---

[7] *See* Johns Hopkins Univ., *COVID-19 Dashboard*, https://coronavirus.jhu.edu/map.html (last viewed March 1, 2021).

[8] *See, e.g.*, N.Y. Times, *Coronavirus in the U.S.: Latest Map and Case Count, Hot Spots*, https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html#hotspots  (last  viewed March 1, 2021); The Marshall Project, *1 in 5 Prisoners in the U.S. Has Had COVID-19* (Dec. 18, 2020),  https://www.themarshallproject.org/2020/12/18/1-in-5-prisoners-in-the-u-s-has-had-covid-19 (noting that the number of confirmed infections and deaths is "a vast undercount").

55

Early in the pandemic, Congress and the Department of Justice acted to try to prevent this crisis, by authorizing the BOP to "immediately" transfer prisoners at risk of COVID-19 infection to home confinement—particularly those "who are non-violent and pose minimal likelihood of recidivism and who might be safer serving their sentences in home confinement."[9]  Nonetheless, the BOP has failed to stem the tide of infections, with frightening conditions at BOP facilities— such as minimal testing, inadequate personal protective equipment, lack of access to hand sanitizer and cleaning supplies, and limited to no space to physically distance from others—leaving prisoners and BOP staff alike unsafe.[10]  Unsurprisingly, the number of COVID-19 cases at BOP facilities has skyrocketed—to at least 54,422 total cases among prisoners and staff, though even that figure likely significantly understates the scale of the crisis[11]—with severe outbreaks continuing to arise across the BOP system.[12]

---

[9] *See* Office of the Attorney General, U.S. Dep't of Justice, *Memo. For Dir. of Bureau of Prisons re Prioritization of Home Confinement As Appropriate in Response to COVID-19 Pandemic* (Mar. 26, 2020), https://www.bop.gov/coronavirus/docs/bop_memo_home_confinement.pdf; Office of the Attorney General, U.S. Dep't of Justice, *Memo. For Dir. of Bureau of Prisons re Increasing Use of Home Confinement at Instits. Most Affected by COVID-19* (Apr. 3, 2020), https://www. justice.gov/file/1266661/download.

[10] *See, e.g.*, *id.*; Washington Post, *Prisoners and Guards Agree about Federal Coronavirus Response: 'We Do Not Feel Safe'* (Aug. 24, 2020), https://www.washingtonpost.com/nation/ 2020/08/24/prisoners-guards-agree-about-federal-coronavirus-response-we-do-not-feel-safe/.

[11] *See* BOP, *COVID-19 Cases*, https://www.bop.gov/coronavirus/ (reporting the numbers of infected, recovered, and deceased prisoners and staff) (last viewed March 1, 2021); Office of the Inspector General, U.S. Dep't of Justice, *Pandemic Response Report 21-003*, at i (Nov. 2020), https://oig.justice.gov/sites/default/files/reports/21-003.pdf ("In those institutions where more widespread inmate testing has been undertaken, the percentage of inmates testing positive has been substantial.").

[12] *See, e.g.*, NJ.com, *Warden at N.J. federal prison reassigned amid massive COVID outbreak* (Feb. 1, 2021), https://www.nj.com/news/2021/02/warden-at-nj-federal-prison-reassigned-amid-massive-covid-outbreak.html ("cases have soared over the last couple months"); Tribune-Star, *6th inmate at Terre Haute federal prison complex dies of COVID-19* (Feb. 10, 2021), https://www.tribstar.com/news/6th-inmate-at-terre-haute-federal-prison-complex-dies-of-covid-19/article_ccefbd7a-6bad-11eb-89f0-bfca9a06200b.html ("Cases of COVID-19 soared to more

Vaccines, of course, promise some relief.  But there are still significant questions concerning what course the pandemic will take over at least the next several months, if not longer—particularly for someone of Tom's advanced age and ██████████████   While ████████████████████████████████████████ the vaccines are not completely effective in preventing the disease.[13]   It is also unknown how long protection from the vaccines lasts.[14] More troublingly, it is also not clear how effective the vaccines will be against the many more contagious and more deadly variants that are spreading across the country—though it is clear that the vaccines could be *much* less effective against at least some of those variants.[15]   Given these uncertainties, the risk of COVID-19 exposure and restrictions to limit its spread are almost certain to persist in prisons for some time, regardless of vaccine status.  And for Tom, these risks are alarmingly severe—████ increases the risk of severe illness from COVID-19, and, on the cusp of turning 80, Tom is 187 times more likely to die from the virus than someone in their 20's.[16]

---

than 280 at the USP in December."); Live 5 News, *35 staff COVID-19 cases, 2 inmate deaths reported at FCI Williamsburg* (Jan. 21, 2021), https://www.live5news.com/2021/01/21/staff-covid-cases-inmate-deaths-reported-fci-williamsburg/ (noting a "steady increase in reported cases over the last two weeks").

