# EXHIBIT 107

January 21, 2020

The Honorable Joan M. Azrack
United States District Judge
United States Courthouse
100 Federal Plaza
Central Islip, New York 11722

Dear Judge Azrack,

My name is Deanna Spota. I am Thomas Spota's first cousin, our fathers were brothers.

Tom has been a wonderful and loving member of our family. He has always been loving and considerate to all members of our family. He has been ready a willing to help anytime there was a sickness or other problems we were facing.

████████████████████████████████
████████████████ At this time, Tom was a criminal defense attorney. █████████████
████████████████████████████████
████████████████████████████████

His recommendation allowed me to negotiate a satisfactory outcome. I was always

2

grateful to Tom for taking an interest in my benefit at a difficult time in my life.

Years later, my mother, Tom's aunt was admitted to a nursing home at age 93. The day after her admission, Tom came to visit her. She was so happy to see him and he brought her much comfort and re-assurance. He had taken time from his very busy work schedule to visit at a time when she was frightened and unsure of her future.

My brother and I were so appreciative of his caring and concerned for our mother.

Tom has always been a loving and devoted husband to his wife Mary Ellen and a loving father to his three children and grandchildren. He values his family life above all else.

Thank you for your consideration in this matter.

Respectfully,
Deanna Spota

# EXHIBIT 108

February 7, 2020

The Honorable Joan M. Azrack
United States District Judge
United States Courthouse
100 Federal Plaza
Central Islip, New York 11722

    Re:  Tom Spota

Dear Judge Azrack:

    I watched every day of my father's trial.  I appreciate Your Honor's consideration of my thoughts in this letter.

    Let me begin by telling you a few facts about me.  I am the middle child in my family.  Now 43 years old, I am married and my husband, Preston, and I have a nearly five-year-old daughter, ███ We live in Brooklyn.  I am attorney working in public service.

    My father has had a profound influence on my life.  He taught me invaluable lessons about hard work and loyalty to family and friends.  Those lessons form the basis of some of my core beliefs today.

    In terms of my father's dedication to hard work and service, Your Honor no doubt has heard from many about his devotion to the DA's Office and how his leadership touched the lives of many for the better.  I personally can recall my father's investment in cases, including late night and weekend calls, his excitement when an important investigation was taken down or arrest made, and his absolute dedication to and pride in his employees.  I also remember how proud he was when the DA's Office released its Grand Jury report into abuse by priests in the Catholic Church – a church to which we belong – and his belief that his office's efforts would help to right such a tragic wrong.

    My father also is a very loyal person, and he believes strongly in standing by his family and friends.  That loyalty and dedication has translated into a close-knit family and long-standing bonds of friendship.  While my mom is the heart of the family, my dad is its source of exuberance.  He brings energy and enthusiasm to every situation and is especially adored by his five grandchildren, including my ███ who absolutely delight in his jokes, games, and imaginary "monster" play.  My father has a great sense of humor and is a terrific storyteller, often getting us all laughing when we gather together.

    In addition to his close family ties, my dad has sustained dear friendships throughout his years.  Indeed, even as he approaches 80 years old, two of his closest

friends from childhood attended the trial nearly every day, supporting my father in the same way he would for them.

This is just a small glimpse into my father -- the man you must now judge. As Your Honor considers what his punishment will be, I want you to know and understand that my father has suffered mightily during this ordeal, as our whole family has. His professional life and reputation was destroyed, his ability to practice law was stripped from him, he was humiliated relentlessly in the press, and he had to watch as his family and his colleagues suffered as a result. He has tried to remain stoic, especially in front of his kids, but he cannot hide the fact that this experience has devastated him, and I don't think he will ever recover from it. And so he has already been punished time and again for the last four years as he endured this process, from the investigation through the trial.

I am making a sincere request to please not compound this tremendous suffering by removing my mother's husband of 50 years, my father, and the grandfather to my child, as he nears the end of his life.

Respectfully,

Kate Spota

2

# EXHIBIT 109

Lawrence R. Spota



February 1, 2020

The Honorable Joan M. Azrack
United States District Judge
United States Courthouse
100 Federal Plaza
Central Islip, New York 11722

Dear Judge Azrack:

My name is Larry Spota. Tom Spota is my first cousin. I am writing on behalf of him to tell you about the person I have known and admired since my childhood in the 1950s.

Tom is eleven years older than me. When I was a very young boy I recall looking forward to any time I knew I would see him. He was like an older brother who spent some time having fun and could always make you laugh. That's a cool thing when you're a kid and it leaves a great impression. It's a wonderful personality trait to make people enjoy the moment but Tom had other attributes that were more important to appreciate and emulate as I became older.
It was during this time Tom showed he realized the importance of education by working hard to gain admission to a highly regarded parochial high school. From there he went on to college and law school. I'm sure I failed to realize the significance of pursuing a strong education as a first grader; however, later on it became clear to me as I decided to follow in his footsteps to the same high school. As I continued to mature I also saw his sense of duty to the community, evidenced by his service as a volunteer fireman, participation in charity fund-raising, and service in the Marine Corps reserves. I am convinced, based on some of our conversations, that his sense of service was a prime driving factor in his decision to run for District Attorney. The importance of family life, education, volunteerism and public service was always understood in our family. Tom was the most relatable real life example for me of those right things to do when I was an adolescent.

As I mentioned above I attended the same high school Tom did, partly because I wanted to do what he did and partly because of the positive reviews my family heard from his family. That decision was one of the best I ever made. It was a great education full of diversified knowledge but as I always said the most important benefit was "they taught me to think." That critical thinking was the most important skill I brought to any endeavor for the rest of my life. As an added bonus it was there I experienced my first serious experiences in volunteerism and service. Without Tom acting as a pathfinder I don't know if I would have found my way there.

Tom graduated from law school about the same time I started high school. He and his wife, Mary Ellen, were married before I graduated. Obviously, he was well into his adult life before I even began mine. Through all the ups and downs adult life can bring, Tom has remained that great guy with the easy smile, great sense of humor, and true interest in what was going on with

whomever he met.  More importantly for me, through the years that older brother aspect of steering you in the right direction has continued.  Whenever I have had the occasion to seek his advice or opinion I knew Tom would take the time to provide an honest sounding board on different issues.  He would let me know if he thought I was right and, more importantly, Tom would not hesitate to state his dissent with views I expressed or make clear his concerns for decisions he thought would be unwise.  Some of that advice has made me see things more clearly and others more than likely kept me or people I was trying to help from making poor decisions.  In the end I could always summarize that his advice or opinion, on legal topics or other subjects, was to look at the situation honestly and do the right thing for the right reasons.

For 50 years Tom has been a loving husband. He and Mary Ellen have been loving parents for almost as long.  His love and care for Mary Ellen and their children has been undeniable.  It is easy to see this is a two-way street.  Tom's love and thoughtfulness extends to the rest of the extended family as well.  During any stressful event in my life Tom would give me a call to see how we were doing.  At any large family gathering I saw how he was encouraging to younger members of the family and how he expressed admiration for any of their accomplishments. At any of these events I always got a kick out of how much joy he got watching the youngest kids play.  Some things don't change.

Today, as I am sure you can imagine, the results of the case against Tom and all that has led up to it has taken a heavy toll on Tom, Mary Ellen and their children.  Despite the potential future unpleasant and even hazardous position in which Tom finds himself, I know for a fact his biggest concern is not for himself.  Understandably, Tom is concerned how this affects and will continue to affect his children and grandchildren.  He is also concerned about what effect this has on all his relatives and whether the family name will be tarnished.  But without doubt Tom's biggest concern is what lies ahead for Mary Ellen, on top of the enormous toll this situation already has taken on her.

In this letter I have tried to share with Your Honor what I know about Tom and show the positive influence he has been in my life.  I have to imagine that there are others fortunate enough to know Tom who were constructively motivated by him. I also have to believe there are scores of people whose lives have been improved, in ways we would all applaud, as a result of Tom's efforts throughout his life, either as a volunteer or as an attorney.

Ultimately, I have sent this letter to Your Honor asking you to consider all that I have related about Tom and factor in all the good Tom has done in his life when you are contemplating his sentence.  My wish is that as you read what I and others have written on Tom's behalf it can help you find good reason to consider as lenient a sentence as possible.

I thank you for taking the time to read my letter and hope that you found it supportive of my request.

Respectfully,

Lawrence R. Spota

# EXHIBIT 110

Mary Ellen Spota

████████████████████

February 5, 2020

The Honorable Joan M. Azrack
United States District Judge
United States Courthouse
100 Federal Plaza
Central Islip, New York. 11722

Dear Judge Azrack,

Tom and I have just celebrated our Golden Anniversary. Fifty years of sharing life with another brings a unique understanding of that person, but we knew from the beginning that we were meant for each other.

We met in March, were engaged in June and married in January. We knew. ████████████

████████ he persisted that we should go on with our plans. ████████████

From the honeymoon, ████████████████████████████████

████████████████████████████████ no choice but to move in with my parents, sell the little home we had just purchased and try to start our life together. ████████████ Tom took on two more jobs in the evening, after working as an associate in a law firm during the day. He went directly to a liquor store until 9 P.M., and then to an asphalt plant, where he cleaned bathrooms until 2 A.M. to pay every single penny of every single bill.

████████████████████████████████████

Hardly the auspicious start to a marriage! It proved to me, however, in no uncertain terms, the kind of man I married. His strength of character was shown to me then and has remained intact until this day.

We bought a house and raised our family. Tom is a wonderful husband and father. He's been faithful to me and present for his children in all the important ways. His work ethic is outstanding and his commitment to our family is absolute. Tom handles the finances in the family. He anticipates obligations and sets aside funds before the due date. Our Catholic faith led us in teaching values and morals to the children, and they reflect those teachings in their lives. Among them, we have five sweet grandchildren.

There were family trips out West to national parks and trips to Maine. Tom would create a sense of excitement by going on turtle hunts with the kids among the lily pads of the lake. It takes a special kind of man to take this sort of silliness and turn it into an adventure. He was

able to become a child with them and enjoy the time together. The same was true in the swimming pool. The chasing, splashing, screaming and laughing would go on and on.

On a few trips we went without the children. One time, we were scuba diving with friends. We were returning to the boat after a dive. Tom and I were scuba "buddies", but he signaled to me he was going to the surface. He had noticed some turbulence, which turned out being our friend, who had run out of air, panicked, and was drowning. Tom gave him his mouthpiece and then found the pulley to inflate his vest. Tom saved his life. The rest of us were totally unaware of the situation. We were all new divers and hadn't understood fully the importance of staying with your buddy until you returned to the boat.

After many years of raising children, I wanted to return to school for an advanced degree. Tom encouraged me to pursue a Law degree. I decided an M.S.W. would work best for us. Tom also supported the women in the office when he was District Attorney. There were some female ADAs who wanted to try job-sharing in order to balance home and work responsibilities. He readily agreed, although it had never been done before. He promoted women throughout his tenure. He doubled the number of female Bureau Chiefs and tripled the number of female Deputy Bureau Chiefs. Tom appointed the first female Chief Assistant District Attorney in Suffolk County history.

Being District Attorney of Suffolk County was all Tom ever wanted. There was no desire for higher office. He would prosecute fearlessly, but offer second chances when appropriate. He helped so many people.

In 1984, Tom called his close friend, Father John Cervini, who was the pastor of Our Lady of the Miraculous Medal in Wyandanch, asking to volunteer to help, in any way he could, the poor and less fortunate from the Wyandanch community. John asked if Tom would join the Board of the Wyandanch Homes and Property Development Corp., which was, and still is, dedicated to providing homes for homeless women and children who are barely subsistent, lifting them from their poverty, providing educational opportunities and jobs, and, ultimately, helping them become exemplary parents and members of society. He served on the Board for almost 25 years.

Tom was asked in 1998 to volunteer his time and efforts for another wonderful organization, the Cleary School for the Deaf. For ten years he devoted long hours to help these children and their families meet their diverse needs.

Hope House Ministries is another charitable organization, committed to helping those suffering from drug and alcohol addiction. Tom agreed to the release of many incarcerated prisoners who faced long prison terms for crimes fueled by addiction, to long-term residential treatment and ultimate reduction or dismissal of criminal charges upon their successful completion of the treatment program. Many of them have gone on to become successful in business, education and the law. One former prisoner is now an Assistant District Attorney. When we attend Mass at St. Francis' Chapel at Hope House's Friary, many parents of children who went from hopelessness to hope thank Tom for saving their child's life. Few people know about the work and time Tom has given to these various groups. He never boasted or made it known.

We are people of faith, but it has been tested and is being tested as we go through this ordeal. I keep hoping that I'll wake up from this nightmare, or a conscience will be bothered to a point where he will tell the truth, and Tom will be exonerated. It feels like the world has gone topsy-turvy — an Alice in Wonderland existence where nothing makes sense anymore.

This whole period, from indictment to the present, has been a tragedy for us as a family and as individuals. The overwhelming sadness I feel for Tom, the children and me is sometimes beyond description. Tom facing disbarment after 52 years of practicing law is catastrophic for him. From honored to dishonored, respected to disrespected, humiliated and disgraced, the fall is more painful for such a man as this.

Our children have been our strength and support. Their loyalty and faithfulness is humbling. I also know they don't want to reveal the extent of their own distress, especially our daughter, Kate, and our daughter-in-law, Phoebe, who are attorneys.   I try not to think about what we'll say to our precious grandchildren.

Time is not on our side. I just had my 75th birthday and Tom will be 79 in September. My mother and grandfather both were ███████████████ I have ███████ ███████████████████████████ Knowing the existential realities, we had planned to move South to a new home, travel while we're still able, and enjoy the grandchildren and retirement. Obviously, none of this is happening while our lives are in turmoil. We would treasure the time left to us, but our time is running out.

Being separated from the love, commitment and support of my husband is a hardship I'm not sure I can bear. For the children and grandchildren the loss of his support and affection would be terrible. I hope Your Honor will exemplify grace, mercy and wisdom in giving this great man the most lenient of sentences.

Most respectfully yours,

*Mary Ellen Spota*

Mary Ellen Spota

3

# EXHIBIT 111

**PHOEBE S. SPOTA**

February 7, 2020

The Honorable Joan M. Azrack
United States District Judge
United States Courthouse
100 Federal Plaza
Central Islip, New York 11722

Dear Judge Azrack:

Please accept this letter on behalf of my father-in-law, Tom Spota.

I am mindful of the fact that you have received countless letters on behalf of loved ones over the years. This is not a letter I ever imagined I'd have to write, and as an attorney who has devoted the last decade of my career to combatting organized crime and corruption, I do not do so lightly.

Years ago, when I was first getting to know my future in-laws, I braced myself for the interesting clash of cultures that I assumed would inevitably ensue when our families met. Being the daughter of Egyptian immigrants, I was accustomed to having to explain my background, culture and traditions to others. I knew, of course, that Tom and Mary Ellen would be open to, and respectful of, my world. But I never anticipated how warmly, lovingly and unconditionally they'd embrace me into their family.

Tom was particularly intrigued by my rich culture and traditions. I'll never forget the look of unbridled joy on his face as he stood in the Coptic Orthodox church in Woodbury on our wedding day, surrounded by bearded clergy wearing their big hats and traditional garb, as they performed the ceremony in Coptic, Arabic and English. He loved every single minute, especially when the traditional ululations reverberated throughout the church. Later that day, he shared with me how honored he was to have been a part of something so special.

Since then, I've grown to love Tom like my own dad. I've discovered that many of the attributes that I admire about my husband were instilled in him, through example, by Tom. His love of God and devotion to family. His strong work ethic and integrity. His humility and down-to-earth, easygoing nature, regardless of status or personal accomplishment. His overwhelming kindness and generosity. His tireless dedication, at the end of the day, to leaving the world a bit better. In the first few years of our marriage, we were unexpectedly hit with so many seemingly insurmountable obstacles that we never would have been able to overcome without those core values.





Every now and then, Tom sent us pictures of their smiling faces to cheer me up. I remember thinking that they were the luckiest kids in the world to have such a wonderful grandpa who loved them so much. I never had the chance to meet either one of my grandfathers before they died. The close relationship my children have with Tom has not only been a source of incredible joy for them, but also for me on a much deeper level.

I was in church on Christmas Eve, standing next to Tom. As our family stood together - - hands interlocked - - reciting the Lord's Prayer, I thanked God for giving me the strength to get through those difficult months. I was especially thankful for Tom and Mary Ellen, who were there for us every step of the way. And I braced myself for Tom's trial, which we all knew was imminent.

"Please God," I prayed. "Please let everything be ok."

I was in the courtroom, sitting in the first row, every single day of Tom's five-week trial.