[13] *See* N.Y. Times, *2 Companies Say Their Vaccines Are 95% Effective. What Does That Mean?* (Nov. 20, 2020), https://www.nytimes.com/2020/11/20/health/covid-vaccine-95-effective. html.

[14] *See* CDC, *Public health recommendations for vaccinated persons*, https://www.cdc.gov/vaccines/covid-19/info-by-product/clinical-considerations.html (last viewed March 1, 2021) (assuming immunity only for individuals who have been vaccinated within three months).

[15] *See, e.g.*, N.Y. Times, *A New Coronavirus Variant Is Spreading in New York, Researchers Report* (Feb. 24, 2021), https://www.nytimes.com/2021/02/24/health/coronavirus-variant-nyc.html; L.A. Times, *California's coronavirus strain looks increasingly dangerous: 'The devil is already here'* (Feb. 23, 2021), https://www.latimes.com/science/story/2021-02-23/california-homegrown-coronavirus-strain-looks-increasingly-transmissible-and-dangerous;      Washington Post, *Pfizer and Moderna vaccines have reduced effectiveness against South African variant, newly published studies show* (Feb. 18, 2021), https://www.washingtonpost. com/nation/2021/02/18/coronavirus-covid-live-updates-us/.

[16]   *See* CDC, *COVID-19 Hospitalization and Death by Age* (Aug. 18, 2020), https://www.cdc.gov/coronavirus/2019-ncov/covid-data/investigations-discovery/hospitalization-

Moreover, if sentenced to a term of incarceration, Tom would face much harsher conditions of confinement due to COVID-19.  To begin with, he would be required to quarantine upon arrival at, and again before leaving, the prison, ███████████████████—likely in a small, windowless Special Housing Unit cell, for weeks and potentially months, with limited, if any, access to medical care, and in total isolation, other than short and infrequent showers.  (J. Sickler Decl., Ex. 126, at ¶¶ 7–11.)  Such treatment has rightly been recognized as "cruel," "inhuman," and "harmful to an individual's health" by the National Commission on Correctional Health Care and the United Nations.  (*Id.* at ¶ 12.)  Once out of quarantine, he would likely be subject to lockdowns as well as restrictions on his ability to communicate with his loved ones, given ongoing visitation and communication blackouts at BOP facilities.[17]  And he would be subjected to these conditions—newly incarcerated as a vulnerable, old, and ███ man, without means of even seeing his loved ones—all while facing the very real risk of contracting a lethal virus.

Under the Department of Justice's own directives on home confinement, Tom—a non-violent offender, with no chance of recidivism, who is at significant risk from COVID-19—should not be subjected to these conditions, and should instead be placed in home confinement. Particularly in light of these unique and potentially grave circumstances, the availability of home confinement renders a term of incarceration a far greater punishment than is necessary to

---

death-by-age.html (noting 75 to 84-year-olds are 187 times more likely to die from COVID-19 than 18 to 29-year-olds); ███████████████████████████████████

[17] *See, e.g.*, BOP, *FCI Butner Low*, https://www.bop.gov/locations/institutions/buf/ (noting, as of March 1, 2021, that "[a]ll visiting at this facility has been suspended until further notice"); BOP, *FMC Butner*, https://www.bop.gov/locations/institutions/buh/ (same); Filter, *Brooklyn Federal Prison Denying Communication Rights in Pandemic* (Jan. 25, 2021), https://filtermag.org/brooklyn-federal-prison-covid-communication/.

accomplish the goals of sentencing.  *See, e.g.*, *United States v. Bryan Cohen*, No. 19 Cr. 741 (WHP), Doc. No. 48 at pp. 42–44 (S.D.N.Y. Jun. 9, 2020) (imposing sentence of home confinement and community service, despite government's request for Guideline sentence of 37 months imprisonment, based in part on the defendant's susceptibility to COVID-19).[18]

### 2.    Tom's Extraordinary Record of Civic, Charitable, and Public Service

While Tom's age and health alone would render a term of imprisonment a greater than necessary punishment here, his decades of good works also support the same result.  Indeed, those good works have been exceptional.  From a young age, Tom was driven to serve his community—volunteering for the Marines during the Vietnam War, and taking on the risk of firefighting in his community.  While he could have pursued a lucrative career in the private sector, he twice left those opportunities to work for his community, as an assistant district attorney prosecuting some of Suffolk County's most deplorable crimes and as District Attorney, a role in which he strove daily to protect the 1.5 million residents of the county, from Melville to Montauk.  And Tom exercised significant compassion throughout that public service, delving into cases to secure justice for traumatized victims; searching out opportunities to assist the less powerful; and embracing programs that extended opportunities for a second chance to meritorious defendants.