It was the second time I'd worn it. I told Tom I'd purposely put it on that morning because I figured that lightning can't strike twice. I was stunned when, a short while later, the jury came back with the verdict.

Since then, I've tried to be just as strong for Tom as he was for me, and to give him the same reassurance he gave me when I was fighting my own battle. "You're going to be alright. We're here, no matter what. We'll get through this." But I'm scared. We're all scared.

This case has been profoundly devastating for our family. We've watched, heartbroken, as Tom has lost nearly everything that he holds dear. He loved the law and public service almost as much as he loves his family. His career is over and his once unblemished reputation, for which he worked so hard for over 50 years, is forever marred. His life, and ours, will never be the same.

It's hard to fathom, after all that we've painfully endured during these past several years, what lies ahead. Tom and Mary Ellen are undeniably the glue that holds our family together. I can't begin to imagine what would happen were Tom to be separated from us. The impact it would have on our family, particularly on Tom and Mary Ellen at this late stage of their lives, would be simply tragic. It breaks my heart to even think about it.

I respectfully ask Your Honor for leniency so that, however Tom is punished, he may live whatever remaining years he has left with us.

Respectfully,

Phoebe S. Spota

# EXHIBIT 112

Thomas J. Spota IV

██████████████████████████████████

February 7, 2020

The Honorable Joan M. Azrack
United States District Judge
United States Courthouse
100 Federal Plaza
Central Islip, NY 11722

Dear Judge Azrack:

Please accept this letter on behalf of my father, Tom Spota.

As I get older, I'm realizing that the memories I treasure most are the simple, sweet and often quiet times I've shared with the people I love. I've had many of these times with my father. Day trips to the ocean, canoeing up in Maine, playing tennis at the local courts, and doing summer yardwork around the house. One of my fondest memories was driving cross-country with my father when I was out of college. We had a great time exploring the countryside, the Badlands in South Dakota, little towns in Wyoming and Montana, and the stunning coastline off the Pacific Coast Highway. We did the trip in about six days, but we could have easily spent six months together on that trip. These are the special memories that I hold onto as I look back on life.

My father is a sweet and loving man who has not had an easy path. ████████████████
██████████████████████ Shortly afterwards, he met my mother. They quickly fell in love and were soon engaged to be married. However, what ought to have been a happy time in their young lives quickly turned tragic █████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
██████████████████████████████████

███████████████████████████████████ My father, undeterred, sold the small home he'd purchased with the money he worked so hard to save, and moved in with my mother's parents. He worked three jobs (as an attorney, a liquor store clerk and a nighttime janitor) in order to make ends meet. He was steadfastly by my mother's side ██████████████████████. That was 50 years ago, and he's been by her side ever since.

I never fully understood just how difficult that time must have been for my father until last year,
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
██████████████████████████

My father is the hardest worker I've ever met. I believe his hard work, discipline and focus came from his years of service in the Marine Corps. He is also tough, always facing challenges head on, putting one foot in front of the other and keeping the faith that things will always get better.

My father has never shied away from doing the right thing, regardless of how difficult. This was never more evident than when he launched an investigation into the Catholic Church, which exposed the widespread sexual abuse of children by priests. This certainly wasn't easy for my father, a devout Catholic, who attends church every Sunday. But he did the right thing, and I was always proud of him for it.

My father always taught us to follow our gut when making decisions in life. There is only one time that I can recall when he didn't follow his gut, and that was when he left the DA's office back in the early '80s for private practice. And when he did, he lost the sparkle and happiness that he exuded when he was an Assistant District Attorney. As a young boy, I witnessed the passion and love he had for the law and the DA's office. He simply loved his job and being in public service. I'll never forget when, as a teenager, I asked him "Dad, do you have any regrets in life?" Without skipping a beat, he replied "Leaving the DA's office. I knew in my gut it wasn't the right thing to do but I didn't listen to my gut." It was only when he returned to the DA's office many years later that his lightheartedness and sparkle returned. I always thought that it was a redemption of sorts, a great comeback and a happy ending to a distinguished career.

Unfortunately, it hasn't been the happy ending we had all expected. It's been a brutal three years for our family. We've watched, helpless, as this case has broken my father's spirit. Sitting through the trial was one of the hardest things I've ever had to endure. Throughout those difficult weeks I often found myself wishing I could tell the jury about the real Tom Spota that I know, first-hand. A good, kind-hearted man who lives a simple lifestyle, lives in an understated house, drives a modest car and who still, to this day, rakes leaves and mows his own lawn.

It is times like these that can either bring a family closer together or tear it apart. As a result of the unbreakable bond instilled in us by our parents, we are closer now more than ever. Even though we were heartbroken by the verdict, we did everything we could to stay in the present moment together this past Christmas. And we all tried to be in the present moment as we celebrated my parents' 50th wedding anniversary last month. The unfortunate reality is that because of my father's uncertain future, we have to cherish every single day that we now have together.

My father's career is over, and his hard-earned reputation has been disgraced. And now we are scared of what the future holds. After working so hard his entire life, what will become of him? And what will become of my mother, if they are ever separated? It is far too painful to even think about. I respectfully ask Your Honor for leniency in imposing your sentence.

Respectfully,

Thomas J. Spota IV

Thomas J. Spota IV

# EXHIBIT 113

The Honorable Joan M. Azrack
United States District Judge
United States Courthouse
100 Federal Plaza
Central Islip, New York 11722

Dear Judge Azrack,

I am writing to you in support of Thomas Spota. He is a personal friend for over ten years whom I met through my brother in law, Barry Steinberg. My husband and I do not live on Long Island but have spent many delightful evenings with Tom and his wife Mary Ellen at the farm we share with Barry and his wife in upstate New York. We also get to sit with them at weddings, baby showers and on other occasions. I have come to know Tom reasonably well as an acquaintance over the years.

Tom has always impressed me as a warm and helpful man that I greatly respect for his intellect, dedication to his family as well as his many years of public service and commitment to law and order. I have always felt that he is honest and hard working, someone that I considered to be a salt of the earth type of person. It saddens and surprises me to see the predicament he is in now.

I have spent 28 years as a psychotherapist and feel that I am a reasonable judge of character. I have never felt that Tom was a manipulative, untruthful or devious person. Instead, he seemed to be someone who is open, honest and values friendship and helping a friend when needed. Perhaps it is this instinct that helped lead him into his current situation.

So it is with a very sad heart that I ask you to be merciful in your difficult task of deciding his sentence. It seems that a good man went astray, rather than a bad man who was found out.

Thank You.

Respectfully yours,

Catherine M. Steinberg

Catherine M. Steinberg

# EXHIBIT 114

# DONALD S. SULLIVAN, ESQ.

█████████████████████████

███████████████

The Honorable Joan M. Azrack                                      Feb. 18, 2020

United States District Judge

United States Courthouse

100 Federal Plaza

Central Islip, New York 11722

Dear Judge Azrack:

I am writing to you on behalf of former Suffolk Co. District Attorney Tom Spota. I have known Tom since I became an ADA at the Suffolk County's DA's Office in the mid-1970s. Over the course of many years in the DA's office and later as Undersheriff in the Suffolk County Sheriff's Office I got to know Tom as a professional law enforcement leader. During my years in the DA's office I rose to Chief Investigative ADA, and simultaneously as a Special Assistant U.S. Attorney in the Organized Crime Strike Force, EDNY regarding the very successful Colombo RICO case (which came out of our wiretaps and informants, five of whom went into the Federal Witness Protection Program). I only mention my experience so that you may know my perspective and qualifications to address Tom Spota's character.

In my opinion, Tom Spota, as a senior homicide prosecutor for years inspired many younger prosecutors, including myself. He led by hard work, preparation, skill, and great presentation of evidence. I never saw anyone work as hard as Tom in the DA's Office.

As District Attorney in the early 2000's when I was Undersheriff, DA Spota conducted many successful investigations and prosecutions against powerful, corrupt public and political officers. Suffolk County had never seen so many successful corruption cases in the past. Defendants included Islip Town Supervisor Peter McGowan, Suffolk County Legislator Fred Towle, and political leaders such as Wayne Prospect, Stephen Baranello just to mention a few. There were many others. Tom Spota, as a locally elected officer, conducted these investigations despite the political power and connections of these people, again displaying his character and strength.

One of the most important and brave things that Tom Spota ever did as District Attorney was to convene a grand jury in the early 2000's to investigate the sexual abuse of many children by Catholic priests of the Diocese of Rockville Center here on Long Island over many years. This grand jury went on for a long time and resulted in a detailed grand jury report that revealed decades of covered up sexual abuse of children. This report led to a lot of litigation over many years and caused the Church over time to address these terrible realities. The ramifications of this grand jury investigation conducted by Tom

Spota continues to this day. Taking on the Catholic Church on Long Island was not easy. Nothing like it had ever happened before. And, I know that Tom Spota is a practicing Catholic himself. I have seen him at Mass many times over the years. Tom took on his own Church because it was the right thing to do.

Well before Suffolk County had a diversionary Drug Court it had Fr. Frank Pizzarelli's Hope House in Port Jefferson. Hope House has been a haven for young people addicted to narcotics for decades. Fr. Frank, who I have known well for many years, is an angel on earth. He has saved hundreds of young kids in the deadly grasp of narcotics. He has also done many funeral masses for the ones that didn't make it. I was at one of them. Hope House has been in operation in our county for decades. While Fr. Frank is well known on Long Island and across the nation most people don't know that Tom Spota, as the DA, helped Hope House for a long time before there was a Drug Court. Many of Fr. Frank's kids were addicts and frequently also criminal defendants facing drug charges in Suffolk Co. Tom Spota essentially started a Suffolk Drug Court before NY did and Fr. Frank's kids got a second chance without a criminal record. Not many people know about Spota's role in helping Fr. Frank and Hope House. Spota never made this public or sought recognition for his efforts. Once again, Spota's goodhearted character is obvious.

Lastly Judge, I would like to make sure that you know that Tom Spota enlisted and served in the United States Marine Corps, long before law school or the DA's Office. I believe that means a great deal to most Americans.

Your Honor, I hope I have told you some things about Tom Spota that you may not have known. I know that none of it changes anything about the verdict in this case before you. I accept the jury's decision completely and without question. I do ask you to consider Tom Spota's many years as a professional, tough, hardworking first class law enforcement leader that went after criminals and made our county a safer place to live for many years.

I believe in my heart that Tom Spota is a very good man. I hope you believe that and can take it into consideration when deciding his sentence.

Thank you, Your Honor.

Respectfully yours,

Donald S. Sullivan, Esq.

Cc. Alan Vinegrad, Esq.

# EXHIBIT 115

The Honorable Joan M. Azrack
United States District Court Judge
United States Courthouse
100 Federal Plaza
Central Islip, NY 11722


Dear Judge Azrack,

Let me introduce myself.   My name is John J. Toomey and I am a retired County Court Judge.  I retired on January 1, 2018.

I served fifteen years on the state bench as a District Court judge and County Court judge.  Prior to that I practiced law in Suffolk County for twenty-five years.

During these forty years I got to know Tom Spota as a trial prosecutor, a private attorney and as the District Attorney of Suffolk County.  I always had the utmost respect for Tom Spota, as a prosecutor, as a lawyer and as a person.

My dealings over the years with Tom demonstrated to me that he is a man of high character, great honesty and has empathy for those around him, especially those who are less fortunate or facing serious personal challenges.

Tom and I were not close personal friends, but the respect that I had for him was enormous.  My very favorable view of Tom comes from my own first hand experiences in dealing with him personally.

While a judge in 2011, I was assigned to start and preside over the first Veteran's Treatment Court in Suffolk County.  When the court was formed it was only the second such court in all of New York State and one of the very few in the country.

The court was a huge success.  A large part of that success was due to the empathy Tom had for returning veterans who had put their lives at risk for their country, and now were coming home, and because of Post Traumatic Stress Disorder and other traumas, were finding themselves in the criminal justice system.

In any veteran's treatment court the District Attorney is the gatekeeper and controls who will be allowed to enter the program and who will not get admitted.  The veterans of Suffolk County were extremely fortunate to have a man like Tom Spota making those serious decisions.

Veteran's Courts in most jurisdictions are usually for less serious crimes.  In Suffolk County, thanks to Tom Spota, from the outset the court entertained applications for more serious crimes as well.  In most cases Tom, as District Attorney, would, after careful consideration of the circumstances, often give the benefit of the doubt to the veterans.

Once the District Attorney consented to the veteran coming into the court, the veteran would take a plea, sign a contract agreeing to enter the Veteran's Treatment Court program and to successfully complete all the treatment prescribed for him or her. In exchange, the charges would be reduced or dropped altogether upon successful completion of the program.

Many of the combat veterans returning from Iraq and Afghanistan were coming back with PTSD and Traumatic Brain Injury, which would manifest itself in alcohol abuse, chemical dependency and other socially negative behaviors. Unfortunately, these activities would sometimes result in veterans intersecting with the criminal justice system.

Tom Spota had the insight and compassion to see that, with professional counseling and judicial supervision, these veterans could be rehabilitated and live productive, law-abiding lives. The court had a success rate of over ninety-five percent, so Tom's faith was not misplaced.

There were several veterans that I thought would be good candidates for the Veteran's Treatment Court, but faced an obstacle based on the seriousness of the charges or the sensitivity of the case. On these occasions, I would deal directly with Tom for these veterans and he would, again after careful consideration, typically agree to have them admitted to the program.

I can cite two powerful examples of Tom's willingness to give a combat veteran suffering from PTSD a second chance. One was a robbery by a confused and troubled veteran, and the other was a vehicular homicide. In both of these cases, after I assured Tom that these men were suffering from acute PTSD and that treatment would result in an immense improvement in their lives, he consented to their admittance into the Veteran's Treatment Court. I am happy and proud to state that both of these veterans successfully completed the program.

Being somewhat on the ground floor of the Veteran's Treatment Court, I have been asked from time to time to lecture on the formation and implementation of, and presiding over, Veteran's Courts in other jurisdictions around the country. As part of my presentation I have always explained how important it is to have a gatekeeper, a District Attorney, that has an appreciation of veterans and an understanding of how people who have put their lives on the line for their country deserve a second chance.

I would always bring up our District Attorney, Tom Spota, as the best example of a person who had the wisdom to give these heroes a chance to get their dignity and self-respect back.

I knew that it was a leap of faith for Tom, and a position that took a lot of courage, for if one of these veterans re-offended, it would have been Tom, and no one else, that would have shouldered the blame.

I must state that the positive effect Tom has had on numerous veterans and their families has been immense and long-lasting.

2

In closing, Your Honor, I would respectfully request that when you are in the process of sentencing Tom Spota, when you are thinking of what would be a fair and just sentence, you take into consideration the enormous compassion, mercy and understanding Tom had, in his capacity as District Attorney of Suffolk County, for our veterans.

Respectfully,

John J. Toomey

3

# EXHIBIT 116

February 4, 2020

The Honorable Joan M. Azrack
United States District Judge
United States Courthouse
100 Federal Plaza
Central Islip, New York  11722

Re: Thomas Spota

Dear Judge Azrack:

My name is Rafael M Vasquez (Ralph). I have been a resident of Suffolk County for the past thirty-seven years. My profession is homebuilding and as such I have been a member of the Long Island Builders Institute (LIBI) for well over thirty years. It was my honor to represent this important institution as their President and later Chairman of The Board in 2004 – 2005. I now serve as Life Director of this important institution.

Likewise, I was President in 2006 of the Old Field Club, a social club located in the Incorporated Village of Old Field. Here, I have dedicated a great part of my free time to the practice of the sport of tennis.

Approximately twenty five to thirty years ago, Jim Morgo, who was the President of Long Island Housing Partnership, Inc. at the time, invited me to join in for a doubles tennis match. It was then that I met Tom Spota and got to know him. I thought Tom was a wonderful human being and, like all of us, enjoyed the sport of tennis.

Through the years we became good friends, who played tennis usually during the summers and as free time permitted an occasional dinner with our wives and friends.

About ten years ago, I was a victim of a scam where my company advanced monies for a funding deal that was never there. I asked Tom then if his office could investigate the case, which he did and successfully obtained a conviction. It was always felt that he pursued the case because it was an unjust incident that required investigation, no matter who reported it to his office.

My wife treasured the times spent in the company of Tom and his wife Mary Ellen, always praising them for their modesty and friendliness. She passed away over seven years ago and although the tennis and social gatherings have been curtailed with the passage of time, Tom and Mary Ellen always have made time to get together with me at least once a year.