Tom, of course, saw to many of these good works in his role as District Attorney.  But no one required Tom to forge a new law to protect victimized immigrant workers—particularly at a time and in a place where immigration was a controversial issue.  No one required Tom to adopt alternatives-to-incarceration programs that altered the course of hundreds of lives—and brought

---

[18] *See* Law360, *Ex-Investment Manager Dodges Prison For Stock, Tax Crimes* (May 4, 2020), https://www.law360.com/articles/1270190/ex-investment-manager-dodges-prison-for-stock-tax-crimes (reporting on sentence of probation in *United States v. Panayiotis Kyriacou*, No. 18 Cr. 102 (KAM) (E.D.N.Y.), where court concluded that "an incarceratory sentence in this climate, with COVID easily spread among inmates, is not necessary" for deterrence).

great risk to Tom had any of the defendants faltered.  No one required Tom to mentor younger attorneys, to promote women throughout the SCDA, to stand aside as young prosecutors basked in the well-deserved glow of their hard-fought wins, to fight for better compensation for his staff, or to tend to his staff in times of sickness and need.  Tom did all of these things because they were the right thing to do—and because the chance to do the right thing was the reason he sought public office in the first place.

And Tom acted no differently in his personal life.  He sought out opportunities to help others, spending over two decades on the Board of the WHPDC—securing housing for dozens of low-income families in the process—in addition to his service at the Cleary School for the Deaf and the SCCC's Center on the Holocaust, Diversity, and Human Understanding.  Tom was also always available to family, friends, and neighbors, and quick to assist whenever there was a need.  If financial assistance was needed, Tom was there.  If legal advice was needed, Tom was there.  If emotional support was needed, Tom was there.  Indeed, all too frequently in recent years, Tom has been close by to support his friends in their last days.  Tom did all of this even in the past several years, when he faced significant challenges of his own.  These were all good works, done quietly, across decades, because Tom wanted to make other people's lives easier and better.

Finally, Tom has been the rock of his family.  During hard times—his mother's illness and death; his stepmother's battle with ███████████ his father's battle with ███████████ Mary Ellen's ███████████████████████████████████████ his daughter's ███████████████████ and his daughter-in-law's ███████████████—Tom has always been there, providing steadfast support, and over many decades has been the pillar of his beautiful family.

Tom is, at his core, a fundamentally good and caring person. And that goodness—exhibited in many ways, over a lifetime filled with good works and helping others—is deserving of leniency. Indeed, the Second Circuit has approved substantial downward departures, resulting in sentences of probation, on less exemplary records. *See, e.g.*, *Canova*, 412 F.3d at 358–59 (approving downward departure based solely on the defendant's "extraordinary public service and good works" and resulting in a sentence of probation, where the defendant served in the Marine reserves, volunteered as a fireman, and assisted three individuals in medical distress); *Rioux*, 97 F.3d at 663 (affirming 10-level downward departure and sentence of probation, with a special condition of home confinement, in part due to the defendant's charitable fundraising). Other courts, too, have imposed or affirmed non-incarceratory sentences where a defendant's good works merited leniency. *See, e.g.*, *Greene*, 249 F. Supp. 2d at 264 (awarding 7-level downward departure and imposing sentence of probation for defendant who served as a foster parent and "gave a much more valuable commodity, his time"); *United States v. Tomko*, 562 F.3d 558, 563 (3d Cir. 2009) (en banc) (upholding a below-Guideline sentence of probation, which was granted in part due to the defendant's "involvement in exceptional charitable work"—specifically, "pre-indictment charitable acts that involved not only money, but also his personal time"); *United States v. Cooper*, 394 F.3d 172, 177 (3d Cir. 2005) (upholding 4-level downward departure and sentence of probation based on the defendant's good works, which were "hands-on personal sacrifices" that "had a dramatic and positive impact on the lives of others").

That same leniency should be applied here—to a man who has spent his life giving back to others and working to make others' lives better.