It has been now a fairly long period of time that I have known Tom; I admired his work ethics of long hours and work days, which included weekends, in performing his duties as

District Attorney of Suffolk County. His moral integrity and righteousness have always been above board. When in politics or in a public position of authority, one will never be able to please everyone. Of the many people I have met or known, of different political parties and affiliations, none ever expressed a negative opinion of Tom's gentlemanly and honest personality. Likewise, his conduct as a Public Officer has been exemplary and fair-minded.

I can state without any reservation or doubt, that as a citizen of Suffolk County it has been a **unique privilege** to know Tom Spota.


Respectfully,

Rafael M. Vasquez

# EXHIBIT 117

06 FEBRUARY 2020

**The Honorable Joan M. Azrack**
United States District Judge
United States District Courthouse
100 Federal Plaza
Central Islip, New York 11722

Dear Judge Azrack,

I am a Licensed Master Social Worker who has helped a
countless number of individuals struggling with substance use
disorders. I have helped individuals mend family relationships,
develop self-awareness, and overcome chemical and behavioral
addictions.

I work with both adolescents and adults. I believe I am good at
what I do. I am able to cultivate a sense of safety, motivation, and
empowerment within my clients. I am particularly good with
adolescents. In fact, I had one client who would only see me as
his therapist. He would get in trouble and his mother would call
me. When we worked together, she said he was focused and
staying on a much better path.

I enjoy what I do, and believe I have purpose.

This would not have been possible without the compassion
shown to me by Tom Spota. I went through a very difficult time
in my early twenties. Tom was willing to work with me, and
listened closely to my story. As a result, I was able to benefit
from completing  a residential treatment program at Hope House
Ministries. Tom took the time to listen with empathy and
compassion, and I owe a lot of who I am today to Tom.

Respectfully,

# EXHIBIT 118

Preston D. Vineyard

February 28, 2020

The Honorable Joan M. Azrack
United States District Judge
United States Courthouse
100 Federal Plaza
Central Islip, New York 11722

Dear Judge Azrack,

I am writing to you today to ask for your leniency in your sentencing of Tom Spota. I have known Tom for over 15 years and I have been married to his eldest daughter, Kate, for the past 10 years. Tom has provided unwavering guidance and moral support for myself and my family throughout the many years I have known him. I have great respect for Tom and I look up to him as a father figure. I am honored and proud to be part of Tom's family and to call him my father-in-law.

Tom was a dedicated public servant for much of his professional life and I witnessed the passion he has for law enforcement and the betterment of his community. This passion is only second to that of his family. Since the indictment, all our lives have been upended, but I have witnessed a devastating impact on Tom. I have seen Tom endure great suffering as he resigned as the District Attorney and has been the target of constant, public attacks on his character.

Although Tom has many great qualities and I can attest to quality of his character, I believe that the greatest reflection of Tom's character is his family. Tom and his wife of 50 years, Mary Ellen, have raised 3 exceptionalchildren and are the proud grandparents of 5 young grandchildren. Tom has instilled strong morals and values in his children, which I see every day as the husband to his eldest daughter. All the children are outstanding citizens and positive contributors to their communities. I believe that this a direct reflection of Tom and the values he taught his children throughout their lives.

Tom is adored by his 5 grandchildren, including my young daughter ███ He has the uncanny ability to almost become a kid himself when he plays with the grandchildren, which brings great joy to everyone. These are formative years for the grandchildren and Tom plays an important role in their development. At the age of 78, Tom's remaining years are extremely precious to his family, especially for his grandchildren.

Tom is a good man and a valuable member of our family. It is my sincere hope that you take this letter into consideration at the time of sentencing, not only for Tom, but for his family.


Respectfully,

Preston D. Vineyard

# EXHIBIT 119



**Suffolk County Police Athletic League, Inc.**
P.O. Box 26
Yaphank, N.Y. 11980 - 0026
(631) 852-6109

Our Greatest Resource - OUR YOUTH

February 13, 2020

The Honorable Joan M. Azrack
United States District Judge
United States Courthouse
100 Federal Plaza
Central Islip, New York 11722

Dear Judge Azrack;

I have known Tom Spota both personally and professionally for many years.  However,  as the Executive Director for the Suffolk County Police Athletic League,  I would like to speak specifically to his support of the children and families that participate in PAL programs all throughout our county.

Tom recognized that Suffolk PAL was a lead agency in the prevention of juvenile delinquency, with our nationally recognized sports, drug and gang prevention programs .  He knew that by supporting our efforts at prevention, and by keeping kids off the streets and occupied, he would be prosecuting fewer teens and adults and our county would be a better place.

With over 20,000 children participating countywide in every Township in Suffolk County, he recognized the need for PAL officers to transport children to events, programs and tournaments which would expose them to new experiences outside of the communities they lived in.  Over his term as District Attorney he turned ill gotten gains from drug dealers and other criminal enterprises into vans to transport PAL kids.  During his tenure through the use of asset forfeiture funds, he purchased 6 vans for use by the Suffolk County PAL.   His support of PAL and the police officers who utilized those vans allowed children to see police officers as people, as mentors and not just authority figures.

Tom clearly understood the need for children to have safe supervised places to play and participate in organized sports.  When PAL was in need of fencing at our baseball fields and guard rails to protect children from vehicle traffic, at our sports complex, he acted.  Tom knew that providing support to keep children safe and a great place to play ball, was the right thing to do.  If these costs had to be borne by PAL as a charity, the capital cost would have affected the very programs that keep kids off the streets and out of gangs.

Tom never hesitated to support PAL's fundraising events.  He was always an active participant. At our Polo for PAL event he joined with John Walsh from "America's Most Wanted" to help us raise money to support programs we were starting in Central Islip.

In 2003 PAL created the Ident-A-Kid program. This is a service to families with children where their children would have a photo and fingerprints taken. It would provide immediate identification to a police officer in case a child was lost or kidnapped.   He immediately saw the benefit of such an idea and offered to support the program and expand it.  As a result of his support, we  were able to continue the program and add DNA sampling as part of the program.

Over the years working with Tom for the benefit of the County youth we developed a true friendship. On this level I know Tom to be a loving, caring husband and a wonderful father to his children and grandfather to his grandchildren.

The indictment and trial have taken a toll on Tom and his family. He has refused to meet with me in public. Many of his friends and supporters are heartbroken over what has happened.  For so many years Tom was looked upon as Suffolk's best DA. He was loved and admired by so many thousands of Suffolk County residents.

The pain and embarrassment that Tom and his family feels is shared by many of who know and care for them.

I hope that my letter clearly expresses my sincere support for Tom and his family, and for all the good he has done for PAL and the children we serve.

Respectfully,

Sgt. George Waldbauer, Ret.

Executive Director, Suffolk County Police Athletic League

# EXHIBIT 120



February 5, 2020

The Honorable Joan M. Azrack
United States District Judge
United States Courthouse
100 Federal Plaza
Central Islip, New York 11722

Re: Thomas Spota

Dear Judge Azrack:

My wife and I have known Tom Spota and his wife Mary Ellen for about 10 years. We met fortuitously at the beginning of a tour in Europe. Something clicked and we spent much time with them over the next 10 days. After this we stayed in touch and socialized. We felt a friendship bond. Another tour was arranged down the line. It helped us become more familiar with each other.

There is no doubt in my mind that Tom is at heart a person of high moral character. The way he speaks about his family, and matters in general, confirms this. While he was District Attorney, he didn't speak about the specifics of the job he was doing and I greatly respected this. There was no bravado, just a person of integrity working diligently to produce appropriate results.

My wife and I were shocked at the announcement of an investigation and the subsequent indictment followed by trial. The guilty verdict was unimaginable and contrary to everything we know about Tom. It was one of those "say it isn't so, Joe" moments.

We know first-hand how this has had a devastating effect on Mary Ellen. I won't belabor what Your Honor must know from first-hand daily experiences. For Mary Ellen and the rest of Tom's family it is simply a world turned upside down ten times over. It can't be repaired by their assessment - and mine - of the facts as we believe them to be.

Tom is an honorable person deserving of any consideration that can be given.

Thank you for taking the time to read this letter.

Respectfully,

James B. Wallace

# EXHIBIT 121

STEVEN J. WILUTIS

ATTORNEY AT LAW
P.O. BOX 2021
MILLER PLACE, NEW YORK 11764

(631) 476-9873
FAX (631) 476-9876

April 21, 2020

The Honorable Joan M. Azrack
United States District Judge
United States Courthouse
100 Federal Plaza
Central Islip, New York 11722

Re: Thomas Spota Sentencing

Dear Judge Azrack:

I have had the pleasure of knowing Thomas Spota on a professional and personal basis for over 48 years. I write this letter to inform the Court of Mr. Spota's lifelong sterling character that has affected my life, as well as those in Suffolk County. I ask that Your Honor be as lenient as possible in your sentencing, as this ordeal over the past few years has taken a noticeable toll on Mr. Spota and his family.

In order to appreciate my perspective of Mr. Spota (Tom), a brief history of my relationship with him is necessary. I am an attorney in Suffolk County, New York, and joined the Suffolk County District Attorney's Office in 1972. That is when I first met Tom. We worked together with about twenty other young Assistant District Attorneys, handling misdemeanor cases in the District Court Bureau. Within a year, Tom was promoted to the felony Trial Bureau in Riverhead to prosecute felonies. I eventually followed. We worked together with about a dozen attorneys. Tom was a superb trial attorney, and was promoted to the then newly formed Major Offense Bureau to prosecute homicides and other serious violent felonies. In 1978, I joined the Major Offense Bureau, and Tom was my supervisor with the title of Deputy Bureau Chief. He later became the Major Offense Bureau Chief, and then Chief Trial Prosecutor. I likewise moved up to become the Bureau Chief of the Major Offense Bureau, and then became the Chief Trial Prosecutor when Tom left for private practice. While handling felonies we worked side-by-side with about six or seven other assistant district attorneys. I was fortunate to watch Tom work in and out of the courtroom, as a supervisor, colleague, and friend.

Tom was the consummate prosecutor, and extraordinary in his preparation for trial, strategic planning, and trial skills. His leadership of the Major Offense Bureau was lauded by all. He provided insight for us less experienced attorneys to deal with difficult witnesses, belligerent defense attorneys, and occasionally an upset judge. Oftentimes many ADAs would watch Tom on trial in order to pick up a few points on how to try a good case. He always took the time to speak to us, and teach us, even though he was busy on trial. He personally helped me develop as a trial attorney.

My office was adjacent to Tom's, and as such, I could hear and observe how he dealt with people. His heart went out to homicide victims' relatives. I specifically recall the Pius case, where four young men were charged with brutally killing a 13 year old boy by shoving rocks down his throat. I vividly can still picture Tom speaking to that young boy's parents for hours. I will never forget the compassion and empathy Tom had for those grieving parents. His tenacity in the courtroom was tempered by the mercy he showed for the victim's parents. Tom was like that in all of his cases: compassion for the victims.

I was tasked with the re-trial of one of Tom's bigger trials, People v. Bartolomeo. The conviction had been reversed on appeal, as the Court of Appeals had expanded the right to counsel and excluded the defendant's confession. Tom was busy on another serious murder case, and he asked me to prosecute the re-trial. This was a particularly brutal murder during the course of a home invasion. Without the confession it was to be a difficult case. Tom worked closely with me spending hours explaining the problems with some witnesses, and the strengths and weaknesses within the case. He was working hard on his case, but spent time and was dedicated to help me. Tom was a loyal and positive leader.

I personally watched Tom spend time and provide help to less experienced prosecutors. His door was always open to discuss cases and provide assistance. I personally saw that Tom was well-liked by all, whether attorney, detective, uniformed police officer, secretary, receptionist, or copy machine worker. He always had a smile on his face and a kind remark.

Sometime in the 1980's, Tom left the District Attorney's Office and went into private practice and had an office in Commack, New York. I myself left the District Attorney's office in 1987, and rented office space in Tom's office. While we had our separate practices, I saw Tom on an almost daily basis. He was most helpful to me in getting started. He gave me valuable tips and suggestions, and even referred a few criminal cases my way. His door was always open.

Tom ran for, and was elected as the Suffolk County District Attorney. I saw Tom often as he went around to the various courthouses to observe his Assistants handle their cases. As usual, Tom always had a smile and a kind word for everyone. He was well-respected by the attorneys, court staff, judges and secretaries. As District Attorney, his door was always open. I had only a few occasions to see him on a case. I recall one case that demonstrated Tom's ability to temper his prosecution with mercy. I represented a ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ who used the services of a nationally known dating service, advertising that all participants were over 18 years of age. My client met a woman through the service, dated her, and eventually became intimate. He never knew she was underage. She lied about her age, and looked to be in her 20's. He was charged with statutory rape, and Tom's office was seeking a

2

felony plea, which would have meant ██████████████████████████
████████████████████████ Tom looked into the case, and eventually
allowed my client to plead guilty to a non-criminal violation. ████████████████
█████████ I thought justice was served by Tom's decision.

The last time I saw Tom was a few weeks before his trial started.  I was sitting at
mass in Infant Jesus Church in Port Jefferson on a Sunday.  Tom came in, and ended
up sitting next to my wife and me.  I know that Tom is a devout Catholic, and have
often seen him at mass throughout the years.  On this occasion Tom was clearly
stressed and worried.  The brief words we exchanged showed the emotional toll this
has taken on him.  After mass he quickly left the church, seemingly embarrassed to
speak to other parishioners.

Tom has been such a good and positive force for law enforcement and the people of
Suffolk County.  I personally attest to Tom's reputation as a fair and devoted
professional.  In my opinion, his good nature, honesty, and trustworthiness are
without reproach. I hope and pray Your Honor will afford Tom the most lenient
sentence possible.

Respectfully,

Steven J. Wilutis

3

# EXHIBIT 122

The Honorable Joan Azrack
United States District Judge
United States Court House
100 Federal Plaza
Central Islip, New York


Dear Judge Azrack:

My name is Ralph Zanchelli. I served in the Suffolk County Police Department for thirty one years.

I got to know Tom Spota when I was assigned to the Suffolk County District Attorney's Rackets Bureau, which was then under the leadership of District Attorney Patrick Henry. At that time, Tom Spota was the Chief of the Suffolk County's District Attorney's Homicide Bureau. Tom Spota had an outstanding reputation. To my knowledge Tom was admired and respected by every detective I knew.

There were times when I was working on an investigation or needed information, I would contact Tom. Tom never let me down, he would get back to me as soon as possible.

When Tom got elected Suffolk County District Attorney, I was retired from the Suffolk County Police Department.

At that time I was very involved with the Vietnam Veterans of America Chapter 11. I am a Vietnam Veteran. I served on the USS Bennington, CVS-20, Anti Submarine Warfare Aircraft Carrier in the South China Sea off the Cost of Vietnam.

I contacted District Attorney Tom Spota, who is a United States Marine Corps veteran, about the Suffolk County Veterans Court.

From that day on he assisted the Suffolk County Veterans Court Mentors any way he could.

The Mentors in the Suffolk County Veterans Court consider ourselves blessed having then-District Attorney Tom Spota on the ground floor of this program.

Tom Spota is a major reason why the Suffolk County Veterans Court is a success. He, and Judge Jack Toomey, led the way from the inception of the Suffolk County Veterans Court. The Suffolk County Veterans Court has a ninety five percent success rate.

I would hope Your Honor would consider Tom Spota as a family man with a wonderful wife and children and also all his accomplishments and dedication to the people of Suffolk County, as an Assistant District Attorney, Chief of the Suffolk County District Attorney's Homicide Bureau, and Suffolk County District Attorney.

Your Honor, it would be my hope and prayer that you would take into consideration of all the good District Attorney Tom Spota has done, and that Your Honor would exercise any leniency you can for this very worthy man.

Respectfully yours,

Ralph Zanchelli (SCPD Det. #444. Retired.)

# EXHIBIT 123

Benjamin Lewis Zwirn



Honorable Joan M. Azrack

United States District Court Judge

United States Courthouse

100 Federal Plaza

Central Islip, New York 11722


Honorable Judge Azrack:

My name is Ben Zwirn and I have known Tom Spota for decades, both professionally and socially. I have served in Law Enforcement as a Nassau County Assistant District Attorney and an Assistant New York State Attorney General. I have been an elected Town and County Official as North Hempstead Town Supervisor. I served in both County Executive Steve Levy's and Steve Bellone's Administrations as a Deputy County Executive in Inter-Governmental Relations. Currently I am Director of Government Affairs at Suffolk County Community College.

Tom Spota has always enjoyed a stellar reputation among those individuals I worked with in Law Enforcement over the years. His election and re-election over and over again by the voters of Suffolk County attests to that reputation.

Tom has been a devoted father and husband and active in his church which he attends regularly.