### 3.    The Collateral Consequences of Tom's Conviction

Whether considered as a part of Tom's history, or with respect to the need to "afford adequate deterrence" or "to provide just punishment," *see* 18 U.S.C. § 3553(a)(2)(A)–(B), the significant collateral consequences Tom has already suffered support leniency as well.  What time is left in Tom's life will undoubtedly be spent in the dark shadow of this case.  His once-outstanding reputation is now well-nigh unsalvageable, and he faces continued civil litigation by Suffolk County, which is now seeking to claw back years of wages and benefits based on the events leading to Tom's conviction.[19]  The humiliation he has suffered these past several years will also never abate.  Tom's name will forever be found in news stories involving sex toys and pornography,[20] and he will live with the knowledge that his wife and children, and many others close to him, suffered for years alongside him as these proceedings continued.  For the rest of his life, Tom will struggle with the shame and regret he feels over the relationship that brought him to this place.

These serious collateral consequences—loss of reputation, public humiliation, and significant financial repercussions—have been relied upon by other courts to grant leniency, and warrant leniency here as well.  *See, e.g.*, *United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) (upholding a below-Guideline sentence based, in part, on the potential collateral consequences of the defendant's conviction, including career loss, and observing that "[i]t is difficult to see how a court can calibrate a 'just punishment' without considering collateral effects"); *United States v. Schulman*, No. 16 Cr. 442 (JMA), Doc. No. 155 (E.D.N.Y.  Sept. 26, 2017) (imposing a below-

---

[19] *See* Newsday, *Suffolk Sues Spota, McPartland and Burke for Back Pay and Benefits* (May 8, 2020),    https://www.newsday.com/long-island/suffolk/spota-burke-mcpartland-cover-up-loeb-1. 42539779.

[20] *See* N.Y. Times, *A Bag of Sex Toys, an Alleged Cover-Up and an Ex-D.A. on Trial* (Nov. 14, 2019), https://www.nytimes.com/2019/11/14/nyregion/thomas-spota-corruption-trial.html.

Guideline sentence of probation and community service based, in part, on "the significant collateral effects of the defendant's conviction," including "the stigma" he faced, "his likely disbarment," and the fact that his "emotional well-being ha[d] suffered"); *Samson*, No. 16 Cr. 334 (JLL), Doc. Nos. 24, 25 (imposing a below-Guideline sentence of home confinement and community service based, in part, on the court's finding that "it would be improper . . . to not at least acknowledge that there have been some consequences that are punitive in nature when someone reaches the level of reputation and professional level that the defendant had reached and then finds himself publicly humiliated, ridiculed, the loss of the license," and "the loss of his reputation as a lawyer," given that " all of that does have a punitive aspect to it"); *United States v. Warner*, No. 13 Cr. 731 (CPK), Doc. No. 33 (N.D.Ill. Jan. 14, 2014)  (imposing below-Guideline sentence of probation and community service based, in part, on the court's finding that "the public humiliation and reproachment [the defendant] ha[d] experienced [was] manifest"); *United States v. Anderson*, 533 F.3d 623, 633 (8th Cir. 2008) (upholding a below-Guideline sentence based on "other ways in which the defendant had suffered atypical punishment," including "the loss of his reputation and his company" and an ongoing civil proceeding); *United States v. Diambrosio*, No. 04-CR-66, 2008 WL 732031, at *3 (E.D. Pa. Mar. 13, 2008) (imposing a below-Guideline sentence of probation and one year of home confinement, in part because the "[d]efendant already . . . paid a heavy price for his offense[; h]e has lost his job [and] is forever barred from the securities industry"); *United States v. Roth*, No. 05-CR-792-5, 2008 WL 686783, at *1–3 (N.D. Ill. Mar. 11, 2008) (imposing a below-Guideline sentence of probation where the defendant lost her law license as a result of her participation in the offense).

**B.      *Incarceration Is Not Required to Satisfy the Remaining Goals of Sentencing***

Under 18 U.S.C. § 3553(a), courts must also consider the need for a sentence to "promote respect for the law," "afford adequate deterrence to criminal conduct," "protect the public from further crimes of the defendant," and "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."      *See* 18 U.S.C. § 3553(a)(2)(A)–(C), (6).     These objectives, too, would be satisfied by a non-incarceratory sentence.