I remember while having breakfast with Tom and some friends he stated he was grateful when the US Attorney's Office announced it was looking into the Burke matter, because of his past close relationship with Burke. They way this matter ultimately turned out is completely inconsistent with the Tom Spota that I know.

I know how hard this ordeal has been for Tom and his family. Aside from the enormous financial costs, his name and reputation have been destroyed forever. My father used to say to me that after all is said and done it is your name that will carry on after you are gone, that is really all you leave behind. Tom will not ever recover from this.

I hope when Your Honor is considering Tom's sentence, you measure a lifetime of positive contributions to his community and family.  The shattering of his reputation and his public humiliation is a severe punishment for Tom. Sentencing him to prison will only hurt his wife and family and they are already devastated.


Respectfully,

Benjamin Zwirn

2

# EXHIBIT 124

**COVINGTON**

BEIJING   BRUSSELS   DUBAI   FRANKFURT   JOHANNESBURG
LONDON   LOS ANGELES   NEW YORK   PALO ALTO
SAN FRANCISCO   SEOUL   SHANGHAI   WASHINGTON

Covington & Burling LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
T  +1 212 841 1000

August 12, 2020

**BY E-MAIL**

Mr. Steven S. Guttman
United States Probation Office
Eastern District of New York
202 Federal Plaza
West Wing 2nd Floor
Central Islip, NY 11722-9012

> Re:   United States v. Christopher McPartland and Thomas J. Spota
>          17-cr-0587 (JMA)

Dear Officer Guttman:

As you know, this firm represents Thomas Spota in the above-referenced case.  I am writing to set forth our objections to the Pre-Sentence Report ("PSR") dated June 16, 2020.

Page 3, Offenses, Count 4 – Accessory After the Fact:  Mr. Spota objects to the description of Count 4 as a Class D felony, resulting in potential penalties of "not more than 5 years imprisonment/$125,000 fine."  Because (i) Count 4 did not allege that John Doe (Christopher Loeb) suffered a bodily injury, (ii) the government did not prove a bodily injury at trial, and (iii) the jury was not asked or required to find a bodily injury as an element of Count 4 (*see* 12.16.19 Tr. 3649:7−3654:17), the offense of conviction is instead a Class B misdemeanor – an offense with a statutory maximum term of imprisonment of not more than six months and a maximum fine of $5,000.  *See* 18 U.S.C. § 242 (violation without bodily injury element "shall be fined under this title or imprisoned not more than one year"); § 3 ("an accessory after the fact shall be imprisoned not more than one-half the maximum term of imprisonment or . . . fined not more than one-half the maximum fine prescribed for the punishment of the principal"); § 3559(a)(7) (offense with maximum term of imprisonment of six months or less is a Class B misdemeanor); § 3571(b)(6) (maximum fine for Class B misdemeanor is $5,000); *see also* *https://www.justice.gov/crt/statutes-enforced-criminal-section* ("A violation of [242] is a misdemeanor, unless prosecutors prove one of the statutory aggravating factors such as a bodily injury"); *United States v. Cowden*, 882 F.3d 464, 475 (4th Cir. 2018) (similar).

**COVINGTON**

Mr. Steven S. Guttman
August 12, 2020
Page 2

Paragraphs 7-31 – Offense Conduct:  Mr. Spota maintains his innocence as to each of the charges in the indictment and thus, as a general matter, disputes the PSR's assertions concerning his alleged participation in the alleged offenses.  In addition, Mr. Spota objects to specific assertions relating to the offense conduct, as reflected in the paragraphs that follow herein.  We request that each of these specific assertions be stricken from the PSR.

Paragraph 8 – Offense Conduct:  Mr. Spota objects to the assertions concerning the response to the anonymous letter.  While the response bears Mr. Spota's signature, that fact is insufficient to support the assertion that he "intentionally misrepresented and obfuscated the facts underlying the IA investigation" in the response.  Mr. Spota signed numerous letters during his 16-year tenure as Suffolk County District Attorney, the majority of which he neither drafted nor independently fact-checked.  Mr. Spota's signature on this letter thus cannot fairly support the conclusion that he drafted or personally fact-checked the letter, much less that he was aware of any inaccuracy therein, let alone intentionally misrepresented or obfuscated anything.  Further, the nature of the alleged inaccuracy supports that Mr. Spota was not aware of it at the time.  The letter conflates two alleged incidents that occurred nearly two decades earlier.  Mr. Spota had no involvement with one of those incidents (a 1994 home invasion at James Burke's residence) and was involved only briefly, in his capacity as Mr. Burke's attorney, to finalize a 1995 departmental plea deal in connection with the second (relating to Mr. Burke's relationship with Lowrita Rickenbacker).

In addition, Mr. Spota objects to the assertion that Mr. Burke, once appointed as the Chief of Department, "answered only to Spota."  At that time, Mr. Burke was the Chief of Department of the Suffolk County Police Department ("SCPD"), the highest-ranking uniformed position in the SCPD.  In that role, Mr. Burke reported to the SCPD Commissioner, Edward Webber – not Mr. Spota.  Mr. Burke did not work for Mr. Spota and did not "answer[]" to him.  To the contrary, as former Chief Assistant District Attorney Emily Constant testified at trial, Mr. Spota and Mr. Burke's relationship chilled after Mr. Burke became the Chief of Department, with Mr. Spota lodging complaints concerning the SCPD with Mr. Burke and Mr. Burke's superior, Commissioner Webber.  (12.05.19 Tr. 2599:23–2602:15)

Similarly, Mr. Spota objects to the assertion that he had "control" over SCPD personnel decisions.  The SCPD and the Suffolk County District Attorney's Office ("SCDAO") were distinct agencies, with distinct leadership overseeing each organization's own personnel decisions.  While Mr. Spota had input into which officers served on the SCDAO's Detectives Squad, which operated within and as part of the SCDAO, he had no final authority over SCPD personnel decisions.  Indeed, the vast majority of SCPD promotions were governed solely by civil service examination results – not by the District Attorney or anyone else.  (11.14.19 Tr. 134:19–137:1; GX 833)  Nor did Mr. Spota use his "position[] and influence to promote . . . supporters and punish . . . detractors."

**COVINGTON**

Mr. Steven S. Guttman
August 12, 2020
Page 3

Paragraph 10 – Offense Conduct:  Mr. Spota objects to the assertion that Mr. Burke admitted to him that Mr. Burke assaulted Mr. Loeb.  Mr. Burke never made any such admission to Mr. Spota.  Instead, Mr. Burke repeatedly denied to Mr. Spota and others that he assaulted Mr. Loeb, and reiterated repeatedly to Mr. Spota and others that the federal investigation into the assault was retaliation for Mr. Burke's removal of three SCPD detectives from a joint federal-local gang task force – a decision that enraged the same prosecutor's office that subsequently investigated Mr. Burke for allegedly assaulting Mr. Loeb.  We also note that when Mr. Burke did acknowledge to others – such as Sanjiv Panchal and Dennis Sullivan, who are referenced in the PSR – that he assaulted Mr. Loeb, he minimized his conduct.  Specifically, Mr. Panchal testified at trial that, shortly after the assault, Mr. Burke informed him that he had merely "bopped" Mr. Loeb on the head.  (11.21.19 Tr. 1146:25–1147:13)  Similarly, Mr. Sullivan testified at trial that Mr. Burke initially denied the assault to him – stating that the federal investigation into the assault allegation was "BS" prompted by Mr. Burke's removal of detectives from the task force.  (11.25.19 Tr. 1490:5–25)  It was not until 2013 or 2014 that Mr. Burke told Mr. Sullivan that he had "squeezed" Mr. Loeb's "cheeks."  (11.25.19 Tr. 1492:7–17)  Moreover, Mr. Burke also denied, to his longtime colleague Emily Constant, his longtime close friend Anthony D'Orazio, and his own lawyer Joseph Conway, that he participated in the Loeb assault.  (12.05.19 Tr. 2532:1–2533:20 (Ms. Constant); 12.09.19 Tr. 2910:12–25 (Mr. D'Orazio); 12.10.19 Tr. 3046:5–3047:8 (Mr. Conway))  Thus, contrary to the assertions in and implication of the PSR, Mr. Burke actually denied or minimized his alleged assault of Mr. Loeb to some of his closest associates, including to Mr. Spota (to whom he repeatedly denied it).

Paragraph 11 – Offense Conduct:  Mr. Spota objects to the implication that he assigned Mr. Loeb's case to the SCDAO's Government Corruption Bureau ("GCB"), much less that he did so in order to "control[]" the case.  To the contrary, as Ms. Constant testified at trial, when Mr. Spota learned that a GCB prosecutor, Spiros Moustakas, handled the initial court appearance in the Loeb case (an assignment in which Mr. Spota had no role), Mr. Spota directed Ms. Constant to transfer the case to the Major Crime Bureau.  (12.04.19 Tr. 2427:4–24)  The reason the case was not actually transferred was because, by her own admission, Ms. Constant forgot to follow through on Mr. Spota's directive.  (12.04.19 Tr. 2428:16–20, 2430:8–2432:6)  Indeed, Mr. Moustakas testified at trial that, at a later point – when he was presenting the case to the grand jury and ran into Mr. Spota – Mr. Spota appeared "puzzled" and "surprised" that Mr. Moustakas was still handling the case.  (11.21.19 Tr. 1083:14–1084:8)

In addition, Mr. Spota objects to the characterization of his decision to appoint a special prosecutor.  As Mr. Moustakas's trial testimony made clear, Mr. Loeb's criminal attorney alleged in private – outside of the courtroom, in an empty jury room, off the record, and outside of the presence of the judge and court reporter – that Mr. Burke had assaulted Mr. Loeb, and sought to leverage that allegation in order to secure a favorable plea deal for Mr. Loeb.  (11.21.19 Tr. 1085:5–1088:22)  When Mr. Spota learned about this later that same day, Mr. Spota immediately directed that the case be transferred to a special prosecutor – despite the absence of any public allegation at the time about the alleged assault.  (11.21.19 Tr. 1088:23–

**COVINGTON**

Mr. Steven S. Guttman
August 12, 2020
Page 4

1094:7)   Mr. Spota sought a special prosecutor for the case because, once Mr. Burke was accused of assaulting Mr. Loeb, it was appropriate for the SCDAO to recuse itself from the case, given Mr. Burke's prior affiliation with the SCDAO.  (12.04.19 Tr. 2359:13−20 (John Meehan), 2441:21−2442:8 (Ms. Constant))

Further, Mr. Spota objects to the assertion that it was "inexplicabl[e]" that the Nassau County District Attorney's Office ("NCDAO") was not asked to handle the Loeb case.  As Ms. Constant testified at trial, the NCDAO rarely agreed to act as a special prosecutor on SCDAO cases, even though the SCDAO had willingly assisted the NCDAO by acting as a special prosecutor in NCDAO cases.  In light of this history, the SCDAO asked the Queens County District Attorney's Office ("QCDAO") – the district attorney's office in the second-closest county to Suffolk – if it would assist.  (12.05.19 Tr. 2609:8−2610:25)

Finally, Mr. Spota objects to the assertion that Mr. Spota and Jack Ryan − a member of the QCDAO who was involved in assigning Assistant District Attorney Peter Crusco to handle the Loeb case − "enjoy[ed] a long-standing friendship."  The two had no personal relationship and only interacted, infrequently, in their professional capacities.  As just one indication of the limited nature of their professional relationship, based on phone records introduced by the government at trial, Mr. Spota and Mr. Ryan spoke by phone for over one minute only seven times in nearly 10 years.  (12:10.17 Tr. 3109:14−25 (discussing GX 500C); GX 500 at PH029701, 62332, 24201–03, 24205)

Paragraph 12 – Offense Conduct:  Mr. Spota objects to the implication that he determined the scope of either the SCDAO's request for a special prosecutor, or the proposed order appointing the special prosecutor.  Mr. Spota had no involvement in preparing either document and we are unaware of any evidence that he instructed anyone on the scope of either document.  Further, Mr. Spota objects to the assertions that the request and order "intentionally" omitted the assault allegation and "effectively prevent[ed]" the special prosecutor from investigating that allegation, much less that he had any involvement in that alleged omission.  As both Ms. Constant and former SCDAO Appeals Chief Michael Miller testified at trial, regardless of the wording of the request and order, those documents necessarily provided the special prosecutor with authority to investigate the assault allegation because, in order to respond to a motion to suppress Mr. Loeb's confession as involuntary due to the alleged assault, the special prosecutor would be required to investigate whether the assault had in fact occurred.  (12.05.19 Tr. 2562:25−2564:9 (Ms. Constant), 2756:6−17 (Mr. Miller))  Further, as Mr. Miller testified, while in his opinion the request and order did not authorize the special prosecutor to investigate the alleged assault as an independent crime, the scope of the special prosecutor's authority could easily have been expanded to include such an investigation at the request of the special prosecutor.  (12.05.19 Tr. 2756:18−22, 2764:17−2765:17)  Indeed, as Mr. Crusco told the government prior to trial (GX 3500-PC-11 p. 4), he and Mr. Ryan were also of the opinion that Mr. Crusco's authority could have been expanded to include prosecuting Mr. Burke for the assault, if probable cause against Mr. Burke was developed.

**COVINGTON**

Mr. Steven S. Guttman
August 12, 2020
Page 5

Paragraph 13 – Offense Conduct:  Mr. Spota objects to each of the assertions concerning his alleged conduct in this paragraph.  Mr. Spota played no role in selecting former Chief of Detectives William Madigan as a liaison for the special prosecutor, much less with enlisting Mr. Madigan to "spy" on the special prosecutor.  Instead, after Mr. Spota *rejected* the special prosecutor's request that he appoint a liaison from the SCDAO, Mr. Spota learned that the *SCPD* had appointed Mr. Madigan as a liaison.  (12.04.19 Tr. 2448:19–2449:7)  Indeed, Mr. Madigan himself told the government in an interview and testified in the federal grand jury that Mr. *Burke* asked him to serve as a liaison – with no mention of Mr. Spota.  (GX 3500-WM-2 p. 4; 2016.06.15 Tr. 36:16–38:18; 2017.03.08 Tr. 16:2–5)  Mr. Madigan also described his role as liaison as acting as the "middle person" between the special prosecutor and the SCPD – again, with no mention of Mr. Spota.  (2017.03.08 Tr. 16:6–16)

Mr. Spota also objects to the characterization of Mr. Madigan as a "loyalist" to Mr. Spota, with whatever negative connotation is implied.  While Mr. Madigan previously worked for Mr. Spota and shared a collegial relationship with him, including occasionally joining him at social outings, the implication that Mr. Madigan displayed fealty to Mr. Spota at the time of the events in question – when he no longer worked for Mr. Spota, and instead worked at the SCPD – is false.

Paragraph 15 – Offense Conduct:  Mr. Spota objects to the assertions that he "engaged in numerous meetings and telephone conversations" concerning Mr. Loeb, the assault, and/or the federal investigation with James Hickey, Anthony Leto, or other members of the SCPD – "off-site" or otherwise; that he "agreed," given "Burke's reputation, to conceal Burke's role in the assault and to obstruct the federal investigation to protect Burke"; and that he "regularly pressured, questioned and ultimately threatened" Mr. Hickey to ensure the other detectives' compliance.

As to former SCPD detectives Kenneth Bombace and Mr. Leto – two of the three detectives who, along with Mr. Burke, assaulted Mr. Loeb and then tried to cover it up – both testified that they never had a conversation with Mr. Spota concerning these topics.  (11.20.19 Tr. 801:24–803:7 (Mr. Bombace); 11.25.19 Tr. 1307:7–1308:6 (Mr. Leto))  Indeed, the two barely knew Mr. Spota (*id.*) and Mr. Leto told the government prior to trial that he "could not recall any interaction with the [SCDAO] concerning Burke and the Loeb investigations."  (GX 3500-AL-13 p. 1)  And while Mr. Bombace and Mr. Leto spoke routinely with Mr. Hickey concerning these topics, not once did Mr. Hickey claim to either of them that he had spoken with Mr. Spota concerning these topics – much less pass on any alleged threats by Mr. Spota.  (*Id.*)  As Mr. Leto testified at trial, he "ha[d] no idea" whether Mr. Spota even met with Mr. Hickey about the Loeb case.  (11.25.19 Tr. 1308:4–6; *see also* GX 3500-AL-15 p. 1 (indicating the same in pre-trial government interview)  Similarly, Mr. Bombace testified that, while he spoke with Mr. Hickey "many times" during the course of the Loeb investigation, he agreed that Mr. Hickey had "not once" mentioned conversations with Mr. Spota.  (11.20.19 Tr. 802:25–803:7)  And, while the third detective involved in the Loeb assault, Michael Malone, did not testify at trial,

**COVINGTON**

Mr. Steven S. Guttman
August 12, 2020
Page 6

phone records introduced by the government at trial do not reflect a single call between Mr. Malone and Mr. Spota.  (GX 500 at PH023475–67880, 3000)

As to Mr. Hickey:   the vast majority of his trial testimony concerning his alleged interactions with Mr. Spota is false.