As an initial matter, a term of incarceration is not necessary to promote respect for the law or for general deterrence.  Tom's career is over.  His reputation has been destroyed.  He has been the subject of public scorn and ridicule for years.  His health is in decline.  He is exposed to potentially significant financial penalties.  And he is now a convicted felon and will bear the stigma that his conviction carries with it.  No one will be tempted to commit a crime if an elderly, █ man, who has suffered the way Tom has suffered, is sentenced to home confinement instead of prison.  *See, e.g.*, *Edwards*, 595 F.3d at 1016–18 (finding that § 3553 "does not require the goal of general deterrence be met through a period of incarceration" and upholding district court's determination that below-Guideline sentence of probation provided adequate deterrence).

There is also no need to incarcerate Tom to protect the public—because there is simply no chance that Tom will ever recidivate.  At a minimum, Tom is no longer District Attorney and, therefore, he cannot recidivate.  *See, e.g.*, *Stewart*, 590 F.3d at 141 (approving finding that the fact that the defendant would "not be in a situation to commit the offenses of conviction again" lessened the need for deterrence); *United States v. Gaind*, 829 F. Supp. 669, 671 (S.D.N.Y. 1993) (granting downward departure where the destruction of the defendant's business prevented recidivism); *United States v. Speed Joyeros, S.A.*, 204 F. Supp. 2d 412, 440–41 (E.D.N.Y. 2002) (similar).

64

Indeed, Tom has not spoken to James Burke in several years and has no intention of doing so.  Nor does Tom pose any risk of recidivism, given his age and the absence of any criminal history.  *See, e.g.*, *supra* p. 50 & n.2; *United States v. Autery*, 555 F.3d 864, 874 (9th Cir. 2009) (upholding below-Guideline sentence of probation based, in part, on the finding that "Criminal History Level I did not fully account for [defendant's] complete lack of criminal history"); *United States v. Germosen*, 473 F. Supp. 2d 221, 227, 230 (D. Mass. 2007) (similar).  And Tom will never again expose himself to a situation that could inflict the pain that he and his family have endured as a result of these proceedings.  In short, Tom poses no threat to the public, and should be sentenced with that lack of a need for deterrence in mind.  *See, e.g.*, *Pepper*, 562 U.S. at 492 (noting that the "likelihood that [a defendant] will engage in future criminal conduct" is "a central factor that district courts must assess when imposing sentence"); *Schulman*, No. 16 Cr. 442, Doc. No. 155 (basing a below-Guideline sentence of probation, in part, on the findings "that the significant collateral effects of the defendant's conviction . . . have already achieved the goal of deterrence" and the defendant's advanced age, family support, likely disbarment and loss of career, and lack of criminal history "indicate[d] a very low risk of recidivism"); *United States v. E.L.*, 188 F. Supp. 3d 152, 174 (E.D.N.Y. 2016) (imposing a below-Guideline sentence of probation where the defendant's risk of recidivism was "almost zero").

Finally, a non-incarceratory sentence would not entail unwarranted sentence disparities.  *See* 18 U.S.C. § 3553(a)(2)(A), (6).  Tom's alleged role in the conspiracy was far more limited than others' and deserving of much lesser punishment.  As was made clear at trial, Mr. Burke assaulted Mr. Loeb, orchestrated the cover-up of that assault for his own personal benefit, and oversaw every facet of the conspiracy to preserve that cover-up for nearly three years.  Mr. Burke was, without question, the instigator, mastermind, and beneficiary of the conduct at issue here.  By

contrast, the evidence at trial showed that Tom's alleged involvement paled in comparison. Tom's sentence should reflect his lesser participation. *See Gall*, 552 U.S. at 47 (stating that a court may properly consider "the need to avoid unwarranted similarities among other co-conspirators who were not similarly situated"); *United States v. Ebbers*, 458 F.3d 110, 129 (2d Cir. 2006) (concluding that the sentencing disparity between co-defendants was reasonable based on, *inter alia*, their "varying degrees of culpability").

### C.     A Non-Incarceratory Sentence Would Be Sufficient, But Not Greater than Necessary, To Comply with the Purposes of Sentencing

Given all of these factors, a sentence of probation with special conditions of home confinement and community service would be "sufficient, but not greater than necessary," to accomplish the goals of sentencing. *See* 18 U.S.C. § 3553(a); *Gall*, 552 U.S. at 51  (requiring sentencing courts to "take into account the totality of the circumstances"); *United States v. Hutcherson*, 6:05-cr-00039, Doc. No. 211-1 (W.D. Va. Dec. Aug. 30, 2006) (sentencing the defendant for, *inter alia*, obstruction of justice, to a below-Guideline sentence of probation, home confinement, and community service, based on the defendant's age, health, and family ties; the fact that the offenses were not violent; the lack of any risk of recidivism; the defendant's history of public service; and the defendant's loss of several positions in the community).