While Mr. Hickey claimed to have discussed "all the time" the above-described topics with Mr. Spota on the phone (11.26.19 Tr. 1593:5–16), phone records introduced by the government at trial reflect a total of only three phone calls between Mr. Hickey's phones and Mr. Spota's phones over a three-year period of time, from 2013 to 2015, which includes virtually the entire time period of the alleged conspiracy preceding Mr. Burke's arrest.   (12.03.19 Tr. 2029:16–2031:21; GX 515)  One of those calls (June 25, 2013) was a minute long, with no evidence of its content (or even if the call went through) (12.03.19 Tr. 2030:2–16 (Mr. Hickey); 12.04.19 Tr. 2265:7–14 (FBI agent William Sena); GX 515); a second (May 12, 2015) was a call in which Mr. Spota asked Mr. Hickey where he should park his car at a law enforcement event and whether he could borrow a jacket (12.03.19 Tr. 2030:17–23; GX 515); and a third (August 17, 2015) went to voicemail (12.03.19 Tr. 2030:24–2031:21; 12.04.19 Tr. 2266:17–2268:12 (Mr. Sena's testimony that "F" under "Call Direction" on a Verizon phone record denotes that the call went to voicemail); GX 500 at PH025822 (noting "F" under "Call Direction" for this call), 515).  Mr. Hickey's explanation at trial – that he spoke to Mr. Spota on the phone "all the time" concerning the issues in this case when Mr. Burke conferenced Mr. Spota in to such calls (an allegation notably absent from the reports of Mr. Hickey's 17 pre-trial interviews with the government) – is nothing but a latter-day fabrication intended to plug a gaping hole in his plainly spurious and uncorroborated testimony.

Mr. Hickey's assertion that he spoke with Mr. Spota concerning Mr. Loeb's case "every single time" he saw Mr. Spota in the SCDAO building, either in the hallway or in or near the bathroom – amounting to a "few dozen" times (12.03.19 Tr. 2034:8–18) – is also false.  Swipe card records for the SCDAO building introduced at trial reflect that, during the key time periods of the alleged conspiracy, when the federal grand jury investigation was known by the alleged conspirators to be ongoing, Mr. Hickey entered that building only once.  (DX 17–18, 20)  Mr. Hickey's explanation – that he rarely swiped in because others held the door for him – disintegrates when compared to the far more frequent swipes of SCDAO employees (including Mr. Spota) who were actually in the building on a regular basis.  (DX 17, 19, 22, 25)  Moreover, Mr. Spota had a private bathroom in his office and thus there was no reason for him to run into Mr. Hickey in, or entering or exiting, the public bathrooms located elsewhere in the building.

Further, it defies comprehension that Mr. Spota could have "regularly pressured, questioned and ultimately threatened" Mr. Hickey to ensure the detectives' compliance without Mr. Hickey ever passing that threat on to the detectives involved in the assault.  Yet, according to Mr. Bombace and Mr. Leto's trial testimony, Mr. Hickey never conveyed any such threat.

**COVINGTON**

Mr. Steven S. Guttman
August 12, 2020
Page 7

In addition, Mr. Hickey prepared several pages of detailed handwritten notes for his initial meeting with his criminal attorney, shortly after he learned that he was a target of the federal investigation and as he prepared to cooperate with the government.  According to Mr. Hickey, these notes covered all the "key points" of the conspiracy.  (12.02.19 Tr. 1770:23−1771:8)  Yet, other than a single meeting with Mr. Spota on June 4, 2015, these notes did not reflect any conversations with Mr. Spota at any time.

Finally, Mr. Hickey's credibility as a witness is further undermined by his documented willingness to lie.  This includes lying during in-court testimony in a 1992 criminal case in which he allegedly severely beat a suspect he had arrested (12.03.19 Tr. 2001:3−2009:1; GX 969); lying during an SCPD Internal Affairs Bureau investigation into his courtroom perjury in the 1992 criminal case (*id.*); and numerous lies to his wife to conceal four separate, overlapping, years-long, extramarital affairs with SCPD subordinates and others (12.03.19 Tr. 2012:23−2013:16, 2015:12−2017:15, 2018:2−20, 2019:3−2020:13).  These prior instances of deceit on his part, along with the motive to lie created by his plea bargain with the government, provide yet additional reasons to reject Mr. Hickey's account of events as set forth in the PSR.

Paragraph 17 – Offense Conduct:  Mr. Spota objects to the assertion that he "assigned Madigan" to investigate who leaked Mr. Burke's Internal Affairs Bureau file to Newsday in October 2013.  That assertion is false.  Indeed, Mr. Madigan did not even work for Mr. Spota at that time.  In addition, Mr. Spota objects to the assertion that the SCDAO's "investigati[on of] the leak of confidential officer safety-type crime patterns" in January 2014 was a "cover story" for the wiretap of John Oliva's phone.  As was evidenced by the video of Mr. Spota's press conference concerning the January 2014 leak and other records introduced at trial (DX 10−13), as well as Ms. Constant's testimony at trial concerning the wiretap of Mr. Oliva's phone (12.05.19 Tr. 2615:19−2640:18), Mr. Spota's decision to authorize the wiretap was spurred by the leak to Newsday of confidential police information concerning a robbery spree − a leak that imperiled the lives of officers who were in the field surveilling the robbery suspects at the time that Newsday published the story, and caused (quite understandably) an uproar among SCPD members and the police unions.  The suggestion that Mr. Spota's motive for the wiretap was based on Mr. Burke's animus toward Mr. Oliva is belied by the fact that Mr. Spota initially sought to wiretap the phone of the *reporter* who wrote the story with the leaked information – not Mr. Oliva's phone – but was advised that such a wiretap was not legally permissible due to freedom-of-the-press considerations.  In addition, the suggestion that the January 2014 leak was a cover story for the wiretap is belied by the fact that the SCDAO informed the Federal Bureau of Investigation (the same agency that investigated Mr. Burke in 2013 for allegedly assaulting Mr. Loeb) of the wiretap before it even commenced, and even invited them to participate in monitoring the wiretap.  The SCDAO also informed the United States Attorney's Office for the Eastern District of New York of the wiretap during its pendency and invited the government to listen to calls intercepted during the wiretap – an invitation the government accepted.  And the suggestion that the wiretap was somehow not legitimate is belied by the fact that Mr. Oliva was eventually arrested, confessed, resigned from the SCPD, and pleaded guilty to committing a

**COVINGTON**

Mr. Steven S. Guttman
August 12, 2020
Page 8

crime arising out of his leaks to Newsday.  (11.21.19 Tr. 1060:11−1662:15)  In short, the assertion that the January 2014 leak was a cover story, and not Mr. Spota's true rationale for seeking the wiretap, is false.

Paragraph 18 – Offense Conduct:  Mr. Spota objects to the assertion that he engaged in any "obstructive efforts" prior to the close of the initial federal investigation in December 2013. As noted in the above-stated objections to Paragraph 15, the only evidence that Mr. Spota engaged in any such conduct during that time was Mr. Hickey's uncorroborated trial testimony about phone calls and chance encounters in the SCDAO building and, for all of the reasons stated above, that testimony was false.

Paragraph 19 – Offense Conduct:  Mr. Spota objects to the assertions in this paragraph. For the reasons stated above, Mr. Spota did not "constant[ly]" or "regular[ly]" see Mr. Hickey, much less "remind" him that the detectives should not cooperate with the federal investigation. The assertions concerning the Cherrywood Country Club and Emerald Society events are also false.  Notably, despite allegedly recording meetings concerning the conspiracy – including the initials of the participants – in his calendar for future use with the authorities, Mr. Hickey did not note Mr. Spota's presence at either of these events.  (12.02.19 Tr. 1806:20−1807:2; 12.03.19 Tr. 2039:8−24)  Similarly, despite including the "key points" regarding the conspiracy in his handwritten notes for his criminal attorney, Mr. Hickey did not mention either of these alleged meetings there either.  (12.03.19 Tr. 2091:11−2092:18)  Further, while the government obtained hundreds of photographs of the Emerald Society event, depicting scores of attendees, including elected officials, Mr. Spota is not included in any of them – a puzzling omission if, in fact, the sitting District Attorney actually attended the event.  (12.03.19 Tr. 2045:20−2046:11)  Nor is there any corroboration for Mr. Hickey's testimony that he even saw Mr. Spota at either event, let alone spoke to him, let alone spoke to him about the Loeb investigation.

Paragraphs 20–21 – Offense Conduct:  Mr. Spota objects to the description of the June 4, 2015 meeting in these paragraphs, which reflect Mr. Hickey's false account of what occurred.

As an initial matter, Mr. Hickey's most recent account of this meeting, relayed at trial, is squarely contradicted by Mr. Hickey's initial account of this meeting, included in his handwritten notes for his criminal attorney.  These notes were prepared in or about mid-November 2015, and reflect Mr. Hickey's most contemporaneous account of the meeting.  And Mr. Hickey nowhere stated in his notes that Mr. Spota threatened anyone, that Mr. Spota instructed Mr. Hickey to "get his guys in order," or that Mr. Spota said the detectives couldn't "change their stories."  (12.03.19 Tr. 2105:3−2107:21)  Given the highly-charged nature of these alleged statements, and Mr. Hickey's later testimony that Mr. Spota (the sitting District Attorney) made them, the absence of any of them from Mr. Hickey's notes strongly suggests that these statements were never made.

**COVINGTON**

Mr. Steven S. Guttman
August 12, 2020
Page 9

Other flaws in Mr. Hickey's account of the meeting further undermine his testimony.  For example, Mr. Hickey testified at trial that, in the course of the meeting, he witnessed Mr. Spota call Mr. Burke's attorney, Joseph Conway, and leave a message.  Mr. Hickey's handwritten notes reflect that the meeting began at 11:00 a.m.; Mr. Hickey testified that the call occurred 10 to 15 minutes into the meeting (thus placing the call at 11:10 to 11:15), and that the meeting lasted about an hour (thus placing the end of the meeting at 12:00).  (12.03.19 Tr. 2055:2–2056:8)  Yet, phone records introduced by the government reflect that Mr. Spota called Mr. Conway at 12:54 p.m., well over an hour after Mr. Hickey said the call occurred and even after the meeting ended.  (GX 511)

Mr. Hickey also claimed that Mr. Burke called Brian Mitchell, a Suffolk County attorney defending a civil suit brought by Mr. Loeb, from Mr. Spota's office phone during the meeting.  (12.03.19 Tr. 2056:9–20)  Yet, phone records introduced by the government at trial do not reflect any such call.  (GX 511)

Mr. Hickey also testified that Mr. Spota recommended calling Pete Mayer to confirm whether the special prosecutor had returned Mr. Loeb's case file to the SCDAO.  (12.03.19 Tr. 2056:21–2057:12)  Yet, neither Pete Mayer Sr. nor Pete Mayer Jr. – both former SCDAO assistant district attorneys – worked at the SCDAO at the time of the June 4, 2015 meeting (they both left years before) or had anything to do with Mr. Loeb's case.  (DX 16)

Mr. Hickey also testified that the meeting's attendees speculated that Mr. Bombace was cooperating in light of a meeting Mr. Bombace had with then-Suffolk County Sheriff Vince DeMarco, during which Mr. Bombace asked to work for Sherriff DeMarco in order to retire in short order with a pension – allegedly an important clue that Mr. Bombace was seeking to leave the SCPD prior to cooperating.  (11.26.19 Tr. 1695:16–1696:3)  Yet, that meeting between Mr. Bombace and Sheriff DeMarco did not occur until June 23 – nearly three weeks *after* the June 4 meeting.  (11.20.19 Tr. 811:22–812:12; GX 3000, 3500-KB-9 Tr. 90–91; DX 15, 39)  Thus, Mr. Hickey's testimony that the Bombace/DeMarco June 23 meeting was discussed at the June 4 meeting was obviously false.

All of these inconsistencies and contradictions, together with the many other reasons (set forth above) to reject Mr. Hickey's credibility as a witness, thoroughly undermine Mr. Hickey's claim that Mr. Spota made the statements attributed to him in Paragraphs 20 and 21 of the PSR.

Paragraph 25 – Offense Conduct:  Mr. Spota objects to the assertions in this paragraph.  Indeed, they are proven false by reference to the very grand jury transcripts they purport to summarize.  While the paragraph states that "the detectives involved in the assault of Loeb" testified in the grand jury concerning the alleged extent of Mr. Spota's involvement in the conspiracy – including that, if the detectives had "told the truth from the onset," they "would have been targeted by Spota" – Mr. Malone never even mentioned Mr. Spota in his grand jury testimony (Witness Statement 712–776; 927–953); Mr. Bombace only answered one question

**COVINGTON**

Mr. Steven S. Guttman
August 12, 2020
Page 10

concerning Mr. Spota, stating that he did not know if Mr. Spota and the special prosecutor were acquainted (GX 3500-KB-9 Tr. 70); and Mr. Hickey and Mr. Leto evidently never testified before a grand jury at all.



      Paragraph 33 – The Defendants' Participation: Mr. Spota objects to the assertion that he "exerted pressure on . . . subordinates to lie about what occurred, going so far as to induce one subordinate to commit perjury." None of Mr. Spota's subordinates at the SCDAO has been

**COVINGTON**

Mr. Steven S. Guttman
August 12, 2020
Page 11

accused of lying or committing perjury, much less that Mr. Spota pressured them to do so. The detectives involved in the Loeb assault and subsequent cover-up were not Mr. Spota's subordinates and had no contact with Mr. Spota regarding either event. And while Mr. Leto perjured himself during an October 2013 suppression hearing concerning the assault, there is no credible evidence that Mr. Spota had anything to do with selecting Mr. Leto to testify or determining what he would say. In fact, Peter Crusco, the special prosecutor who conducted the Loeb prosecution, told the government before trial that he (Mr. Crusco) was the one who decided that Mr. Burke would not testify at the hearing, preferring to save his testimony for trial, and that the "cops" would testify at the hearing instead. (GX 3500-PC-7 at 2, 3500-PC-11 at 4–5) Mr. Crusco gave no indication that Mr. Spota had anything whatsoever to do with that decision. (*Id.*)

In addition, Mr. Spota objects to the assertion that the duration of the conspiracy was "at least five years," particularly to the extent it suggests that Mr. Spota engaged in obstructive conduct during all or even much of that time. There is no credible evidence of such conduct by Mr. Spota prior to Mr. Burke's arrest in December 2015, and no evidence whatsoever of such conduct after that time.

Paragraphs 34–35 – The Defendants' Participation: Mr. Spota objects to several of the enhancements identified in these paragraphs.

First, Mr. Spota cannot be held responsible for "substantial interference with the administration of justice." That enhancement requires evidence of involvement in "a premature or improper termination of a felony investigation; an indictment, verdict, or any judicial determination based upon perjury, false testimony, or other false evidence; or the unnecessary expenditure of substantial governmental or court resources." *See* U.S.S.G. § 2J1.2(b) (comment 1). Here, to the extent imposition of the enhancement turns on Mr. Leto's perjurious state court suppression hearing testimony in October 2013 and/or the closure of the initial federal investigation in December 2013, there is (as discussed above, in connection with Paragraph 33 of the PSR) no evidence that Mr. Spota was involved in Mr. Leto's 2013 testimony, nor is there any credible evidence of any other involvement by Mr. Spota in the conspiracy prior to December 2013. Mr. Hickey's uncorroborated, implausible, evolving, and, at times, provably false testimony concerning Mr. Spota's purported involvement during that period does not even come close to approaching the solid evidence required to impose this enhancement. Moreover, Mr. Spota cannot be held responsible for any misconduct by others during that time, given the lack of credible evidence that Mr. Spota joined the conspiracy during that time. *See, e.g.*, U.S.S.G. § 1B1.3 (comment 3(B)) ("A defendant's relevant conduct does not include the conduct of members of a conspiracy prior to the defendant joining the conspiracy, even if the defendant knows of that conduct[.]").

Second, the enhancement for the conspiracy being "extensive in scope" cannot be applied to Mr. Spota, for similar reasons. The credible evidence supports, at most, that Mr. Spota attended a meeting on June 4, 2015 where the Loeb investigation was discussed. That conduct cannot be considered "extensive" under any reasonable understanding of the term. Moreover,

**COVINGTON**

Mr. Steven S. Guttman
August 12, 2020
Page 12

Mr. Spota cannot be held responsible for conduct that occurred prior to that date (for the reasons stated above) and the conspiracy unraveled soon after that date (the detectives involved in the assault began to cooperate in October 2015 and Mr. Burke was arrested in December 2015).