A sentence of probation would subject Tom to significant deprivations. As the Supreme Court recognized in *Gall*, defendants serving probationary sentences are "subject to several standard conditions that substantially restrict their liberty." 552 U.S. at 48. As the Court elaborated, individuals on probation "may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court," and "[t]hey must report regularly to their probation officer, [and] permit unannounced visits to their homes." *Id.* As then-Judge John Gleeson similarly noted, the choice between prison and

66

probation is not a choice "between punishment and no punishment." *United States v. Leitch,* No. 11-CR-00039 (JG), 2013 WL 753445, at \*12 (E.D.N.Y. Feb. 28, 2013).  To the contrary, while "[p]robation is less severe than a prison term . . . both are punishment.  And as the Supreme Court has recognized, probation is *significant* punishment. . . .  In addition to standard and special conditions, there is an array of alternative sanctions—home confinement, community service, and fines, for example—that allow judges to impose enhanced (and sometimes even constructive) punishment without sending the defendant to prison." *Id.*

A term of home confinement would impose even greater restraints on Tom than probation alone—limiting his movements to his home for all but medical and other similarly essential reasons.  A term of home confinement would permit Tom to continue to receive medical treatment from his current physicians.  It would prevent the need for Tom to make the inconceivably difficult transition to prison as an octogenarian, with all of the physical threats and risks that it would entail. It would substantially shield Tom from the potentially lethal dangers of the ongoing COVID-19 pandemic.  And it would avoid the uniquely unjust circumstance of Tom potentially having to suffer more punitive conditions of confinement solely because he is ███████

Finally, a condition of significant community service would give Tom the opportunity to make amends to the community, while also continuing the work that has enriched the lives of so many members of that community over the last several decades.  Community service is a widely accepted alternative to incarceration that has been praised by the United States Office of Probation and Pretrial Services as "a flexible, personalized, and humane sanction" that is also "practical, cost-effective, and fair—a 'win-win' proposition for everyone involved."[21]  Courts have also

[21] *See* U.S. Probation & Pretrial Services, *Court & Community: An Information Series About U.S. Probation & Pretrial Services: Community Service* (2001), http://www.nhp.uscourts.gov/sites/default/files/pdf/ccservice.pdf.

recognized the value of community service as an alternative sentence, with then-Judge Gleeson observing that "[a]lternatives to incarceration exist that can carry both the community and this Court's condemnation of your conduct but channel it in a way that's more constructive." *See* Herb Hoelter, *Symposium on Alternatives to Incarceration*, U.S. SENTENCING COMM'N at 349 (Jul. 14, 2008); *see also, e.g.*, *Samson*, No. 16 Cr. 334 (JLL), Doc. Nos. 24, 25 (imposing below-Guideline sentence of home confinement and community service where the defendant, a former high-level government official, had conducted "a lifetime of good work," was elderly, and had already suffered significant collateral consequences due to his conviction); *United States v. Chatwal*, No. 14 Cr. 143 (ILG), Doc. No. 40 (E.D.N.Y. Dec. 10, 2014) (imposing below-Guideline sentence of community service and advising that the defendant, convicted of campaign contribution violations and obstruction of justice, continue the good works he had previously committed himself to); *Warner*, No. 13 Cr. 731 (CPK), Doc. No. 33 (imposing below-Guideline sentence of probation and community service based, in part, on the court's analysis of "whether society would be better off with [the defendant] in jail or whether it would be best served by utilizing his talents and beneficence to help make this a better world" and its conclusion that "society w[ould] be best-served by allowing [the defendant] to continue his good works"). Further, there are ample options for imposing this punishment here, including by requiring Tom to continue his work supporting one or more of the organizations he did so much to nurture throughout his life, or others deemed suitable to the Court.

**<u>Conclusion</u>**

We respectfully ask the Court to impose a non-incarceratory sentence on Tom Spota, with special conditions of home confinement and community service.  We respectfully submit that the numerous considerations detailed in this memorandum provide truly compelling justification for such a sentence in this case, and that those considerations make it clear that no greater sentence is necessary to achieve the purposes of sentencing.


Dated:  March 5, 2021
       New York, New York

Respectfully submitted,

*/s/ Alan Vinegrad*

_____
Alan Vinegrad
Erin Monju
Sarah LeMaster
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
(212) 841-1022

*Counsel for Thomas J. Spota*