Finally, the enhancement for being an "organizer or leader" also cannot be applied to Mr. Spota. It is incorrect to assert that Mr. Spota was an "organizer or leader" of the conspiracy, much less that he "organized and led the activities of the SCPD officers involved in the incident and its cover-up," given the absence of any credible (much less solid) evidence that Mr. Spota was involved in anything other than a single meeting, on June 4, 2015 – and that was a meeting Mr. Burke (not Mr. Spota) initiated and organized. (11.26.19 Tr. 1688:14–1689:23; 12.02.19 Tr. 1838:2–5) Instead, the only purported basis for applying this enhancement appears to be Mr. Spota's position as District Attorney, rather than actually organizing or leading the alleged conspiracy. But that is not a proper basis for imposing this enhancement. In any event, this factor (Mr. Spota's position) is already captured by the abuse of a position of trust enhancement under U.S.S.G. § 3B1.3, an enhancement to which Mr. Spota does not object. Mr. Spota's position as District Attorney cannot be relied upon to apply the "organizer or leader" enhancement as well.

Further, the fact that the PSR applies this enhancement to three different people (Mr. Burke, Mr. McPartland, and Mr. Spota) further renders the application of this enhancement to Mr. Spota highly suspect. Indeed, to the extent these offenses had an "organizer or leader," it was clearly Mr. Burke, not Mr. Spota. It was Mr. Burke who (i) participated in the assault underlying the investigation that was obstructed, (ii) initiated the cover-up of that assault, (iii) created the false cover story, (iv) told the detectives involved to use that cover story if questioned, (v) created a written timeline that falsely denied his involvement in the assault and distributed the timeline to others, and (vi) repeatedly had direct contact with the detectives who lied on his behalf. Mr. Spota did none of those things.

Paragraphs 43, 47, 48, 50, 53, 57, 59, 61, 63, 66 – Adjustments and Offense Level Computations: For the reasons stated above, Mr. Spota objects to the enhancements applied in these paragraphs and the resulting adjusted offense levels. With the improper enhancements removed, Mr. Spota's total offense level is 16.



**COVINGTON**

Mr. Steven S. Guttman
August 12, 2020
Page 13



Paragraph 111 – Guideline Provisions: For the reasons stated above, Mr. Spota objects to the calculation of his guideline range. Mr. Spota's total offense level, calculated without the improper enhancements, is 16, which – with a criminal history category of I – results in a guideline range of 21 to 27 months.

Paragraph 123 – Factors That May Warrant Departure: There are multiple factors warranting a downward departure from the applicable sentencing guideline range. However, because each of these factors also provides a ground for a downward variance under 18 U.S.C. § 3553(a), we submit that neither the Probation Department nor the Court need resolve this issue.

Paragraph 124 – Factors That May Warrant a Sentence Outside of the Advisory Guideline System: Mr. Spota objects to the assertion that there are no factors that may warrant a sentence below the advisory guideline range. In fact, there are multiple factors warranting a downward variance from that range. These include, among other factors: Mr. Spota's advanced age and increasingly deteriorating physical condition; his exceptional record of charitable endeavors and good works; the serious collateral consequences that Mr. Spota already has suffered and will continue to suffer as a result of this case; and the severe and unnecessary risk that a prison term would pose to Mr. Spota, in light of his advanced age, physical condition, and the ongoing COVID-19 pandemic. These factors – which will be detailed in our sentencing memorandum to the Court – warrant a sentence well below the advisory guideline range, whether those factors are considered individually or in combination with each other.

**COVINGTON**

Mr. Steven S. Guttman
August 12, 2020
Page 14

*       *       *

     Thank you for your consideration of these objections and comments.  I would be happy to discuss these matters further with you and answer any questions that you may have.

Sincerely,

/s/  *Alan Vinegrad*

Alan Vinegrad

cc (by e-mail):

     Nicole M. Boeckmann, Esq.
     Lara Treinis Gatz, Esq.
     Justina L. Geraci, Esq.
     Michael R. Maffei, Esq.

# EXHIBIT 125

# **COVINGTON**

BEIJING  BRUSSELS  DUBAI  FRANKFURT  JOHANNESBURG
LONDON  LOS ANGELES  NEW YORK  PALO ALTO
SAN FRANCISCO  SEOUL  SHANGHAI  WASHINGTON

Covington & Burling LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
T  +1 212 841 1000

September 8, 2020

**BY E-MAIL**

Mr. Steven S. Guttman
United States Probation Office
Eastern District of New York
202 Federal Plaza
West Wing 2nd Floor
Central Islip, N.Y.  11722-9012

Re:  United States v. Christopher McPartland and Thomas J. Spota
     17-cr-0587 (JMA)

Dear Officer Guttman:

I am writing on behalf of Thomas Spota in response to the government's August 28, 2020 letter regarding Mr. Spota's objections to the Pre-Sentence Report ("PSR").  I respectfully request that this response be taken into account in addressing those objections.

Paragraph 8 – Offense Conduct:  The testimony by James Hickey cited by the government does not refute Mr. Spota's objection that the record does not support that he "intentionally misrepresented and obfuscated the facts" contained in the response to the anonymous letter.  Mr. Hickey's testimony does not, and cannot, speak to Mr. Spota's state of mind, and does not shed any light on the extent to which Mr. Spota personally drafted the letter or verified its accuracy.

Nor has the government adequately supported the assertion that Mr. Spota "punish[ed] detractors."  The government's account of the Oliva wire is flawed, for the reasons stated in Mr. Spota's initial objections.  In addition, as explained below, the government's allegations concerning former Suffolk County Police Department ("SCPD") officer Patrick Cuff are without basis.

There is no evidence that Mr. Spota was "heavily involved" in the prosecution of Mr. Cuff's son.  Mr. Cuff testified that he never even spoke to Mr. Spota concerning the prosecution.  (12.04.19 Tr. 2304:17–19)  Further, while Mr. Cuff testified that he was "concerned" prosecutors might seek felony charges against his son, after an assistant district attorney stated she intended to present the case to a grand jury, there was no evidence concerning why that decision was made or who made it.  (*Id.* 2283:25–2284:4)  Instead, Mr. Hickey merely surmised that Mr. Spota or Christopher McPartland was responsible.  (12.02.19 Tr. 1890:5–9)  Even setting aside

**COVINGTON**

Mr. Steven S. Guttman
September 8, 2020
Page 2

Mr. Hickey's many deficits as a witness, such conjecture is insufficient to support the assertion in the PSR. Indeed, as demonstrated below, the trial evidence showed that this conjecture was wrong: Mr. Cuff's son was charged with and pled guilty to a misdemeanor, not a felony.

For that reason, there was nothing "enhanced" about the prosecution of Mr. Cuff's son. Quite the opposite. As Mr. Cuff testified at trial, his son took multiple guns from Mr. Cuff's safe without permission, brought those weapons to a public place, and was arrested after a civilian reported this criminal conduct to the police. (12.04.19 Tr. 2296:19–2297:16, 2302:3–7) Nevertheless, Mr. Cuff's son was charged with and pled guilty only to a single misdemeanor offense—an offense Mr. Cuff readily acknowledged that his son was guilty of committing. (*Id.* 2302:8–21; 2304:5–11) Mr. Cuff's son was given no jail time and, further, was given youthful offender status, as a result of which his case was sealed and his conviction was later vacated. (*Id.* 2302:22–2304:4) In short, Mr. Cuff's son was treated extremely leniently for his serious, potentially dangerous crime.

The government's assertion that Mr. Spota was "heavily involved" in "helping ensure Cuff was demoted" is equally baseless. The government has not pointed to any evidence that Mr. Spota had any role in securing Mr. Cuff's demotion. And Mr. Cuff testified that he never discussed his demotion with Mr. Spota. (*Id.* 2304:20–21) To the contrary, in his testimony he solely blamed James Burke for his demotion. (*Id.* 2289:20–22) Further, Mr. Hickey merely (and falsely) testified that Mr. Spota attended a "demotion party" for Mr. Cuff—not that Mr. Spota had any involvement in the demotion itself. (12.02.19 Tr. 1894:9–10)

Paragraph 10 – Offense Conduct: The testimony cited by the government to support its assertion that Mr. Burke confessed assaulting Christopher Loeb to Mr. Spota is self-defeating. Mr. Hickey initially told prosecutors that he only "assumed" Mr. Spota knew that Mr. Burke had assaulted Mr. Loeb (12.03.19 Tr. 2066:5–16)—a statement at odds with Mr. Hickey's account at trial that Mr. Burke discussed "[t]he fact that [he] beat the hell out of" Mr. Loeb "very openly" with Mr. Spota (11.26.19 Tr. 1576:14–21). Mr. Hickey also testified that, during a June 4, 2015 meeting with Mr. Spota, Mr. Burke admitted only "tapping" Mr. Loeb on the head (*id.* 1696:23–25)—a statement that is, again, inconsistent with Mr. Hickey's testimony that Mr. Burke admitted to Mr. Spota that he "beat the hell out of" Mr. Loeb. And his testimony is inconsistent with the many other witnesses who state that Mr. Burke *denied* that he assaulted Mr. Loeb—including denying it to Mr. Spota. (*E.g.*, 12.04.19 Tr. 2455:2–5; 2457:1–2458:2; 2481:12–13; 2483:10–22)

Paragraphs 11–13 – Offense Conduct: The government's assertion that Mr. Spota "control[led]" the Loeb case because the Government Corruption Bureau handled it is meritless. Mr. Spota was the District Attorney, and therefore was in a position to oversee (or even control) any prosecution, regardless of what Bureau handled it. In any event, Mr. Spota promptly ceded control of the Loeb case to the Queens County District Attorney's Office ("QCDAO") upon learning of Mr. Loeb's assault allegation against Mr. Burke in February 2013. (11.21.19 Tr.

**COVINGTON**

Mr. Steven S. Guttman
September 8, 2020
Page 3

1088:23–1094:7; 12.04.19 Tr. 2441:21−2442:8)  And while the government seeks to disparage the QCDAO as a "friendlier" district attorney's office—thereby implying that the QCDAO was more likely to conceal or ignore Mr. Burke's assault of Mr. Loeb—there is no evidence supporting that nefarious characterization.

Further, the government's claim that there is "corroboration" for Mr. Hickey's testimony that Mr. Spota selected former SCPD Chief of Detectives William Madigan to be a liaison to the special prosecutor is false.  While the government cites testimony by former SCPD Chief of Patrol John Meehan and Mr. Burke's attorney Joseph Conway indicating that Mr. Madigan acted as a liaison for Mr. Burke, their testimony in no way suggested that Mr. Spota had anything to do with assigning Mr. Madigan that role.  (12.04.19 Tr. 2364:24–2365:17, 2366:17–2367:4; 12.10.19 Tr. 2987:3–9)  The sole reference to Mr. Spota in any of the cited testimony came from FBI agent William Sena—but Mr. Sena merely testified that phone records reflected calls between Mr. Spota's phone and Mr. Burke's phone during Mr. Loeb's state suppression hearing. That is in no sense "corroboration" that Mr. Spota had anything to do with selecting Mr. Madigan to act as a liaison—and does nothing to counter the significant evidence (summarized in Mr. Spota's initial objections) supporting that Mr. Spota had nothing to do with that decision.

Finally, the government misdescribes Mr. Spota's role in Mr. Madigan's so-called "meteoric" rise at the SCPD.  Mr. *Burke* appointed Mr. Madigan to the three-star role of Chief of Detectives, not Mr. Spota.  (11.14.19 Tr. 174:21–25)  And while former Chief Assistant District Attorney Emily Constant testified that Mr. Spota tried to help save Mr. Madigan's job in October 2015, after Mr. Burke was fired from the SCPD, the government omits the explanation:  although County Executive Steve Bellone's statement to Mr. Burke that he was going to be arrested suggested that Mr. Burke had committed the assault (GX 3500-EC-5 at 12), there was no similar basis for Mr. Spota to believe that Mr. Madigan was also involved, prompting Mr. Spota's belief that his firing would have been "unfair."  (12.05.19 Tr. 2514:1–8)

Paragraphs 15–16 – Offense Conduct:  The government's assertion here—and throughout its response (*see* Gov't Resp. ¶¶ 8, 10–13, 15–16, 20–22)—that "the jury credited Hickey's testimony in its entirety" is specious.  As the Court itself observed in ruling on Mr. Spota's motion under Rule 29 of the Federal Rules of Criminal Procedure, the jury could "credit only a sliver of Mr. Hickey's testimony" and still vote to convict.  (12.11.19 Tr. 3244:5–14)  Thus, while the jury may have credited a "sliver" of Mr. Hickey's testimony, the government cannot possibly know what portion of his testimony the jury relied on to reach its verdict, let alone rely on the verdict as a basis to credit Mr. Hickey's testimony in its entirety. There is, therefore, absolutely no basis to conclude that the jury credited Mr. Hickey's uncorroborated account (nowhere to be found in the memoranda of his 17 pre-trial interviews) of "conference calls" with Mr. Spota, as an explanation for the fact that phone records reflected only three phone calls between the two during a several-year period.

Paragraph 17 – Offense Conduct:  The government's proposed revision is itself objectionable.  The evidence cited by the government does not support the assertion that Mr.

**COVINGTON**

Mr. Steven S. Guttman
September 8, 2020
Page 4

Burke "enlisted . . . Spota . . . to investigate the leak of his personal file."  Mr. Meehan testified
that Mr. Burke said that Mr. McPartland would be leading the leak investigation—and made no
mention of Mr. Spota.  (12.04.19 Tr. 2378:9–16)  While the government also cites testimony by
Mr. Meehan recounting Mr. Burke's claim that "they" (the SCDAO) were going to investigate the
leak (*id.* 2367:12–2368:8), that testimony was stricken from the record (*id.* 2376:8–14) and
even the government, in its offer of proof to the Court, did not mention Mr. Spota in the context
of this allegation (*id.* 2370:2–2372:5).

      Paragraphs 18–19 – Offense Conduct:  Notwithstanding the government's argument,
there remains no corroboration for Mr. Hickey's testimony that he even saw Mr. Spota at the
Cherrywood Country Club and Emerald Society events, let alone spoke to him, let alone spoke to
him about the Loeb investigation.  Government Exhibit 957 is an email from Mr. Spota's office
to East End law enforcement officials inviting them to attend a meeting at the Cherrywood
Country Club, to discuss gang-related crime.  Notably, while Mr. Hickey eventually received the
email from another recipient, Mr. Spota did not invite him to the event.  More to the point, there
is nothing in the email corroborating that Mr. Spota saw Mr. Hickey at the event, much less
spoke to him, much less (if they spoke) what they spoke about.  Second, Mr. Meehan testified
that Mr. Spota and Mr. Hickey attended the Emerald Society event in 2015—but Mr. Meehan's
account is at odds with both (i) the record (Mr. Meehan recalled that Mr. Spota spoke at the
event (12.04.19 Tr. 2402:1–7), but there is no photograph of Mr. Spota among the hundreds of
photographs of the event's attendees), and (ii) Mr. Hickey's testimony (Mr. Hickey testified that
Mr. Spota did not speak at the event (12.03.19 Tr. 2047:2–4)).  The most likely explanation is
that Mr. Meehan was recalling some other event, or an Emerald Society event in a different year.
In any event, Mr. Meehan's testimony does not corroborate that Mr. Spota saw Mr. Hickey at the
event or spoke to him there—about the Loeb investigation or anything else.

      Paragraph 25 – Offense Conduct:  While Mr. Spota agrees with the government that the
PSR assertion—that SCPD officers' grand jury testimony supports that Mr. Spota was involved
in the conspiracy—must be revised, many of the government's proposed revisions to this
paragraph are unsound.

      First, the implication of the government's proposed revision—that the officers accused
Mr. Spota of *any* misconduct in their grand jury testimony—is false.  Not a single officer
mentioned Mr. Spota in the context of the conspiracy during their testimony—which is not
surprising, given that Mr. Hickey is the *only* officer who claimed to have interacted with Mr.
Spota in any way concerning the conspiracy.

      Second, the government's argument—that officers attested to "the fact that, had [they]
told the truth from the onset, not only would they have lost their jobs, but they and their families
also would have been targeted by Burke and his powerful friends and allies, including and
especially Spota"—is misleading, at best.  The two officers (other than Mr. Hickey) who told the
government about such a concern prior to trial (Mr. Bombace and Michael Kelly) shared their

**COVINGTON**

Mr. Steven S. Guttman
September 8, 2020
Page 5

unsubstantiated *belief*—not a "fact"—about what might happen to them, untethered to anything they knew Mr. Spota had actually done. For example, while Mr. Kelly stated that the prosecution of former SCPD officer John Oliva inspired this belief, Mr. Kelly also admitted that he was ignorant of whether Mr. Oliva had actually committed a crime meriting prosecution. (GX 3500-MK-15) As for Mr. Hickey, his account of Mr. Spota's alleged conduct is not credible, for the reasons stated above and in Mr. Spota's initial objections.

Third, the government's argument that the officers were concerned that they would "be made out to be the instigator[s] of the assault" is also misplaced. The officers *were* the instigators of the assault—as former SCPD detectives Kenneth Bombace, Anthony Leto, and Michael Malone all testified, they assaulted Mr. Loeb before Mr. Burke even arrived on the scene. (10.20.15 Tr. 16–24; 11.19.19 Tr. 645:13–646:6; 11.21.19 Tr. 1190:25–1191:23, 1193:3–14) That is not an unsubstantiated belief; it's a fact.

Applicable Guidelines Enhancements and Advisory Guidelines Range: The government has almost entirely failed to grapple with the specific objections Mr. Spota made to the credibility of various of Mr. Hickey's claims, instead asserting the mistaken proposition that all of Mr. Hickey's testimony must be credited in light of the verdict. But because that proposition is incorrect, because much of Mr. Hickey's testimony cannot be credited for the reasons stated above and in Mr. Spota's initial objections, and because application of the guideline enhancements Mr. Spota objects to turns on crediting Mr. Hickey's testimony, those enhancements must be removed.

Further, to the extent the government asserts that the aggravating role enhancement should be predicated on references at trial to "they" and "the Administration," that assertion must be rejected. While Mr. Bombace speculated that Mr. Spota may have been one of the "they" who selected Mr. Leto to testify at Mr. Loeb's state suppression hearing—speculation that was wrong, according to a witness with first-hand knowledge of the events (GX 3500-PC-7 at 2, 3500-PC-11 at 4–5)—the Court struck that speculative testimony for lack of foundation and prevented Mr. Leto from offering similar testimony for the same reason (11.20.19 Tr. 697:3–702:4, 711:5–18; 11.21.19 1160:2–1161:15). As to the alleged "Administration" moniker, Mr. Hickey was the sole witness to testify to that term (11.26.19 Tr. 1545:21–1546:1) and—even if his testimony were credible (which it is not)—a mere nickname cannot support application of this enhancement, especially considering the lack of evidence that Mr. Spota actually acted as a leader or organizer of the conduct in question.

**COVINGTON**

Mr. Steven S. Guttman
September 8, 2020
Page 6



\*        \*        \*

Thank you for your consideration of these objections and comments.  I would be happy to discuss these matters further with you and answer any questions that you might have.

Sincerely,

/s/  *Alan Vinegrad*

Alan Vinegrad

cc (by e-mail):

Nicole M. Boeckmann, Esq.
Lara Treinis Gatz, Esq.
Justina L. Geraci, Esq.
Michael R. Maffei, Esq.

# EXHIBIT 126

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- against -

CHRISTOPHER MCPARTLAND and
THOMAS J. SPOTA,

No. 2:17-cr-0587 (JMA)

Defendants.

### DECLARATION OF JOEL A. SICKLER

I, JOEL A. SICKLER, declare as follows pursuant to 28 U.S.C. § 1746:

1.     I am the founder of, and a sentencing specialist for, the Justice Advocacy Group,
LLC, a consortium of criminal justice professionals based in Alexandria, Virginia.  The Justice
Advocacy Group provides research for and advises criminal defense lawyers, U.S. probation
departments, and federal judges on federal sentencing issues and matters involving federal
confinement.

2.     I have been retained by Thomas Spota to advise on his likely Bureau of Prisons
("BOP") classification and designation, if he is sentenced to a term of incarceration, as well as the
likely conditions he would face in federal confinement.

### I.     Education and Experience

3.     I earned a Bachelor of Science in Criminal Justice at Saint Anselm College in
Manchester, New Hampshire, and a Master of Science in the Administration of Justice at American
University's School of Justice in Washington, D.C.  Since then, I have practiced as a criminologist
with particular expertise in the area of federal sentencing and corrections, with 40 years of
experience in the field.  My resume and biography is attached hereto as Exhibit A.

4.      Over the course of my career, I have prepared over 2,500 evaluations for felony-level defendants facing sentencing in federal courts nationwide.  I have submitted sentencing reports in 41 of the 94 federal judicial districts, received 40 federal court appointments as a capital case mitigation specialist, and testified as an expert regarding mitigation findings and recommendations in six federal jurisdictions.  I have visited 51 federal prisons and have advised clients with inmate-related matters in 86 of the BOP's 122 institutions.  *Id.*

5.      I am an associate member of the National Association of Criminal Defense Lawyers and a founding member of the National Association of Sentencing Advocates and Mitigation Specialists, for which I served as Vice President from 1998 to 2000.  I speak regularly at conferences and seminars for these associations, and am published and widely cited in the media on the topics of federal sentencing and confinement.  *Id.*

## II.      Relevant Issues

6.      In this declaration, I set forth the likely impact the ongoing COVID-19 pandemic would have on Mr. Spota's conditions of confinement, were he to be sentenced to a term of incarceration in a BOP facility, and the potential impact Mr. Spota's ▮▮▮▮▮▮▮ would have on his BOP classification and designation, and the conditions he would likely experience as a result.

## III.      Impact of the COVID-19 Pandemic

7.      In response to the spread of COVID-19 across BOP facilities, BOP has instituted a strict quarantine requirement for <u>all</u> prisoners entering and exiting BOP facilities, regardless of vaccine status.  As a result, if Mr. Spota were sentenced to a term of incarceration, he would be placed in quarantine at the beginning and, if conditions required, the end of his term of incarceration.  The conditions of these quarantine confinements are oppressive.

2

8.      Based on my experience, prisoners held in quarantine are almost always housed in an isolation cell in the facility's Special Housing Unit (also known as "the SHU" or "the hole"). Such housing is, in essence, solitary confinement. As a general matter, cells in the SHU measure approximately 8 x 10 feet, with no windows except for a small, wire mesh window on the door, to permit observation of the prisoner. The cell includes a bed, toilet, and sink, and sometimes a desk and chair. Prisoners held in the SHU are kept isolated in their cells 24 hours a day, 7 days a week, except for intermittent and brief periods of time for showers.

9.      Prisoners in the SHU are deprived of virtually all human contact. Meals are served under the door. Family and other social visits are not allowed, and while legal visits are not expressly prohibited, I have found that they do not occur in practice. Similarly, prisoners are frequently not allowed to make telephone calls during their quarantine, including legal calls. In some institutions, no mail is allowed. I am aware of many institutions in which, contrary to BOP policy, prisoners in quarantine are kept in their cell, without books or anything else with which to occupy their time during the weeks or even months that they are confined there.

10.     In addition, prisoners introduced into the BOP system through quarantine are not offered the standard Admissions and Orientation ("A&O") program until their quarantine is complete. Accordingly, these prisoners do not meet with a case manager, counselor, or unit manager when they arrive at the facility. In addition, they do not receive a physical examination or standard medical tests, or consult with a treatment provider concerning their medications, until the quarantine has concluded. Based on my experience, it is at best uncertain whether a particular quarantined inmate will or will not receive his or her required medications, including medications for life-threatening or other serious conditions.

3

11.     While BOP policy states that quarantine must extend for "at least" 14 days[1], in my experience, the current standard length of quarantine is at least 21 days, with some prisoners facing far more extended periods of isolation for reasons outside of their control.  For example, one prisoner I have advised, who is currently incarcerated at the Federal Correctional Institution ("FCI") in Allenwood, Pennsylvania, was required to quarantine for a total of 73 days (i.e., approximately 2-1/2 months) because other prisoners on his unit tested positive for COVID-19.  A second prisoner that I advised, who was designated to serve his term of imprisonment at the minimum-security facility adjacent to the United States Penitentiary ("USP") at Tuscon, Arizona, spent two-thirds of his sentence—60 of 90 days—in isolation due to COVID-19 quarantine procedures.  And I am aware that a third prisoner, whose case has been covered in the media, was kept in isolation at USP Lompoc, California for 56 days, despite testing negative for COVID-19 a total of 10 times.  All of these prisoners were designated to serve their sentences at minimum or low security facilities, but were nonetheless required to serve their periods of quarantine in the SHUs of neighboring, higher-security facilities.

12.     Notably, the National Commission on Correctional Health Care has recognized that "[p]rolonged (greater than 15 consecutive days) solitary confinement is cruel, inhuman and degrading treatment, and harmful to an individual's health" and advised that "[s]olitary confinement should never exceed 15 days."[2]  The United Nations' Mandela *Standard Minimum Rules for the Treatment of Prisoners (the Mandela Rules)* also prohibit solitary confinement in

---

[1] *See* BOP, *BOP Modified Operations* (Nov. 25, 2020), https://www.bop.gov/coronavirus/covid19_status.jsp.

[2] *See* NCCHC, *Solitary Confinement (Isolation)*, https://www.ncchc.org/solitary-confinement (last visited on Mar. 4, 2021).

4

excess of 15 consecutive days, and declares that such conditions amount to "torture or other cruel, inhuman or degrading treatment or punishment."[3]

13.     Even after prisoners are released from quarantine, conditions in the general population of the facility are also severely restricted due to COVID-19.  Most facilities are on modified lockdown, with prisoners sequestered in their housing units.  In addition, while prisoners are theoretically required to wear masks, other than when they are eating, other precautions—such as hand sanitizer, social distancing, and adequate ventilation—are frequently unavailable.

## IV.     Impact of ██████████

14.     Mr. Spota's ████████████████████████████████ will impact his assigned Medical Care Level ("MCL").[4]  According to BOP Clinical Guidance, generally, inmates who are "stable outpatients" requiring "clinical evaluations monthly to every 6 months" are designed as MCL 2 prisoners, whereas inmates who are outpatients requiring "frequent clinical contacts to maintain control or stability of their condition," such as inmates with ████████████ ████████ are designated as MCL 3 prisoners.[5]

15.     BOP guidance, for inmates with a ██████████████ in particular, provides that they may be designated as ████████████ depending on the nature of the ████████ ████████████████████[6]  Given that Mr. Spota's ████████████ it is unclear whether he would ultimately be designated as an MCL 2, MCL 3, or MCL 4 inmate.

---

[3] *See id.*

[4] There are four levels in the BOP medical care level classification system.  BOP, *Clinical Guidance: Care Level Classification for Medical and Mental Health Conditions or Disabilities*, pp. 1–3 (May 2019).  Healthiest inmates are classified as MCL 1, whereas the most infirm inmates are classified as MCL 4.  *Id.*

[5] *Id.* at 1–3.

[6] *Id.* at 1, 13.

16.     An MCL 2 inmate would, under normal circumstances, be eligible for placement in a minimum-security facility. However, minimum-security facilities generally do not provide medical care within the facility (at least, not the level of care that an inmate ████████████ ████ would require) and therefore must transport prisoners to an external health care facility within the surrounding community. However, based on my experience, these minimum-security facilities often lack the personnel resources necessary to ensure the requisite level of external medical care—a deficiency that has only become exacerbated because of staffing shortages and other burdens resulting from COVID-19. And even if such a facility were somehow able to provide the required level of external medical care, each such external medical visit would carry with it another 21-day (or more) period of quarantine, due to COVID-19. For any or all of these reasons, it is at least possible, if not likely, that Mr. Spota would be treated as an MCL 3 or MCL 4 inmate.

17.     As an MCL 3 or MCL 4 inmate, Mr. Spota would almost certainly be designated to the low-security facility or the administrative-security medical center facility at Federal Correctional Complex ("FCC") Butner, near Raleigh, North Carolina. Butner has the only MCL 3 and MCL 4 facility in the eastern United States and, because ███████████████████ ████████████████████████████████████████████████████ There would be several consequences to this designation.

18.     First, Mr. Spota would be incarcerated over 500 miles away from his wife and three children, all of whom live either in the New York City metropolitan area or in the southeast United States, making visitation (let alone regular visits) difficult, especially for his 76-year-old wife.

19.     Second, the conditions Mr. Spota would face would be far more restrictive than in a BOP minimum-security facility. More specifically, unlike a minimum-security facility, low-

6

security facilities and administrative-security facilities have a secure perimeter, controlled inmate movements, and far fewer privileges allowed to prisoners.[7] If housed at the administrative-security (medical) facility, Mr. Spota would likely be housed in an 8 x 10 foot cell with another inmate.

20.     Third, Mr. Spota would be at far greater risk of violence at a low-security facility or an administrative-security facility.  Minimum-security facilities house non-violent prisoners with sentences of less than 10 years, low-security facilities house violent prisoners with sentences of more than 10 years who pose a risk to the community, and administrative-security facilities are capable of housing inmates in all security categories.  Accordingly, low-security facilities and administrative-security facilities are inherently more violent than minimum-security facilities.

21.     Statistics bear this out. There is a 143% greater chance of being assaulted at a low-security facility as opposed to a minimum-security facility.[8]  Furthermore, the rate of "serious assault" [9] is 553% higher in low-security facilities than minimum-security facilities.  The rate of assault at an administrative-security facility is even higher than at a low-security facility.  There is a 529% greater chance of being assaulted at an administrative-security facility as opposed to a minimum-security facility. The rate of "serious assault" is even worse—1,228% higher in an administrative-security facility than a minimum-security facility.

22.     Based on my experience, which is consistent with these statistics, low-security facilities can be violent environments.  Almost all of the dozens of white-collar inmates housed in

---

[7] Because administrative-security medical center facilities house prisoners at all strata of security levels (minimum to high), their security protocols are similar to those at a medium-security facility.

[8] This analysis is based on data provided by the BOP, at the Justice Advocacy Group's request, reflecting the number of assaults recorded in BOP facilities from 2008 to 2017.

[9] BOP defines "assaulting any person (serious)" to include "[a]ssaulting any person . . . when serious physical injury has been attempted or accomplished." *See* BOP, *Inmate Discipline Program P5270.09*, at App'x C, p. 44 (tbl 1) (Aug. 2011), https://www.bop.gov/policy/progstat/5270_009.pdf.

low-security facilities that I have assisted have reported feeling intimidated and scared by the environment. Several of them have actually been assaulted or threatened with assault, and many of them have been victims of extortion. Based on my experience, I believe these concerns are heightened as to Mr. Spota, who, as a former member of law enforcement, will be at an even higher risk in a low-security facility. Prisoners' backgrounds are easily discovered by fellow prisoners; indeed, researching inmates' alleged offenses and individual backgrounds is a standard activity within prison communities. Because of Mr. Spota's background, he will likely be a target for threats of physical violence and intimidation and, potentially, actual physical harm.

23.    Fourth, while I understand that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮ my understanding, from my review of governmental guidance and other public information concerning COVID-19, is that ▮▮▮▮▮ at risk of COVID-19 infection from either the initial strain of the virus (since the vaccine is admittedly not 100% effective) or from one of the several variants of the virus that are currently spreading throughout the United States (for which the efficacy of the current vaccines is at best uncertain). Moreover, ▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮ a risk of transmission from and to others. As a result, ▮▮▮▮▮▮▮ be subjected to extended COVID-19 restrictions at his designated facility. This is consistent with my experience and understanding of how the BOP is currently addressing the COVID-19 pandemic.

24.    The risks to Mr. Spota would be particularly acute at the Butner complex, given its well-documented struggle to respond adequately to the pandemic. In October 2020, federal prisoners filed a class action lawsuit challenging Butner's handling of the COVID-19 pandemic. *See Hallinan et al. v. Scarantino et al.*, 5:20-ct-03333-M, Dkt. 1 (E.D.N.C.). By December 2020, Butner had the "single largest share of the 154 BOP prisoners who have died [from COVID-19 in

BOP custody] during the pandemic."[10]  And in January 2021, the U.S. Department of Justice's Office of the Inspector General ("OIG") released a report criticizing many aspects of Butner's handling of the pandemic.[11]  Among other findings, the OIG report stated that, as of July 2020, "1,020 FCC Butner inmates, including 698 [low-security] inmates, had confirmed COVID-19 cases"; 25 prisoners had died; 70 staff members had been infected; and one staff member had died.[12]  Further, COVID-19 was still circulating at Butner just last month: "As of January 17, 2021, 226 Butner inmates and 23 staff members had active COVID-19 cases and 2 additional inmates had died due to COVID-19."[13]  To explain these failures, the OIG found that "it was difficult for Butner to implement and enforce effective social distancing measures in three of its five facilities"—including the low-security facility—and that Butner's lack of compliance with several BOP COVID-19 directives also "undermined Butner's ability to contain the spread of the disease."[14]  Due to the ongoing circulation of COVID-19 at Butner, all visitation is currently suspended, such that, even if Mr. Spota's family could travel to visit him, they would not be allowed to enter the facility.

25.      Finally, based on my experience, even setting aside COVID-19, Mr. Spota may struggle to obtain minimally adequate medical care at FCI Butner.  I have worked closely (and recently) with a significant number of prisoners serving sentences at FCI Butner, as well as

---

[10] *See North Carolina Prisoners at Deadliest Federal Prison File Suit on COVID-19 Response,* PRISON LEGAL NEWS (Jan. 1, 2021), *available at* https://www.prisonlegalnews.org/news/2021/jan/1/north-carolina-prisoners-deadliest-federal-prison-file-suit-covid-19-response/ (last viewed Mar. 4, 2021).

[11] *See* OIG, *Pandemic Response Report 21-031: Remote Inspection of Federal Correctional Complex Butner*, p. i (Jan. 2021), available at https://oig.justice.gov/sites/default/files/reports/21-031.pdf.

[12] *Id.* at iii.

[13] *Id.* at iii–iv.

[14] *Id.* at ii–iv, 1.

9

Butner's Federal Medical Center. I have interviewed, spoken to, and regularly communicated with dozens of FCI Butner detainees over the years. Many of those I have assisted, both past and current detainees, have encountered substantial difficulties and hardships, particularly relating to the inadequacy and mismanagement of prisoner healthcare and the facility's unresponsiveness to acute medical needs.

26.     For example, a prisoner I advised, who was in his 80s and suffered from cancer and related conditions, recently died at Butner. The prisoner, who was a medical doctor imprisoned for a non-violent crime, knew that his condition was deteriorating and shared his concerns with the medical staff. Nonetheless, the medical staff refused to recognize that his condition was worsening and declined to refer him to an outside specialist, even after the prisoner sought relief in court. He died at the prison alone and in pain, far away from his family and friends.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on March 4, 2021 in Alexandria, Virginia.

Joel A. Sickler

10

# EXHIBIT A

# JOEL A. SICKLER

## Sentencing Mitigation Specialist/Prisoner Advocate

**Office Addresses:**    114 N. Alfred Street, STE 330
Alexandria, Virginia 22314
Phone: (703) 574-1075
Fax: (703) 997-6306

**E-Mail**:    jsickler@justiceadvocacygroupllc.com

## PROFESSIONAL EXPERIENCE

2003-Present
**Sentencing Specialist/Prisoner Advocate**
**Justice Advocacy Group, LLC**

Helping criminal defense lawyers and their clients with preparation of comprehensive sentencing memoranda and strategic defense sentencing planning. Sentencing guidelines research and analysis. Federal prisoner designation, classification and adjustment to confinement consultation. Prisoner administrative remedy appeals. Capital mitigation investigation and presentation of mitigation evidence. Bail reports: flight/dangerousness assessments. Training. Expert testimony.

I have worked in the field of corrections for more than 30 years and currently head the Justice Advocacy Group, LLC, a consortium of criminal justice professionals based in Alexandria, Virginia.  The Justice Advocacy Group provides research for and advises criminal defense lawyers, probation departments and judges on federal sentencing issues and matters involving federal confinement. The firm also provides advocacy services related to federal prisoner designation and classification, and adjustment to confinement.  Since 1980, as a criminologist, I have prepared over 2,500 evaluations for felony-level defendants facing sentencing in federal courts nationwide.  I have submitted sentencing reports in 41 of the 93 federal judicial districts. I have received 40 federal court-appointments as a capital mitigation specialist and have testified as an expert regarding mitigation findings and recommendations in six federal jurisdictions. I have visited 51 federal prisons and have advised clients with inmate matters in 86 of the Bureau of Prisons' (BOP) 120 institutions. With experience as a correctional counselor in the District of Columbia's Department of Corrections and with prior tenure as Director of Client Services at the National Center on Institutions & Alternatives in Washington, DC, I have worked consistently for the past 30 years on federal sentencing and federal prison-related matters. Based on more than 30 years of experience assisting clients committed to the federal Bureau of Prisons (BOP), I have extensive knowledge of the BOP and its stated mission, services, policies, program statements, regulations, and institutions.

1991-2003
**Director, Client Specific Planning Services**
**National Center on Institutions and Alternatives, Alexandria, Virginia**

Supervision of national, non-profit's sentencing services to courts and defense attorneys overseeing network of regional divisions. Preparation of comprehensive sentencing reports and evaluations in major felony cases. Expert in development and design of multi-component, community-based sentencing plans.  State and federal parole representation.

*Joel A. Sickler*
*Page 2*

1988-1991
**Principal Criminologist**
**The Sentencing Group, Los Angeles, California**

Founded consulting firm specializing in sentencing research and forensic services to defense lawyers and criminal justice agencies. Court-appointed penalty phase investigator, Los Angeles County Superior Court.

1981-1987
**Senior Case Developer/Administrator**
**National Center on Institutions and Alternatives, Washington, DC**

Produced detailed sentencing profiles and recommended creative sentencing alternatives to federal, state and local courts. Director of NCIA's western regional office advancing Client Specific Planning services to leading criminal defense lawyers. Trained CSP case developers and headed research project with the RAND Corporation studying the effectiveness of community-based dispositions for juvenile offenders. See Academy of Criminal Justice Sciences, "Private Presentence Reports for Serious Juvenile Offenders: Implementation Issues and Impacts," Peter W. Greenwood & Susan Turner, *Justice Quarterly*, Vol. 10, No. 2, June 1993.

1978-1981
**Corrections Officer/Classification and Parole/Probation Officer**
**Department of Corrections, Washington, D.C.**

Yielded insight towards the inner workings of a state penitentiary system and parole & probation practices. Headed DOC committee to study system overcrowding and alternatives to confinement.

## PRESENTATIONS/TRAININGS

**Lecturer,** *New York City Criminal Bar Association*, CLE Webinar Series, "Understanding the Bureau Prisons: Incarceration-Related Considerations for New Federal Practitioners," New York, New York, August 20, 2020.

**Guest Speaker,** *Pennsylvania Association of Criminal Defense Lawyers*, White Collar Practice Seminar, "Preparing for Sentencing from the Presentence Investigation Interview to the Sentencing Hearing," Philadelphia, Pennsylvania, November 21, 2019.

**Guest Speaker,** *National Association of Criminal Defense Lawyers*, West Coast White Collar Conference, "Creative Post-Sentencing Strategies, Pardons & Other Requests for Leniency," Santa Monica, California, June 21, 2019.

**Guest Speaker,** *New York Federal Bar Council Committee on Sentencing*, "Navigating the Federal Bureau of Prisons", Sullivan & Cromwell LLP, New York, New York, February 28, 2018.

**Guest Speaker,** *New York State Bar Association Committee on While Collar Criminal Litigation*, "Federal Sentencing and Post-Conviction Strategies", Proskauer Rose LLP, New York, New York, June 29, 2010.

**Invited Participant,** *United States Sentencing Commission,* "Symposium on Alternatives to Incarceration," Washington, D.C., July 14-15, 2008.

**Lecturer,** *National Association of Criminal Defense Lawyers***,** "Defending the White Collar Case

–Federal Sentencing," with David Debold, Gibson, Dunn & Crutcher, Georgetown University School of Law, Washington, DC, September 27, 2007.

**Lecturer,** *National Legal Aid & Defender Association, National Alliance of Sentencing Advocates & Mitigation Specialists*, 2006 Death Penalty Mitigation Institute and Summer Conference, "Nuts & Bolts of Federal Prison Placements," Baltimore, Maryland, August 2, 2006.

**Faculty,** Criminal Justice Act Panel Training Program, "How to Navigate the Bureau of Prisons," United States Courthouse, Greenbelt, Maryland, December 16, 2005.

**Invited Speaker**, *New York Association of Criminal Defense Lawyers*, "Preparing Your Client for the Federal Bureau of Prisons," Annual CLE Seminar, New York, New York, December 6, 2001.

**Moderator,** *National Association of Sentencing Advocates*, "Working with the Press" and "Creative Writing Skills," Seventh Annual Conference, San Diego, California, April 12-15, 2000.

**Faculty,** Death Penalty Mitigation Institute, *National Association of Sentencing Advocates*, a grant project of the Bureau of Justice Assistance, San Diego, California, April 12-15, 2000.

**Faculty,** Death Penalty Mitigation Institute, *National Association of Sentencing Advocates,* a grant project of the Bureau of Justice Assistance, Miami, Florida, April 14-15, 1999.

**Invited Speaker**, *National Association of Sentencing Advocates,* "Back to Basics, Alternative Sentencing Planning," and "Advanced Report Writing," *Sixth Annual Conference,* Arlington, Virginia, April 16-18, 1998

**Instructor,** *Maryland HotSpot Communities Initiative,* Governor Parris N. Glendening, Cabinet Council on Criminal and Juvenile Justice, "Application of Client Specific Planning," Hagerstown, October 27, 1997; Salisbury, October 29, 1997; and Baltimore, Maryland, November 5, 1997.

**Invited Speaker**, *National Association of Sentencing Advocates,* "Making the Case with Writing Skills," and "Meeting the Federal Court Challenge, New Angles on the Guidelines," *Fifth Annual Conference,* San Francisco, California, May 1, 1997.

**Invited Speaker**, *Association of Criminal Defense Lawyers of New Jersey,* "How to Get Your Client an Alternative Sentence," *8th Annual Seminar,* East Brunswick, New Jersey, November 2, 1996.

**Trainer**, *National Legal Aid and Defender Association,* Washington, D.C. Trained public defender attorneys and social workers in sentencing advocacy, West Palm Beach, Florida; Fayetteville, North Carolina, 1981-1982.


# PUBLICATIONS

**Co-Author,** National Association of Criminal Defense Lawyers, "Bureau of Prisons Update: More Beds Less Rehabilitation," *The Champion*, March 2005.

**Contributor**, with Steven Vance, of chapter "Sentencing Alternatives in the Federal System," in Matthew Bender treatise, *Federal Sentencing for Business Crimes*, by Kirby D. Behre & A. Jeff Ifrah, Washington, D.C., 2002.

**Editor,** *The Sentencing Advocate,* Criminal Defense and Sentencing Resource Guide, NCIA, 1999-2003.

*Joel A. Sickler*
*Page 4*

**Editor**, *NASA Notes,* Quarterly newsletter for the National Association of Sentencing Advocates, Washington, D.C., 1998-2003.

**Co-Author,** California Attorneys for Criminal Justice, "Federal Sentencing Guidelines: Must Reducing Disparity Mean Increasing Severity," with Vincent Schiraldi *The Forum,* Volume 14, No. 2, March-April 1987.


# MEDIA

**Appearance,** "Unraveled" film documentary directed & produced by Marc H. Simon, April 2012 release, Showtime and CNBC networks.

**Cited**, "Michael Cohen Choice of Prison: Well Known to Jewish Offenders," Corey Kilgannan, *New York Times*, January 22, 2019.

**Cited**, "Reality Winner Could Get Record-Setting Sentence in NSA Leak Case," Jeremy Redman, *Atlanta Journal Constitution,* August 22, 2018.

**Cited**, *"Shkreli Pledges Honesty If He Gets A Break on Prison Time,"* Patricia Hurtado, *Bloomberg News,* February 18, 2018.

**Cited,** "Rajat Gupta To Finish Insider Trading Sentence at Home," Anita Raghaven, *New York Times*, January 20, 2016.

**Referenced**, "School for Scoundrels: Doing Time in Prison Prep School," Michael Rothfeld, *The Wall Street Journal*, March 26, 2012.

**Cited**, "No Place for Titans. Behind Bars, Fumo to Go From King to Serf", Jeff Gammage, *Philadelphia Inquirer*, August 30. 2009.

**Profiled,** "Pre-Prison Prep for White-Collar Criminals", Willow Duttge, Conde Nast Protfolio.com,             http://www.portfolio.com/resources/business-intelligence/preparation_prep_for_whitecollor, May 11, 2007.

**Contributor**, "What's Left of Lay and Skilling Wealth Is at Risk", John R. Emshwiller & Gary McWilliams, *Wall Street Journal*, May 27, 2006.

**Contributor**, "For the Elite, Easing the Way to Prison." Alex Kuczynski, *New York Times*, December 9, 2001.

**Contributor**, "Alternatives to Jail Can be Hard Labor or Stroll in the Park," Robert F. Worth, *New York Times*, July 6, 2002.

**Panel Member,** American Bar Association Television Debate, "Bias in Sentencing," *Inside the Law* with Jack Ford, Chief Legal Correspondent, NBC News, Florida State University, Tallahassee, Florida, April 26, 1996.


# VOLUNTEER

***Fundraiser*, Knights of Columbus, Edward Douglas White Council,** "Knights Assisting Virginia's Retarded," Arlington, Virginia, 1992-present.

*Joel A. Sickler*
*Page 5*

## EDUCATION

**1980**   **American University, Washington, D.C.**
Master of Science Administration of Justice
National Honor Society for Public Affairs and Administration

**1978**   **Saint Anselm College, Manchester, New Hampshire**
Bachelor of Science Criminal Justice Studies, *Magna Cum Laude*

## MEMBERSHIPS

*Associate Member*, **National Association of Criminal Defense Lawyers**, Washington, D.C. Member of Corrections Committee.

*Professional Member*, **National Alliance of Sentencing Advocates and Mitigation Specialists**, Washington, D.C. Served on Governing Board June 1997 – June 2001. Elected and served as Vice-President July 1998 – July 2000. Committee member: certification, newsletter, policy.

## CERTIFICATIONS

**Private Investigator:** State of California, Department of Consumer Affairs, Bureau of Collection and Investigative Services. Licensed in good standing since 1988 (PI 11941).



Justice Advocacy Group LLC

Joel A. Sickler
Founder

Joel A. Sickler, Founder
Justice Advocacy Group LLC
114 N. Alfred St. Alexandria, VA 22314
703-622-6227
jsickler@justiceadvocacygroupllc.com

Joel Sickler has worked in the field of sentencing and prisoner advocacy for more than 30 years and is the founder of the Justice Advocacy Group LLC in Alexandria, Virginia. He was a graduate fellow at American University's School of Justice in Washington, DC, where he earned a Master of Science in the Administration of Justice.

In the late 1970s, Mr. Sickler worked as a correctional officer at a large maximum-security penitentiary that served the District of Columbia (Lorton Reformatory). Active in the officer's union, it was his idea to promote alternative, community-based sentencing and treatment programs for non-violent, mainly youthful offenders in hopes of curtailing the growth of Lorton's prison population. Less crowded conditions would mean a safer work environment for the union members and fairer conditions for the inmates. The idea gained traction and the DC city council funded related programs. Not surprisingly, Mr. Sickler was notified by his union bosses to cease and desist. He was asked to take the position that the prison population was so dangerous few could be released early or diverted, and the union needed a new contract. After refusing to do so he was given the prison's least desirable work assignments (mainly guarding mentally challenged prisoners in segregation). After witnessing that outcome and numerous atrocities at the prison—including having an inmate die in his arms—Mr. Sickler sought to achieve prison reforms consulting with the DC Parole & Probation offices and through the private sector.

In 1981 he became a case developer with the prestigious National Center on Institutions and Alternatives' (NCIA) Client Specific Planning (CSP) program in Washington, DC. He later became the NCIA's director of client services.

In 2003 he formed the Justice Advocacy Group LLC in Alexandria, VA to aid criminal lawyers and their clients with federal sentencing mitigation assistance and prison advocacy.

Mr. Sickler has prepared over 2,500 evaluations for felony-level defendants facing sentencing in federal courts. He has visited 51 federal prisons and has advised clients with inmate matters in 86 of the Bureau of Prisons' 122 institutions. Based on more than 35 years of experience assisting clients committed to the federal Bureau of Prisons (BOP), he has extensive knowledge of the BOP and its stated mission, services, policies, program statements, regulations, and institutions.

Mr. Sickler is an associate member of National Association of Criminal Defense Lawyers and National Legal Aid and Defender Association. He is a founding member of the National Association of Sentencing Advocates & Mitigation Specialists (NASAMS), serving as the organization first Vice President from 1998-2000. He speaks yearly at conferences and seminars for all three associations.

In 2011, he appeared in the Showtime network documentary, *Unraveled*, which featured the pathos of a scheming, prominent NYC lawyer dubbed "mini-Madoff" who was about to be sentenced and imprisoned.

Clients of JAG LLC have included many of the most prominent defendants charged in high-profile federal criminal cases in the US.